**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-01727-WJM-STV

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

     Plaintiff,

v.

WESTERN DISTRIBUTING COMPANY, d/b/a WESTERN DISTRIBUTING
TRANSPORTATION CORP., a Colorado corporation,

     Defendant.

---

## DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT

---

### INTRODUCTION

As a licensed motor carrier with an impeccable safety record, Defendant Western

Distributing Transportation Corp. ("Western") has been forced between a rock and a hard place.

Since this case began more than a decade ago, EEOC has been on a ruthless crusade to force

Western to lower its standards for assessing whether an employee on medical leave can safely

return to a commercial driving position. EEOC has asserted that, in order to avoid running afoul

of the Americans with Disabilities Act ("ADA"), Western should have taken a number of actions

which would have violated the federal motor carrier safety regulations and recklessly endangered

anyone traveling on public roads. For example, EEOC seeks relief on behalf of former Western

drivers who concealed serious medical conditions that made them legally unqualified to drive

commercial vehicles. Acquiescing to EEOC's unreasonable demands of putting unqualified

drivers behind the wheel of a tractor-trailer and on the road prematurely would risk serious harm

to both the drivers and the public. It would also open Western up to liability based on violation of

safety guidelines, negligence, and even wrongful death. At no point does Western's steadfast commitment to driver safety cross the line into disability discrimination.

This case began with a Charge of Discrimination filed by Clinton Kallenbach, a truck driver recovering from heart surgery who was restricted from commercial driving by Department of Transportation ("DOT") safety guidelines and alleges Western should have given him additional medical leave. Since 2009, EEOC has argued that Kallenbach's situation shows that Western engaged in a pattern or practice of discrimination against disabled individuals. However, in the eleven years since this case began, EEOC has failed to identify any statistical or anecdotal evidence demonstrating that Kallenbach's situation was more than an isolated and unique scenario. Significantly, Kallenbach's allegations have little in common with the allegations of the other aggrieved individuals ("AIs") in the lawsuit, most of whom Western reasonably believed were unable to safely drive a commercial vehicle and required indefinite leave. As it became clear that Western did not in fact engage in a pattern-or-practice of discrimination against disabled individuals or maintain the "inflexible" maximum-leave and full-duty policies alleged by EEOC, EEOC's theories multiplied into individualized post-hoc theories of liability for each of the 57 AIs in the case. By relying on a disparate group of extremely varied, flawed, and fact-specific claims, EEOC cannot establish a coherent theory of discrimination that applies to a group of disabled individuals. EEOC has failed to establish the prima facie elements of its claims because it has not produced sufficient evidence supporting a rebuttable presumption that Western acted with the deliberate purpose and intent of discrimination against an entire class.

But EEOC's failure to satisfy the essential requirements of its pattern-or-practice claim is not the only fatal flaw in EEOC's case. EEOC now relies on multiple theories that were never investigated prior to filing this lawsuit. EEOC also relies on patently unreasonable viewpoints on

the scope of Western's ADA obligations, such as arguing that Western was required to provide impaired drivers with indefinite and extensive medical leave. Moreover, almost all of the "reasonable accommodations" proposed by EEOC are hypothetical and were not requested by *any* of the AIs; instead, EEOC simply invented new ideas for accommodations throughout the course of the lawsuit, implicitly arguing that Western should be held liable for merely failing to imagine and offer all possible accommodations an employee might hypothetically seek. EEOC's desperate efforts to go forward with this case through an "everything-but-the-kitchen-sink" approach demonstrates its failure to establish that Western's standard operating procedure was disability discrimination. Western respectfully requests that the Court grant summary judgment in Western's favor, holding that Western did not engage in a pattern-or-practice of discrimination.

## MOVANT'S STATEMENT OF MATERIAL FACTS ("SOF")[1]

### *Western's Business Operations*

**1.** Western is a family-owned trucking company based in Denver, which primarily employs commercial truck drivers who haul goods between Denver and the West Coast. ECF No. 815-64, Rau Dep. 53:7-18, 60:19-23; ECF No. 815-19, Gaines Dep. 21:13-16, 29:8-22, May 21, 2019.

**2.** As a DOT-licensed motor carrier employing commercial drivers, Western must comply with DOT regulations and guidelines, including ensuring that all drivers are qualified. ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 39:18-19; ECF No. 815-19, Gaines Dep. 149:11-12, 201:3-8.

**3.** Western Transportation has several divisions, including the Refrigerated ("Reefer") division, the United States Armored Company ("USAC"), and Western Towing and Recovery ("Towing"). ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 49:24-50:12.

---

[1] For the sole purpose of this Motion for Summary Judgment, certain allegations and claimant testimony contained in this Motion and accompanying exhibits are treated as undisputed by Western. Western reserves all rights to dispute EEOC's allegations and claimant testimony and to present counter evidence in these proceedings.

4.  Reefer specializes in providing over-the-road and local transportation of refrigerated commodities, including produce.  ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 21:7-12; ECF No. 815-20, Garcia Dep. 19:1-7; ECF No. 815-19, Gaines Dep. 291:6-21.

5.  Reefer employs DOT-certified drivers who can be either Over-the-Road ("OTR") (who drive longer distances and sleep in their truck) or Local/Regional (who come home at the end of the day), but the physical requirements are the same for both jobs.  ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 49:20-25, 51:24-52:4, 53:1-5, 53:12-54:1, 54:8-13.

6.  Local drivers make and pickup deliveries in the Denver metro area and service distributors and customers along the Front Range and I-70 corridor in the mountains. ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 113:24-115:3; ECF No. 815-40, Larsen Dep. 62:12-65:6.

7.  USAC employs DOT-certified drivers to transport and deliver secured cargo, primarily to government facilities, including loading and unloading at the facilities. ECF No. 816-1, Garcia Dep. 161:1-162:13; ECF No. 816-6, Garcia Decl. ¶¶3-4, 7-10.

8.  Towing employs DOT-certified drivers of heavy wreckers, rollback (flatbed) trucks, and other vehicles to handle towing and recovery tasks, including ensuring that I-70 between Golden and Vail stays clear of breakdowns and accidents. ECF No. 815-78, Thompson Dep. 117:2-121:12.

9.  The nature of Western's business involves complex logistical planning for freight deliveries and other transportation needs, including considerations of driver locations, driver service hours, customer commitments and needs, and other efficiencies in assigning loads. ECF No. 815-64, Rau Dep. 22:12-23, 38:18-42:5, 40:24-44:15, 45:2-19, 50:13-21, 80:5-23, 107:17-21; ECF No. 815-20, Garcia Dep. 94:13-95:25, 224:12-20; ECF No. 815-40, Larsen Dep. 51:4-12, 53:21-54:25; ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 191:25-192:15.

**10.** Western's business activities are time-sensitive because the commodities are perishable (Reefer), are high-security and time-sensitive (USAC), and involve the need to quickly clear busy highways of disabled vehicles and accidents (Towing). ECF No. 815-64, Rau Dep. 176:10-16; ECF No. 815-19, Gaines Dep. 291:6-21; ECF No. 815-40, Larsen Dep. 55:5-8; ECF No. 815-78, Thompson Dep. 119:6-18, 146:25-147:5, 158:17-159:3; ECF No. 816-6, Garcia Decl. ¶¶ 7, 10, 15.

**11.** Costs related to employee leave time are "an extreme expense to the company" and also cause Western to lose revenue. ECF No. 815-19, Gaines Dep. 256:7-14; ECF No. 815-65, Respass Dep. 181:1-7; ECF No. 815-24, D. Guadagni Dep. 116:7-117:7; ECF No. 815-44, Maddox Dep. 534:15-535:7.

**12.** Western used to have a small Auto Transport division, which employed DOT-certified drivers to load, transport, unload, and deliver (mostly high-end) vehicles using an enclosed commercial truck. ECF No. 815-25, S. Guadagni Dep. 20:25-21:5, 38:18-20, 44:17-23, 56:11-17.

**13.** EEOC has identified 57 AIs for whom it seeks relief—56 of them held the following DOT-regulated driving positions at the time of their employment separations: OTR Driver, Local Driver, USAC Driver, Auto Transport Driver, Heavy Tow Truck Driver, Relief Tow Driver, and Roll Back Tow Truck Driver. ECF No. 815-86 at 2-11, Def.'s 10th Supp. Resps. to Interrogs., No. 8, Sept. 9, 2020. The 57th—White—was a dispatcher at the time of her separation. *Id.* at 4.

***Western's Non-Discrimination and Medical Leave Policies***

**14.** At all times relevant to this case, Western's Equal Employment Policy prohibits disability discrimination. ECF No. 815-87, EEO Policies; ECF No. 815-88 at 17, Employee Policy Manual.

**15.** Additionally, Western has had a Reasonable Accommodation Policy since prior to 2008, which was formalized in writing in 2015 and distributed to all employees to read and sign. ECF

No. 815-44, Maddox Dep. 142:17-143:7; ECF No. 815-38, Keithline Dep. 126:1-14; ECF No. 815-89, Reasonable Accommodation Policy.

**16.** Western's policy and practice is that all disability-related issues, including requests for accommodation and medical leave, are referred to and handled by Human Resources ("HR"). ECF No. 815-44, Maddox Dep. 162:14-24; ECF No. 815-89 at 1; ECF No. 815-14, Dutton Dep. 72:9-25; ECF No. 815-19, Gaines Dep. 81:2-5; ECF No. 815-20, Garcia Dep. 60:3-20, 68:24-69:11; ECF No. 815-25, S. Guadagni Dep. 36:3-14; ECF No. 815-43, Long Dep. 111:20-112:9.

**17.** Jennifer Maddox, Western's HR Director from March 2008 until December 2017, was responsible for managing employee leave, accommodations, and the interactive process. ECF No. 815-44, Maddox Dep. 16:11-18, 18:7-19:6, 31:25-32:2, 45:25-46:5, 47:12-21.

**18.** Western has provided drivers with reasonable accommodations to allow the driver to perform the essential functions of the job, such as modified or reduced work schedules, headsets, and CPAP machines. ECF No. 815-44, Maddox Dep. 434:17-435:22, 437:20-439:9, 440:12-21.

**19.** Pursuant to Western's Reasonable Accommodation Policy, an employee with medical restrictions who can perform the essential functions of the job may return to work with restrictions as a reasonable accommodation unless it would impose an undue hardship. ECF No. 815-89 at 1.

**20.** The Policy further states, "It is not the Company's policy that an employee cannot return to work unless they are released to work without any medical restrictions." ECF No. 815-89, at 1.

**21.** As explained in the Reasonable Accommodation Policy, if a disabled employee on leave expresses interest in reassignment, Western will provide reassignment to a vacant position (that is not a promotion) as a reasonable accommodation. ECF No. 815-89, at 2. The employee does not need to be the best-qualified individual for the position, but must meet the minimum qualifications and requirements. ECF No. 815-44, Maddox Dep. 255:9-256:3; ECF No. 815-89, at 2.

**22.** Western's Employee Policy Manual also contains a Return to Work Policy, which states Western's intent to "utilize eligible injured workers in a productive capacity while they are recovering from an injury" by providing them with temporary and transitional modified duty assignments if such assignments are available. ECF No. 815-88 at 32.

**23.** Western's practice is to try to find modified or light duty for any individual with an injury or illness who requests it, but as a small company with limited office operations, Western only occasionally has light-duty assignments available, and the assignments are only in Denver. ECF No. 815-44, Maddox Dep. 647:9-25, 667:22-668:11; ECF No. 816-6, Garcia Decl. ¶ 14.

**24.** Western provided light-duty assignments or reassignments to AIs and other employees when they were unable to return to driving a truck. SOF ¶ 105; ECF No. 815-44, Maddox Dep. 366:24-367:9, 370:18-371:11, 368:16-369:4, 372:23-373:22, 374:9-375:6, 380:5-382:12.

**25.** Western's Employee Manual contains a Family and Medical Leave Act ("FMLA") Policy that, per the FMLA, provides employees with up to 12 weeks of unpaid, job-protected leave per rolling 12-month period for certain family and medical reasons. ECF No. 815-88 at 37.

**26.** When an employee needs medical leave but is not eligible for FMLA leave, Western will determine whether to provide leave on a case-by-case basis; however, Western has routinely provided 12 weeks of leave to employees who are not eligible for FMLA leave. ECF No. 815-44, Maddox Dep. 237:2-5; 247:1-24.

**27.** When an employee requests and is granted FMLA leave, the employee is advised that he or she will need to communicate to HR any changes to their anticipated return-to-work date. ECF No. 815-44, Maddox Dep. 237:10-238:17, 240:24-241:15.

**28.** After 12 weeks of FMLA leave, Western's policy and practice is to conduct a case-by-case assessment of the circumstances regarding the employee's ability to return to work in their original

position, a modified or light duty position, or a reassignment position, or whether a definite amount of reasonable leave extension can be determined and granted as an ADA accommodation. ECF No. 815-89; ECF No. 815-19, Gaines Dep. 81:2-5, 179:7-14; ECF No. 815-44, Maddox Dep. 237:2-5, 248:19-250:2, 814:11-17; ECF No. 815-51, McLemore Dep. 254:10-255:14; ECF No. 815-65, Respass Dep. 257:6-258:11.

**29.** Western's Reasonable Accommodation Policy explains that if an employee is "unable to return to work at the end of all company-provided leave," Western "will engage in the interactive process and provide additional unpaid leave as a reasonable accommodation unless additional leave would impose an undue hardship on the operation of the Company." ECF 815-89, at 1.

**30.** Maddox testified that her practice was to communicate with employees during their leave, and AIs recall having such conversations with Maddox. ECF No. 815-44, Maddox Dep. 238:4-10, 243:9-15, 244:20-245:1; ECF No. 815-3, Backstrom Dep. 70:16–20; ECF No. 815-15, Edwards Dep. 76:12-77:24; ECF No. 815-57, Otsea Dep. 51:16-19, 63:11-17, 64:19-20; ECF. No. 815-59, A. Padilla Dep. 46:8-23; ECF No. 815-71, Smallridge Dep. 195:6-21.

**31.** If an employee is separated after 12 weeks of medical leave because he or she is unable to return or be accommodated at that time, Western also gives an additional 30 days to reapply for their position without losing any seniority.  ECF No. 815-44, Maddox Dep. 257:15-24; ECF No. 815-20, Garcia Dep. 205:24-206:15.

**32.** Western does not have a policy prohibiting rehire of individuals who previously requested accommodations or who were separated for reasons related to an impairment. ECF No. 815-44, Maddox Dep. 782:14-783:21; ECF No. 815-65, Respass Dep. 259:20-260:21.

**33.** Western has rehired AIs who left for reasons related to a medical condition. ECF No. 815-12, Dennison Dep. 47:10-22, 55:21-23, 75:14-19, 185:4-16, 203:22-204:1; ECF No. 815-16,

Fernandez Dep. 58:10-15, 85:3-86:2, 87:23-25, 89:4-90:25; ECF No. 815-18, Fries Dep. 106:18-107:9; ECF No. 815-32, Ingland Dep. 11:16-18; ECF No. 815-34, Jimenez Dep. 15:6-16:17, 21:3-7, 24:22-25:9, 34:21-35:1, 77:11-18 (had medical issues before layoff due to a department closure and was later rehired); ECF No. 815-36, Kallenbach Dep. 120:25-121:9; ECF No. 815-39, LaFuria Dep. 50:16-19; ECF No. 815-46, Marshall Dep. 45:7-16, 110:18-21; ECF No. 815-49, McCallan Dep. 23:3-7, 137:6-13, 194:3-5; ECF No. 815-53, Morin Dep. 30:2-18, 32:17-18, 219:1-7, 228:9-24; ECF No. 815-55, O'Dwyer Dep. 55:1-6, 64:6-10, 70:10-14, 136:9-18, 138:4-9; ECF No. 815-57, Otsea Dep. 51:5-15, 58:3-17, 76:3-6, 104:24-105:2; ECF No. 815-59, A. Padilla Dep. 15:6-16:1, 16:7-17:15, 18:10-19; ECF No. 815-73, Julie Smith Dep. 25:13-15, 103:25-104:10, 104:22-23, 117:23-118:10; ECF No. 815-82, Bryan Dep. 13:24-14:13, 21:5-9, 27:12-14.

**34.**  In providing responses to EEOC's requests for information during the investigative stage of the case, Maddox provided information about Western's FMLA policy, which is limited to 12 weeks of leave as is required by the law. ECF No. 815-44, Maddox Dep. 261:19-280:6.

**35.**  Maddox perceived EEOC's investigator as aggressive, and the investigator changed topics frequently, so Maddox admits that she did not provide a full explanation of all aspects of Western's leave practices and policies and did not discuss the ADA exceptions granted to the 12-week leave limit in her interview. ECF No. 815-44, Maddox Dep. 276:13-19.

*EEOC's Misconceptions About Western's Workers' Compensation Policy*

**36.**  Western's Employee Policy Manual additionally contains a Workers' Compensation Policy which generally describes the procedures to follow when a work-related injury occurs, including a statement regarding requirements to "return to full duty." ECF No. 815-88 at 24.

**37.**  The Workers' Compensation Policy, however, is not a complete statement of Western's policies and practices pertaining to medical leave because it does not explain Western's ADA

policies, FMLA policies, reasonable accommodation policies, or reinstatement policies. ECF No. 815-44, Maddox Dep. 257:15-24, 688:1-689:5; ECF No. 815-20, Garcia Dep. 205:24-206:15.

**38.** The term "full duty" in the Workers' Compensation Policy relates solely to wage status for workers' compensation, and Western did not interpret or implement it in a way that prohibits employees from returning to work with restrictions. ECF No. 815-44, Maddox Dep. 681:3-24.

**39.** Western managers testified that "full duty" at Western means employees can return drivers to their driving positions if their medical impairments do not affect their ability to maintain DOT-certification and safely operate a commercial vehicle. ECF No. 815-44, Maddox Dep. 650:5-653:10; 671:9-672:20; ECF No. 815-65, Respass Dep. 123:16-124:24, 246:25-249:17, 258:22-259:1; ECF No. 815-60, M. Padilla Dep. 225:21-227:14, 293:20-25; ECF No. 815-51, McLemore Dep. 236:1-5, 239:4-21; ECF No. 815-14, Dutton Dep. 55:20-56:16; ECF No. 815-24, D. Guadagni Dep. 216:5-9; ECF No. 815-25, S. Guadagni Dep. 33:9-19; ECF No. 815-43, Long Dep. 74:23-75:6, 185:9-12, 213:8-23.

**40.** Western's policy and practice is to permit employees to return with medical restrictions. ECF No. 815-19, Gaines Dep. 113:13-21; ECF No. 815-20, Garcia Dep. 204:8-10, 207:22-208:3; ECF No. 815-14, Dutton Dep. 55:25-56:16; ECF No. 815-25, S. Guadagni Dep. 33:9-19; ECF No. 815-43, Long Dep. 74:23-75:6, 213:8-23; ECF No. 815-51, McLemore Dep. 236:1-5, 239:4-21.

***Essential Functions of Driver Positions at Western***

**41.** Compliance with DOT requirements is an essential function of driving positions. ECF No. 820-1, Corporate Policy Manual, at 30-31; ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 39:18-19.

**42.** After receiving an offer of employment or upon return from medical leave, drivers must complete a DOT physical, a drug screen, and an ErgoMed physical demands evaluation to ensure

they can perform the physical demands of the specific driving position for which they will perform. ECF No. 815-44, Maddox Dep. 103:10-104:7, 257:25-259:25, 659:23-661:16; ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 55:24-56:7; ECF No. 815-28, 30(b)(6) Dep. of ErgoMed (Haynes) 10:19-11:3, 61:15-62:14; ECF No. 815-78, Thompson Dep. 52:4-53:3; 57:19-58:1.

43.  ErgoMed determined the physical demands of Western's jobs by gathering information about the job functions from Western and measuring the functions' physical demands. ECF No. 815-60, M. Padilla Dep. 119:1-23; ECF No. 815-28, 30(b)(6) Dep. of ErgoMed (Haynes) 30:21-31:9.

44.  ErgoMed tests whether drivers are physically capable of performing certain functions required by DOT. ECF No. 815-19, Gaines Dep. 193:18-21, 196:13-201:25, 210:16-211:10.

45.  Western follows DOT guidelines as to what medical conditions could prohibit a driver from being able to drive a truck, such as high blood pressure, epilepsy, and diabetes controlled by insulin. ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 37:24-39:19.

46.  For a driver to be medically qualified, the driver must be able to perform both driving and non-driving tasks. ECF No. 815-90, FMCSA Medical Examiner Handbook, July 6, 2018, at 43.

47.  DOT regulations require all drivers to perform a pre-trip and post-trip inspection of their vehicle to ensure that the vehicle is within the DOT's guidelines for safe operation. ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 70:6-11, 79:7-25.

48.  To properly conduct the inspection, a driver must be able to stoop down to inspect underneath the vehicle. ECF No. 815-60, M. Padilla Dep. 82:1-12, 83:24-84:16.

49.  A driver must be able to open and close the hood of the truck to make sure no fluids are leaking or parts are loose, and to ensure that everything is secure and intact. ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 71:6-74:7.

**50.** From 2008 until approximately 2014, it required 98 pounds of force to open the hood of Western's Reefer and USAC trucks, but because new hydraulic technology became a standard feature on Western's trucks in 2014, the force required dropped to 54 pounds as measured by ErgoMed. ECF. No. 815-63, 30(b)(6) Dep. of Western (Rau) 57:15-58:17, 61:2-18, 69:11-25.

**51.** EEOC's expert determined that it required an average of 117 pounds of force to pull the hood down and 93 pounds to push it closed. ECF No. 815-92 at 10-11, Allison Expert Report—OTR/Reefer Drivers, April 18, 2019.

**52.** All drivers at Western must be able to reach overhead and climb into their truck while maintaining three points of contact. ECF No. 815-60, M. Padilla Dep. 222:2-223:9.

**53.** All Reefer and USAC drivers have to be able to climb into a trailer, open and close the trailer doors, which can require a lot of force in windy conditions, and secure a load with load locks, which involves applying pressure to clasp a ratchet together.  ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 31:5-7, 32:10-24, 83:9-84:8.

**54.** All drivers must be able to hold the steering wheel, shift with the right arm, and use both legs to push and pull in the clutch and pedals.  *Id.* at 20:15-21:4, 37:10-15.

**55.** All Reefer and USAC drivers must be able to connect and disconnect the trailer from the tractor, which involves repeatedly turning a crank in a circular motion to adjust the landing gear and pulling out the fifth wheel pin. *Id.* at 68:5-69:5, 70:1-5; 76:4-77:14.

**56.** Western supplies its drivers with a fifth wheel hook to assist with this task, but it can be a very physically demanding task, and can be more difficult depending on weather conditions. *Id.*

**57.** ErgoMed determined it takes at least 58-100 pounds of pulling force to remove the fifth wheel pin, and EEOC's expert determined that it actually required an average peak pull force of 153 pounds to remove the fifth wheel pin. ECF No. 815-92 at 11.

**58.** The ability to safely navigate hazardous driving conditions is an essential function of any DOT-driving position. ECF No. 815-69, Sill Dep. 49:14-18, Dec. 19, 2019.

**59.** Because Western is based in Denver and primarily hauls time-sensitive refrigerated goods between Denver and the West, transporting goods through the mountains is the "main part of [Western's] business," and the ability to safely drive through the mountains in inclement weather is an essential function of Western's driver jobs. ECF No. 815-64, Rau Dep. 124:13-17, 192:11-15.

**60.** To safely traverse mountains and other roads in inclement weather, Western requires its drivers to be able to chain their tires. ECF No. 815-91, Western-EEOC-012856. Reefer tire chains come in a bag weighing 50 pounds which contains two single 25 lb. chains. ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 33:20-22. A double chain weighs 50 pounds. *Id.* at 64:17-21.

**61.** A 50-pound lifting requirement is consistent with the Federal Motor Carrier Safety Administration's classification of commercial motor vehicle operation as "medium work." ECF No. 815-27, Hartenbaum Dep. 138:2-25; 143:13-22; 147:7-149:10; 151:6-25.

**62.** A lifting restriction affects a driver's ability to get into a truck, couple the trailer, and open the hood. ECF No. 815-27, Hartenbaum Dep. 179:1-5; ECF No. 815-60, M. Padilla Dep. 221:18-222:7.

***Essential Functions Specific to USAC, Towing, and Auto Transport***

**63.** USAC, Auto Transport, Heavy Wrecker, and Rollback Driver jobs are even more physically demanding than Reefer Driver jobs. ECF No. 816-1, Garcia Dep. 161:1-162:13; ECF No. 815-65, Respass Dep. 80:8-17.

**64.** USAC Drivers must be able to load and unload heavy cargo using hand carry or whatever equipment the government facility provides, such as a pallet jack or hand jack. ECF No. 816-1, Garcia Dep. 161:1-162:13; ECF No. 816-6, Garcia Decl. ¶¶ 3-8.

**65.** One USAC team member cannot perform all physical demands of the USAC position. If one driver handled all of the loading and unloading, it would increase the risk of injury for that driver and significantly increase the time it takes to complete the task. For some loads, it would be physically impossible for a single driver to complete the unloading alone due to the weight and positioning of the cargo, the volume of the cargo being unloaded, and layout of the loading dock. ECF No. 816-6, Garcia Decl. ¶ 3, 6-7, 9-13.

**66.** In order to load and unload a vehicle, Auto Transport drivers needed to be able to lift, push, and pull a deck plate that weighs approximately 100 pounds, and be able to use chains and straps to secure vehicles. ECF No. 815-25, S. Guadagni Dep. 45:3-47:15; 49:2-53:5.

**67.** Heavy Wrecker and Rollback Tow drivers perform towing tasks, such as hooking up and hauling away inoperable vehicles, and recovery tasks, such as dragging, winching, pulling, and relocating items and vehicles to be hauled away. ECF No. 815-78, Thompson Dep. 154:1-8.

**68.** All tow drivers must be able to lift and use chains, straps, and binders to secure cargo, and be able to pull a drive line out from under a vehicle. *Id.* at 155:9-156:20; 160:23-164:2.

**69.** Ninety-five percent of towing jobs are completed by a single driver, however all tow drivers assist in the physical labor of recovery work, which involves cleaning up accident scenes and rollover crashes. *Id.* at 59:6-9, 144:4-147:25, 153:15-22, 216:12-22.

**70.** Tow drivers must be able to respond quickly and promptly to emergency requests, and they perform extremely physical work such as crawling under vehicles, traversing slippery surfaces, and climbing down embankments in the mountains during inclement weather. ECF No. 815-63, 30(b)(b) Dep. of Western (Rau) 149:12-150:22; ECF No. 815-65, Respass Dep. 80:8-17.

***Safety Concerns with EEOC's Hypothetical Accommodations for Truck Drivers***

**71.** EEOC has not presented evidence that AIs requested automatic hood openers, automatic couplers, AutoSocks, or automatic snow chains as reasonable accommodations for disabilities.

**72.** Western never received a request to install an automatic hood opener and was not aware of the existence of any automatic hood-opening technology that would safely allow drivers to open or close the hood with the push of a button because that type of device is not readily available or easily accessible (nor has it been during the relevant period of this case), and was never widely used throughout the United States by trucking companies. ECF No. 815-69, Sill Dep. 58:25-59:7; ECF No. 815-62, Pullins Dep. 83:8-22, Jan. 9, 2020; ECF No. 815-19, Gaines Dep. 244:18-245:3.

**73.** The automatic hood-opening product proposed as an accommodation by EEOC was only on the market between 2006 and 2010, during which time less than 700 units were sold, and no units for Kenworth or Peterbilt trucks (the trucks used by Western) were sold after 2008.  ECF No. 815-62, Pullins Dep. 10:10-13, 78:14-18, 83:18-21; ECF No. 815-19, Gaines Dep. 252:20-253:9.

**74.** Western's towing vehicles all have winches—used for pulling and dragging heavy items— but cannot be used to lift any item that a driver may need to lift. ECF No. 815-78, Thompson Dep. 193:9-22; ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 157:23-158:19, 218:5-23.

**75.** Western (and its customers) already regularly pay lumpers to unload Reefer trucks when drivers deliver loads, but lumpers are not available in all circumstances or locations.  ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 81:13-82:10, 210:10-211:11.

**76.** Western has a yard hostler truck with an automatic coupler which allows the yard hostler to hook and unhook trailers without pulling the pin only *in Western's yard*. ECF. 815-60, M. Padilla Dep. 287:19-288:19; ECF No. 815-19, Gaines Dep. 245:8-246:5, 250:16-252:16.

**77.** Western determined that using automatic coupler devices on public roads and highways would pose a major safety risk because the trailer could become disconnected from the tractor and cause

an accident. ECF No. 815-60, M. Padilla Dep. 287:19-288:19; ECF No. 815-19, Gaines Dep. 245:8-246:5, 250:16-252:16; ECF No. 815-65, Respass Dep. 179:4-12.

**78.** Western does not believe that AutoSocks are as safe or efficient as chains because they have less traction and wear out quickly.  ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 66:7-25; ECF No. 815-60, M. Padilla Dep. 171:20-175:4, 281:22-285:20; ECF No. 815-19, Gaines Dep. 246:9-19; ECF No. 815-65, Respass Dep. 175:20-177:4.

**79.** Western allows drivers to use AutoSocks in appropriate conditions, but also requires drivers to equip the truck with tire chains and be able to install and use chains in case AutoSocks are inadequate or damaged. ECF No. 815-60, M. Padilla Dep. 157:19-161:7; ECF No. 815-65, Respass Dep. 175:2-19.

**80.** Western has provided AutoSocks to every driver who has requested them. ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 66:7-15; ECF No. 815-60, M. Padilla Dep. 175:5-180:11.

**81.** Western's opinion on the safety of AutoSocks is based on its experience and business judgment, the experience of Western drivers, conversations with safety representatives of other trucking companies, and conversations with a representative from AutoSocks.  ECF No. 815-60, M. Padilla Dep. 159:6-161:7, 174:2-175:4; ECF No. 815-20, Garcia Dep. 155:5-156:23.

**82.** In 2016, Western installed automatic chains on certain trucks that frequently drive in the mountains, but the device is ineffective when there is a lot of snow or when they break, so drivers with automatic chains must still be able to install tire chains. SOF ¶83; ECF No. 815-60, M. Padilla Dep. 165:22-167:16, 168:4-169:16, 285:22-287:18; ECF No. 815-19, Gaines Dep. 249:11-16.

**83.** Auto-chains are expensive, unreliable, and so heavy (about 800 pounds) that they significantly reduce the freight a driver can transport. ECF No. 815-19, Gaines Dep. 247:22- 248:25.

***Clinton Kallenbach***

**84.** Charging Party Clinton Kallenbach began working for Western as an OTR driver but, per his request, Western reassigned him to a local driver position to accommodate his health issues and allow him to be home every night. ECF No. 815-36, Kallenbach Dep. 83:1-5, 84:7-85:11.

**85.** Kallenbach informed Western of his preexisting heart issues during his 2007 DOT examination. *Id.* at 88:19-22, 89:23-90:5; ECF No. 816-7, at 2, Kallenbach 7/18/2007 Medical Examination Report (disclosing health history of cardiovascular condition).

**86.** As a local driver, Kallenbach drove a DOT-regulated vehicle on routes within a 100-mile radius of Denver. ECF No. 815-36, Kallenbach Dep. 86:1-12, 23-25.

**87.** In March 2009, Kallenbach took FMLA leave to undergo heart surgery, and as a result, DOT regulations mandated that he could not work in a DOT position for three months. ECF No. 816-3, Kallenbach Dep. 90:6-92:25, ECF No. 815-36, Kallenbach Dep. 98:8-16; ECF No. 816-8, Dep. Ex. 14 at 4-5.

**88.** In May 2009, Kallenbach requested reassignment to two positions: a Yard Hostler position, which required DOT certification (because it involved driving outside the yard) that he did not possess at the time, and a Dispatcher position, which did not have any vacancies. ECF No. 816-9, 5/26/2009 Letter; ECF No. 815-36, Kallenbach Dep. 103:3-6; ECF No. 815-44, Maddox Dep. 256:7-15.

**89.** He was not aware of any vacant position at the time to which he should have been reassigned. ECF No. 815-36, Kallenbach Dep. 103:19-22.

**90.** Western terminated Kallenbach's employment at the end of his FMLA leave on June 17, 2009, but immediately offered to reinstate his employment once Kallenbach was able to obtain his DOT certification. *Id.* at 82:22-25; 121:4-12; 122:1-7.

**91.** As Kallenbach admits, he was ultimately not rehired because he did not show up to complete the pre-hire screening process, and if not for his failure to show up Western would have reinstated his employment. *Id.* at 111:8-12, 113:5-10, 118:6-121:12, 120:25-121:9; ECF No. 816-10, 7/7/2009 ErgoMed Recommendation; ECF No. 815-44, Maddox Dep. 103:16-23, 801:20-802:3.

### *EEOC Cannot Demonstrate a Pattern or Practice of Discrimination*

**92.** EEOC has submitted no statistical evidence showing a discriminatory pattern or practice.

**93.** More than half of the AIs (32 of 57) could not work in any capacity at the time of separation. ECF No. 815-1, Aldridge Dep. 93:8-13, 132:19-133:19, 120:5-19, 148:21-149:13; ECF No. 815-2, Arseneau Dep. 89:13-17; ECF No. 815-3, Backstrom Dep. 38:24-39:12; ECF No. 815-4, Bahmer Dep. 115:2-10, 119:16-25, 135:17-136:5; ECF No. 815-5, Bohannon Dep. 99:2-100:8, 101:4-21, 107:6-108:4; ECF No. 815-11, Dean Dep. 49:8-20, 142:24-146:18; ECF No. 815-12, Dennison Dep. 158:13-159:14, 169:10-16; ECF No. 815-13, Dixon Dep. 20:13-21:14, 52:19-25; ECF No. 815-15, Edwards Dep. 68:4-21, 80:8-16, 118:19-119:6; ECF No. 815-17, Floyd Dep. 73:25-74:11, 87:15-88:11; ECF No. 815-22, Gildner Dep. 122:19-22, 123:22-125:12; ECF No. 815-23, Grossman Dep. 78:21-80:21, 91:6-23, 110:5-8; ECF No. 815-32, Ingland Dep. 138:22-141:7; ECF No. 815-41, Lien Dep. 77:21-78:7; ECF No. 815-42, Lisk Dep. 60:18-61:11, 90:4-91:1, 103:5-12; ECF No. 815-45, Manley Dep. 41:12-42:11; ECF No. 815-48, McCafferty Dep. 21:21-22:1, 142:3-21, 169:19-23; ECF No. 815-50, McDonald Dep. 77:22-78:6, 79:1-10; ECF No. 815-52, Mendoza Dep. 28:20-29:23, 43:5-7; ECF No. 815-53, Morin Dep. 13:8-23, 189:18-190:25, 198:3-199:22; ECF No. 815-55, O'Dwyer Dep. 55:1-6, 137:17-138:9; ECF No. 815-59, A. Padilla 108:7-18, 111:19-112:25; ECF No. 815-61, Perkins Dep. 111:16-24, 112:12-113:23, 118:4-18; ECF No. 815-67, Schmotzer Dep. 110:18-22, 115:22-25, 127:20-128:2; ECF No. 815-70, Simms Dep. 9:13-10:20, 11:4-13:4; ECF No. 815-71, Smallridge Dep. 149:24-151:12; ECF No. 815-73,

Julie Smith Dep. 94:3-95:25; ECF No. 815-74, M. Smith Dep. 66:25-67:7, 68:22-70:1, 91:19-92:6; ECF No. 815-76, Tacker Dep. 61:16-18; 65:19-66:9; ECF No. 815-79, Valdez Dep. 63:5-64:9; ECF No. 815-82, Bryan Dep. 28:5-8 (White); ECF No. 815-84, Wyman Dep. 59:25-60:2, 73:8-17.

**94.** 41 out of 57 AIs were unable to drive commercially at the time of separation. SOF ¶103; ECF No. 815-97, EEOC Resp. to Req. for Admin. No. 3, July 26, 2018; ECF No. 815-6, T. Brethour Dep. for R. Brethour 24:2-21; ECF No. 815-7, T. Brethour Dep. 27:16-21, 145:14-19; ECF No. 815-33, Jarvis Dep. 140:10-141:22; ECF No. 815-36, Kallenbach Dep. 98:8-13, 106:12-16; ECF No. 815-39, LaFuria Dep. 42:14-43:3, 77:2-5;  ECF No. 815-46, Marshall Dep. 20:9-19; ECF No. 815-54, Newport Dep. 33:10-12, 151:1-18, 155:3-12; ECF No. 815-57, Otsea Dep. 49:1-3, 51:5-11, 68:24-69:11; ECF No. 815-72, June Smith Dep. 9:24-10:6, 31:19-32:20 (James Smith).

**95.** Some AIs admitted they could not safely perform their job duties. ECF No. 815-9, Jeffrey Davis Dep. 86:5-9; ECF No. 815-13, Dixon Dep. 46:21–47:8, 47:16-25; ECF No. 815-23, Grossman Dep. 79:8-15; ECF No. 816-2, Hines Dep. 29:3-24, 38:18-39:8; ECF No. 815-45, Manley Dep. 57:17-58:1; ECF No. 815-48, McCafferty Dep. 112:4-15, 162:18-25; ECF No. 815-52, Mendoza Dep. 14:1-3, 32:1-16; ECF No. 815-55, O'Dwyer Dep. 56:4-12, 61:23-62:4; ECF No. 815-58, Otten Dep. 63:5-12, 80:20-24, 91:14-22; ECF No. 815-71, Smallridge Dep. 170:9-171:25; ECF No. 815-79, Valdez Dep. 54:15-55:2, 72:7-12; ECF No. 815-84, Wyman Dep. 64:21-65:5, 65:19-66:17.

**96.** Some AIs failed to disclose potentially DOT-disqualifying conditions. ECF No. 815-1, Aldridge Dep. 29:14-30:3, 40:2-12, 41:10-42:1 (high blood pressure, shortness of breath, COPD); ECF No. 816-2, Hines Dep. 9:11-21, 21:7-22:19, 47:10-48:2, 52:12-54:7 (high blood pressure, grand mal seizures); ECF No. 815-42, Lisk Dep. 15:13-16:1, 48:3-50:20 (blood clots, deep vein thrombosis); ECF No. 815-54, Newport Dep. 127:23-130:25, 132:1-12, 184:16-185:9 (high blood

sugar and pressure); ECF No. 815-57, Otsea Dep. 81:16–82:14, 85:9-15, 102:11-103:22 (hearing loss, brain tumor surgery); ECF No. 816-5, Wade Dep. 67:15-25, 73:4-74:25, 78:12-79:4 (back pain, seizure disorder); ECF No. 815-83, Wones Dep. 17:8-20, 19:3-21, 275:2-277:19 (shortness of breath, COPD).

**97.** EEOC seeks relief on behalf of AIs who were not restricted or impaired at the time of separation. ECF No. 815-98, EEOC Resp. to Req. for Admin. No. 1; ECF No. 815-6, T. Brethour Dep. for R. Brethour 45:12-17, 67:14-19; ECF No. 815-16, Fernandez Dep. 69:20-70:23, 131:3-9, 132:10-14;   ECF No. 815-17, Floyd Dep. 38:16-39:17; ECF No. 816-2, Hines Dep. 31:18-22, 47:19-49:3; ECF No. 815-34, Jimenez Dep. 8:17-9:24, 12:3-14:5, 44:16-19, 54:23-55:6; ECF No. 815-49, McCallan Dep. 21:11-18; ECF No. 815-58, Otten Dep. 87:12-18; ECF No. 815-66, Rockhill Dep. 152:9-154:16; ECF No. 815-68, Scott Dep. 104:10-13, 184:22-187:17; ECF No. 815-73, Julie Smith Dep. 24:6-7; ECF No. 815-75, Sombelon Dep. 324:16-19; ECF No. 816-5, Wade Dep. 14:2-4; ECF No. 815-84, Wyman Dep. 60:20-62:12.

**98.**   EEOC seeks relief on behalf of AIs whose impairments were short in duration, not permanent or long-term, and/or were not severe. ECF No. 815-8, Cross Dep. 22:23-23:24 (cut to left hand healed in 1 month); ECF No. 815-22, Gildner Dep. 9:2-4, 13:7 (fractured toe he described as "fairly minor"); ECF No. 816-3, Kallenbach Dep. 92:1-22, 94:22-95:23 (no physical problems before or after surgery); ECF No. 815-46, Marshall Dep. 20:1-8, 120:2-5 (broken pinky finger for 2-3 months); ECF No. 815-66, Rockhill Dep. 140:17-23, 136:8-17, 152:9-25 (arm injury healed in 6 weeks); ECF No. 816-11, Sombelon Medical Records (Hernia surgery; recovered in less than 1 month); ECF No. 815-80, Vancil Dep. 53:20-54:12, 60:9-61:1 (stomach flu for 2-3 days; diarrhea condition does not prevent him from doing anything).

**99.** EEOC seeks relief on behalf of AIs who never notified Western of their purported disabilities or disability-related need for accommodation. ECF No. 815-6, T. Brethour Dep. for R. Brethour 45:12-17, 67:14-19; ECF No. 815-8, Cross Dep. 106:22-108:1, 253:9-21; ECF No. 816-2, Hines Dep. 21:7-17, 47:19-49:3; ECF No. 815-35, Johnson Dep. 112:10-13; ECF No. 815-56, Oney Dep. 107:22-109:6 and ECF No. 816-12, at 2, Oney Medical Records; ECF No. 815-58, Otten Dep. 71:8-14, 78:17-80:8; ECF No. 816-5, Wade Dep. 14:5-12, 73:4-74:25, 78:12-79:7.

**100.** EEOC seeks relief on behalf of AIs Russell Brethour, Johnson, Oney, and Otten, who have no documentation showing that they had a purported disability during the relevant time at Western.

**101.** EEOC seeks relief on behalf of AIs who voluntarily resigned or were separated for performance or conduct issues. ECF No. 815-8, Cross Dep. 57:22-23 (does not know why he was terminated); ECF No. 815-101, at 3, Separation Notices ("did not pass 90 day probation"); ECF No. 815-16, Fernandez Dep. 61:7-13, 61:17-20, 64:12-14 (miscommunicated need for a day off and voluntarily resigned) and 85:3-86:2, 87:23-25, 89:4-90:25 (after rehire, he voluntarily quit); ECF No. 815-105, 6/4/2009 Letter; ECF No. 815-18, Fries Dep. 75:1-76:18, ECF No. 815-101, at 4 ("has not worked in 274 days. Position abandoned."); ECF No. 815-22, Gildner Dep. 9:14-15, 16:12-15, 17:17-19, 18:11-12, 69:5-10, 75:23-76:6, 79:19-22, 135:15-17, 125:12-13, ECF No. 815-101, at 5 ("nonperformance"); ECF No. 816-2, Hines Dep. 23:24-24:8, 28:6-20, 32:22-33:8, 44:25-45:23, 50:23-51:4, ECF No. 815-101, at 6 ("major preventable accident"); ECF No. 815-34, Jimenez Dep. 79:1-22, 80:2-25, 84:15-24, 85:7-88:2, ECF No. 815-101, at 7 ("gross misconduct"); ECF No. 815-46, Marshall Dep. 89:1-92:1, ECF No. 815-101, at 9 ("conduct unbecoming . . . fighting with another WDTC driver" and misuse of company property); ECF No. 815-54, Newport Dep. 149:17-150:3, 218:17-22, ECF No. 815-101, at 10 (voluntarily resigned); ECF No. 815-55, O'Dwyer Dep. 70:15-17, 117:7-10, 131:17-132:5 (voluntarily resigned); ECF No. 815-56, Oney

Dep. 81:2-16, 116:18-117:3, ECF No. 815-101, at 11 (voluntarily resigned); ECF No. 815-58, Otten Dep. 67:15-21, 71:8-9, 87:12-18, 91:14-22 (refusal to comply with company policy); ECF No. 815-66, Rockhill Dep. 153:4-16, 173:19-174:17, ECF No. 815-101, at 12 (voluntarily resigned and "abandoned truck"); ECF No. 815-68, Scott Dep. 66:3-13, 182:1-183:25, 210:20-211:7, ECF No. 815-101, at 13 ("misuse of company property"); ECF No. 815-75, Sombelon Dep. 308:17-310:9, 311:14-20, 317:5-318:2, ECF No. 815-101, at 14 ("poor job performance"); ECF No. 816-5, Wade Dep. 38:21-40:22, 140:12-22 (job abandonment).

***There is no pattern to the AIs' medical leave needs or requests***

**102.**   Western routinely granted requests for medical leave, but some AIs did not require medical leave or accommodations at the time of separation. ECF No. 815-102, EEOC Resp. to Stand. Interrog. No. 17, at 6 (R. Brethour), 10-11 (Jarvis), 11 (Jimenez), 11 (Lien did not need **<u>any</u>** accommodation), 11-12 (Manley), 13 (Oney), 14 (Scott did not need **<u>any</u>** accommodation), 17 (Otten),  15 (Wones); ECF No. 815-103 at 2-6, EEOC Resp. for Jarvis to Interrog. Nos. 5, 9; ECF No. 815-104 at 2-4, EEOC Resp. for Johnson to Interrog Nos. 8-9 (Johnson did not request leave nor need accommodation); ECF No. 815-8, Cross Dep. 38:5-8, 39:22-40:2, 162:20-24, 163:8-11 (Western granted leave and he returned to work); ECF No. 815-22, Gildner Dep. 81:6-9 (Western granted leave request); ECF No. 816-5, Wade Dep. 33:23-34:11, 132:11-14 (Western granted all days off needed for medical appointments).

**103.**  For AIs whom EEOC alleges Western should have provided additional leave as an accommodation, nearly all did not request a definite amount of additional leave. ECF No. 815-1 Aldridge Dep. 96:5-12, 102:19-20, 109:8-24; ECF No. 815-2, Arseneau Dep. 55:20-22; ECF No. 815-3, Backstrom Dep. 39:9-40:7, 54:9-19; ECF No. 815-4, Bahmer Dep. 135:17-136:5; ECF No. 815-5, Bohannon Dep. 135:21-137:23; ECF No. 815-7, T. Brethour Dep. 138:18-22, 139:4-25,

146:17-20, 164:23-25; ECF No. 815-11, Dean Dep. 142:24-143:4; ECF No. 815-12, Dennison

Dep. 80:2-5, 82:20-24, 159:6-14, 160:10-13; ECF No. 815-13, Dixon Dep. 53:1-8, 54:18-20; ECF

No. 815-15, Edwards Dep. 118:5-119:5; ECF No. 815-16, Fernandez Dep. 61:11-13, 67:10-11;

ECF No. 815-105; ECF No. 815-17, Floyd Dep. 59:23-60:1; ECF No. 815-23, Grossman Dep.

106:17-20; ECF No. 815-32, Ingland Dep. 27:23-28:2, 65:7-12, 149:16-19; ECF No. 815-39,

LaFuria Dep. 83:5-6; ECF No. 815-42, Lisk Dep. 58:5-7, 60:18-61:3, 91:4-11; ECF No. 815-46,

Marshall Dep. 122:17-19; ECF No. 815-48, McCafferty Dep. 99:11-102:16; ECF No. 815-49,

McCallan Dep. 17:22-18:7, 21:19-22:4, 30:5-31:23; ECF No. 815-50, McDonald Dep. 71:17-72:1,

73:8-13, 78:2-6, 80:1-3; ECF No. 815-52, Mendoza Dep. 27:5-7, 28:20-29:6, 30:6-10, 33:1-22;

ECF No. 815-53, Morin Dep. 198:25-199:22, 200:6-11; ECF No. 815-54, Newport Dep. 151:13-

18, 155:4-12, 160:14-24; ECF No. 815-57, Otsea Dep. 49:1-17; ECF No. 815-59, A. Padilla Dep.

127:11-21; ECF No. 815-61, Perkins Dep. 111:6-24, 113:6-10, 116:25-117:14; ECF No. 815-66,

Rockhill Dep. 83:7-15, 151:1-7, 152:9-25; ECF No. 815-67, Schmotzer Dep. 76:19-77:7, 105:1-5,

110:18-25; ECF No. 815-44, Maddox Dep. 538:12-19 (James Smith); ECF No. 815-73, Julie

Smith Dep. 72:22-25, 82:24-83:11, 107:17-109:11, 142:8-21, 159:18-160:23; ECF No. 815-74,

M. Smith Dep. 90:3-91:3; ECF No. 815-75, Sombelon Dep. 318:21-320:12, 344:4-9; ECF No.

815-76, Tacker Dep. 65:6-18, ECF No. 816-4, Tacker Dep. 83:12-16, 126:19-128:7; ECF No.

815-79, Valdez Dep. 94:11-96:2.

**104.**   Western provides more than 12-weeks of leave to employees. ECF No. 815-2, Arseneau Dep.

51:19-24 and ECF No. 815-101 at 1, Arseneau Separation Notice (13 weeks and 3 days); ECF No.

815-4, Bahmer Dep. 92:2-21 and ECF No. 815-101 at 2, Bahmer Separation Notice (12 weeks and

4 days); ECF No. 815-12, Dennison Dep. 112:8-11, 112:20-22, 169:10-13 (13 weeks and 5 days);

ECF No. 815-17, Floyd Dep. 9:19-10:1, 58:12-17, 87:17-22 (15 weeks and 5 days); ECF No.

815-18, Fries Dep. 139:14-19, 155:9-14, 167:11-168:20, 46:19-47:7, 75:4, 76:1, 88:12-13, 126:23-127:12 and ECF No. 815-101 at 4, Fries Separation Notice (39 weeks); ECF No. 815-45, Manley Dep. 41:8-13, 43:3-6, 45:3-11, ECF No. 815-101 at 8, Manley Separation Notice, ECF No. 816-13, Manley Dispatch Report (22 weeks and 2 days); ECF No. 815-73, Julie Smith Dep. 117:16-22, 118:15-18 (13 weeks, and additional leave whenever needed following return to work); ECF No. 815-79, Valdez Dep. 45:17-25, 102:23-25 (15 weeks).

### *EEOC Cannot Show That Western Had a Pattern of Denying Reassignment Requests*

**105.** There is no evidence that Western prohibits reassignment; in fact, the evidence shows that Western reassigns employees, including medically disqualified drivers, to vacant positions for which they were qualified in any division of the company. ECF No. 815-3, Backstrom Dep. 63:7-24, 64:16-24, 65:10-24 (reassignment to an office position while injured); ECF No. 815-9, Jeffrey Davis Dep. 39:17-40:1, 40:22-41:16, 69:9-70:19 (temporary reassignment to warehouse position and then reassignment to tow position while injured); ECF No. 815-10, Jesse Davis Dep. 14:1-15:22 (reassignment to office position while injured); ECF No. 815-15, Edwards Dep. 54:15-55:12, 58:12-59:14 (reassignment to light duty driving while injured); ECF No. 815-26, Hale Dep. 19:20-20:6, 23:9-17, 26:4-6 (reassignment to wash bay/yard position while injured); ECF No. 815-29, Heisa Dep. 33:12-34:34 (reassignment to shop position while injured); ECF No. 815-31, Hunt Dep. 74:23-76:25 (describing the process she implemented for Western seeking employee reassignment positions) and  84:16-85:5 (describing her role in reassigning an injured OTR driver to a yard position); ECF No. 815-34, Jimenez Dep. 17:4-18:5, 26:1-27:7, 45:18-46:25 (repeated reassignment to light duty driving and office position while injured); ECF No. 815-36, Kallenbach Dep. 84:7-85:11 (reassignment from OTR to local driver position for his medical issues); ECF No. 815-45, Manley Dep. 21:7-9, 22:6-8, 33:10-12, 46:1-11 (reassignment to office and light duty

driving positions following surgery); ECF No. 815-53, Morin Dep. 176:4-7, 178:1-9, 179:1-15, 180:18-181:2 (reassignment to light duty while injured); ECF No. 815-47, Mays Dep. 9:13-20, 137:15-139:24, 145:15-20 (reassignment to regional driver due to injury); ECF No. 815-57, Otsea Dep. 42:24-43:2, 56:25–57:12, 64:23-25 (knew he could transfer to any position he was qualified for following surgery); ECF No. 815-68, Scott Dep. 155:16-156:9 (reassignment to light duty driving while injured); ECF No. 815-71, Smallridge Dep. 184:17-185:12 (offered reassignment position in Denver, but turned it down).

**106.** Most AIs who lived outside of Colorado were not interested in relocating to Denver for reassignments. ECF No. 815-44, Maddox Dep. 668:6-11; ECF No. 815-2, Arseneau Dep. 17:3-25, 64:19-65:3, 67:16-25, 83:9-14; ECF No. 815-4, Bahmer Dep. 121:18-122:12; ECF No. 815-5, Bohannon Dep. 101:9-18; ECF No. 815-12, Dennison Dep. 147:18-23, 208:5-10; ECF No. 815-16, Fernandez Dep. 56:12-22; ECF No. 815-23, Grossman Dep. 109:18-22, 132:8-16; ECF No. 815-35, Johnson Dep. 122:17-24, 130:7-14; ECF No. 815-42, Lisk Dep. 72:13-21, 102:20-23; ECF No. 815-46, Marshall Dep. 126:19-24; ECF No. 815-48, McCafferty Dep. 113:8-115:8; ECF No. 815-50, McDonald Dep. 59:21-60:1; ECF No. 815-52, Mendoza Dep. 36:5-14; ECF No. 815-71, Smallridge Dep. 184:17-185:12; ECF No. 815-75, Sombelon Dep. 259:23-260:4; ECF No. 815-79, Valdez Dep. 73:12-74:17, 80:6-8; ECF No. 815-84, Wyman Dep. 79:10-16.

**107.** There is no evidence that Western engaged in a pattern or practice of denying disabled employees' requests for reassignment to vacant positions for which the employees were qualified.

**108.** Western employs yard hostlers to wash, sanitize, inspect, inventory, and fuel trailers, as well as repairing chains and handling all yard maintenance tasks. ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 98:3-25, 104:20-105:16, 107:1-13, 108:5-9, 110:24-111:5.

**109.** Although Western does not currently require yard hostlers to maintain a commercial driver license (CDL), between 2009 and 2011 Western had a position that was a combination Local Driver/Yard Hostler, which required a CDL because the driver had to leave the yard to make local deliveries in a DOT-regulated truck on public roads. ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 132:3-133:22, 211:12-212:15; ECF No. 815-107, Yard/Local Driver Position Description.

**110.** Western employs dispatchers, who must have strong communication and computer skills, be able to multi-task, handle stress, and be detail-oriented. ECF No. 815-63, 30(b)(6) Dep. of Western (Rau) 191:9-198:24; ECF No. 815-108, Dispatcher Position Description.

**111.** Western considers the dispatcher position to be a promotion compared to a driver position. ECF No. 815-44, Maddox Dep. at 1037:8-17.

***EEOC failed to administratively exhaust theories it is attempting to pursue in litigation***

**112.** None of the Charges of Discrimination forming the basis of this case mention refusal to rehire individuals based on prior medical restrictions or refusal to provide light-duty to disabled individuals not injured on the job. ECF No. 815-109, Charges of Discrimination.

**113.** The Amended Letters of Determination issued by EEOC do not contain any mention of physical demands testing, physical requirements, or testing administration by either Western or ErgoMed. ECF No. 815-110, 12/18/2014 Amended Letters of Determination.

**114.** EEOC's Amended Letters of Determination do not contain any mention of alleged refusal to hire individuals with disabilities or former employees who separated for medical-related reasons. ECF No. 815-110, 12/18/2014 Amended Letters of Determination.

**115.** In discovery, EEOC identified 20 purportedly discriminatory standards, criteria, methods of administration, discriminatory qualification standards, employment tests, and other selection criteria for Claim Three. ECF No. 815-111 at 3-6. None of these standards are the lifting, carrying,

pushing, or pulling requirements identified in the Final Pretrial Order that EEOC states it "will present evidence" on in Phase I in support of its Claim Three. *Id.*; ECF No. 808 at 6.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56, a court must grant summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *EEOC v. JBS USA, LLC*, 115 F. Supp. 3d 1203, 1218 (D. Colo. 2015) ("*JBS Colorado*") (citing *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001). A moving party is not required to provide evidence negating an opponent's claim. *Mitchell v. City of Moore, Oklahoma,* 218 F.3d 1190, 1197 (10th Cir. 2000). In order to avoid summary judgment, the nonmoving party must do more than rest solely on the allegations in the pleadings, and must establish "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In the face of insufficient evidence, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 322-23.

## ARGUMENT

### I.       Summary of EEOC's Phase I Claims

As a pattern-or-practice case proceeding under § 706, this lawsuit is currently in the first of two phases. ECF No. 166 at 9-10. During Phase I, EEOC bears the burden of demonstrating that Western has engaged in a pattern or practice of unlawful discrimination by failing to accommodate disabilities (Count I) and intentionally discriminating against disabled individuals (Count II) through its alleged full-duty and maximum-leave policies. ECF No. 166 at 17; ECF No.

1 at 12, 14. If EEOC satisfies this burden, during Phase II's determination of individual claims there will be a presumption that any adverse actions regarding the AIs were part of the pattern or practice of discrimination. ECF No. 166 at 18.

In addition to the pattern-or-practice claims, EEOC's Claim Three will also be decided during Phase I.[2] ECF No. 166 at 18. To prevail on its Claim Three, EEOC must demonstrate that Western use standards or in a manner that "has an effect of discrimination on the basis of disability." ECF No. 166 at 17-18; ECF No. 1 at 16.

## II.   EEOC's First and Second Claims for Relief Fail as a Matter of Law.

### A.   EEOC's burden in a pattern-or-practice case is higher than that of a plaintiff in a typical discrimination case.

"Pattern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination." *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001). During this initial "liability phase," EEOC must "establish 'a prima facie case of a policy, pattern, or practice of intentional discrimination against [a] protected group.'" *EEOC v. JBS USA, LLC*, 940 F. Supp. 2d 949, 968 (D. Neb. 2013) (citing *Reynolds v. Barrett*, 685 F.3d 193, 203 (2d Cir. 2012)). To do so, EEOC must demonstrate that "unlawful discrimination has been a regular procedure or policy" of Western. *JBS Colorado*, 115 F. Supp. 3d at 1219 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S 324, 360 (1977) ("*Teamsters*")). EEOC "ultimately ha[s] to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. *Teamsters*, 431 U.S. at 336. "It ha[s] to establish by a preponderance of the evidence that [the alleged] discrimination was the company's standard operating procedure[–] the regular rather than the unusual practice." *Id.* "*Teamsters* sets a high

---

[2] Pursuant to the Court's Bifurcation Order, EEOC's Count IV retaliation claim will not be addressed until Phase II (ECF No. 166 at 18), and Western accordingly reserves its arguments on retaliation until Phase II.

bar for the prima facie case the [EEOC] must present in a pattern-or-practice case: evidence supporting a rebuttable presumption that an employer acted with the deliberate purpose and intent of discrimination against an entire class." *United States v. City of N.Y.*, 717 F.3d 72, 87 (2d Cir. 2013). The burden to establish a pattern or practice of discrimination is not an easy one to carry and requires "substantial proof of the practice." *King v. Gen. Elec. Co*., 960 F.2d 617, 624 (7th Cir. 1992); *In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1085 (W.D.N.Y. 1994).

*Teamsters* established the framework for litigating a pattern-or-practice case, but the statutory framework of disability discrimination "applies with equal force" and determines the EEOC's specific evidentiary burdens. *JBS Colorado*, 115 F. Supp. 3d at 1226-1227; *Hohider v. United Parcel Serv., In*c., 574 F.3d 169, 183 (3d Cir. 2009).  In 2015, the United States District Court for the District of Colorado clarified the framework for a pattern-or-practice case involving alleged failure to accommodate.[3]  *JBS Colorado*, 115 F. Supp. 3d at 1227.  EEOC must show: (1) Western is a covered entity under the ADA; (2) Western's policy or practice is undisputed; and (3) Western's policy or practice discriminates against individuals protected by the ADA. *Id*. at 1226 (citing *United States v. City & Cnty. of Denver*, 943 F. Supp. 1304, 1309 (D. Colo. 1996) ("*Denver*")). Although EEOC need not demonstrate at this stage that each and every AI was a victim of the allegedly discriminatory policy, it nonetheless must establish that "a broad-based policy of employment discrimination existed" that impacted a group of employees. *Denver*, 943 F. Supp. at 1309 (citing *Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 449 n. 1 (10th Cir. 1981)). EEOC must "additionally produce some evidence that a policy or practice of reasonable accommodation is possible, such as showing that its proposed accommodations are reasonable on

---

[3] Although *JBS Colorado* involved religious accommodations, the case also discussed in detail and relied upon failure-to-accommodate cases under the ADA. *Id.* at 1225-1228.

their face." *JBS Colorado*, 115 F. Supp. 3d at 1227-28.

If EEOC carries its burden to establish a prima facie case, Western's burden is to "provide a nondiscriminatory explanation for the apparently discriminatory result." *Teamsters*, 431 U.S. at 360 n. 46. Western can defeat EEOC's claims by demonstrating that EEOC's prima facie case is "inaccurate or insignificant." *Thiessen*, 267 F.3d at 1106. For example, Western can point to EEOC's failure to demonstrate that there is a group of disabled individuals actually aggrieved by an overarching discriminatory policy. *Thiessen v. Gen. Elec. Capital Corp.*, 996 F. Supp. 1071, 1082 (D. Kan. 1998); *see also Hohider*, 574 F.3d at 195-6; *Gardenhire v. Johns Manville*, 722 F. App'x 835, 840 (10th Cir. 2018); *EEOC v. Prestige Care, Inc.*, 1:17-CV-1299 AWI SAB, 2018 WL 3473964, at *3 (E.D. Cal. July 17, 2018) (explaining that even in a pattern-or-practice case, "the circumstances and eligibility to recover under the ADA of any identified class member is put directly into issue."); *Henderson v. Ardco, Inc.*, 247 F.3d 645, 653 (6th Cir. 2001).

Here, EEOC cannot show the existence—let alone substantial proof—of an undisputed policy or practice, evidence that any policy or practice discriminates against disabled individuals, or any intent by Western to discriminate against disabled individuals. Significantly, EEOC cannot show that the alleged policies at issue failed to reasonably accommodate disabled, but qualified, employees, and cannot show that a policy of reasonable accommodation was possible. As Western show in this brief, EEOC bases its case on a mischaracterization of Western's policies and has ignored copious evidence that Western does discriminate against, and in fact reasonably accommodates, disabled individuals. Therefore, EEOC cannot satisfy its prima facie burden.

Even if EEOC were to succeed in establishing a prima facie case, summary judgment should still be denied because Western can provide non-discriminatory reasons for its policies and practices as well as any purportedly discriminatory results. Any evidence of alleged discrimination

proffered by EEOC is too inaccurate or insignificant to support a presumption that Western acted

with the deliberate purpose and intent of discriminating against disabled individuals.

**B. Because EEOC does not have statistical evidence, it must produce stronger anecdotal evidence to support its case.**

EEOC may prove its case through a combination of statistical evidence and "testimony

from protected class members detailing specific instances of discrimination." *Robinson v. Metro-*

*N. Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001); *Teamsters*, 431 U.S. at 338 ( burden of

proof met with statistical evidence bolstered by testimony of 40 specific instances); *EEOC v. Joe's*

*Stone Crab, Inc.*, 220 F.3d 1263, 1287 (11th Cir. 2000). Typically, statistical evidence is the "core"

of a prima facie pattern or practice case and is critical to the success of such a claim. *EEOC v.*

*Bloomberg L.P.*, 778 F. Supp. 2d 458, 469 (S.D.N.Y. 2011); *Bell v. EPA*, 232 F.3d 546, 553 (7th

Cir. 2000). EEOC's own compliance manual states that statistical evidence is "extremely

important" in a case alleging a pattern or practice of disparate treatment. *EEOC Compliance*

*Manual* § 604.3(b), available at https://www.eeoc.gov/laws/guidance/cm-604-theories-

discrimination (last visited October 15, 2021). Nonetheless, anecdotal evidence may be used in

addition to statistical evidence to bring "the cold numbers convincingly to life" and to provide the

court "the opportunity to see reflected in individual cases the policies alleged to exist on a general

scale." *Teamsters*, 431 U.S. at 339. Evidence, whether statistical or anecdotal, should be assessed

on a cumulative basis. *Pitre v. W. Elec. Co., Inc.*, 843 F.2d 1262, 1268 (10th Cir. 1988).

EEOC has not produced any statistical evidence, and instead relies exclusively on

anecdotes. SOF ¶92. Although statistical evidence is not strictly required in a pattern or practice

case, summary judgment is often granted for defendants where plaintiffs rely exclusively on

anecdotal evidence. *See, e.g.*, *EEOC v. Republic Servs., Inc.*, 640 F. Supp. 2d 1267, 1317-19 (D.

Nev. 2009) (striking plaintiff's statistical evidence and granting summary judgment for defendant);

*EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 952-54 (N.D. Iowa 2009) (granting summary judgment for defendants where plaintiff presented no statistical evidence); *Bloomberg*, 778 F. Supp. 2d at 471 (holding EEOC's failure to present anything other than anecdotal evidence was "fatal" to its case). Where EEOC relies solely on anecdotal evidence, such evidence must be much stronger to meet its burden of proof than it would need to be if combined with statistical evidence. *In re Xerox*, 850 F. Supp. at 1085. EEOC must show specific evidence of discrimination against some of the employees it seeks to represent, as well as a broad-based policy of discrimination. *Coe*, 646 F.2d at 449 n. 1; *Denver*, 943 F. Supp. at 1309. Courts have declined to find a pattern or practice based on a "small number of incidents of discrimination . . . over a period of years." *Cooper v. Fed. Res. Bank of Richmond*, 467 U.S. 867, 876 (1984). Moreover, in a pattern-or-practice claim, the anecdotal evidence must demonstrate more than the validity of an individual's discrimination claim. *Id*. at 876-77, 879 (a few instances of discrimination not enough to establish a general policy). The Supreme Court has cautioned, "[I]solated or individual instances of discrimination, even if true, should not be construed to turn every [discrimination] case in[to] 'a potential companywide class action.'" *Bloomberg*, 778 F. Supp. 2d at 468 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 (1982)). When examining anecdotal evidence, a "court must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless free-standing trees." *Cooper,* 467 U.S. at 879-80.

## C.  EEOC fails to establish a prima facie case of pattern-or-practice discrimination.

EEOC's pattern-or-practice claims of failure to accommodate and disparate treatment are both based on two alleged policies: a "full duty" policy and a "maximum leave" policy. ECF No. 1 at ¶¶ 75-92. As described by EEOC, the alleged "maximum leave" policy refers to "never allow[ing] more than 12 weeks of FMLA or medical leave, without exception" and Western's discharge of any employee who was unable to return by the expiration of the twelve-week period

"without regard for whether some reasonable accommodation could be provided which would enable the employee to perform the essential functions of his or her job." ECF No. 1 at ¶¶ 22-25. EEOC further alleges that, pursuant to this policy, Western denied requests for reasonable accommodations and requests for extensions of leave, and advised employees that they would have to compete for reassignment positions. *Id.* at ¶¶ 26-28. As described by EEOC, the alleged "full duty" policy refers to denying work to employees with medical restrictions, and not allowing them to return until they provided a "full duty" medical release. *Id.* at ¶¶ 30-41.

1. EEOC cannot show that Western has a "maximum leave" policy.

EEOC, not Western, coined the phrases "maximum leave" and "full duty" by alleging that Western had iron-clad policies that, respectively, did not permit any employees to take more than 12 weeks of medical leave and required employees to be 100 percent healed before they could return to work. ECF No. 1 at ¶¶ 19-41. EEOC claims Western's alleged policies are discriminatory because they were "inflexible" and do not allow for reasonable accommodations for disabled individuals. *Id.* at ¶ 77. However, EEOC's description of the policies is incomplete and inaccurate.

When interpreting Western's policies, the Court must give effect to all of Western's policies and provisions so that none are rendered meaningless. *Mountain States Adjustment v. Cooke*, 412 P.3d 819, 822 (Colo. App. 2016). Directly refuting EEOC's "maximum leave" allegations, Western in fact has a Reasonable Accommodation Policy that explicitly states that if an employee is "unable to return to work at the end of all company-provided leave," Western "will engage in the interactive process and provide additional unpaid leave as a reasonable accommodation unless additional leave would impose an undue hardship on the operation of the Company." SOF ¶¶ 15, 29. Multiple managers testified that Western makes medical leave decisions on a case-by-case basis as required by the ADA. SOF ¶ 28. The company does not have a policy mandating termination at the end of 12 weeks with no exceptions. SOF ¶¶ 20, 22, 28-29,

104. Although Western has an *FMLA Policy* that provides for 12 weeks of leave for family and medical reasons, it provides additional leave beyond 12 weeks on a case-by-case basis as an *ADA* accommodation. SOF ¶¶ 25-28.[4] In fact, Western granted more than 12 weeks of leave on numerous occasions, demonstrating that there is no "inflexible" leave policy. SOF ¶ 104.

Western also has a policy of reinstating employees to full seniority if they return within 30 days of termination, which effectively acts as an additional month of unpaid leave. SOF ¶ 31. Further demonstrating Western's intent to accommodate employees with medical impairments, Western routinely provides 12 weeks of medical leave to employees who would not have been eligible for FMLA leave. SOF ¶ 26; *see also*, *Thornburg v. Frac Tech. Servs., Ltd.*, 709 F. Supp. 2d 1166, 1172-73 (E.D. Okla. 2010) (holding that the ADA does not require an employer to affirmatively offer a leave of absence to an employee who is not eligible for FMLA leave).

The evidence demonstrates that EEOC cannot satisfy its prima facie case because it cannot show that the existence of an inflexible "maximum leave" policy is undisputed. To the contrary, the evidence directly refutes EEOC's bald assertion that Western's leave policies were "inflexible," as well as EEOC's assertion that Western used a specific policy or practice to discriminate against disabled employees.

2. EEOC's allegations of a "maximum leave" policy fail as a matter of law because the ADA is not a leave statute and Western's policies are not discriminatory.

EEOC also fails to satisfy its prima facie case with respect to its "maximum leave" claim because it cannot demonstrate that Western's leave policies discriminate against disabled

___

[4] EEOC will likely argue that Western's prior responses to EEOC's investigative requests and interview questions demonstrate that Western automatically capped all leave at 12 weeks. However, as Western's former HR Director Maddox explained, Western's responses to EEOC's investigative requests were not a complete statement of Western's policies and practices pertaining to leave because Maddox believed EEOC was inquiring about the FMLA policy. SOF ¶¶ 34-35.

individuals. EEOC's theory is that a maximum leave policy is "inherently discriminatory" because it does not allow for reasonable accommodations or exceptions to the policy. However, even if the court found that Western had a maximum leave policy, the Tenth Circuit has rejected the notion that such policies are "inherently discriminatory," and EEOC's theory fails as a matter of law.

EEOC's entire case is based on a flawed legal analysis that treats the ADA like a leave-entitlement statute rather than an anti-discrimination statute. *See Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017) (explaining that "[t]he ADA is an antidiscrimination statute, not a medical-leave entitlement."). The ADA, like the Rehabilitation Act, "seeks to prevent employers from callously denying reasonable accommodations that permit otherwise qualified disabled persons to work—not to turn employers into safety net providers for those who cannot work." *Hwang v. Kan. State Univ.,* 753 F.3d 1159, 1162 (10th Cir. 2014). The ADA frames its requirements in the present tense, asking "whether an individual 'can' (not 'will be able to') perform the job with reasonable accommodations." *Billups v. Emerald Coast Util. Auth.*, 714 F. App'x 929, 934 (11th Cir. 2017). This is consistent with the ADA's status as an antidiscrimination statute rather than a medical-leave entitlement statute. *Severson*, 872 F.3d at 479 (affirming summary judgment for employer who terminated employee after denying request for extended medical leave following FMLA entitlement).

The Tenth Circuit (and other Circuits) has emphasized this distinction, flatly rejecting EEOC's suggestion that the ADA requires employers to provide additional leave (beyond that required by the FMLA) as a reasonable accommodation. *Hwang*, 753 F.3d at 1162; *Severson*, 872 F.3d at 479. It is well-settled in the Tenth Circuit and throughout the country that the ADA does not require employers to provide extensive or indefinite medical leave as an accommodation to disabled employees. *Valdez v. McGill*, 462 F. App'x 814, 818 (10th Cir. 2012); *Hwang*, 753 F.3d

at 1162; *Severson*, 872 F.3d at 479 ("A multimonth leave of absence is beyond the scope of a reasonable accommodation under the ADA."); *Billups*, 714 F. App'x at 934; *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) ("The ADA covers people who can perform the essential functions of their jobs presently or in the immediate future."); *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 903 (8th Cir. 2009) ("[E]mployers should not be burdened with guess-work regarding an employee's return to work after an illness.").

Indeed, the Tenth Circuit has explicitly condoned an employer's ability to maintain an inflexible leave policy. In 2014, a plaintiff asked the Tenth Circuit to hold that all "inflexible" sick leave policies necessarily violate the Rehabilitation Act. *Hwang,* 753 F.3d at 1162. The Tenth Circuit not only refused this request, but also held the "inflexible" nature of a leave policy is *not* "inherently discriminatory." *Id*. at 1164. The court explained that "an inflexible leave policy can serve to protect rather than threaten the rights of the disabled—by ensuring disabled employees' leave requests aren't secretly singled out for discriminatory treatment, as can happen in a leave system with fewer rules, more discretion, and less transparency." *Id*. Consequently, EEOC's allegation that Western had a practice of not providing more than 12 weeks of leave as an ADA accommodation does not state a cognizable ADA discrimination claim. Even if EEOC shows that Western had a "maximum leave" policy or that it terminated some employees after 12 weeks of medical leave, it is not enough to prove a pattern-or-practice of *discrimination* under the laws of this jurisdiction.

*a.  Extensive and/or indefinite leave is not a reasonable accommodation.*

Notably, a leave of absence is not actually included in the ADA's definition of a "reasonable accommodation" (*See* 29 C.F.R. § 1630.2(o)(1)), though the Tenth Circuit has held that a leave of absence *may lead* to a reasonable accommodation if the leave allows an employee sufficient time to recover from an injury or illness such that the employee can perform the essential

functions of the job in the "near future." *Robert v. Bd. of Cnty. Comm'rs of Brown Cnty., Kan.*, 691 F.3d 1211, 1218 (10th Cir. 2012).

For leave to be considered a reasonable accommodation, "an employee is required to inform the employer of the *expected duration of the impairment* (not the duration of the leave request)." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1051 (10th Cir. 2017) (emphasis in original). Without information about the expected duration of impairment, "an employer cannot determine whether an employee will be able to perform the essential functions of the job *in the near future* and therefore whether the leave request is a 'reasonable' accommodation." *Id*. When an employee requests leave, "but it is uncertain if or when he will be able to return to work, a leave of absence is not a reasonable accommodation." *Valdez*, 462 F. App'x at 818.

Certainty, definitiveness, and advanced notice are paramount to establishing that an employee's medical leave is a reasonable accommodation. In the Tenth Circuit, an employee who keeps delaying or changing his or her return to work date cannot establish a valid ADA claim based on an employer's failure to provide extensions to a leave of absence. In *Valdez*, an employee submitted a physician's note indicating that he could return to work on February 8, 2007, and a subsequent note saying he "may return to work on March 1[, 2007.]" *Valdez*, 462 F. App'x at 818. The Tenth Circuit held that the employer's decision to terminate the employee on February 8th was not discriminatory, explaining that, in light of the employee's "inability to return to work according to the earlier physician's note, it was uncertain he would be able to return to work on March 1, 2007." *Id*. Significantly, even the EEOC has argued that a medical leave of absence can only qualify as a reasonable accommodation when leave is (1) of a definite, time-limited duration;

(2) requested in advance; and (3) likely to enable the employee to perform the essential job functions when the employee returns. *Severson*, 872 F.3d at 482.[5]

> b.  *Anecdotal evidence of discrimination resulting from the alleged maximum leave policy is insufficient.*

EEOC has alleged that Western discriminated against disabled individuals by automatically terminating their employment after 12 weeks of medical leave. ECF No. 1 at ¶¶ 22-23. Even if the Court finds that Western had such a policy, EEOC must still establish, through statistical and/or anecdotal evidence, that the policy actually caused discrimination against disabled individuals, such that it constituted a pattern or practice of intentional discrimination. *JBS Colorado*, 115 F. Supp. 3d at 1226.  To do so, EEOC must also show that reasonable accommodations were possible, but not provided by Western. *Id*. at 1227-28. In light of Tenth Circuit law defining when a request for additional leave can constitute a reasonable accommodation, EEOC must show that Western utilized a maximum-leave policy to deny requests for additional leave to disabled individuals who, prior to their termination, requested a definite amount of leave additional leave that would have allowed them to perform the essential functions of their job in the near future. *Robert*, 691 F. 3d at 1218; *Punt*, 862 F.3d at 1051. Individuals who did not know their expected duration of impairment at the time of termination could not have been reasonably accommodated.

EEOC's evidence related to its maximum-leave policy is insufficient support for a pattern or practice. EEOC will likely rely on Clinton Kallenbach, the only AI identified in its Complaint, as support for its maximum-leave theory. ECF No. 1 at 8-12. EEOC alleges that Western should have given Kallenbach nine additional days of medical leave after his FMLA expired. *Id*. at 11,

---

[5] Even this position was rejected as too stringent because it places no limits on the amount of leave an employer would need to provide, transforming the ADA into an open-ended medical-leave statute. *Severson*, 872 F.3d at 482.

¶ 66.  However, Kallenbach's discrimination claim fails because the undisputed facts show that: 1) Kallenbach was accommodated by Western on multiple occasions and 2) Kallenbach's own actions were the reason he did not return to work at Western. SOF ¶ 84-91. Kallenbach began working for Western as an over-the-road driver but, per his request due to his health issues, Western reassigned him to a local driver position, a DOT-regulated position, which would allow him to be home every night. SOF ¶ 84-86. In March 2009, Kallenbach took FMLA leave to undergo heart surgery. SOF ¶ 87. Pursuant to DOT guidelines, Kallenbach could not work in a DOT-driver position for three months following his surgery. *Id.* In May 2009, Kallenbach requested reassignment to two different positions, one which required DOT certification that he did not possess at the time, and one which did not have any vacancies. SOF ¶ 88. He admits he was not aware of any vacant position at the time to which he should have been reassigned. SOF ¶ 89. Western terminated Kallenbach's employment at the end of his FMLA leave on June 17th, but immediately offered to reinstate his employment once he was able to obtain his DOT certification (which would have restored his full seniority). SOF ¶¶ 31, 90. As Kallenbach admits, if not for his failure to show up for his ErgoMed appointment, Western would have rehired him, thus alleviating the alleged discrimination of which he complains. SOF ¶ 91.

More importantly, even if the Court considers Kallenbach to have a valid claim, EEOC cannot prove its prima facie case with a single, isolated incident of discrimination over a more-than 10-year period. *Cooper,* 467 U.S. at 879. Kallenbach's allegations have little in common with the allegations of the other AIs, and do not support EEOC's pattern-or-practice theories. *Compare* SOF ¶ 84-91 *and* SOF ¶¶ 93-101. EEOC has failed to demonstrate that Western denied other AIs additional leave under similar circumstances to Kallenbach, or circumstances demonstrating a pattern or practice of intentional discrimination against disabled individuals. EEOC cannot support

its claim by relying on individuals who failed to request a specific amount of additional leave, did not know how much more leave they would need at the time of termination, and/or, based on a *post-hoc* review of their medical records, would have needed at least a month if not many months of additional leave. SOF ¶ 102-103. Nearly all AIs who needed leave admitted that they never requested additional leave with a definite return date. SOF ¶ 103. EEOC's failure to demonstrate that AIs' experiences followed the same pattern or practice of discrimination is fatal to its prima facie case. Therefore, EEOC's discrimination claims based on an alleged pattern of denying additional medical leave (whether or not related to a maximum leave policy) should be dismissed.

3. <u>Western has non-discriminatory reasons for its leave policies.</u>

Although Western does not have the inflexible maximum leave policy EEOC alleges, Western does have a policy that comports with the FMLA to provide 12 weeks of leave. SOF ¶ 25. After 12 weeks of FMLA leave have passed, Western's policy and practice is to conduct a case-by-case assessment of the individual's ability to return to work—in their original position, in a modified or light duty position, or in a reassignment position if any are available—or whether a reasonable extension of leave can be definitely determined and granted. SOF ¶ 28. Western's leave policy is structured this way for non-discriminatory reasons – due to the complex logistical and time-sensitive nature of Western's business. SOF ¶¶ 9-10. Western needs certainty as to when its drivers will be returning from leave in order to carry out the complex logistical planning of time-sensitive freight delivery. *Id.* Further, there is a significant cost to Western to keep trucks out of commission when a driver takes lengthy or open-ended leave. SOF ¶ 11.

4. <u>Western does not have a "fully healed" policy.</u>

EEOC alleges Western discriminated against disabled individuals by having a "full duty" policy, which EEOC describes as a "per se violation of the ADA" under which employees on medical leave were not allowed to return to work unless they provided a "full duty" medical

release. ECF No. 1 at ¶ 30; ECF 808 at 3. EEOC claims this violates the ADA because it forecloses use of the interactive process to determine whether the employee could perform the essential functions of the job. ECF No. 1 ¶¶ 33-34. EEOC incorrectly suggests that Western's policy is akin to "100% healed" policies that have been treated as ADA violations by various courts. To the contrary, those policies are easily distinguishable from, and much more restrictive than Western's alleged policy. For example, courts have found 100% healed policies to violate the ADA where they inform employees that they cannot return to *any* position unless they were 100% healed or disability-free. *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 115-16 (9th Cir. 1999) (prohibiting return to any position until 100% healed); *Warmsley v. N.Y.C. Transit Auth.*, 308 F. Supp. 2d 114, 120 (E.D.N.Y. 2004) (requiring returning employee to be disability-free). However, an employer does not violate the ADA by having a policy requiring employees returning from medical leave to demonstrate that they are capable of performing the essential functions of their specific jobs. *Beveridge v. Nw. Airlines, Inc.*, 259 F. Supp. 2d 838, 848–51 (D. Minn. 2003) (comparing return-to-work requirements to 100% healed policy); *Lenker v. Methodist Hospital,* 210 F.3d 792, 798 (7th Cir. 2000) (noting a requirement that "an employee with a lifting restriction would not be allowed to return to work until that restriction was removed because lifting was an essential function of the job that could not be accommodated," " is a far cry from saying that [employee's] [multiple sclerosis] must be 100% healed before being allowed to return to work.").

EEOC cannot show that Western has a policy requiring employees to be 100% healed to return to work. In fact, Western's written policies directly refute EEOC's theories. For example, the Reasonable Accommodation Policy expressly states that "[i]t is not the Company's policy that an employee cannot return to work unless they are released without any medical restrictions." SOF

¶ 20.  It also provides that an employee with medical restrictions who can perform the essential functions of the job may return to work with restrictions as a reasonable accommodation unless it would impose an undue hardship. SOF ¶ 19.  Likewise, Western's Return to Work Policy provides that workers can return to work before they are 100% healed in order to take a modified duty assignment. SOF ¶ 22. Finally, Western's EEO Policy prohibits discrimination on the basis of disability. SOF ¶ 14.

EEOC will likely cite to a single statement in Western's Workers' Compensation Policy to support its theory. However, even that statement fails to show that Western has an unlawful "100% healed" policy. SOF ¶ 36. Notably, the statement does not say that a worker must be "full-duty" to return to any level of work. *Id.* It also does not prohibit light-duty assignments or reassignment, and certainly does not say that Western will not consider or provide reasonable accommodations. In any case, the Workers Compensation Policy statement must be analyzed in the context of other Western policies and practices pertaining to requests for reasonable accommodations under the ADA, which firmly prove that Western did not require employees to be 100% healed to return to work. SOF ¶¶ 14-15, 19-20, 22-23, 31-32, 37; *Mountain States Adjustment*, 412 P.3d at 822. When considered together, Western's policies demonstrate that Western does not have an inflexible policy prohibiting employees from returning to work until they were fully healed.

EEOC's characterization of Western's "full-duty" policy is nothing more than a creation of EEOC's counsel. The undisputed evidence shows that Western did not implement the full-duty language in a way that prohibited employees from returning to work unless they were fully healed or disability-free. SOF ¶¶ 37-40. In fact, Western's policy and practice has been to permit employees to return with medical restrictions before they were "100% healed." SOF ¶¶ 37-40, 105. It is Western's practice to try to find modified or light duty work for any individual with an injury

or illness who requests it. SOF ¶¶ 18, 23. However, Western is a small company and only infrequently has temporary light-duty assignments available. SOF ¶ 23. Furthermore, light-duty assignments are only available in Denver, and most out-of-state drivers have not been interested in relocating to Denver for such assignments. SOF ¶¶ 23, 106. Nonetheless, when available, Western provided employees with an accommodation of temporary light-duty work or reassignment when they were unable to return to "full duty" driving a truck. SOF ¶ 105. Additionally, Western has provided other accommodations such as modified work schedules, and modifications to its equipment (including installation of CPAP machines) that allowed disabled individuals to fully perform the essential functions of their position. SOF ¶ 18. Thus, employees are not prohibited from returning to work until they were 100% healed.

Although the phrase "full duty" appears in the Workers Compensation Policy and other evidence that may be presented by EEOC, Western has never utilized the term to foreclose the interactive process or to arbitrarily deny reasonable accommodations. As discussed in more detail below, Western's use of the term is nondiscriminatory and part of Western's federally mandated obligation to comply with requirements and guidelines from the DOT. SOF ¶¶ 2, 39. Indeed, Western managers testified that their understanding of the "full duty" language in the Workers' Compensation Policy was that Western can only return medically-impaired drivers to their driving positions if the impairments do not affect their ability to maintain DOT-certification and safely operate a commercial vehicle. SOF ¶ 39. EEOC has not demonstrated that such a policy is a "100% healed" policy that violates the ADA.

5. <u>Western is legally required to ensure that its drivers are DOT-certified and able to safely perform the duties of their driving jobs before allowing them to return to work.</u>

Even if the Court determines that Western has a "full duty" policy, Western has non-discriminatory reasons for its policy because it is necessary to comply with federal regulations and

ensure the safety of Western's workforce and the general public.[6] As a DOT-licensed motor carrier employing commercial drivers, Western is required to comply with all DOT regulations and guidelines. SOF ¶ 2. The Federal Motor Carrier Safety Administration ("FMCSA") regulations **prohibit** Western from permitting a person to drive a commercial motor vehicle unless that person is qualified to do so. 49 CFR § 391.11(a). Accordingly, Western is required to ensure that it is not putting drivers on the road who cannot safely perform both the everyday and emergency functions of their job. In service of this gravely important obligation, Western can only return medically-impaired drivers to their driving positions if the drivers' impairments do not affect their ability to safely operate a commercial vehicle. SOF ¶ 39.

Courts have routinely recognized the importance of permitting employers to impose safety-related medical qualifications on truck drivers. An employer's compliance with other federal regulations "is a complete defense under the ADA." *Bower v. Fed. Express Corp.*, 156 F. Supp. 2d 678, 686 (W.D. Tenn. 2001). In fact, when Congress enacted the ADA, "it recognized that federal safety rules would limit application of the ADA as a matter of law." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 573 (1999).

FMCSA regulations require a medical examination and recertification for any driver whose ability to perform his or her normal duties has been impaired by a physical or mental injury or disease. 49 C.F.R. § 391.45(f). The FMCSA regulations and the Tenth Circuit also explicitly allow employers to impose more stringent physical requirements for truck drivers to ensure the safety of operation and employee safety and health. 49 C.F.R. § 390.3(d) (employers may mandate "more stringent requirements relating to safety of operation and employee safety and health."); *Tate v.*

---

[6] EEOC's failure to satisfy its prima facie burden will be discussed further below. Western's non-discriminatory reasons for its policies provide necessary context for EEOC's evidentiary failures.

*Farmland Indus., Inc.*, 268 F.3d 989, 995 (10th Cir. 2001) ("Subject to DOT's minimum standards, Defendant as the employer has the prerogative of determining what is physically required of its [Commercial Motor Vehicle] operators."). In other words, Western "is entitled to determine how much risk is too great for *it* to be willing to take." *EEOC v. Schneider Nat., Inc.*, 481 F.3d 507, 510 (7th Cir. 2007) (affirming trucking company's decision not to employ truck drivers with neurocardiogenic syncope, even though DOT allowed it).

For a driver to be medically qualified, the driver must be able to perform both driving and non-driving tasks. SOF ¶ 46. "[A]n employer may set standards not only for the mundane work but also for the exceptional. As long as the need to perform in an emergency is a realistic component of the job, the employer should be able to 'establish reasonable physical qualifications' to ensure that an emergency situation can be dealt with safely and efficiently by the employee, especially in situations … where the physical safety of others may be at risk." *Wilkerson v. Shineski*, 606 F.3d 1256, 1264-65 (10th Cir. 2010). Notably, the FMCSA standards do not permit limitations for drivers aside from the use of corrective lenses, hearing aids, or waivers for particular situations. FMCSA Guidance for § 391.41, *Question 4: May the medical examiner restrict a driver's duties?*, *available at* https://www.fmcsa.dot.gov/regulations/title49/section/391.41 (last accessed October 19, 2021). Thus, restrictions on lifting, reaching, carrying, limiting duration of driving, or imposing specific rest breaks would not be permitted under 49 C.F.R. 391.41. *Id.*

To the extent Western has not returned certain drivers to work due to medical reasons, Western's failure to return such employees to work was not an example of a pattern of discrimination against disabled individuals. Instead, it was necessary to ensure that Western was abiding by federal safety requirements. Consequently, whenever a driver goes on medical leave, regardless of whether the employee separated from employment, Western will not return them to

work without first requiring the driver to undergo a DOT medical examination, drug screen, and in most cases, an ErgoMed physical demands test to ensure they can safely perform the essential functions of their driving position. SOF ¶ 39. These physical demands were determined by having a company called ErgoMed gather information about Western's jobs and measure the physical demands of the job functions.[7] SOF ¶ 43. Because Western cannot abdicate its responsibility to ensure the safety of its drivers and the public, it cannot permit drivers to return to work without their DOT-certification and assurance that the drivers can safely perform their jobs. SOF ¶¶ 2, 41.

6. EEOC has not produced evidence to show that the alleged "Full-Duty" Policy is a pattern or practice of discrimination against qualified disabled individuals.

Even if EEOC could prove that Western had a full-duty policy like the one it describes (which it cannot), the existence of such a policy also would not be sufficient, on its own, to establish a pattern or practice of discrimination. Although EEOC asserts that such policies are discriminatory because they deny qualified individuals with disabilities the opportunity to work, a 100% healed policy does not violate the ADA unless it actually caused discrimination against qualified individuals with disabilities. *Gardenhire*, 722 F. App'x at 840; *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012); *Prestige Care*, 2018 WL 3473964, at *3. A 100% healed policy "cannot give rise to a finding of liability and relief under the ADA without the statutorily required inquiry into whether those affected by [the] policy are disabled and able to perform the essential functions of the jobs they seek or desire with or without reasonable accommodation." *Gardenhire*, 722 F. App'x at 840 (citing *Hohider*, 574 F.3d at 195). EEOC's full-duty theory fails because EEOC cannot demonstrate that the alleged policy existed or that it was discriminatory with respect

---

[7] EEOC's expert took its own measurements and found that some tasks required even more physical effort than ErgoMed had assessed. SOF ¶ 50-51, 57. Even if a court were to find minor errors in the ErgoMed exam, however, that would not evidence a discriminatory intent by Western.

to qualified individuals with a disability. *See also Gardenhire*, 722 Fed. Appx. at 840 (holding that speculative testimony is not sufficient evidence to show the existence of a 100% healed policy).

In choosing to file a pattern-or-practice case based on disability discrimination, EEOC assumed the burden of having to prove that Western has engaged in "more than isolated or sporadic" discrimination against disabled individuals through a specific policy or practice. *Teamsters*, 431 U.S. at 336. Notably, EEOC has alleged that this alleged pattern or practice occurred over a ten-year period and has asserted claims on behalf of 57 AIs who worked in a variety of driving positions. Accordingly, EEOC must show that discrimination was Western's regular practice for that entire period and across an entire group of disabled individuals. One of the many flaws in EEOC's case, however, is that EEOC has failed to produce statistical or anecdotal evidence that Western's policies discriminate against disabled individuals. Even if EEOC points to a couple isolated statements in a handbook, EEOC has not demonstrated that those statements resulted in discrimination against a group of disabled individuals. Critically, EEOC has not produced statistical or anecdotal evidence of a group of qualified individuals with a disability who were aggrieved by Western's policies, let alone an ongoing pattern of deliberate and intentional discrimination that occurred for ten years.

EEOC cannot establish that Western had a standard practice of discrimination by relying on individuals whose claims contradict or do not support EEOC's pattern-or-practice theories or whose claims amount to individual business disputes. *Bloomberg L.P.*, 778 F. Supp. 2d at 477 (evidence that does not support the EEOC's assertions, evidence based on complaints with the demands placed on everyone at the company, and evidence of run-of-the-mill employment disputes do not suffice to show standard operating procedure of discrimination). For example, EEOC cannot prove its case by relying on individuals who were unable to drive a

commercial vehicle or work at all because such individuals would not have been able be accommodated even in the absence of a "full-duty" policy. Likewise, individuals who did not provide a definite return-to-work date are not probative evidence of discrimination through a maximum-leave policy. AIs who left Western for reasons unrelated to any disability have even less of a link to the policies on which EEOC bases its case.[8] SOF ¶ 97, 99-101. These drivers' inability to work was not caused by any policies of Western but rather by FMCSA/DOT requirements and/or their own actions and inactions. Although EEOC does not have to show in Phase I of this pattern-and-practice case that each and every claimant for whom it seeks relief was actually disabled at the time of the subject employment decision, EEOC's failure to present a group of individuals with viable ADA claims demonstrates the extreme overreach and inaccuracy of its pattern-or-practice case.

a.  *EEOC cannot rely on unqualified individuals to establish a pattern or practice.*

EEOC bears the burden of proof to show Western had a pattern or practice of discriminating against qualified individuals with a disability. Even assuming, solely for purposes of Phase I summary judgment, that the AIs are disabled, EEOC's pattern-or-practice claim fails because there is no group of qualified AIs in this case. The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Whether AIs were qualified to perform the essential functions of their jobs, with or without accommodation, is a two-part inquiry: (1) whether the claimant could perform the essential functions of the job; and (2) if he was unable to perform the essential functions of his job, whether

---

[8] For example, drivers who were terminated for punching another driver, falsifying records, or causing a major preventable accident cannot be said to be a victim of a maximum-leave or full-duty policy. *See* SOF ¶ 101.

any reasonable accommodation by the employer would have enabled him to perform those functions. *Gipson v. Bear Commc'ns, LLC*, 16-2123-JAR-JPO, 2016 WL 3743106, at *5 (D. Kan. July 13, 2016) (citing *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 887–88 (10th Cir. 2015)). A reasonable accommodation must allow an individual "to perform the essential functions of his job either presently or in the immediate future." *Billups v.*, 714 F. App'x at 935-6 (holding that a reasonable jury could not have concluded that employee was a qualified individual where employee was unable to perform the essential functions of his position at the date of his termination and was requesting leave that would allow him to work "at some indefinite point" in the future). In this case, EEOC's heavy reliance on AIs who, based on their own testimony, were unqualified, destroys EEOC's ability to establish a pattern or practice of discrimination. SOF ¶¶ 93-96.

   i.   *Ability to safely operate a commercial vehicle and maintain a DOT certification are essential functions of Western's driving positions.*

At the time of the relevant employment decisions, 56 of the 57 AIs held commercial driver positions. SOF ¶ 13. "[A]s a matter of law, if an essential function of a position is the ability to operate a commercial vehicle, then being DOT-certified is an automatic, binding, and utterly unavoidable requirement." *Hawkins*, 778 F.3d at 895–96 (granting summary judgment for employer who terminated employee who could not obtain DOT certification.); *Bay v. Cassens Transport Co.*, 212 F.3d 969, 974 (7th Cir. 2000) (holding that a commercial truck driver cannot be a "qualified individual" if he could not obtain a DOT certification.). A motor carrier does not violate the ADA by terminating truck drivers who are not DOT-certified at the time of termination, or who the employer reasonably determines, based on DOT guidance and the physical demands of the position at issue, cannot safely operate a commercial vehicle according to the employer's level of risk tolerance. *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 811 (5th Cir. 2016) ); *Tate*, 68 F.3d at 993-96 (holding that employers may rely on a reasonable interpretation of DOT's guidance

to establish physical requirements for drivers). Consequently, any of the AIs were unable to be DOT-certified at the time of their termination, they were, as a matter of law, unqualified for their commercial driving jobs.

According to FMCSA regulations, a person is qualified to drive a motor vehicle if he or she, among other things: can, by reason of experience, training, or both, safely operate the type of commercial motor vehicle he/she drives; is physically qualified to drive a commercial motor vehicle; is not disqualified to drive a commercial motor vehicle under the rules in §391.15. 49 C.F.R. § 391.11(b). In order to be "physically qualified," a driver must comply with the medical examination requirements in § 391.43. *Daily v. Martin Transp. Sys., Inc.*, 1:12-cv-115, 2013 WL 5442750, at *6 (W.D. Mich. Sept. 30, 2013) (quoting 49 C.F.R. § 391.41) Additionally, a motor carrier is not permitted to allow a person to drive a commercial motor vehicle unless the person "can, by reason of experience, training, or both, determine whether the cargo he/she transports . . . has been properly located, distributed, and secured in or on the commercial motor vehicle he/she drives." 49 C.F.R. § 391.13(b). Commercial motor vehicle driving is classified by the FMCSA as "medium work," which contemplates a lifting requirement of 50 pounds. SOF ¶ 61.

Employers may rely on DOT regulations when defining the essential functions of a position. *Zizzo v. Jewel Food Stores, Inc.*, 13 C 2408, 2014 WL 5858363, at *5 (N.D. Ill. Nov. 12, 2014) (citing *Kirkingburg*, 527 U.S. at 570–572). Further, employers can require additional or different physical examinations for their truck drivers. *Tate*, 268 F.3d at 995; *see also* 49 C.F.R. § 390.3(d); *Collins v. Raytheon Aircraft Co.*, 01-1415-JTM, 2003 WL 192553, at *4–5 (D. Kan. Jan. 16, 2003) (holding that applicant who failed employer's physical examination was not a qualified individual).

DOT regulations require all drivers to perform a pre-trip inspection and post-trip inspection of their vehicle to ensure that the vehicle is within the DOT's guidelines for safe operation. SOF ¶ 47; 49 C.F.R. § 396.13. In order to properly conduct the inspection, a driver must be able to stoop down to look underneath the vehicle. SOF ¶ 48. A driver must be able to open and close the hood of the truck to make sure no fluids are leaking or parts are loose, and to ensure that everything is secure and intact. SOF ¶ 49. From 2008 until approximately 2014, it required 98 pounds of force to open or close the hood of Western's trucks. SOF ¶ 50. Because of new hydraulic technology that became a standard feature on Western's trucks in 2014, the force requirement dropped to 54 pounds according to an evaluation by ErgoMed. *Id.* EEOC's experts determined that it required approximately 117 pounds of force to open the hood and 93 pounds to close it. SOF ¶ 51.

Drivers at Western must also be able to connect and disconnect the trailer from the tractor. SOF ¶ 55. In order to perform this task, the driver must be able to repeatedly turn a crank in a circular motion to adjust the landing gear and must be able to pull out the fifth wheel pin. *Id.* Western supplies its drivers with a fifth wheel hook to assist with this task, but it still can be a very physically demanding task, and can be more difficult depending on weather conditions. SOF ¶ 56. ErgoMed determined that it takes at least 58 pounds of pulling force to remove the fifth wheel pin. SOF ¶ 57. EEOC's own expert was not able to accomplish the task with less than 153 pounds of pulling force. *Id.*

The ability to safely navigate hazardous driving conditions is an essential function of any DOT-driving position. SOF ¶ 58. Because Western is based in Denver and primarily hauls time-sensitive refrigerated goods west of Denver, transporting goods through the mountains is the "main part of [Western's] business," and the ability to safely drive through the mountains in inclement weather is an essential function of Western's commercial driver jobs. SOF ¶ 59. In order to safely

traverse the mountains and other roads in inclement weather, Western requires its drivers to be able to chain up their tires. SOF ¶ 60.

ii. _Most AIs could not perform the essential functions of their positions._

The undisputed evidence shows that Western reasonably believed most AIs could not perform the essential functions of their positions based on their communications and representations to Western at the time of their termination with or without reasonable accommodations. *See, e.g.*, *EEOC v. Reliv Int'l, Inc.*, 4:07CV1051SNLJ, 2009 WL 537063, at *4 (E.D. Mo. Mar. 3, 2009) (granting summary judgment to employer where employer had reasonable belief that employee could not perform essential functions of his job based on employee's representations to employer); *EEOC v. Greystar Mgmt. Servs., L.P.*, ELH-11-2789, 2013 WL 6731885, at *23 (D. Md. Dec. 18, 2013) (holding that it was legitimate and lawful for employer to defer to doctor's notes even in light of employee's attempt to waive her medical restriction).

Specifically, 32 of 57 AIs admitted that they were unable to work at all at the time of their termination. SOF ¶ 93. 41 of 57 AIs were unable to do commercial driving at the time of their termination. SOF ¶ 94. Some AIs admitted that they would have been unable to drive or perform their job duties. SOF ¶ 95.

In addition to the AIs who were not qualified at the time of their termination, EEOC also relies on AIs who were not qualified to drive while they were actively working for Western. As part of the DOT physical, drivers are required to fill out a DOT Medical Examination Report Form which contains a certification that false or missing information may invalidate the examination and the driver's Medical Examiner's Certificate. 29 C.F.R. § 391.43(f). DOT regulations specifically identify certain medical conditions as disqualifying, including but not limited to the following: diabetes currently treated with insulin (unless the person has a waiver); epilepsy; current clinical diagnosis of cardiovascular diseases such as thrombosis; current clinical diagnosis of a

respiratory dysfunction likely to interfere with his/her ability to control and drive a commercial motor vehicle safely; current clinical diagnosis of high blood pressure likely to interfere with his/her ability to operate a commercial motor vehicle safely. 49 C.F.R. § 391.41(b). If a driver provides inaccurate, false, or misleading information on their DOT form, the medical examiner's certificate is invalid. 49 U.S.C. § 521(b)(2)(b); FMCSA FAQ *What happens if a driver is not truthful about his/her health history on the medical examination form*, *available at* https://www.fmcsa.dot.gov/faq/what-happens-if-driver-not-truthful-about-hisher-health-history-medical-examination (last accessed October 22, 2021). Further demonstrating the extreme overreach of EEOC's attempts to show discrimination, EEOC seeks relief on behalf of several AIs who violated federal law and were working at Western under invalid medical certificates because they failed to disclose disqualifying medical conditions on their DOT forms. SOF ¶ 96. The undisclosed medical conditions include seizures, COPD, high blood pressure, diabetes, and thrombosis. *Id*. Because these AIs provided false information on their DOT medical examination forms about conditions that might have disqualified them from driving and caused grave danger to the public, they were, as a matter of law, not qualified for their positions at Western.

EEOC's proof of discrimination through the alleged full-duty policy is insufficient because EEOC cannot present statistical evidence or anecdotal evidence demonstrating that Western's policy of not returning unqualified individuals to DOT positions was discriminatory.

b. *Accommodation was not possible, feasible, or reasonable.*

In addition to bearing the burden of proof that Western engaged in a pattern or practice of discrimination, EEOC must "additionally produce some evidence that a policy or practice of reasonable accommodation is possible, such as showing that its proposed accommodations are reasonable on their face." *JBS Colorado*, 115 F. Supp. 3d at 1227-28. The determination of whether an accommodation is reasonable "must be made on the facts of each case taking into

consideration the particular individual's disability and employment position." *Punt*, 862 F.3d at 1050 (citing *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1123-24 (10th Cir. 2004)). Significantly, "an employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." *Id.* at 1051.

    c.  *EEOC cannot prove its case by relying on AIs who did not request accommodations and/or failed to participate in the interactive process.*

        EEOC has failed to show substantial proof that Western had a policy or practice of denying requests for reasonable accommodations. Western cannot be found to have failed to provide reasonable accommodations to AIs who did not request the same. "[B]efore an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *See EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011). The request "must be sufficiently direct and specific, giving notice that she needs a special accommodation." *Id.* That is, an "employer must of course know of the employee's disability *and of the accommodation the employee wishes to receive* in order to have any responsibility for providing such an accommodation." *Punt*, 862 F.3d at 1048 (emphasis added); "[M]ere awareness of an employee's health issues does not translate into an awareness of that employee's need for additional accommodations under the ADA," especially where an employer has already granted all of the employee's requests for accommodations. *Lievre v. JRM Constr. Mgmt., LLC*, 17-CV-4439 (BCM), 2019 WL 4572777, at *21 (S.D.N.Y. Sept. 20, 2019); *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015) (holding that employer was not required to provide reasonable accommodation to employee who never requested any accommodation other than intermittent leave). Ultimately, it is the employee who is "saddled with the burden of proposing an accommodation and proving that it is reasonable." *Jakubowski v. Christ Hosp., Inc.*,

627 F.3d 195, 202 (6th Cir. 2010).

It is undisputed that many of the AIs in this case requested medical leave and Western granted those requests. SOF ¶ 30. Although Western granted the AIs the precise accommodation they requested, EEOC nonetheless asserts that Western did not engage in the interactive process because it did not provide the AIs a litany of hypothetical alternative and additional accommodations that were never actually requested. However, a request for FMLA leave is not the same as a request for a reasonable accommodation under the ADA because the laws "have divergent aims, operate in different ways, and offer disparate relief." *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 791 (5th Cir. 2017). "By requesting FMLA leave an employee is alerting her employer that she has 'a serious health condition that makes the employee **unable to perform the functions of the position** . . . .'" *Rutt v. City of Reading, Pa.*, 13-4559, 2014 WL 5390428, at *4 n.11 (E.D. Pa. Oct. 22, 2014) (emphasis added). In contrast, an employee requesting a reasonable accommodation is signaling that he or she **can perform the essential function of the job**. *Id.*; *see also Capps v. Mondelez Global*, *LLC*, 147 F. Supp. 3d 327, 340-41 (E.D. Pa. 2015), *aff'd*, 847 F.3d 144 (3d Cir. 2017). EEOC suggests that Western could not have satisfied the interactive process unless it second-guessed the AIs' representations that they were unable to perform the essential functions of the job and instead offered accommodations in the workplace. The ADA, however, does not impose liability for an employer's failure to explore alternative accommodations for an employee's disability when the accommodations already provided to the employee were plainly reasonable. *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 98 (2d Cir. 2015). Additionally, "failure to engage in the interactive process" is not a standalone claim under the ADA. *Echevarria v. AstraZeneca LP*, 133 F. Supp. 3d 372, 399 (D.P.R. 2015). An employer's failure to engage in the interactive process can only lead to liability where it would in fact have

been *possible* to provide reasonable accommodations. *Id.*; *McFarland v. City & Cnty. of Denver*, 15-cv-01258-KMT, 2017 WL 3872639, at *6-9 (D. Colo. Sept. 5, 2017) (holding that where a plaintiff ceases communicating about accommodations, the plaintiff is precluded from claiming an employer has failed to provide a reasonable accommodation).

In this case, EEOC has failed to present statistical or anecdotal evidence showing substantial proof of AIs requesting reasonable accommodations that were denied by Western. SOF ¶¶ 71-72, 74-75, 79-80, 99, 103, 107. Consequently, EEOC fails to satisfy another element of its prima facie pattern-or-practice claim: proof that reasonable accommodations would have been possible.

> d. *EEOC cannot rely on hypothetical and/or vague accommodation requests that were devised by EEOC during this lawsuit but never made to Western.*

In addition to failing to produce evidence of a pattern or practice of Western denying requests for reasonable accommodation, EEOC has also failed to show Western had a pattern or practice of denying the specific accommodations EEOC argues should have been provided. EEOC's case focuses on hypothetical accommodations devised by EEOC during litigation. However, in order to be reasonable, an accommodation "cannot be merely hypothetical." *Barnett v. U.S. Air, Inc.*, 157 F.3d 744, 749 (9th Cir. 1998); *Kilgore v. Tulare Cnty.*, CV F 10-0031 LJO BAM, 2012 WL 483085, at *10 (E.D. Cal. Feb. 14, 2012). A plaintiff has the burden of establishing the existence of a specific accommodation "at the time the employer allegedly denied it" and may not "rely on merely hypothetical suppositions and conjecture." *McMackins v. Elk Grove Unified Sch. Dist.*, 21 F. Supp. 2d 1201, 1205 (E.D. Cal. 1998). Courts routinely grant summary judgment in failure-to-accommodate cases where the possible accommodations proposed by a plaintiff were proposed "for the first time during litigation" and were never actually requested from the employer. *Aston v. Tapco Int'l Corp.*, 12-14467, 2014 WL 3385073, at *20,

*22 (E.D. Mich. July 10, 2014), *aff'd*, 631 F. App'x 292 (6th Cir. 2015); *see also Mbawe v. Ferris State Univ.*, 366 F. Supp. 3d 942, 958–59 (W.D. Mich. 2018), *aff'd*, 751 F. App'x 832 (6th Cir. 2018); *Jakubowski*, 627 F.3d at 203.

In this case, EEOC has conjured up a list of alleged accommodations that Western should have provided to the AIs. Notably, however, EEOC has failed to produce evidence showing that such accommodations were ever requested as an accommodation for a disability. SOF ¶ 71. A list of hypothetical accommodations does not constitute anecdotal or statistical proof of discrimination. Further, by creating a post-litigation list of hypothetical accommodations, EEOC is essentially suggesting that an employer should be held liable for merely failing to imagine and offer all the possible accommodations an employee might seek. This type of *post-hoc* liability for hypothetical accommodations is not in line with the spirit of the interactive process as defined in the ADA. The ADA is designed to prevent discrimination; it is not designed to impose liability merely for an employer's imaginative shortcomings.

Furthermore, EEOC has even argued that Western should have accommodated employees with various types of "assistive devices" that did not exist or were not widely available or accepted in the trucking industry. For example, EEOC asserts that Western should have provided AIs with an "automatic hood opener" that would allow a driver to open the hood of a truck by pushing a button. SOF ¶ 72. However, Western was not aware of the existence of such technology. *Id.* In fact, the type of hood-assist mechanism proposed by EEOC is not readily available or easily accessible (nor has it been during the relevant period of this case), and was never widely used throughout the United States by trucking companies. SOF ¶ 72-73. Because an automatic hood opener was not requested by any AIs, and was scarcely or not available at all during the relevant time period in this case, it is far too hypothetical to constitute a reasonable accommodation. SOF

¶ 72-73. Western's obligation under the ADA to provide reasonable accommodations is not triggered by hypothetical accommodations concocted by counsel during litigation.

e. *EEOC proposes numerous accommodations that are unreasonable as a matter of law.*

EEOC cannot meet its burden of proof to show that reasonable accommodation was possible by pointing to accommodations that were unreasonable as a matter of law. It is well-settled law that an employer is not required to relieve an employee of an essential job function, and a request to be relieved from an essential function is not, as a matter of law, a reasonable or even plausible accommodation. *EEOC v. Picture People, Inc.*, 684 F.3d 981, 987 (10th Cir. 2012). This is true even if the employee would be able to perform "most" but not all of the job—even a "relative[ly] infrequen[t]" inability to perform a job's essential functions is enough to render a plaintiff not a "qualified individual" under the ADA. *Billups*, 714 F. App'x at 936 (citing *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997).

Despite this legal reality, EEOC insists, in hindsight, that Western should have provided drivers with accommodations that would have eliminated essential functions of the job. For example, EEOC argues that Western should have provided alternative non-mountainous routes to drivers who did not want to, or were unable to, chain tires. However, most of Western's routes go west from Denver, and as a result, drivers are almost always going to encounter a mountain pass no matter which route they take. SOF ¶ 59. Because being able to drive in the mountains is an essential function of the driving jobs at Western, EEOC's suggestion is patently unreasonable.

Additionally, EEOC suggests that Western should have paid third-party workers or "lumpers" to assist drivers with snow chains or other lifting tasks. However, lumpers are not available in all circumstances or locations. SOF ¶ 75. Moreover, the "ADA does not require an employer to create a new position or even modify an essential function of an existing position in order to accommodate a disabled worker." *Bauer v. Muscular Dystrophy Ass'n, Inc.*, 427 F.3d

1326, 1333 (10th Cir. 2005). Because hiring lumpers would not assist the AIs in performing the essential functions of their own jobs, this accommodation is not reasonable as a matter of law. *Lievre*, 2019 WL 4572777, at *20 (holding that plaintiff's proposed hypothetical accommodation of assigning someone to assist plaintiff did not demonstrate existence of a reasonable accommodation) (citing *Molina v. City of Rochester*, 764 F. App'x 49, 51 (2d Cir. 2019)).

With respect to USAC drivers, who drive in teams, EEOC will likely argue that Western should have allowed one teammate to perform any physically demanding functions that a disabled teammate could not perform, such as loading and unloading extremely heavy cargo. SOF ¶ 64. This accommodation not only removes essential functions from the disabled teammate's job, but also is impractical and burdensome because in many situations, it would be physically impossible for one driver to perform all the physically demanding tasks. SOF ¶ 65. At a minimum, requiring one driver to perform all physically demanding tasks would subject that driver to additional risk of injury and substantially increase the time needed to complete such tasks. *Id.*

f. *EEOC proposes numerous accommodations that would not have been effective or reasonable because they created safety risks for drivers and the public.*

EEOC attempts to hold Western liable for failing to provide drivers with "accommodations" that would create unacceptable safety risks. For example, EEOC argues that AIs who had pushing and pulling restrictions should have been accommodated with an "automatic coupler" which could be used to hook and unhook trailers by pushing a button instead of pulling a fifth wheel pin. SOF ¶¶ 57, 76. However, using a truck with an automatic coupler on public roads, particularly highways, would pose a major safety risk because the trailer could become disconnected from the tractor and cause a serious accident. *Id.* at ¶ 77.

EEOC also asserts that Western should have allowed AIs with lifting restrictions to use AutoSocks instead of heavier tire chains. Actually, Western has always allowed its drivers to

utilize AutoSocks in appropriate circumstances and has purchased them for every driver who has requested them. SOF ¶¶ 79, 80. However, Western's informed opinion of AutoSocks is that they are not as safe as chains because they have less traction and wear out quickly, particularly when used on dry pavement. SOF ¶¶ 78, 81.  Therefore, Western allows its drivers to use AutoSocks in appropriate conditions, but also requires drivers to carry chains and be able to use those chains in case the AutoSocks are inadequate or damaged. SOF ¶ 79. Because of the safety issues that may arise with AutoSocks, allowing a driver to exclusively use AutoSocks would not be a reasonable accommodation. Moreover, AutoSocks would not enable drivers with lifting restrictions to perform other essential functions that would be affected by a lifting restriction such as opening the hood or pulling the fifth wheel pin. SOF ¶¶ 47-57, 62.

EEOC further asserts that Western should have installed automatic snow chain systems on AIs' trucks.  Although Western has recently installed automatic snow chains on a few trucks that drive in the mountains every day, automatic chains have proven to be expensive, unreliable, and heavy. SOF ¶¶ 82-83. Notably, the automatic chains are ineffective when there is a lot of snow on the road and the drivers still have to utilize regular tire chains. *Id.* Therefore, installation of automatic snow chains would not be an effective accommodation because it would not remove the need to manually chain. Additionally, automatic snow chains still would not have enabled drivers with lifting restrictions to perform other essential functions that would be affected by a lifting restriction such as opening the hood or pulling the fifth wheel pin. SOF ¶¶ 47-57, 62.

In sum, EEOC has failed to demonstrate that reasonable accommodations were possible as an alternative to Western's policy of ensuring that returning drivers' impairments do not affect their ability to safely operate a commercial vehicle. Western is required to ensure its drivers are DOT-qualified, so accommodation is not possible where the accommodation would conflict with

DOT requirements. Because the FMCSA standards do not permit limitations on a DOT license aside from corrective lenses, hearing aids, or certain waivers, it is not possible for Western to allow a driver to return to work in a DOT-regulated position with unlawful restrictions on the driver's ability to drive. *See supra* at 44-45. As such, EEOC cannot establish its failure to accommodate claim by asserting that Western should accommodate drivers who can only drive if they are provided with specialized equipment, helpers, or if they are restricted to driving in certain areas.

7.   <u>EEOC fails to establish the essential elements of its reassignment claim.</u>

To survive summary judgment on a reassignment claim, a plaintiff "must establish that he was qualified to perform an appropriate vacant job which he must specifically identify and show was available within the company at or about the time he requested reassignment." *Taylor v. Pepsi–Cola Co.*, 196 F.3d 1106, 1110 (10th Cir. 1999); *see also Duvall v. Ga.-Pac. Consumer Prod., L.P.*, 607 F.3d 1255, 1263 (10th Cir. 2010). Critically, an employee must show that he or she actually requested reassignment to a vacant position. *Duvall*, 607 F.3d at 1260 (citing *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1179 (10th Cir. 1999)); *Hines v. Chrysler Corp.*, 231 F. Supp. 2d 1027, 1040 (D. Colo. 2002). A plaintiff cannot prevail on a reassignment claim by merely identifying possible reassignments, for the first time, during litigation. *Mbawe*, 366 F. Supp. 3d at 958-59; *Aston*, 2014 WL 3385073, at *20, *22.

Even if an employee requests reassignment, there are still numerous limits on an employer's duty to reassign a disabled employee. For example, the ADA does not require an employer to promote a disabled employee, reassign a disabled employee to an occupied position, or create a new position to accommodate a disabled employee. *Midland Brake*, 180 F.3d at 1176-77. Western does not have a duty to assign to reassign a disabled employee to a position unless it is vacant or where the employer reasonably anticipates that the position will become vacant in "the

fairly immediate future." *Id.* at 1175. Importantly, reassignment is not required when the individual is not qualified for another available position. *See Taylor*, 196 F.3d at 1110.

EEOC cannot demonstrate that Western has a pattern or practice of denying requests for reassignments to disabled individuals. First, there is no evidence that Western had a policy or practice of prohibiting reassignments. In fact, Western's Reasonable Accommodation Policy explicitly encourages reassignments, and it is undisputed that Western provided reassignments to numerous employees who requested them, including AIs. SOF ¶¶ 21, 105. Second, although Kallenbach[9] requested reassignment to a dispatcher[10] position that was not vacant and a yard hostler position[11] which required DOT-certification that he did not possess, EEOC has not presented evidence showing a pattern or practice of Western denying employees' requests for reassignment. Additionally, EEOC has failed to present any evidence establishing that Western anticipated there would be a specific vacant position in the reasonably foreseeable future for any AI who was medically disqualified from driving and could not be reassigned at the time of termination. EEOC's failure to meet these essential elements of its reassignment claims are fatal to its assertion that Western had a pattern or practice of not reassigning disabled employees.

### D.  To the extent EEOC relies on other alleged policies or practices, such arguments are not worth consideration.

Over the five years of this case, EEOC's two theories of discriminatory pattern or practice have morphed into numerous additional theories, implicitly demonstrating that there is no overarching discriminatory policy or practice at issue. To the extent EEOC seeks to rely on claims

---

[9] Kallenbach requested and received reassignment to a Local Driver position to accommodate his health issues (SOF ¶ 84), so his case fails to support EEOC's theory that Western refused to reassign employees who made such requests.

[10] The dispatcher position also would have been considered a promotion (SOF ¶ 111), and as such Western would have no duty to reassign Kallenbach to such a position.

[11] The only available yard hostler position was a Yard Hostler/Local Driver position which required a DOT-certification because the driver would be driving outside the yard. SOF ¶ 88.

that it did not investigate, conciliate, plead, or produce evidence to support, such claims should be deemed waived. *See infra*, at 68-71.

For example, in the Final Pretrial Order, EEOC lists various theories of discrimination that were not investigated or pled, such as an allegation that Western "discriminatorily den[ies] the accommodation of light or modified duty to individuals not injured on the job." ECF No. 808 at 4. This allegation appeared for the first time in the Final Pretrial Order. It was not included in the Charges of Discrimination or EEOC's Complaint. SOF ¶ 112; ECF No. 1. EEOC has not produced any evidence to support such a claim or identified any individuals affected by such claim. In any case, Western has provided light duty to individuals not injured on the job. SOF ¶¶ 24, 105 (Backstrom, Jesse Davis, Hale).

Likewise, EEOC's allegation that Western "refus[ed] to rehire individuals based on prior medical restrictions" does not appear in any of the Charges of Discrimination. ECF 808 at 4; SOF ¶ 112. EEOC has not produced any evidence to support a claim that Western had such a policy or practice. In fact, Western has rehired (or attempted to rehire) numerous individuals, including Kallenbach and other AIs, who had prior medical restrictions. SOF ¶ 33, 90-91.

## III.   EEOC's Third Claim for Relief Fails as a Matter of Law

EEOC's Claim Three—alleging Western used discriminatory qualification standards under Sections 102(b)(3)(A) and 102(b)(6) of the ADA—fails as a matter of law because EEOC cannot establish its prima facie case or rebut Western's defenses. ECF No. 1 at 16-17. In the Final Pretrial Order, EEOC has recently identified the following qualification standards it is challenging[12]:

1. The alleged "inflexible leave policy";
2. The alleged "full-duty policy";

---

[12] "At trial, the EEOC will present evidence regarding the standards identified above and will not present evidence on any standard not identified above." ECF No. 808 at 6.

3. Policy requiring OTR, USAC, local drivers, and yard hostlers be able to lift 50 pounds;

4. Policy requiring OTR, USAC, local drivers, and yard hostlers be able to lift 50 pounds and carry 75 feet;

5. Policy requiring OTR, USAC, local drivers, and yard hostlers be able to lift 50 pounds from the ground to shoulders;

6. Policy requiring OTR, USAC, local drivers, and yard hostlers be able to static push and pull 130 pounds;

7. Policy requiring OTR, USAC, local drivers, and yard hostlers be able to static push and pull 130 pounds at 58 inches above the ground;

8. Policy requiring tow drivers be able to push 76 pounds;

9. Policy requiring tow drivers be able to push 76 pounds for 100 feet;

10. Policy requiring tow drivers be able to lift 60 pounds;

11. Policy requiring tow drivers be able to lift 60 pounds to 45 inches from the ground or to the waist;

12. Policy requiring tow drivers be able to lift 132 pounds; and

13. Policy requiring tow drivers be able to lift 132 pounds 40 inches above the ground and carry 30 feet.

ECF No. 808 at 4-6. Western is entitled to summary judgment because EEOC cannot meet its evidentiary burden to show—*individually, for each qualification standard*—which AIs were purportedly discriminated against by the application of these standards, meet the prima facie elements for each standard, and refute Western's defenses for each.

As a preliminary matter, Claim Three is not a pattern or practice claim. Although Claim Three will be decided during Phase I per the Bifurcation Order (ECF No. 166 at 18), the claim itself is not bifurcated by the two-phase structure like pattern-or-practice claims. EEOC has not requested nor has the Court ordered Claim Three to be bifurcated. Western has not uncovered any legal authority which permits or contemplates bifurcation of a claim like Claim Three into multiple phases. Therefore, the ***entirety*** of Claim Three must be decided during Phase I, which means EEOC must establish its prima facie case and overcome Western's defenses for Claim Three in Phase I. To survive summary judgment, EEOC must defend against all of Western's challenges to its failure to meet its prima facie case and refute Western's defenses—EEOC will not have further opportunity to present evidence for Claim Three after Phase I.

Moreover, EEOC pled Count Three as a class claim, which dictates the evidentiary burdens EEOC must meet to survive summary judgment. *See* Complaint, ECF No. 1 at 17, ¶102 (alleging that qualification standards "deprive[d] *a group of aggrieved individuals* of equal employment opportunities and otherwise adversely affect[ed] their status as employees because of their disabilities.") (emphasis added); *see also* ECF No. 150 at 3 (EEOC stating Claim Three relates to "class-wide issues rather than individual issues."). As it has pled, EEOC must establish a significant adverse impact on a group of AIs—not merely show that one AI was impacted by a qualification standard—which it is unable to do.

### A.   EEOC cannot meet the threshold requirement to show that qualified individuals with disabilities were subject to alleged discriminatory qualification standards.

A foundational requirement for EEOC to prevail on Claim Three is to establish that the AIs subjected to the alleged discriminatory qualification standards were qualified individuals with disabilities. *EEOC v. Murray*, 175 F. Supp. 2d 1053, 1058-59 (M.D. Tenn. 2001); *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188-89 (10th Cir. 2003). Indeed, Sections 102(b)(3)(A) and (b)(6)—the statutes upon which Claim Three is premised—prohibit discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(b)(3)(A) and (b)(6).

EEOC bears the burden to prove disability. *Lusk v. Ryder Integrated Logistics*, 258 F.3d 1237, 1239 (10th Cir. 2001). A plaintiff must, at the time of the adverse employment decision, establish a recognized impairment that substantially limits a major life activity as compared to the general population. 29 C.F.R. § 1630.2(g)(1), (j)(1)(ii); *Crowell v. Denver Health & Hosp. Auth.*, 572 F. App'x 650, 657 (10th Cir. 2014); *Lee v. Spectranetics Corp.*, 12-CV-00633-WYD-MEH, 2013 WL 5416972, at *2 (D. Colo. April 9, 2014); *Hollstein v. Caleel & Hayden, LLC*, 2012 WL 4050302, 11-cv-00605-CMA-BNB, at *7 (D. Colo. Sep. 14, 2012). In considering whether an impairment is substantially limiting, courts consider the impairment's nature and severity, duration

or expected duration, and permanent or long-term impact. *Hollstein*, 2012 WL 4050302, at *7 n. 8. Here, EEOC challenges numerous physical requirements that unnamed AIs purportedly could not meet. However, evidence that an AI has a physical restriction such as a lifting limitation, without more, is insufficient to establish a substantial limitation. *Lusk*, 238 F.3d at 1240. A lifting restriction of 25 pounds or higher is not substantially limiting on its face. *Id.* at 1240-41 (collecting cases). A plaintiff must present comparative evidence of the lifting ability of the general population from which a reasonable inference can be drawn that the aggrieved individual is substantially limited. *Id.* Simply because a person does not have the physical qualifications to perform a specific job does not mean the person is disabled. *Valdez v. Holder*, 2010 WL 11622644, 08-cv-00992-RB-DJS, at *5 (D.N.M. May 10, 2010).

For any individual whom EEOC asserts was subjected to a discriminatory qualification standard, it must show that the individual had a substantially-limiting impairment (as compared to the general population) at the time the standard was applied. For any group of individuals whom EEOC asserts were impacted by a qualification standard, EEOC must not only specifically identify which AIs belong to the purported group, but also must establish that ***all*** of those AIs were disabled at the time the standard was applied. EEOC is unable to show that individuals subjected to the challenged standards were substantially limited in major life activities. There is no evidence in the record comparing AIs' restrictions with the general population. Inability to pass the physical testing required for the positions sought by the AI does not automatically establish disability under the ADA. Therefore, EEOC is unable to meet this threshold showing and Claim Three fails.

EEOC also bears the burden to prove qualification for the position sought. *Hennagir v. Utah Dep't of Corrections*, 587 F.3d 1255, 1262 (10th Cir. 2009). Qualification is a two-step inquiry. *Davidson*, 337 F.3d at 1190. First, the court determines whether the individual can perform

the essential functions of the job. *Id.* Second, if the court concludes the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation would enable performance. *Id.* Employers are permitted to set job-related requirements—including the physical qualifications—for the position. *Midland Brake, Inc.*, 180 F.3d at 1161. The essential function inquiry is not intended to second guess the employer or require the employer to lower its standards. *Tate*, 268 F.3d at 993.

As discussed above, EEOC's heavy reliance on AIs who—based on their own testimony—were unqualified for the DOT-regulated positions they sought, destroys EEOC's ability to meet the threshold showing that individuals were qualified. SOF ¶¶ 93-96. EEOC cannot rely on AIs who were unable to work in any capacity—AIs who cannot work at all are not qualified because they cannot perform ***any*** essential functions. SOF ¶ 93. Similarly, EEOC cannot rely on AIs who was not able to perform DOT driving—the most important of all essential functions for a DOT-regulated driver. SOF ¶ 94. EEOC has neither identified which AIs were subjected to the qualification standards it challenges as discriminatory nor demonstrated that those AIs were qualified for the positions sought. EEOC cannot meet its statutorily-required showing that AIs purportedly subjected to a qualification standard were qualified for the positions sought.

### B.  EEOC cannot establish a prima facie case on its disparate impact claim.

A qualification standard claim made under Sections 102(b)(3)(A) and 102(b)(6) of the ADA is a disparate-impact claim.[13] *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003).

---

[13] EEOC previously affirmed that Claim Three is a disparate impact claim. ECF No. 632 at 42-43. In the Final Pretrial Order, EEOC asserted for the first time that Claim Three may be based on a disparate impact or disparate treatment theory, or both, but did not cite any legal authority for this proposition. ECF No. 808 at 4. Notably, EEOC did not clarify whether it was actually proceeding under a disparate treatment theory for Claim Three. *Id.* "Courts must be careful to distinguish between these theories" of disparate treatment and impact. *Raytheon*, 540 U.S. at 53.

Essentially, EEOC alleges that Western applied neutral standards that imposed a greater burden on disabled individuals than non-disabled individuals. The question at issue in a disparate impact claim is whether a neutral standard falls more harshly on a protected group as compared to another (*i.e.*, has the "effect" of discrimination) or screens out a disproportionate number of individuals in the protected class. *Raytheon*, 540 U.S. at 52, 54; *Teamsters*, 431 U.S. at 335 n. 15. EEOC must: 1) identify the challenged employment standard and pinpoint Western's use of it; and 2) show that the identified standard caused a significant disparate impact on disabled individuals.[14] *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659 (1989); *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1193 (10th Cir. 2006). The burden of proving that discrimination occurred against a protected group and was caused by a specific employment standard remains with the plaintiff at all times. *Watson*, 487 U.S. at 997. The requirements of a prima facie disparate impact case are "more exacting" than a disparate treatment case. *Garcia v. Spun Steaks*, 998 F.2d 1480, 1486 (9th Cir. 1993). Plaintiffs must do more than raise an inference of discrimination—they must actually prove the discriminatory impact at issue. *Id.*

EEOC has fundamentally failed to identify who, if anyone, within a group of qualified employees with disabilities, was subjected to a discriminatory qualification standard. EEOC seeks relief on behalf of 57 AIs in this case—and yet, there is no challenged qualification standard that applies to all 57 individuals. *See, e.g.*, SOF ¶¶ 93-101 (disparate circumstances of various groups of AIs). EEOC has never specifically identified which AIs were purportedly impacted by each or any of the 13 challenged qualification standards. Indeed, for most standards identified by EEOC, not a single AI was subjected to and adversely impacted by the standards now-identified by EEOC.

---

[14] In assessing a disparate impact claim, a Title VII and ADA inquiry is similar. *Anderson v. Duncan*, 20 F. Supp. 3d 42, 52 (D.D.C. 2013) (applying the disparate impact prima facie standard set forth in *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) to a disability claim).

EEOC has also failed to identify any comparative group of non-disabled individuals subjected to the standards in order to demonstrate a significant impact to a protected class. Therefore, EEOC cannot establish a prima facie case of disparate impact for Claim Three.

1. <u>EEOC has failed to adequately identify the challenged standards and pinpoint Western's use of such standards.</u>

EEOC's theories on what qualification standards it is challenging have been an ever-moving target in this case. EEOC's Complaint—which has never been amended—asserts only two challenged standards for Claim Three: what EEOC refers to as the "full duty" policy and "maximum leave" policy. ECF No. 1 at 16-17, ¶¶ 96-99. EEOC is bound by its pleadings in the Complaint, which does not include any of the physical test standards recently alleged in the Final Pretrial Order (items 3 – 13 listed above). *Bio Med Techs. Corp. v. Sorin CRM USA, Inc.*, 14-cv-0154-WJM-CBS, 2015 WL 4882572, at *9 (D. Colo. Aug. 17, 2015) (citing *Fuqua v. Lindsey Mgmt. Co.*, 321 F. App'x 732, 734 (10th Cir. 2009) and *Lawmaster v. Ward*, 125 F.3d 1341, 1346 (10th Cir. 1997)). EEOC's other recitations of different and varying challenges are long since abandoned and waived.[15] In the Final Pretrial Order, EEOC challenged the alleged maximum leave policy, the full duty policy, and attempts to add *eleven* physical test standards related to lifting, carrying, pushing, and pulling for a variety of positions. ECF No. 808 at 5-6. Notably, EEOC misrepresents that these standards were "previously identified in its discovery responses."

---

[15] In discovery, Western attempted to gain clarity on Claim Three by asking EEOC to identify all discriminatory standards, criteria, methods of administration, qualification standards, employment tests, and other selection criteria that EEOC alleges. SOF ¶ 115. In response, EEOC asserted 20 separate standards. *Id.* In the first proposed Final Pretrial Order submitted to the Court on June 22, 2021, EEOC identified the challenged standards as the maximum leave policy, the full duty policy, and six standards related to lifting, carrying, pushing, and pulling for various positions. ECF No. 797 at 4. The six physical standards were not disclosed during discovery as standards challenged in Claim Three. SOF ¶ 115. In the Final Pretrial Order adopted by the Court, EEOC again changed its target and asserted a different set of eleven physical test standards, as discussed in this Motion, which were also not disclosed during discovery. *Id.*

*Compare Id.* at 5 *with* SOF ¶ 115 (ECF No. 815-111, at 3-6) (no mention of the eleven physical test standards). This Court should limit EEOC to the two qualification standards in the Complaint.

> a. *EEOC has failed to meet its pre-suit administrative obligations regarding all standards other than the alleged full duty and maximum leave policies.*

In addition to failing to plead more than the purported full duty and maximum leave policies, EEOC has failed to fulfill its statutory duty to investigate and conciliate the eleven physical test standards it identifies for the first time in the Final Pretrial Order. Prior to filing an enforcement action, EEOC is required to conduct specific pre-litigation activities to provide a "full opportunity for resolution of the charges it intends to bring." *EEOC v. Original Honeybaked Ham Co. of Georgia, Inc.*, 918 F. Supp. 2d 1171, 1176 (D. Colo. 2013). As part of this investigative process, EEOC must tell the employer "**what practice** has harmed which person or class." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 488 (2015) (emphasis added). Here, EEOC neither identified the practices it now challenges nor identified the individuals harmed by each practice.

Once EEOC resorts to litigation, it can proceed "only with regard to unlawful conduct that was discovered and disclosed in the pre-litigation process." *Honeybaked Ham*, 918 F. Supp. 2d at 1179 (agreeing with *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657 (8th Cir. 2012)). EEOC is not permitted to "use discovery in the resulting lawsuit 'as a fishing expedition' to uncover more violations." *CRST*, 679 F.3d at 675. Courts have broad discretion to dismiss claims for which EEOC failed to satisfy its statutory pre-litigation obligations. *Id.* at 677. Where EEOC fails to exhaust administrative remedies prior to bringing an enforcement suit, the court lacks subject matter jurisdiction over the action. *EEOC v. Outback Steak House of Fla.*, 520 F. Supp. 2d 1250, 1262 (D. Colo. 2007); *EEOC v. Unit Drilling Co.*, 4 F. Supp. 3d 1257, 1262-63. (N.D. Okla. 2013).

The eleven physical test standards EEOC challenges in Claim Three were not included in its Amended Letters of Determination. SOF ¶ 113. They were not pled in the Complaint. ECF No.

1 at 16-17. They were not even disclosed in discovery in response to an interrogatory directly seeking identification of the standards challenged in Claim Three. SOF ¶ 115. Because EEOC failed to investigate, conciliate, plead, or disclose these standards, EEOC is barred from relying on them in this lawsuit. It would be highly prejudicial to Western to permit EEOC to challenge standards disclosed for the first time in the Final Pretrial Order. The Court should find as a matter of law that EEOC cannot proceed on Claim Three with the eleven physical test standards.

   b.   *The EEOC-described full duty policy does not exist, and EEOC cannot pinpoint Western's use of any such policy.*

As discussed in detail above, Western does not have a full duty policy requiring "no restrictions" or "100% healed" before an employee can return to work. *See supra* at 40-43; SOF ¶ 39-40. Testimony from various Western managers and employees was that "full duty" means full duty to perform the position sought—not without any restrictions whatsoever. SOF ¶ 39. Nowhere in Western's policy documents state that an employee must have "no restrictions," be "100% healed," or any other similar language to return to work. SOF ¶¶ 14-15, 19-22, 29, 36-40. To the contrary, Western's policy manuals expressly provide for employees to return to work with restrictions, and many Western employees, including AIs, have worked with restrictions in their positions or in reassignment positions. SOF ¶¶ 19-20, 24, 40, 105. EEOC cannot cite a single example of any qualified AI with a disability who was actually subjected to the full duty policy as it is described by EEOC.

   c.   *A leave policy is not a qualification standard, test, or selection criteria.*

ADA regulations define a qualification standard as "the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q). Cases on qualification standards frequently deal with physical demands testing,

physical job requirements, and other means of determining whether applicants are qualified. *Atkins v. Salazar*, 677 F.3d 667, 682 (5th Cir. 2011) (NPS Standard for park rangers); *Tate*, 268 F.3d at 993-96 (DOT Medical Advisory Criteria); *Wilkerson*, 606 F.3d at 1263-66 (occupational safety guidelines). A policy that merely describes the amount of leave a company provides as an employee benefit is not a qualification standard, employment test, or selection criteria as defined by the ADA. A leave policy does not set requirements for screening applicants, determine whether an applicant is qualified, or even determine the circumstances under which an employee can return to work. Instead, it describes the benefits provided by the employer to employees who have already been hired and screened by the employer, and the amount of time an employee who cannot work at all can remain employed. SOF ¶ 25. In any case, because indefinite or extensive medical leave is not a reasonable accommodation, EEOC's maximum leave claim fails. *See supra* at 36-37.

2. <u>EEOC has failed to demonstrate that any challenged qualification standard caused a significant disparate impact on qualified employees with disabilities.</u>

EEOC cannot establish that any of its identified standards making up Claim Three caused a significant disparate impact on qualified employees with disabilities. Once the challenged standard has been identified, the plaintiff must offer evidence of a kind and degree to show that the standard caused members of a protected class to be excluded from an employment opportunity. *Watso*n, 487 U.S. at 994; *Carpenter*, 456 F.3d at 1193. EEOC must show that there is a legally significant disparity between (a) the composition, caused by the challenged employment practice, of the pool of those enjoying a job or job benefit; and (b) the composition of the qualified applicant pool, *i.e.*, the pool from which potential qualified individuals might come. *Carpenter*, 456 F.3d at 1193. The court then compares the composition of the group of those who are subject to the challenged employment practice with the composition of the group of those enjoying the benefit for which the practice selects to determine whether those in the protected class (here, qualified

individuals with disabilities) are significantly impacted. *Id.* "In assessing whether a plaintiff has established a prima facie case, it is, of course, irrelevant what happens to those who do not qualify for consideration." *Id.*

The plaintiff is required to pinpoint the specific employment practice that caused a disadvantage to all class members, not merely assert that a collection of decisions produced an overall effect. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 357 (2011). Accordingly, EEOC cannot simply aggregate all AIs it claims were subjected to any one of the challenged standards to show an overall significant disparate impact at the bottom line. *Wards Cove*, 490 U.S. at 656-57. Rather, EEOC must show a significant disparate impact was caused by each of the unique standards it challenges. *Id.* at 657 (plaintiffs must show the "application of ***a specific or particular*** employment practice that has created the disparate impact."); *Watson*, 487 U.S. at 994 ("[P]laintiff must begin by identifying ***the specific employment practice***."); *Pathways Psychosocial v. Town of Leonardtown, MD*, 133 F. Supp. 2d 772, 788 (D. Maryland 2001) ("it is the disparity between ***a single policy's*** different effects on different groups which forms the basis of the action). Specific identification of the challenged standard is important to establish causation. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1223 (10th Cir. 2013). Here, EEOC cannot show that all—or even most—of the AIs were impacted by any particular employment practice, let alone establish a significant disparate impact on qualified disabled individuals for each of the challenged standards.

Plaintiff's proof must be specific to establishing the ***disproportionate*** impact of the challenged standard—is it not sufficient to simply asset that a standard had an impact or would hypothetically have an impact. *Carpenter v. Bd. Of Regents of Univ. of Wisconsin Sys.*, 728 F.2d 911, 914 (7th Cir. 1984). As noted in *Garcia*:

> The plaintiff may not merely assert that the policy has harmed members of the group to which he or she belongs. Instead, the plaintiff must prove the existence of

> adverse effects of the policy, must prove that the impact of the policy is on terms, conditions, or privileges of employment of the protected class, must prove that the adverse effects are significant, and must prove that the employee population in general is not affected by the policy to the same degree.

998 F.2d at 1486. Statistical evidence is the acceptable and most-common means of proving disparate impact. *Tabor*, 703 F.3d at 1222; *Carpenter*, 456 F.3d at 1196; *see also Fair Housing Opportunities of Nw. Ohio v. Am. Family Mut. Ins. Co.*, 684 F. Supp. 2d 964, 969 (N.D. Ohio 2010) ("The Court is aware of no case sustaining a disparate impact claim solely on the basis of anecdotal evidence of a claimed adverse effect."). Statistics must concern the proper population and should be based on persons qualified for the job who were subject to the challenged standard. *Carpenter*, 456 F.3d at 1196. The evidence must show a statistically-significant disparity between the compared groups measuring the likelihood that the disparity is random, which is expressed in terms of standard deviations. *Tabor*, 703 F.3d at 1223 (two to three standard deviations in a sufficiently-large sample size typically demonstrates a statistically-significant disparity). Generally, when a plaintiff does not have the statistical evidence necessary to show causation, a disparate impact claim cannot survive summary judgment. *Menoken v. Weichert*, 16-0083 (ABJ), 2019 WL 4418757, at *5 (D.D.C. Sept. 16, 2019). Here, EEOC has not submitted any statistical evidence demonstrating that a challenged qualification standard caused a disparate impact on qualified, disabled employees, and instead relies exclusively on anecdotal evidence. SOF ¶ 92. Notably, "[d]iscriminatory impact cannot be established [by] just one isolated decision." *Coe*, 646 F.2d at 449 n. 1; *see also Carter v. Mineta*, 125 Fed. Appx. 231, 237-38 (10th Cir. 2005) (two anecdotes cannot establish disparate impact).

EEOC cannot establish a significantly adverse impact on qualified individuals with disabilities caused by the identified standards, either statistically or anecdotally. Nor can it

establish a significantly adverse impact either individually or collectively.[16] EEOC has not identified the qualified individuals with disabilities who were adversely impacted by an alleged full duty policy, an alleged maximum leave policy, or any of the eleven physical test standards. EEOC has failed to identify a group of non-disabled individuals who enjoy an employment benefit with which to compare the group of impacted disabled individuals. There is no evidence in the record that compares any two groups of disabled and non-disabled individuals uniformly subjected to a challenged standard in order to demonstrate a significant disparate impact on the protected group. Without evidence demonstrating the content of the group of impacted disabled individuals, the group of non-disabled individuals enjoying an employment benefit, and any comparison of the two groups to show a legally significant disparity between them, it is impossible for EEOC to meet its prima facie case on Claim Three. Mere impact on a few individuals (without a showing of significant disparate impact on a protected class), speculation, and hypothetical scenarios are insufficient. EEOC has failed to show any discriminatory impact.

### C. EEOC cannot establish a prima facie case for Claim Three under a disparate treatment theory of intentional discrimination.

As discussed above, EEOC's Complaint alleges that its Claim Three was asserted on behalf of a group of AIs, and EEOC has not amended its Complaint to allege discrimination for any specific individual. ECF No. 1 at 17, ¶102. Even if the Court permits EEOC to pursue individual claims for Claim Three under a theory of disparate treatment intentional discrimination, EEOC must establish all of the elements of the claim, including identification of the individual,

---

[16] Western disputes that EEOC is permitted to challenge numerous qualification standards "individually and collectively" as asserted in the Final Pretrial Order. ECF No. 808 at 6. EEOC has cited no legal authority demonstrating an ability or mechanism to pursue a "collective" challenge of qualification standards, which contradicts the legal requirement to specifically identify the standard causing the alleged discrimination. EEOC's attempt to prosecute this case via a "death by a thousand cuts" method by aggregating all of its divergent theories is not viable.

identification of which standard(s) EEOC alleges the individual was subjected to, proof that the individual was disabled and qualified for the position sought, and proof that the adverse decision was made because of disability, *i.e.*, with intent. There is no evidence in the record that Western established or applied any challenged qualification standard with the express intent to discriminate against disabled individuals. Because Claim Three must be decided entirely in Phase I, EEOC must establish all elements of a disparate treatment claim for an individual in order to survive summary judgment on such theory, which is it unable to do.

Further, any individual relied upon by EEOC in pursuit of Claim Three must be an AI identified at the outset of this case in order for the Court to make any assessment of whether Claim Three has been established and any relief can be granted. EEOC is only permitted to seek relief on behalf of identified AIs. 42 U.S.C. § 2000e–5(f). Because Claim Three is not a pattern-or-practice claim, there is no presumption of discrimination that carries over into Phase II based on a "finding" of qualification standard discrimination against a non-AI. Nor does any aspect of Claim Three continue into Phase II for an assessment of damages. If EEOC's proof of a discriminatory qualification standard rests solely on adverse impact to a non-AI, it is entirely immaterial to Claim Three because a non-AI cannot receive relief nor proceed into Phase II via Claim Three.

### D. Even if EEOC could establish a prima facie case on Claim Three, it cannot overcome Western's defense that the challenged standards are job-related and consistent with business necessity.

Even if EEOC could satisfy its prima facie case for Claim Three, Western can nonetheless prevail by showing that the standards were job-related, consistent with business necessity, and performance cannot be accomplished by reasonable accommodation. 42 U.S.C. § 12112(b)(6); 29 C.F.R. § 1630.15(b)(1); *Wilkerson*, 606 F.3d at 1263.

DOT/FMCSA regulations prohibit Western from permitting a person to drive a commercial motor vehicle unless that person is qualified to do so. 49 CFR § 391.11(a). Western can only return medically-impaired drivers to their driving positions if the impairments do not affect their ability to safely operate a commercial vehicle. SOF ¶ 39. As discussed above, the "full duty" policy described by EEOC does not exist, and many employees were permitted to work with restrictions. SOF ¶¶ 40, 105. Western's policy to only return individuals to DOT-regulated positions if they do not have restrictions that prevent them from being DOT certified or from safely operating a commercial vehicle is entirely job-related and consistent with Western's business necessity to legally and safely transport goods on public roads. SOF ¶ 39. Because Western is legally required to only permitted DOT-qualified drivers to perform DOT-regulated positions, this standard cannot be satisfied with any accommodation which would interfere with DOT requirements. Therefore, Western's policy that persons hired to drive commercial vehicles be able to perform the DOT-regulated position (the "qualification standard" challenged by EEOC) is job-related, consistent with business necessity, and unable to be performed with a reasonable accommodation.

As discussed above, a leave policy is not a qualifications standard under Sections 102(b)(3)(A) and 102(b)(6) of the ADA. Nonetheless, if the Court permits EEOC to challenge Western's leave policy as part of Claim Three, Western's leave policy is job-related, consistent with business necessity, and cannot be "performed"[17] with an accommodation. The maximum leave policy described by EEOC does not exist, and many employees were granted more than 12 weeks of leave. SOF ¶¶ 25, 28-29, 104. Western has a policy that comports with the FMLA to provide 12 weeks of leave. SOF ¶ 25. After 12 weeks of FMLA leave, Western's policy and

---

[17] Further demonstrating that a leave policy is not a qualification standard, it is unclear how an employee can "perform" the position given that the employee is taking leave and therefore conceding that they *cannot* perform the job.

practice is to conduct a case-by-case assessment of the individual's ability to return to work—in their original position, in a modified or light duty position, or in a reassignment position if any are available—or whether a reasonable extension of leave can be definitely determined and granted. SOF ¶ 28. Western's leave policy is structured in this way due to the complex logistical and time-sensitive nature of Western's transportation business needs. SOF ¶ 9-10. Western needs to know when its drivers will be returning from leave in order to carry out the complex logistical planning of time-sensitive freight delivery. *Id.* Further, there is a significant cost to Western to keep trucks out of commission when a driver takes lengthy or open-ended leave. SOF ¶ 11. By definition, an accommodation to permit performance cannot be provided for a leave policy because leave is the opposite of job performance. Therefore, Western's leave policy is job-related, consistent with business necessity, and performance cannot be accomplished with reasonable accommodation.

If the Court permits EEOC to proceed with the previously-unidentified eleven physical test standards which were not administratively exhausted and not disclosed in discovery, such standards are job-related, consistent with business necessity, and not able to be performed with reasonable accommodation. After receiving an offer of employment, drivers are required to complete a DOT commercial driver physical and an ErgoMed physical demands evaluation to ensure they can perform the physical demands of the driving position for which they have been hired. SOF ¶ 42. ErgoMed determined the physical demands of Western's jobs by gathering information about the job functions from Western and measuring the job functions' physical demands. SOF ¶ 43. ErgoMed tests whether drivers are physically capable of performing certain functions required by DOT so that Western is compliant with DOT guidelines in deciding whether to hire or rehire someone. SOF ¶ 44. Therefore, the physical tests are job-related and consistent with Western's business needs to ensuring its drivers—who are subject to DOT regulations—are

capable of safely performing DOT-regulated positions. No reasonable accommodation would permit performance of the challenged standards. Western is legally required to ensure drivers meet DOT regulations, which prohibit Western from allowing an unqualified driver to operate a commercial vehicle. 49 CFR § 391.11(a). To overcome this defense, EEOC must demonstrate that the group of AIs who were adversely impacted by the physical test standards were capable of safe commercial driving per DOT laws and regulations, which it is unable to do.

IV.  **Western is entitled to summary judgment on punitive and compensatory damages based on its good faith efforts to accommodate AIs.**

EEOC's claim for punitive damages should be dismissed because EEOC cannot dispute Western's good faith efforts to comply with the ADA.  Under the ADA, "an employer is not subject to punitive or compensatory damages if it 'demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the business."  42 U.S.C. § 1981(a)(3). As described above, Western had policies prohibiting discrimination on the basis of disability and provided reasonable accommodations, including medical leave, light duty, modified work schedules, CPAP machines, and reassignments to disabled employees, including many of the AIs. SOF ¶¶ 14-15, 18-24, 40, 104-105. EEOC has failed to establish that Western had a pattern or practice of denying reasonable accommodations to employees who actually requested them. Therefore, punitive and compensatory damages cannot be awarded in this case.

## CONCLUSION

In conclusion, summary judgment should be granted for the following reasons:

- EEOC cannot demonstrate that the inflexible maximum-leave or full-duty policies existed.

- Maximum-leave policies are not inherently discriminatory, so EEOC's theory fails.

- Western's policy of requiring employees returning from medical leave to demonstrate that they can safely operate a commercial vehicle is not an unlawful 100% healed policy.

- EEOC has failed to show that Western has a pattern or practice of discriminating against disabled individuals through its leave policy or its DOT-related policies. Without statistical evidence, EEOC must provide substantial anecdotal evidence of a pattern or practice, particularly over a period spanning more than a decade. EEOC has not met this burden.

- Western has non-discriminatory reasons for its leave policies and DOT policies.

- Accommodation is not possible for individuals who require indefinite leave. Likewise, because Western has to follow DOT requirements, EEOC cannot show that a policy of reasonable accommodation was possible or that EEOC's proposed accommodations are reasonable.

- EEOC's punitive damages claim fails because EEOC cannot dispute Western's good-faith efforts to comply with the ADA.

- EEOC cannot demonstrate that any of the qualification standards at issue in Claim Three cause a significant disparate impact on qualified disabled individuals.

- EEOC failed to administratively exhaust and plead most of the standards in Claim Three.

- EEOC has failed to identify which AIs who are qualified and disabled were subject to the alleged full duty and maximum leave policy.

- EEOC has failed to identify any group of qualified individuals with disabilities and any group of non-disabled employees with which to compare the groups to show a significant disparate impact.

- Western's standards are job-related and consistent with business necessity.

For the reasons described above, Western respectfully requests that the Court grant summary judgment in Western's favor, denying any presumption of discrimination, and hold that Western did not have a pattern or practice of discrimination against disabled individuals.

Respectfully submitted this 25th day of October, 2021.

**FOX ROTHSCHILD LLP**
s/ Heidi Wilbur
Steven W. Moore
*Heidi Wilbur*
Renee Sheyko
1225 17th Street, Suite 2200
Denver, CO  80202
Telephone:  (303) 292.1200
Facsimile:   (303) 292.1300
SWMoore@FoxRothschild.com
HWilbur@FoxRothschild.com
RSheyko@FoxRothschild.com

Nicole H. Howell
4050 Pennsylvania Avenue, Suite 2000
Kansas City, MO  64111
Telephone:   (303) 292.1200
Facsimile:    (303) 292.1300
NHowell@FoxRothschild.com

**SEAN VISCIANO CANGES, P.C.**
James S. Bailey
1700 Lincoln Street, Suite 4500
Denver, CO 80203
Telephone:  (303) 298-1122
Facsimile:   (303) 296-9101
jsbailey@sennlaw.com
Attorneys for Defendant
WESTERN DISTRIBUTING COMPANY
d/b/a WESTERN DISTRIBUTING
TRANSPORTATION CORP.

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October, 2021, a true and correct copy of the foregoing **DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT**  was electronically served on the following individuals**:**

Karl R. Tetzlaff
Karl.Tetzlaff@eeoc.gov

Rita Byrnes Kittle
Rita.Kittle@eeoc.gov

Lauren A. Duke
Lauren.Duke@eeoc.gov

Michael J. LaGarde
Michael.LaGarde@eeoc.gov

Jeff A. Lee
Jeff.lee@eeoc.gov

Benjamin J. Price
Benjamin.Price@eeoc.gov

Attorneys for Plaintiff,
Equal Employment Opportunity Commission

s/ Heidi Wilbur
*Heidi Wilbur*