IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01727-WJM-STV

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

v.

WESTERN DISTRIBUTING COMPANY, d/b/a Western Distributing Transportation Co., a Colorado corporation,

Defendant.

---

## EEOC's AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT

---

U.S. Equal Employment Opportunity Commission
Denver Field Office
950 17th Street, Suite #300
Denver, Colorado 80202

Rita Byrnes Kittle, Supervisory Trial Attorney
Karl Tetzlaff, Trial Attorney
Benjamin Price, Trial Attorney
Lauren Duke, Trial Attorney
Michael LaGarde, Trial Attorney

# TABLE OF CONTENTS

I.      Introduction ...................................................................................................1

II.     Plaintiff's statement of material facts (PSF) ...........................................2

    A.   Background facts ........................................................................................2

    B.   Western's full-duty policy ..........................................................................3

    C.   Western's inflexible maximum-leave policy ...............................................6

    D.   Western's use of physical tests to screen drivers ...................................13

    E.   No undue hardship for Western to provide four different
       accommodations .....................................................................................28

III.    The EEOC is entitled to summary judgment on its claim that Western
       engaged in a pattern or practice of disability discrimination. .........34

    A.   Legal standards for proving a prima facie case of discriminatory
       pattern or practice ...................................................................................35

    B.   Western's full duty policy constituted a standard operating
       procedure of unlawful discrimination against Western employees.......36

    C.   Western's inflexible maximum leave policy constituted a standard
       operating procedure of unlawful discrimination.....................................40

IV.     Western used discriminatory qualification standards prohibited under
       Sections 102(b)(3) and 102(b)(6) of the ADA. .......................................51

    A.   Legal Standards ......................................................................................52

    B.   Western used five qualification standards that deny employment
       opportunities because of disability, in violation of the ADA.................58

V.      Western cannot establish that the accommodations of AutoSocks, automatic
       decouplers, automatic hood openers, and additional leave would cause it
       undue hardship. ......................................................................................67

    A.   Western cannot establish that providing AutoSocks would cause an
       undue hardship. .....................................................................................68

    B.   Western cannot establish that providing automatic decouplers
       would cause an undue hardship. ............................................................71

    C.   Western cannot establish that providing hood openers
       would cause an undue hardship. ............................................................73

    D.   Western cannot establish that making an exception to its
       maximum-leave policy to allow extended medical leave for drivers
       would cause an undue hardship. ............................................................73

VI.     Conclusion ..............................................................................................75

# TABLE OF AUTHORITIES

**Cases**

*Adair v. City of Muskogee*, 823 F.3d 1297 (10th Cir. 2016) ......................................... 53

*Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136 (10th Cir. 2008) ...................... 57

*Albemarle Paper Co. v. Moody*, 422 US 405 (1975) .............................................. 56, 57

*Apsley v. Boeing Co.*, 691 F.3d 1184 (10th Cir. 2012) ...................................... 35, 39, 42

*Atkins v. Salazar*, 677 F.3d 667 (5th Cir. 2011) ....................................... 56, 59

*Aubrey v. Koppes*, 975 F.3d 995 (10th Cir. 2020) ...................................... 44, 45, 48, 49

*Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906 (10th Cir. 2004) .................................... 45

*Barton v. Checkers Drive-In Restaurants, Inc.*, 2011 WL 1193061 (E.D. La. 2011) .................. 40

*Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007) ................................... 52

*Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946 (8th Cir. 1999) ...................................... 57, 59, 62

*Best v. Shell Oil Co.*, 107 F.3d 544, 545-49 (7th Cir. 1997) ......................................... 45

*Boudreau v. Bethesda Found. of Nebraska*, 2016 WL 322706 (D. Colo. Jan. 27, 2016) ............. 47

*Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281 (7th Cir.1996) ........................... 47

*Campbell v. Wal-Mart Stores, Inc.*, 272 F. Supp. 2d 1276 (N.D. Okla. 2003) ...................... 47, 48

*Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002) .............................................. 56

*Coe v. Yellow Freight Sys. Inc.*, 646 F.2d 444 (10th Cir. 1981) ................................... 35

*Cooper v. Fed. Res. Bank of Richmond*, 467 U.S. 867 (1984) ...................................... 35

*Cripe v. City of San Jose*, 261 F.3d 877 (9th Cir. 2001) .................................... 57, 59, 66

*Davoll v. Webb*, 194 F.3d 1116 (10th Cir. 1999) ........................................ 36, 46, 68

*Dillard v. City of Austin, Texas*, 837 F.3d 557 (5th Cir. 2016) ..................................... 47

*EEOC v. CTI, Inc.*, 2015 WL 11120707 (D. Ariz. May 8, 2015) ................................. 53

*EEOC v. Dolgencorp, LLC*, 196 F. Supp. 3d 783 (E.D. Tenn. 2016) ............................................ 46

*EEOC v. Midwest Reg'l Med. Ctr., LLC*, 2014 WL 3881418 (W.D. Okla. Aug. 7, 2014) ........... 54

*EEOC v. W. Distrib. Co.*, 322 F. Supp. 3d 1100 (D. Colo. 2018) ................................................ 35

*EEOC v. Yellow Freight Systems, Inc.*, 2002 WL 31011859 (S.D.N.Y. Sept. 9, 2002) ............... 39

*Ernst v. City of Chicago*, 837 F.3d 788 (7th Cir. 2016) ............................................................... 57

*Gallegos v. Swift & Co.*, 237 F.R.D. 633 (D. Colo. 2006) ........................................................... 47

*Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir. 2000) .................................... 46

*Gardenhire v. Manville*, 722 F. App'x. 835 (10th Cir. 2018) ................................................. 40, 43

*Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 834 (5th Cir. 1999)................................ 53, 65

*Harris v. Union Pacific Railroad Co.*, 953 F.3d 1030 (8th Cir. 2020).......................................... 57

*Hatter v. WMATA*, 244 F. Supp. 3d 132 (D.D.C. 2017) ......................................................... 55, 60

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993) ...................................................................... 53

*Heise v. Genuine Parts Co.*, 900 F. Supp. 1137 (D. Minn. 1995)................................................ 40

*Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685 (7th Cir. 1998) ......................................... 40, 46

*Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128 (9th Cir. 2001) .................................... 45, 47, 48

*Hutchinson v. United Parcel Serv., Inc.*, 883 F. Supp. 379 (N.D. Iowa 1995)........................ 40, 43

*Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324 (1977)................................................ 35, 36, 39, 42

*Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir. 1989)................................................... 45

*Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018) ......................................................... 46

*Lusk v. Ryder*, 238 F.3d 1237 (10th Cir. 2001) .............................................................. 54, 60, 65

*Maxwell v. Cty. of Cook*, 2014 WL 3859981 (N.D. Ill. Aug. 4, 2014)................................... 54, 65

*McGregor v. Nat'l R.R. Passenger. Corp.,* 187 F.3d 1113 (9th Cir. 1999) ...................... 39, 40, 43

*Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243 (9th Cir. 1999) ............................................ 44, 45

*Purewal v. T-Mobile USA, Inc.*, 2019 WL 4805994 (D. Kan. Oct. 1, 2019)................................. 45

*Ralph v. Lucent Technologies, Inc.*, 135 F.3d 166 (1st Cir.1998))........................................... 46, 47

*Rascon v. US W. Commc'ns, Inc.*, 143 F.3d 1324 (10th Cir. 1998)......................................... 45, 68

*Russello v. United States*, 464 U.S. 16 (1983) ............................................................................. 55

*Smith v. C.K.L.C., LLC*, 2016 WL 11594236 (W.D. Okla. May 25, 2016)............................ 54, 65

*Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154 (10th Cir. 1999) .......... passim

*Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095 (10th Cir. 2001)........................... 35, 36, 39, 42

*Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125 (10th Cir. 2009)................................................. 36

*United States v. City & Cty. of Denver*, 943 F. Supp. 1304 (D. Colo. 1996) ........................ passim

*United States v. Pioneer Nat. Res. Co.*, 309 F. Supp. 3d 923 (D. Colo. 2018) ............................. 36

*United States v. S. Dakota Dep't of Soc. Servs.*, 344 F. Supp. 3d 1055 (D.S.D. 2018)................. 36

*Valdez v. McGill*, 462 Fed. App'x. 814 (10th Cir. 2012)......................................................... 44, 48

*Villalobos v. TWC Admin. LLC*, 720 Fed. App'x. 839 (9th Cir. 2017) ........................................ 56

*Warmsley v. New York City Transit Auth.*, 308 F. Supp. 2d 114 (E.D.N.Y. 2004) ....................... 39

*White v. Telcom Credit Union*, 874 F. Supp. 2d 690 (E.D. Mich. 2012).................... 10, 41, 54, 65

*Williams v. Prison Health Servs., Inc.*, 159 F. Supp. 2d 1301 (D. Kan. 2001) ................ 44, 49, 53

*Woodman v. Runyon*, 132 F.3d 1330 (10th Cir. 1997) ................................................................. 44

**Statutes**

29 C.F.R. § 1607.14(C) ................................................................................................................. 57

29 C.F.R. § 1607.3 ........................................................................................................................ 57

29 C.F.R. Pt. 1630 ........................................................................................................................ 45

29 C.F.R. § 1630.10(a)................................................................................................................... 52

29 C.F.R. Pt. 1630, App. § 1630.10(a)......................................................................................... 52

29 C.F.R. § 1630.15(b) ............................................................................................... 52

29 C.F.R. § 1630.2(j)(3) ......................................................................................... 23, 54

29 C.F.R. § 1630.2(o)(3) ..................................................................................... passim

29 C.F.R. § 1630.7 ............................................................................................... 52, 56

42 U.S.C. § 12102(2)(A) ............................................................................................ 65

42 U.S.C. § 12111 ............................................................................................... 45, 46

42 U.S.C. § 12111(8) .................................................................................................. 55

42 U.S.C. § 12112(5)(A) ............................................................................................ 68

42 U.S.C. § 12112(b)(2) ............................................................................................. 55

42 U.S.C. § 12112(b)(3) ....................................................................................... passim

42 U.S.C. § 12112(b)(4) ............................................................................................. 55

42 U.S.C. § 12112(b)(5) ....................................................................................... 44, 55

42 U.S.C. § 12112(b)(6) ....................................................................................... passim

42 U.S.C. § 12113(a) .................................................................................................. 56

C.C.R. 601-14(5.02) .................................................................................................... 29

C.R.S. § 42-4-106 ................................................................................................ 28, 29

## I.   INTRODUCTION

Since at least January 2008, Defendant Western Distributing has maintained two interrelated policies that violate the Americans with Disabilities Act (ADA) by systematically denying reasonable accommodations for individuals with disabilities. Western's full-duty policy forecloses employment for people with medical restrictions and operates as a per se violation of the ADA. Western's maximum-leave policy requires discharge of employees unable to return to full duty work within 12 weeks, with "no exceptions." Both policies violate the ADA because they replace the individualized assessment required by the ADA with arbitrary decision-making. The existence of both policies is beyond dispute based on Western's own policy manuals, testimony, and emails from its managers, and third-party evidence from Western's own workers' compensation doctors and insurance carrier. Accordingly, the EEOC seeks summary judgment as to its claims alleging a pattern or practice of disability discrimination based on the two policies.

The EEOC also seeks summary judgment as to five discriminatory qualification standards: the full-duty and inflexible maximum-leave policies, and physical tests that require drivers to lift, carry, push, and pull specified weights for specified distances – actions unrelated to the driver's job duties. The tests were implemented to reduce workers' compensation costs by foreclosing employment opportunities to individuals with prior injuries or physical restrictions.

And the EEOC seeks summary judgment on Western's affirmative defense of undue hardship as to four accommodations – AutoSocks, automatic decouplers, automatic hood openers, and an exception to Western's leave policy to allow extended medical leave. Western cannot meet its burden of proof to establish its affirmative defense that providing these accommodations would cause an undue hardship to the company.[1]

---

[1] Pursuant to the Court's order entered September 8, 2020, the EEOC's motion is limited to Phase I issues. ECF 613.

## II.   PLAINTIFF'S STATEMENT OF MATERIAL FACTS (PSF)

### A.  Background facts

1.   Defendant Western Distributing Co. (Western) is a corporate conglomerate consisting of at least 15 companies, including Western Distributing Transportation Company, United States Armored Company (USAC), and Western Towing and Recovery (Towing). ECF 822-1 at 6-10; *see also*: https://www.westerndistco.com/companies/companies.html.

2.   Between 2008 and 2017, Western has had between 285 and 441 employees, most of whom are drivers. ECF 822-2 at 3-4.

3.   For purposes of this motion, the relevant drivers that Western employs are: Over-the-Road/Reefer[2] (OTR) Driver, Local Driver, Yard Hostler, USAC Driver, Rollback Tow Driver, and Heavy Wrecker Tow Driver. ECF 822-3 at 1-6.

4.   In 2007, at the suggestion of its insurance broker, Western engaged ErgoMed Work Systems (ErgoMed) to help reduce Western's workers' compensation costs by using pre-employment and fitness-for-duty physical testing of drivers. ECF 817-1 at 5, 30(b)(6) ErgoMed Dep. (DuShane) 58:5-58:18, November 8, 2019; ECF 822-4.

5.   ErgoMed describes itself as "providing loss prevention services." ECF 818-1 at 3.

6.   At all relevant times, Western required its OTR, USAC, and Towing drivers to hold a current Department of Transportation (DOT) Medical Examiner's Certificate. ECF 817-6 at 12, 30(b)(6) Western Dep. (Rau) 126:1-126:7, 169:12-23, November 30, 2018; ECF 822-6.

7.   Since at least 2008, Western has used Aviation & Occupational Medicine (Aviation) to conduct DOT certification exams and workers' compensation evaluations of Western's drivers.

---

[2] Western also refers to the Over the Road (OTR) position as Refrigerated or "Reefer", OTR Reefer, and "Long Haul Driver." ECF 817-6 at 2, 4, 7-8; Western 30(b)(6) (Rau) Dep. 26:4-13, 49:13-23; 54:19-55:3, Nov 30, 2018.

ECF 817-21 at 4-5, Ladwig Dep. 35:20-36:1, November 19, 2019.

8.  Dr. Michael Ladwig is a physician and owner of Aviation. ECF 817-21 at 2-3, Ladwig Dep. 18:2-18:7, 20:6-20:9, November 19, 2019.

9.  Dr. Hector Brignoni is a physician who worked at Aviation for 20 years. ECF 817-10 at 2-3, Brignoni Dep. 11:15-12:14, October 25, 2019.

10. Pinnacol Assurance is Western's workers' compensation carrier in Colorado. ECF 817-13 at 6, Gaines Dep. 194:20-194:22, May 21, 2019.

**B.  Western's full-duty policy**

11. In discovery, Western produced multiple Employee Policy Manuals, with effective dates ranging from 2007 to present. ECF 822-7—822-14; ECF 822-15 at 30-32.

12. Since at least 2009 and to the present, Western's Employee Policy Manual has stated that to return after an injury, an employee's "physician report must state that you can return to full duty or that you are 'discharged' before you can return to work at full duty." ECF 822-10 at 24; ECF 822-11 at 26; ECF 822-12 at 30; ECF 822-13 at 26; ECF 822-14 at 28; ECF 822-15 at 30-32.

13. Western reviewed the Manual, page by page, with all employees. ECF 817-25 at 4, Maddox I Dep. 138:6-22, May 23, 2018.

14. Dr. Ladwig and Dr. Brignoni testified that "full duty" means returning without restrictions. ECF 817-21 at 7, Ladwig Dep. 68:16-20, November 19, 2019; ECF 817-10 at 5-6, Brignoni Dep. 69:15-70:4, October 25, 2019.

15. Janice Hunt, Western's benefits coordinator from 2001 to 2010, testified that employees could not return until medically released to "full duty," and if employees did not meet this standard in 12 weeks, Western discharged them. ECF 817-17 at 2, 5, 8, 9, Hunt Dep. 6:8-19, 118:16-20, 125:11-126:6, October 9, 2019.

16. Jennifer Maddox (aka Prochaska) was Western's Human Resource Director from 2008 until

2015. ECF 817-26 at 3, Maddox sworn testimony 6:7-12, April 17, 2012. Maddox handled all employee requests for accommodation and the interactive processes. ECF 822-16 at 9.

17. The only modified-duty work Western offered was in its beverage division, which Western sold in 2010. ECF 817-26, at 7, 8, Maddox sworn testimony at 21:9-15, 22:1-5, April 17, 2012.

18. Lakesha McLemore, Western's benefits coordinator and HR Manager from 1999 to 2008, testified that to return to work, employees must submit a medical note stating, "that the person can return to full duty" or "that they can return without restrictions." ECF 817-29 at 2-3, 5, McLemore Dep. 25:24-26:25, 202:3-8, July 10, 2019.

19. Stephanie Dechant, Western's HR Director from late 2017 to early 2018, wrote in an email about a Western driver: "[u]nless the Dr. releases him to full duty, no restrictions today his employment will be terminated." ECF 818-2 at 1; ECF 817-27 at 2-3, Maddox II Dep. 304:24-305:7, June 12, 2019.

20. Similarly, Dechant wrote in an email on February 26, 2018: ". . . Western doesn't have any modified duty . . . ." ECF 818-3.

21. Mark Respass was Western's Safety Director for all driving divisions from August 2010 until March 2014. ECF 822-19 at 2. He helped administer the "full-duty" policy and instructed employees about it. ECF 817-35 at 4-6, 10-11, Respass Dep. 96:17-98:8, 112:18-113:6, April 24, 2019.

22. Respass understood "full-duty" to mean the employee "can perform their job at a 100 percent level" and believed that this was Western's policy for the duration of his tenure at Western. *Id*. at 7-8, 100:24-101:7.

23. Respass required a doctor's note saying the driver "could return to full duty to drive a commercial vehicle with no restrictions" before he would allow an employee to return from

medical leave. ECF 817-35 at 7, Respass Dep. 100:17-23, April 24, 2019.

24. In 2012, Respass emailed multiple Western departments stating a driver could proceed with returning to work "[o]nce a full release is received from the treating physician stating that the individual is cleared to drive a commercial vehicle without restrictions . . . ." ECF 822-20.

25. Michael Padilla, Western's Safety Director for all driving divisions as of March 2014, ECF 822-19 at 1, testified that employees can return "once they have been released of all restrictions from their injuries, [so that] they're back to full duty." ECF 817-31 at 13-14, M. Padilla Dep. 226:3-227:4, June 26, 2019.

26. For Western to refer a driver to a physician for a DOT certification to return to work, drivers were required to provide "information from their doctor stating that they have been cleared free of any restrictions and they're capable of going back to work." *Id*. at 11, 221:4-10.

27. Wayne Long, Western's Safety Supervisor from 2010 until present, testified that applicants must provide medical releases and that the releases must say the employee "has no restrictions, and can operate a commercial vehicle." ECF 817-24 at 2, 7-8, Long Dep. 12:10-20, 93:20-94:14, June 21, 2019.

28. In September 2017, Long sent an email stating: "The release should state the Driver has been released with no lifting restrictions to operate a Commercial motor [sic] Vehicle." ECF 818-4.

29. Pinnacol's claims representatives document their conversations relevant to a worker's compensation claim. ECF 817-4 at 2, 5-6, Pinnacol Assurance 30(b)(6) Dep. 146:6-12, 203:16-204:9, December 16, 2019.

30. From at least 2005 through at least 2018, notes of Pinnacol's claim representatives repeatedly refer to Western not providing accommodation or light duty work. ECF 818-5 at 1-15.

31. The notes confirm Western's full-duty policy and also often memorialize instructions from

Western. ECF 818-5 at 1-15. Examples include: "the employer cannot accommodate restriction of any kind per Jennifer [Maddox]," "the employer has no light duty and will not have any in the future," "[t]hey need him to be at full duty and able to drive per DOT standards before he can return to work," and "the injured worker must be at full duty before he can return to work." *Id.* at 2, 9, 10, 13.

32. Pinnacol testified that "full-duty" in the notes means "without restrictions." ECF 817-4 at 7-8, Pinnacol 30(b)(6) Dep. 208:25-209:4, December 16, 2019.

33. Pinnacol confirmed the notes were based on conversations with Western's HR staff, Hunt, and Maddox. *Id.* at 3, 4, 164:2-13, 195:14-18.

34. Aviation's notes about John Cooper, a Western driver, state, ". . . there is no point in us seeing [the driver] until he is FULL DUTY no restrictions from his surgeon. Western will not accommodate an OTR driver on restriction." ECF 818-6 (emphasis in original).

**C.  Western's inflexible maximum-leave policy**

35. All of Western's employee policy manuals include these provisions: (1) "If you are not able to return at the end of the twelve-week period, you will be replaced in your position and your employment with the company will be terminated," and (2) "The **total** amount of FMLA leave an eligible employee is entitled to take for any of the purposes set forth in this Policy, or for any combination of purposes, is 12 weeks during any rolling 12-month period, measured backward from the date the employee uses FMLA leave." ECF 822-7 at 1; ECF 822-8 at 1; ECF 822-9 at 1; ECF 822-10 at 24, 37; ECF 822-11 at 19, 26; ECF 822-12 at 30, 36; ECF 822-13 at 19, 26; ECF 822-14 at 22, 28; ECF 822-15 at 30-32 (emphasis in original).

36. Western's employee policy manuals failed to include, however, any mention of an ADA accommodation policy until 2015. ECF 822-7—822-15.

37. In 2011, in response to the EEOC's question, "Is [Western's] policy and practice to

automatically discharge employees who are not able to return to work after the 12 weeks of FMLA expire? If there are any exceptions, please describe those exceptions," Western responded: "Yes. There are no exceptions to this policy." ECF 822-16 at 4.

38. In Western's 2011, 2012, and 2013 position statements regarding three different charges of discrimination, Western stated to the EEOC: "Western Transportation does not grant extensions of the 12-week policy; to do so could give rise to a probable claim of discriminatory, preferential practices." ECF 822-16 at 7; ECF 822-24 at 5; ECF 822-25 at 4.

39. During her pre-litigation, sworn interview, HR Director Maddox testified that although there had "certainly" been requests to make exceptions, Western had made no exceptions to discharging employees after twelve weeks of leave. ECF 817-26, at 5-6, Maddox sworn testimony 17:3-18:7, April 17, 2012.

40. When asked if Maddox considered a request for more time off beyond twelve weeks to be a reasonable accommodation, Maddox testified: "I would say no." ECF 817-26, at 10, Maddox sworn testimony 47:20-23, April 17, 2012.

41. Maddox testified: "If the leave or the illness is going to extend past the twelve weeks, again we terminate the employment at the twelve-week marks." [sic] ECF 817-26, at 4, Maddox sworn testimony 14:18-20, April 17, 2012.

42. Benefits coordinator Hunt testified she discussed with Pinnacol "that [drivers] are only given the 12 weeks to return to work full duty." ECF 817-17 at 5, Hunt Dep. 118:16-20, Oct. 9, 2019.

43. Hunt's testimony is corroborated by records of Western's workers' compensation insurer, Pinnacol, which include the following note dated January 6, 2009: "Ms. Hunt explained the company policy regarding termination following 12 weeks away from work, whether it be FMLA, workers' compensation, or long-term disability. According to company policy, the

employee must be terminated at 12 weeks off-duty . . . ." ECF 822-91 at 4.

44. Hunt testified she told employees that after 12 weeks of leave without being full duty "they would be let go, yes. That's in the manual." ECF 817-17 at 6-7, Hunt Dep. 122:8-123:23, Oct. 9, 2019. She also testified that she told Western's managers of the policy. *Id*. at 3-4, 29:17-30:15.

45. Safety Director Respass testified: "once the 12 weeks expired, if they were not in a position to return to work, that they would be terminated." ECF 817-35 at 9, Respass Dep. 103:12-22. April 24, 2019.

46. Undisputed examples of Western's full duty and 12-week policies include Western's treatment of four employees (Schmotzer, Kallenbach, Valdez, and Bahmer) who were discharged after 12 weeks of FMLA leave despite having return-to-work dates that required minimal extensions of leave. ECF 818-7 at 4, 5; ECF 822-27 (Schmotzer–6 days); ECF 818-8, ECF 822-29 (Kallenbach–9 days); ECF 818-09 at 4,5; ECF 822-31 (Valdez–5 weeks and 4 days); ECF 822-32; ECF 818-10 (Bahmer–5 weeks and 5 days).

47. Kallenbach worked as a driver for Western for nearly two years, from July 2007 until June 2009. ECF 822-34.

48. In 2009, Western approved Kallenbach for 12 weeks of FMLA leave. ECF 818-11 at 7.

49. Kallenbach informed Western that he needed FMLA leave because of his coronary artery bypass graft. *Id*. at 4.

50. This procedure was required because of his coronary disease, severe triple vessel, which substantially limited his circulatory system. ECF 817-16 at 5, Henson Dep. 28:12-21, November 25, 2019.

51. Kallenbach's quintuple bypass surgery required the surgeon to relocate a vein from Kallenbach's leg and an artery from his arm. *Id.* at 3-4, 24:21-25:12.

52. By May 26, 2009, Western knew that Kallenbach could return to work on or around June 26, 2009. ECF 822-36 at 1; ECF 818-12 at 2; ECF 818-8.

53. Kallenbach's doctor released him to return to work without restrictions before his 12 weeks of leave expired. ECF 818-12 at 2; ECF 818-8.

54. Western sent Kallenbach to Aviation for DOT certification, where Dr. Ladwig advised that Kallenbach could return to work on June 26 and asked to see Kallenbach "just prior to then." ECF 817-26, at 9, Maddox sworn testimony 32:1-7, April 17, 2012; ECF 818-8; ECF 822-36 at 1.

55. Nevertheless, according to Western, "On 6/17/2009 Mr. Kallenbach reached his 12 weeks of allowed FMLA leave and his position was terminated." ECF 822-36 at 2.

56. Kallenbach's separation notice states: termination reason "FMLA has Expired." ECF 822-34.

57. Kallenbach needed only 9 more days after June 17, 2009 to obtain a DOT certification, but Western discharged him, asserting to the EEOC that no exceptions were made to the 12-week policy. ECF 822-16 at 4; ECF 818-8.

58. As another example, Western driver Steve Bahmer injured his spine on the job in December 2013, and Western received notice of the injury on December 7. ECF 822-108.

59. Bahmer's spinal condition made it difficult for him to walk and sit. ECF 817-9 at 4, Bahmer Dep. 103:9-103:19, June 13, 2018.

60. By February 2014, Bahmer's doctor estimated Bahmer would be recovered on approximately April 11, 2014. ECF 817-20 at 2-4, Krafft Dep. 46:22-47:3, 47:22-48:8, September 27, 2019; ECF 818-13 at 2.

61. Western discharged Bahmer when his FMLA leave expired on March 3, 2014, even though Western had notice that Bahmer was expected to return on April 11, 2014. ECF 822-32.

62. Western wrote as the termination reason on Bahmer's separation notice: "Left on medical 3/3 was last day of FMLA – no contact back FMLA Expired." ECF 822-32.

63. Bahmer was released for work less than six weeks later on April 14, 2014. ECF 818-10.

64. Notes of Pinnacol's claims representatives include repeated references to the inflexible leave policy, dating back to at least 2005. ECF 818-15. For example, Anthony Padilla's Pinnacol file states, "laid off because > 12 weeks FMLA," Linda White's file states, "since she has used up all her family leave she does not have a job to go back to," Julianne Lafuria's file states, "she will be laid off after 12 weeks," and Curtis Lien's file states, "does not know if he will be ready by 4/18 which is the 12 week time frame for employer to hold his job." *Id.* at 1, 3-5.

65. The Pinnacol notes for Daniel Dennison say Dennison "was going to see if he could be released on Monday of this week . . . so he could return to work at the 90 days prior to policy taking effect, which is termination after being off work for 90 days without return." ECF 818-14 at 2. The notes continue: "Now [Dennison] has missed 90 days, per protocols and policy of trucking company Western, he is under termination if not RTW full duty." *Id.* at 3.

66. Western had discharged Dennison a week prior, writing on his separation notice "FMLA Expired on 5/3/10." ECF 822-43.

67. Western wrote "FMLA expired" (or similar language) as the reason for discharge for at least 46 individuals from 2006 to 2016. ECF 822-44 at 1-46.

68. Schmotzer was one of those individuals whose separation notice stated: termination reason "FMLA Expired." ECF 822-27.

69. When Schmotzer was discharged, Western knew his medical leave was due to pulmonary hypertension. ECF 817-5 at 14-15, Western 30(b)(6) Dep. (Garcia) 84:20-85:8, July 2, 2020.

70. Pulmonary hypertension substantially limits a person's circulatory and pulmonary systems.

ECF 822-114 at 3, Bull Decl. ¶ 20, November 19, 2019.

71. Schmotzer requested 12 weeks and 6 days of leave for this condition, through February 27, 2013. ECF 818-7 at 5.

72. Instead, Western only provided 12 weeks of leave and terminated him on February 21, 2013. ECF 822-27.

73. Valdez was also one of the individuals whose stated termination reason was "FMLA Ended." ECF 822-31.

74. When Valdez was discharged, Western knew her medical leave was for "debilitating back issues" which led to a number of restrictions. ECF 817-5 at 12-13, Western 30(b)(6) Dep. (Garcia) 76:7-77:1, July 2, 2020.

75. Valdez's condition restricted her ability to bend, crawl, kneel, lift, crouch, or to sit, stand, or walk for more than thirty-minutes at a time. ECF 822-109.

76. Valdez requested 3 - 4 months of leave for this condition, through April 1, 2012. ECF 818-9 at 4, 5.

77. Instead, Western only provided 12 weeks of leave and terminated her on February 22, 2012. ECF 822-31.

78. In a request for information in the EEOC's pre-litigation investigation, the EEOC asked Western to: "[d]escribe the Respondent's interactive process in effect during the relevant time period." ECF 822-16 at 9. Western responded, through its outside counsel: "Neither Ms. [Maddox] nor I is clear in what is meant by 'interactive process' in this Information Request." ECF 822-45 at 1.

79. At least four other members of Western management (Garcia, Long, McLemore, and Dutton) testified they did not know the meaning of "interactive process."

80. Former USAC General Manager and now Vice President Marty Garcia testified that he does not know "what 'interactive process' means under the ADA." ECF 817-14 at 2, Garcia Dep. 36:17-19, March 13, 2019.

81. Safety Supervisor Wayne Long testified that he does not know "what the phrase 'interactive process' means." ECF 817-24 at 3, Long Dep. 63:15-22, June 21, 2019.

82. Former HR Director McLemore testified that she was "not familiar with the phrase 'interactive process.'" ECF 817-29 at 4, McLemore Dep. 50:4-12, July 10, 2019.

83. Frank Dutton, General Manager of Western's reefer division from 2014 to 2016, testified that he never participated in an interactive process. ECF 817-12 at 2-3, Dutton Dep. 12:15-22, 66:4-12, May 14, 2019.

84.  Sheila Scoyne, dispatch supervisor, and general manager from 2008 to 2010, did not receive training from Western on the ADA, including what to do if a driver needed help doing a job because of a medical condition or how to assist people with their job responsibilities so they could return to work. ECF 822-111 at 1, 6, Scoyne Decl. ¶¶ 1, 44-45, 47-48, July 30, 2019.

85.  Many aggrieved individuals first learned Western discharged them through a letter. *See, e.g.*, ECF 817-22 at 2-4, 6, LaFuria Dep. 71:15-72:3, 75:1-21, 108:17-20, May 17, 2018; ECF 817-38 at 10, Simms Dep. 61:10-16, April 17, 2018; ECF 817-41 at 3-4, Wyman Dep. 98:1-99:25, December 9, 2017; ECF 817-39 at 6, Smallridge Dep. 244:18-23, July 29, 2018; ECF 817-37 at 3-5, Schmotzer Dep. 13:25-14:20, 45:12-23, January 19, 2018.

86.  Elias Mendoza said the letter came "out of nowhere." ECF 817-30 at 2-3, Mendoza Dep. 43:16-23, 62:12-23, April 16, 2018.

87. Western was on notice of some employees' medical conditions from the employee's initial request for medical leave. *See, e.g.*, ECF 818-7 at 2-6 (Schmotzer); ECF 818-9 at 1-6 (Valdez);

ECF 822-92 (other aggrieved individuals).

88.  Western was on notice of other employees' medical conditions from the employee's workers' compensation records. *See, e.g.*, ECF 818-16 (Padilla); ECF 818-17 (Brethour); ECF 822-93 (other aggrieved individuals).

### D.  Western's use of physical tests to screen drivers

89. In 2007, Western engaged ErgoMed to conduct pre-employment and fitness-for-duty physical tests for various Western driving positions. ECF 818-1; ECF 818-18 at 1.

90. Western engaged ErgoMed at the suggestions of its insurance agent, Don Carver, "to reduce Western's workers' compensation costs" for truck drivers by implementing pre-employment physical exams. ECF 822-4.

91. In 2017, Carver confirmed to Western CEO Veiri Gaines that engaging ErgoMed to conduct physical testing of drivers had "significantly" improved Western's loss experience. *Id.*

92. Back on November 9, 2007, ErgoMed sent Western a proposal after initial conversations, identifying four areas of concern for Western, one of which included "[a] need to implement a program to limit the organization's exposure to pre-existing conditions." ECF 818-1 at 2.

93. Since 2007 ErgoMed directly marketed to Western that it could "decrease workers' compensation exposure . . . by screening new hires," ECF 818-1 at 3, and "limit [Western's] exposure to pre-existing conditions." *Id.* at 2

94. Respass confirmed that Western used ErgoMed to learn about pre-existing medical conditions and make hiring and return-to-work decisions. ECF 817-35 at 2, Respass Dep. 93:7-25, April 24, 2019.

95. ErgoMed explained one goal was to "decrease[] workers' compensation exposure" for Western, to be accomplished, in part, "by screening new hires." ECF 818-1 at 3.

96. Respass confirmed Western's goal was to reduce workers' compensation costs and agreed the

only way to do that through ErgoMed tests is by screening out individuals with pre-existing conditions. ECF 817-35 at 3, Respass Dep. 95:6-10, April 24, 2019.

97. In January 2008 ErgoMed created a physical demands job analysis (PDE) for the OTR driver position; according to ErgoMed the PDE "document[ed] the physical requirements" of the position. ECF 818-1 at 4; ECF 822-51 at 2.

98. ErgoMed then used the PDE to create a battery of physical tests to be used for pre-employment screening of job applicants and re-hires, and also as a fitness-for-duty test for employees seeking to return to work after an injury or illness. ECF 818-1 at 4; ECF 822-94; ECF 817-1 at 2-4, ErgoMed Dep. (Dushane) 51:16-53:9, November 8, 2019.

99. According to ErgoMed, the physical tests would "identify the applicant's ability to complete the essential job functions." ECF 818-1 at 5.

100.  In 2007, Western began sending drivers to ErgoMed for pre-employment testing. ECF 818-4.

101.  Western sent drivers to ErgoMed after first determining that the driver met the minimum qualifications such as possessing a valid commercial driver's license and requisite experience. ECF 817-28 at 2, Maddox III Dep. 806:8-13, June 13, 2019; ECF 817-25 at 3, Maddox I Dep., 103:19-25, May 23, 2018; ECF 817-7 at 2-3, Allaire Dep. 64:19-65:3, June 7, 2019; ECF 817-31 at 3, Padilla, M. Dep., 123:1-123:3, June 26, 2019.

102.  If a driver could not successfully complete the entire battery of tests, ErgoMed issued a "no job match recommendation" to Western. ECF 817-2 at 2, ErgoMed 30(b)(6) Dep. (Haynes) 59:13-18, November 8, 2019.

103.  ErgoMed's own protocol requires that the reasons for the "no job match" recommendation be communicated to the employer "for reasonable accommodations considerations." ECF 822-95

at 9.

104.   ErgoMed's protocol emphasizes "The No Job Match Recommendation is an ErgoMed recommendation to the employer's Human Resources department. It is the employer's decision, not ErgoMed's, to either make reasonable accommodations or rescind the job offer." *Id.*

105.   Upon receipt of a "no job match recommendation" Western would either retest the individual or retract its offer to a new hire or discharge an existing employee. ECF 817-5 at 7, 9, 10, 11, Western 30(b)(6) Dep. (Garcia) 52:1-24, 56:10-16, 60:10-15, 64:16-23, July 2, 2020; ECF 817-24 at 6, Long Dep. 91:4-13, June 21, 2019.

106.   If an individual was retested and failed, Western would retract its offer to the new hire or discharge the existing employee. ECF 817-5 at 9, Western 30(b)(6) Dep. (Garcia) 56:10-16, July 2, 2020.

107.   Western has not presented evidence or the name of any driver it hired after receiving an ErgoMed "no job match recommendation" without the driver retesting and passing all tests. *Id*. at 8-9, 53:16-22; 56:10-16.

108.   Western has not presented evidence or the name of a driver it accommodated in the ErgoMed testing process.

109.   Sometime on or after September 1, 2009, ErgoMed created PDEs and test batteries for USAC drivers, ECF 822-53, and Heavy Wrecker drivers (Heavy Wrecker PDE), ECF 822-54.

110.   Western describes the physical demands of USAC and OTR drivers as "completely" different, but nevertheless instructed ErgoMed to use the same test for OTR and USAC drivers, noting only one exception to the job's essential functions – USAC drivers need to be able to carry 50 lbs. to mimic a bag of coins. ECF 817-6 at 5, Western 30b6 Dep. (Rau) 52:22-25, November 30, 2018; ECF 817-1 at 6-7, ErgoMed 30b6 (Dushane) Dep. 74:17-75:3, November 8,

2019.

111.   Although USAC drivers work in two-person teams, Western tests both drivers to meet all the physical demands even though the function can be satisfied by one of the drivers, as is common in husband/wife driving teams. ECF 817-6 at 30, Western 30b6 Dep. (Rau) 207:22-24, November 30, 2018; ECF 817-11 at 2-3, Dryden Dep. 110:1-111:25, March 27, 2019.

112.   Western required all tow drivers to satisfy the Heavy Wrecker physical demands, even though the demands are unique to that position, other tow drivers did not have to drive a Heavy Wrecker truck, and the Heavy Wrecker physical demands were greater than that of other tow positions. ECF 817-6 at 13-14, 15-16, 20-21, Western 30(b)(6) (Rau) Dep. 135:24-136:10, 143:23-144:15, 162:10-163:15, November 30, 2018; ECF 822-113 at 4-5, Grinolds Decl. ¶¶ 22-26, May 30, 2019.

113.   Western tested all tow drivers by the Heavy Wrecker physical demands just in case the drivers needed to assist a Heavy Wrecker driver in recovery efforts. ECF 817-6 at 24-25, Western 30(b)(6) (Rau) Dep. 167:10-168:2, November 30, 2018.

114.   Western required all tow drivers since 2009, *inter alia*, to lift 60 lbs. 45 inches from the ground, lift and carry 132lbs. for 30 feet, and push 76 lbs. 100 feet. ECF 822-54 at 1.

115.   ErgoMed acknowledged in 2019 that it was a "mistake" to test drivers on their ability to push 76 lbs. 100 feet because the test was unrelated to any aspect of the job. ECF 817-1 at 14-15, ErgoMed 30(b)(6) (DuShane) Dep. 92:21-93:4, November 8, 2019; ECF 822-113 at 4, Grinolds Decl. ¶ 21, May 30, 2019.

116.   Despite this acknowledgment, Western has continued to maintain that standard for tow drivers since 2009 and to date has not revealed it changed its test. ECF 817-6 at 25, Western 30(b)(6) Dep. (Rau) 168:4-168:14, November 30, 2018; ECF 817-15 at 3, Haynes Dep. 83:10-

17, December 17, 2019.

117.   Western's job descriptions for the Heavy Wrecker and Rollback positions do not mention any of the alleged physical requirements and Western had different job descriptions for all of the various tow positions. ECF 822-56.

118.   If an object is too heavy to lift manually, the driver can use a winch, ECF 817-35 at 14-15, Respass Dep. 251:23-252:2, April 24, 2019; ECF 817-6 at 19, Western 30(b)(6) Dep. (Rau) 160:8-160:13, November 30, 2018, other heavy wrecker trucks will be sent out to assist, or Western will hire laborers to help. ECF 817-6 at 17-18, 31-32, Western 30(b)(6) Dep. (Rau) 158:20-159:12, 223:4-224:12; ECF 822-11 at 6, Scoyne Decl. ¶ 40, 42, July 30, 2019; ECF 822-113 at 5, Grinolds Decl. ¶ 31, May 30, 2019.

119.   Western asserts the 132 lb. lift test is to replicate the strength necessary to lift a tire of a commercial truck into the back of a tow truck. ECF 822-54 at 3, 4.

120.   Jorge Rodriguez, an 8-year towing veteran whom Western selected for its entry on land demonstration, has never had to lift a truck tire in his career at Western. ECF 817-36 at 2, 4, Rodriguez Dep. 7:4-6, 44:12-14, April 4, 2019.

121.   Rodriguez noted that the need for more than one vehicle is also rare, occurring only ten to fifteen times over 8 years, but dispatch never turned down his request for more help. *Id*. at 5-6; 75:18-76:5; ECF 822-113 at 5, Grinolds Decl. ¶ 29, May 30, 2019.

122.   William Keithline, who Western also selected for its entry on land demonstrations, testified that he could use the winch that is outfitted on each truck to stand the tire up and then he typically just rolls the tire after that. ECF 817-19 at 3-5, Keithline Dep. 61:22-62:5, 62:21-63:16, April 18, 2019.

123.   On February 17, 2010, Western told ErgoMed to test Yard Hostlers as OTR drivers, ECF

822-57 at 2, even though the physical demands of the two positions are different. *Compare* ECF 817-1 at 8-13, ErgoMed 30b6 Dep. (DuShane) 77:6-82:4, November 8, 2019 *with* ECF 817-6 at 6, Western 30b6 Dep. (Rau) 53:9-20, November 30, 2018; ECF 822-96 at 5.

124.   Western did not create a job analysis or PDE for the Yard Hostler position. ECF 817-1 at 8-13, ErgoMed 30b6 Dep. (DuShane) 79:13-80:6, November 8, 2019.

125.   Between January 14, 2008 and November 10, 2015, the ErgoMed test battery used for OTR, Local, USAC, and Hostler drivers included tests to (a) statically push and pull 130 lbs. of force, (b) lift 50 lbs. and carry the weight 20 feet, and (c) lift 50 lbs. ground-to-shoulder. ECF 822-51 at 1; ECF 822-53 at 1; ECF 822- 57 at 1; ECF 817-6 at 6-7, Western 30b6 Dep. (Rau) 53:1-3, 53:12-54:18, November 30, 2018.

126.   In an October 2015 email thread among managers including Western's CEO, Vice President, General Manager, and HR Director, VP Guadagni said ErgoMed "is getting a little out of hand . . . the weight test is a little overboard . . . get them to tone it down a bit." ECF 822-59 at 1.

127.   Western's Human Resources Director responded that she discussed with the Vice President and General Manager changing the standards on multiple occasions over a year but cautioned that the test was a "necessary part of the qualification process" and "effective [at] reduc[ing] our work comp claims year after year since we implemented ErgoMed." *Id*. at 1.

128.   On November 11, 2015, Western adopted a revised PDE and test battery for the OTR driver position (2015 OTR PDE) but did not change the PDE or test battery for USAC drivers and continued to use the old OTR/USAC test. ECF 822-58; ECF 817-6 at 28-29, Western 30b6 Dep. (Rau) 203:20-204:3, November 30, 2018; see also PSF 110.

129.   With the revised 2015 OTR PDE, Western required lifting 50 lbs. from 15 inches off the

ground to waist instead of to shoulder level, as required in the prior PDE. ECF 822-58 at 1.

130.   Western required the 50 lbs. lifting tests based on the alleged weight of tire chains used by OTR drivers for traction while driving in snow. ECF 822-58 at 4.

131.   A single tire chain only weighs 25 lbs.; a pair of chains weighs approximately 50 lbs. but can be carried one at a time. ECF 817-6 at 3, Western 30(b)(6) Dep. (Rau) 33:20-22, November 30, 2018 and ECF 817-31 at 4-5, M. Padilla Dep. 129:17-130:1, June 26, 2019.

132.   It is in a driver's discretion to lift a single chain or the pair, and to either carry or drag the chain to each tire. ECF 817-12 at 4-6, Dutton Dep. 164:25-165:21, 166:11-18, May 14, 2019.

133.   Western's required 130 lb. push/pull tests allegedly corresponded with the task of using a ratchet strap to secure loads. *See, e.g.*, ECF 822-60 at 2. ECF 817-6 at 9-11, Western 30(b)(6) Dep. (Rau) 88:18-89:5, 91:3-11, November 30, 2018.

134.   Western acknowledges that ratcheting is not a required task for an OTR driver. ECF 817-12 at 7-8, Dutton Dep. 174:23-175:7, May 14, 2019.

135.   OTR drivers were not required to even carry ratchet straps, which were only used by flatbed drivers when Western owned flatbed trucks before 2009 or 2010, or USAC drivers – an entirely different position. *See* PSF 107. ECF 817-6 at 9-11, Western 30(b)(6) Dep. (Rau) 88:18-89:5, 91:3-11, November 30, 2018.

136.   The OTR job descriptions do not mention ratchet straps or driving flatbed trucks. ECF 822-6.

137.   On December 16, 2014, Manager Dutton said the 130 lb. push/pull test was "ridiculous," in response to an email about Ronald Perkins, who failed the test. ECF 822-61.

138.   The 2015 OTR PDE also entirely removed any pushing requirement and reduced the pulling requirement to 58 lbs. ECF 822-62 at 1.

19

139.   The USAC subdivision hauls freight for the U.S. Mint, as well as jewelry, bonds, and other high security items for private parties. ECF 822-63 at 2-3.

140.   USAC drivers drive in teams of two. ECF 817-6 at 27, Western 30(b)(6) Dep. (Rau) 170:2-7, November 30, 2018.

141.   Only one USAC team driver needs to use the ratchet straps. *Id.* at 30; 207:22-207:24.

### 1.   Western's tests were not validated.

142.   Dr. Steve Allison, P.T., D.P.T, is a Doctor of Physical Therapy, Board Certified Orthopedic Physical Therapist, Board Certified Disability Analyst, and DOT Certified Medical Examiner. ECF 822-97 at 1.

143.   Dr. Allison opined on industry standards for creating physical demands tests. ECF 822-97.

144.   His opinions are based on his 19 years of experience conducting functional capacity evaluations and job analysis. *Id.* at 1.

145.   Dr. Allison also has direct involvement in creating over 100 physical demands tests. ECF 817-8 at 9, Dr. Allison Dep. 34:1-4, October 17, 2019.

146.   Dr. Allison employs industry-standard practices, according to Biddle Consulting which administers Physical Ability Validity Evaluator (PAVE) training. *Id.* at 4-5, 9-10; 15:23-16:5; 34:25-35:2.

147.   Creating a valid physical demands tests consists of a two-step process, with the first step consisting of a job analysis and the second step consisting of content validation. *Id.* at 6-8, 11-12; 30:4-32:22, 38:5-39:21.

148.   According to industry standards, the first step - job analysis - consists of interviewing HR supervisors, incumbent workers, and managers to understand the physical demands of a particular position. *Id.*

149.   For ErgoMed's 2008 OTR PDE only one general manager attended, and there is no

evidence that ErgoMed conducted any interviews of incumbent workers or HR supervisors. ECF 822-51 at 2.

150.   For ErgoMed's 2009 USAC PDE only one general manager attended, and there is no evidence that ErgoMed conducted any interviews of incumbent workers or HR supervisors. ECF 822-53 at 2.

151.   For ErgoMed's 2009 Heavy Wrecker PDE, only one general manager attended, and there is no evidence that ErgoMed conducted any interviews of incumbent workers or HR supervisors. ECF 822-54 at 2.

152.   Next, industry standards require the evaluator to observe the incumbent worker performing or demonstrating their job duties, while the evaluator takes measurements and documents the demonstrated physical demands. ECF 817-8 at 6-8, 11-12, Dr. Allison Dep. 30:4-32:22, 38:5-39:21, October 17, 2019.

153.   There is no evidence that for any of the job analysis from 2008 and 2009 ErgoMed observed incumbent workers perform or demonstrate their job duties; rather managers performed the demonstrations. ECF 822-51 at 2; 822-53 at 2; 822-54 at 2.

154.   Once a draft of the job analysis is created, the evaluator should provide it to the HR supervisors, incumbent workers, and managers to provide edits and feedback. ECF 817-8 at 7, Dr. Allison Dep. 31:1-4, October 17, 2019.

155.   There is no evidence that ErgoMed provided incumbent workers any opportunity to provide feedback on the 2008 OTR PDE, 2009 USAC PDE, or 2009 Heavy Wrecker PDE.

156.   The functional capacity evaluator then designs a physical demands test from this job analysis. *Id*. at 7, 31:4-9.

157.   The second step – content validation – requires the evaluator to first run a sample of the

designed test using between five and seven incumbent workers who hold the precise position for which the test is designed, as well as two supervisors. *Id*. at 7-8, 10, 31:8-12, 32:10-16, 35:3-5; ECF 822-97 at 5.

158.   Industry standards require that the incumbent workers participating in the sample test run should have worked in the position for at least one year, and demographically be a representative sample of the employees who work in the same position. ECF 817-8 at 7-8, Dr. Allison Dep. 32:16-22, October 17, 2019; ECF 822-97 at 5.

159.   According to industry standards, the evaluator will survey the sample incumbent workers after they perform the test to determine the accuracy between the test performed and the actual skill required when performing a particular task while on the job. ECF 817-8 at 7-8, 16, Dr. Allison Dep. 31:20-32:7, 197:22, October 17, 2019.

160.   According to industry standards, each aspect of the test will be accepted only if 70% of the sample incumbents agree that the test accurately matches the skill required. *Id*. at 8, 32:7-10.

161.   If an aspect does not reach the 70% threshold, the evaluator must modify the test after receiving feedback from the sample incumbents, and retest until a 70% threshold is achieved. *Id*. at 16-17, 197:22-198:10.

162.   These standards have been in practice since 1978. *Id*. at 13-14, 194:20-195:24.

163.   At no point has Western tried to validate any of the employment tests implemented in 2008 and 2009 (2008 OTR test; 2009 USAC test, 2009 Heavy Wrecker test), so it did not send any incumbent workers for validation purposes. ECF 817-15 at 2, Haynes Dep. 76:10-17, December 17, 2019.

164.   ErgoMed sent frequent reminders and invitations to Western to validate its tests and update its PDEs, but Western failed to do so. ECF 822-98 at 5-6.

165.   When the OTR PDE was revised in 2015, ErgoMed invited Western to send a

"representative sampl[e] of existing employees" to validate the 2015 OTR test. ECF 822-99.

166.   In 2015, Western finally tried to validate its revised OTR test, but only sent a single

incumbent worker to ErgoMed, and did not provide a representative sample. ECF 822-100 at 1.

### 2.   Ronald Perkins was denied employment due to the 130 lb. static push/pull test.

167.   Aggrieved individual Ronald Perkins drove OTR at Western for nearly 17 years. ECF 817-

32 at 2-3, Perkins Dep. 94:25-95:7, February 28, 2018.

168.   Perkins was diagnosed with throat cancer in or around May 2014. ECF 818-19 at 1.

169.   On June 24, 2014, Western approved Perkins's request for FMLA leave which revealed he

needed leave "for his own serious health condition." ECF 818-20 at 1, 7.

170.   Perkins made Western aware of his cancer diagnosis. ECF 817-27 at 4, Maddox II Dep.

350:8-15, June 12, 2019.

171.   Perkins's throat cancer substantially limited the major life activity of cell growth. *See* 29

CFR 1630.2(j)(3)(iii) .

172.   Western discharged Perkins on September 5, 2014, with a stated reason of "FMLA expired,

medical." ECF 822-66.

173.   In December 2014 Perkins reapplied for the OTR Driver position, was given a conditional

offer of employment, and needed to undergo pre-employment physical testing at ErgoMed. ECF

818-22; ECF 822-67.

174.   When Perkins took the pre-employment test at ErgoMed, he successfully pushed 114 lbs.

and pulled 98 lbs., but could not pass the 130 lb. push/pull tests. ECF 818-23.

175.   Perkins failed no other aspects of the test. *Id.*

176.   ErgoMed issued a "no job match" recommendation. *Id.*

177.   Western did not talk to Perkins about potential accommodations. ECF 817-32 at 4-5,

Perkins Dep. 161:16-162:4, February 28, 2018.

178.   Western rescinded its offer to Perkins and refused to hire him. ECF 822-101.

### 3.   **Gary Nehrig was denied employment due to a lifting restriction.**

179.   On November 20, 2013, Gary Nehrig applied to Western. ECF XXX-102.

180.   On January 6, 2014, Western sent Nehrig to ErgoMed, after receiving a conditional offer, to be tested as an OTR Driver, noting that he "will be a delivery driver." ECF 818-24 at 20.

181.   Nehrig told ErgoMed that he injured his lower back in July 2012 and filed a worker's compensation claim. *Id*. at 13.

182.   ErgoMed sent Nehrig for further examination of his lower back based on a 2012 slip-and-fall as to which Nehrig was still reporting pain. *Id.* at 4.

183.   The ErgoMed examiner stated on the referral form that she, "need[ed] to know if it is safe and if Gary is capable to perform the required essential functions of the job which are: lift 50 lbs. to waist & shoulders carry for 75 ft. lift 10 lbs. overhead carry for 75 ft., push/pull 100 lbs. (dynamic), push/pull 100 lbs.(static, [illegible]." *Id.*

184.   The examiner also revealed "The lifting is occasional 7-33% of total shift . . . The push/pulls [illegible] infrequent 2-6% of total shift." *Id.*

185.   The examiner noted the test was incomplete, that Nehrig had until January 13, 2014 to complete the test, and that Nehrig would need to perform the OTR lift protocol. *Id.* at 9.

186.   ErgoMed obtained a medical record indicating Nehrig suffered from a lumbar strain and degenerative disc disease, with a restriction of no lifting over 30 - 35 lbs. ECF 818-24 at 15-16.

187.   On January 8, 2014, ErgoMed issued the no-job-match recommendation shown below:



*Id.* at 18.

188.   That same day, Western's Safety Supervisor Wayne Long determined Nehrig was "not

qualified" because he "failed ErgoMed." ECF 822-103.

**4.   David Vasquez was denied employment due to a lifting restriction.**

189.   On July 23, 2014, David Vasquez applied to be an OTR driver at Western. ECF 822-71.

190.   On August 18, 2014, Vasquez took the ErgoMed test, after receiving a conditional offer.

ECF 818-25 at 2-9.

191.   Vasquez told ErgoMed that he had a 15 lb. "weight restriction" on his left arm and a

fractured elbow from 2011. *Id.* at 14, 17 and 19.

192.   ErgoMed obtained a note from Vasquez's physician dated September 5, 2013, which

cleared Vasquez to return to full-time truck driving but restricted him as unable to perform

"medium to heavy lifting," and circled the requirement of Light-Medium lifting which had a 35

lb. occasional lift, 15 lb. frequent lift, and 7 lb. continuous lift. *Id.* at 21.

193.   The ErgoMed screener noted Vasquez's 35 lb. lifting restriction, and tested Vasquez, but

stopped the test when Vasquez reported pain in his elbow when lifting 30 lbs. from floor to waist.

*Id.* at 7.

194.   ErgoMed issued a no-job-match recommendation, noting "required to lift 50 lbs." *Id.* at 22.

195.   On August 25, 2014, Western HR Manager Maddox determined Vasquez was not qualified

for a position. ECF 822-71.

**5.** __Korey Preston was denied employment due to a lifting restriction.__

196.  Korey Preston began working for Western on December 29, 2008, as an OTR driver. ECF 822-75 at 17.

197.  Western discharged Preston on August 5, 2009. *Id*.

198.  On August 18, 2009, Preston reapplied for his OTR position. ECF 822-71.

199.  On August 31, 2009, Western sent Preston for testing at ErgoMed. ECF 818-27 at 3.

200.  That same day, Western discovered for the first time that Preston had a permanent 30 lb. lifting restriction from 2005. *Id*. at 5.

201.  ErgoMed issued the no-job-match recommendation shown below:



*Id.* at 3.

202.  On September 16, 2009 Western determined Preston, was "not qualified" for the OTR position, and rescinded his conditional offer. ECF 822-71.

**6.** __Charles Morgan was denied employment due to a lifting restriction.__

203.  Charles Morgan began working for Western in April 2003 as an OTR driver. ECF 818-26 at 7.

204.  On September 15, 2007, Morgan injured his chest while working. ECF 818-29.

205.  For his on-the-job injury, Morgan was seen by Dr. Ladwig at Aviation. ECF 818-30.

206.  On December 18, 2007, Morgan's doctor revealed he had reached "Maximum Medical Improvement" (MMI) and imposed the following permanent restrictions: "25-pound max lift,

bending and twisting to [sic] an occasional basis." ECF 818-31 at 2.

207. Western was provided a copy of this doctor's note. *Id.*

208. Dr. Ladwig restricted Morgan from driving in the mountains. *Id.* at 6.

209. On January 14, 2008, Western sent Morgan for fitness-for-duty testing at ErgoMed, which issued the no-job-match recommendation shown below:

ErgoMed recommends a no job match secondary to:
___✓___ Inability to complete one or more of the essential functions tested during the screen. Unable To Lift 50#. Pt placed on permanent
25# lift restriction

*Id.* at 7.

210. On January 21, 2008, Western discharged Morgan because he was "unable to perform work due to ErgoMed evaluation." ECF 822-71; ECF 818-32.

211. Morgan reapplied to Western on September 29, 2011. ECF 822-71.

212. On October 3, 2011, Maddox deemed Morgan "not qualified" and also entered a note of "permanent restrictions" in response to his application. *Id.*

### 7. **Jeffrey Jarvis was denied employment due to medical restrictions.**

213. Jeffrey Jarvis started work as an OTR driver for Western on July 3, 2007. ECF 822-80.

214. On November 5, 2007, Jarvis injured his shoulder. ECF 818-34 at 1.

215. On December 28, 2007, Jarvis slipped on ice and hurt his hand and wrist which resulted in a 10 lb. lifting restriction. ECF 818-35 at 1.

216. On January 6, 2008, Jarvis aggravated his shoulder injury. ECF 818-34; ECF 818-35.

217. Western sent Jarvis to ErgoMed for testing on January 9, 2008. ECF 822-82.

218. ErgoMed would not perform the test because it wanted more medical information from Jarvis's primary care physician. ECF 822-82 at 2; ECF 822-110.

219. On January 10, 2008 Jarvis failed ErgoMed's test and ErgoMed issued a no-job-match

recommendation. ECF 822-82.

220.  The ErgoMed screener noted the following: "Able to lift 10 lbs. Has M.D. restriction of 10 lbs.; job requires in excess of 50 lbs." ECF 822--82 at 1.

221.  Jarvis requested accommodations of being routed to destinations that did not require travel over the mountains or for assistance with chaining his tires in the mountains. ECF 817-18 at 3-4, Jarvis Dep. 122:15-20, 126:17-20, April 24, 2018.

222.  Western denied Jarvis's request and told him that he could reapply after he recovered from his injury. *Id*. at 2,116:10-15.

223.  On January 11, 2008, Western discharged Jarvis, with a stated reason of, "Medical evaluation states unable to perform duties based on medical information provided." ECF 822-80.

224.  Western told Jarvis he was discharged due to his shoulder injury. ECF 817-18 at 2, Jarvis Dep. 116:10-15, April 24, 2018.

**E.  No undue hardship for Western to provide four different accommodations**

225.  Western is a multimillion-dollar company. ECF 818-36.

226.  Western reported positive balances of cash (or equivalents) annually from 2007 to 2017. *Id.*

227.   When replacing a truck every three to five years, Western has provided upgrades to drivers' trucks such as TVs, refrigerators, interior fabrics, motors, transmissions, and chrome parts. ECF 817-13 at 2-3, Gaines Dep. 98:4-11, 99:6-20, May 21, 2019.

**1.  <u>AutoSocks as a reasonable accommodation for drivers</u>**

228.  Since at least January 1, 2008, Colorado has not required commercial motor vehicles to carry metal tire chains. ECF 822-104 at 2 (2014-2019 version of C.R.S. § 42-4-106(5)(a)(I) defining "tire chains" to include "metal chains" and "other traction devices."); ECF 822-105 at 1 (2007-2014 version of the statute with the same definition). *See also* ECF 822-106 at 4 (2 C.C.R.

601-14(5.02)).[3]

229.  For purposes of Colorado's tire chain law, the Colorado Department of Transportation (CDOT) permits commercial motor vehicles to carry approved alternative traction devices (ATDs). ECF 822-86; ECF 817-24 at 9-10, Long Dep. 176:15-177:25, June 21, 2019.

230.  CDOT permits AutoSocks, traction sanders, and automatic chains as ATDs. ECF 822-86.

231.  Drivers can avoid lifting chains by being rerouted, pulling off the highway and waiting until the snowstorm passes, using hired roadside assistance to chain or unchain the truck, or using an approved ATD – such as AutoSocks. ECF 822-111 at 2, 3, Scoyne Decl. ¶¶ 13, 14, 17 – 19, July 30, 2019; ECF 817-18 at 5, Jarvis Dep. 127:1-127:19, April 24, 2018; ECF 817-23 at 2-3, Lien Dep. 159:21-160:20, June 5, 2018; ECF 817-40 at 2, M. Smith Dep. 126:4-22, August 10, 2018.

232.  AutoSocks are fabric coverings for tires that function as traction devices for driving on snow and ice. ECF 822-112 at 2, 4, McGee Decl. ¶¶ 7, 31, July 19, 2019.

233.  A pair of AutoSocks weighs up to 6.6 lbs. *Id*. at 3, ¶ 19.

234.  A pair of AutoSocks cost between $179.00 and $269.00. *Id*. at 3, ¶¶ 23, 24.

235.  In response to an interrogatory asking for the factual basis of its defense as to AutoSocks, Western asserted that providing AutoSocks as an accommodation is an undue hardship because doing so would violate state chain laws, pose a safety risk, and be too costly. ECF 822-88 at 4-5.

236.  According to Western's commercial trucking expert, Jimmy Sill, AutoSocks are allowable as an ATD within the 48 contiguous states. ECF 822-89 at 5.

237.  Western allows drivers to use AutoSocks, ECF 822-88 at 8; ECF 817-31 at 10, M. Padilla

---

[3] 2019 amendments no longer include ATDs in the definition of tire chains, but continue to include them as permitted equipment. *See* C.R.S. § 42-4-106(5)(a)(I)(B). And agency regulations implementing these statutory changes continue to allow commercial vehicles to use chains *or* alternative traction devices. ECF 822-106 at 4.

Dep. 176:12-20, June 26, 2019, and has provided AutoSocks to drivers who requested them. *Id.*

238.  Once, a Western Vice President suggested a manager tell the HR Director a driver could return to work because they were giving "him auto socks so no chains needed." ECF 822-61.

239.  Western asserts in an interrogatory response on its defenses that its "understanding of the chain laws of various states has been that regular chains must be carried on the vehicle even if auto socks are used," but Western provided no citation to any state law or regulation. ECF 822-88 at 5.

240.  Western's Safety Manager testified he was unaware of any state where the laws prevented a driver from using AutoSocks in lieu of tire chains. ECF 817-31 at 6, M. Padilla Dep. 164:4-13, June 26, 2019.

241.  Western also asserts the cost of AutoSocks "could be unduly burdensome if a driver is frequently destroying his or her socks." ECF 822-88 at 5.

242.  Western's expert opines that AutoSocks "have issues with wear and are costlier in the long term," but provides no facts showing the amount of any alleged additional cost. ECF 822-89 at 5.

243.  Western's Safety Manager testified that outside sources told him that AutoSocks will shred after "a mile or two" if driving over 25 miles an hour on dry pavement. ECF 817-31 at 7-9, M. Padilla Dep. 171:20-22, 172:25-173:2, 173:6-8, June 26, 2019.

244.  But Safety Manager Padilla did not know how long AutoSocks will last on dry pavement going under 25 miles an hour, testifying it "could depend." *Id.* at 9; 173:14-19. Padilla acknowledged AutoSocks "hold up well, depending on the conditions." *Id.* at 8; 172:11-12.

245.  To be an approved ATD in Colorado, AutoSocks had to be still functional after driving 100 miles on dry pavement at 20 miles per hour. ECF 822-112 at 3-4, McGee Decl. ¶ 30, July 19, 2019.

## 2.   <u>Automatic decouplers as a reasonable accommodation for drivers</u>

246.  The "fifth wheel" is what connects and locks a truck's tractor to its trailer. ECF 817-3 at 2, Jost 30(b)(6) Dep. 10:6-7, June 30, 2020.

247.  To uncouple a trailer using a standard fifth wheel, a driver must manually release the locking mechanism by pulling. *Id*. at 3-4; 15:24-16:8.

248.  An air-release fifth wheel acts as an automatic decoupler, allowing drivers to disconnect a trailer without physically pulling to unlock the fifth wheel. *Id.* at 2; 10:5-15.

249.  The only difference between automatic decouplers and "standard" fifth wheels is the addition of an air-powered release. *Id.* at 5; 23:7-16.

250.  The safety and reliability of the part locking the tractor and trailer together is the same for both models because the locking mechanism's design is the same. *Id*.

251.  Jost's automatic decoupler has a range of safety features that prevent it from releasing the trailer while the vehicle is moving, including that the driver has to: engage the trailer brakes, flip a safety switch on the cab's console, and press and hold a release button on the console for five seconds. *Id.* at 6-7; 55:21-56:17.

252.  Western has automatic decouplers installed on several of its tractors used to move trailers around within Western's yard. ECF 817-13 at 8, Gaines Dep. 245:15-20, May 21, 2019; ECF 817-31 at 15-16, 19-20, M. Padilla Dep 287:24-288:3, 306:25-307:4, June 26, 2019.

253.  Multiple Western managers testified they did not look into the feasibility or cost of automatic decouplers as an accommodation. ECF 817-13 at 8, Gaines Dep. 245:8-11, May 21, 2019; ECF 817-27 at 6-7, Maddox II Dep. 506:3-507:14, June 12, 2019; ECF 817-34 at 2-3, Rau Dep. 180:25-181:2, June 19, 2019; ECF 817-24 at 5, Long Dep. 86:10-12, June 21. 2019.

254.  Some Western managers opined that automatic decouplers are dangerous because of the possibility that a trailer could be unintentionally disengaged while driving on a highway. ECF

817-34 at 4-5, Rau Dep. 183:21-184:4, June 19, 2019; ECF 817-13 at 10-12, Gaines Dep. 250:19-252:16, May 21, 2019; ECF 817-31 at 16, M. Padilla Dep. 288:4-11, June 26, 2019.

255.  Gaines and Padilla conceded that they did not know if the device was on the market or if it even existed for OTR driving. ECF 817-13 at 8-9, Gaines Dep. 245:21-246:5, May 21, 2019; ECF 817-31 at 19, M. Padilla Dep. 307:5-13, June 26, 2019.

256.  Rau and Padilla conceded they did not know about specific safety features of these devices. ECF 817-34 at 5, Rau Dep. 184:5-8, June 19, 2019; ECF 817-31 at 20, M. Padilla Dep. 307:14-22, June 26, 2019.

257.  Jost testified it is required by law to monitor accident reports involving its products and is notified if "any kind of incident in the field" involves its product. ECF 817-3 at 8, Jost 30(b)(6) Dep. 57:2-8, June 30, 2020.

258.  Since Jost introduced its automatic decoupler in 2006, it is unaware of *any* accidents where a trailer was unintentionally released while the truck was in operation or where the automatic decoupler malfunctioned and uncoupled a trailer on a highway. *Id.* at 7-8, 56:22-57:18.

259.  There have been no safety recalls of Jost's automatic decoupler. *Id.* at 12, 100:4-12.

260.  From 2008 to 2020, the Jost device cost between $750.00 to $1,200.00 dollars, plus approximately $50.00 to $100.00 to install. *Id.* at 9-10, 70:15-25, 81:17-23.

### 3.  Automatic hood openers as a reasonable accommodation for drivers

261.  HoodXpress is a device that automatically opens a truck's hood. ECF 817-33 at 2-3, Pullins Dep. 9:25-10:2, January 9, 2020.

262.  HoodXpress allows drivers to push a button to open and close the hood of their truck without having to physically pull or push the hood. *Id.* at 4-6, 16:23-18:6.

263.  From 2006 to 2010, HoodXpress cost $899.00 to $929.00. *Id.* at 7-8, 48:7-10, 49:5-8.

264.  Multiple Western managers testified that they did not look into or consider automatic hood

openers as an accommodation. ECF 817-27 at 5, Maddox II Dep. 504:1-20, June 12, 2019; ECF 817-13 at 7-8, Gaines Dep. 244:18-245:7, May 21, 2019; ECF 817-7 at 5, Allaire Dep. 193:6-19, June 7, 2019; ECF 817-24 at 4-5, Long Dep. 85:17-86:3, June 21, 2019; ECF 817-31 at 2, M. Padilla Dep. 77:5-9, June 26, 2019.

### 4. Exception to Western's maximum-leave policy to allow extended leave as a reasonable accommodation

265.  Western has a "no slip-seating" policy, where each driver has a permanently assigned tractor, instead of driving a different tractor each trip. ECF 817-5 at 2, Western 30(b)(6) Dep. (Garcia) 28:6-17, July 2, 2020.

266.  Western applies the "no slip-seating" policy even when a driver is on leave, resulting in tractors that sit idle until the driver returns. ECF 822-90 at 3.

267.  Western asserts its "no slip-seating" policy makes extending leave for drivers an undue hardship due to the "amount of revenue that is lost when a driver is out on leave." *Id.* at 3-4.

268.  Western managers testified that the costs of idle tractors are the only cost of a driver being on extended leave. ECF 817-13 at 13, Gaines Dep. 256:11-23, May 21, 2019; ECF 817-35 at 13, Respass Dep. 181:1-4, 12-16, April 24, 2019.

269.  Western calculated the current, total cost of a truck sitting empty is $8,141.69 per month. ECF 817-5 at 5-6, Western 30(b)(6) Dep. (Garcia) 38:18-39:15, July 2, 2020.

270.  Western's CEO and past Safety Director both testified Western has always had unused tractors in its yard. ECF 817-13 at 14-15, Gaines Dep. 259:20-260:4, May 21, 2019; ECF 817-35 at 12, Respass Dep. 180:21-24, April 24, 2019.

271.  In recent years, the number of these unused tractors at Western at one time ranged as high as 17 or 18. ECF 817-13 at 14-15, Gaines Dep. 259:18-260:15, May 21, 2019.

272.  Western's former Safety Director also testified that when a driver was gone for extended

periods, when they returned either they would get their tractor back or be assigned a different one. ECF 817-35 at 12, Respass Dep. 180:6-10, April 24, 2019.

273.  In both corporate testimony and a policy manual, Western explained that, at least between 2010 and 2012, it used relief drivers such that "if someone was on vacation, [the relief driver] would be able to drive that truck for that week that that person was gone." ECF 817-5 at 3-4, Western 30(b)(6) Dep. (Garcia) 32:25-33:2, July 2, 2020; ECF 822-107 at 2.

274.  Western has a "no slip seating" policy because it is popular and helps recruit and retain drivers. *Id*. at 2, 28:22-25.634

275.  Western is "always in need of drivers" and "is always hiring drivers." ECF 817-7 at 4, Allaire Dep. 72:6-9, 15-16 21-23, June 7, 2019; ECF 817-27 at 8, Maddox II Dep. 534:1-4, June 12, 2019.

276.  Since at least 2012, due to a driver shortage there are not enough drivers available for Western to hire "extra drivers." ECF 817-5 at 4, Western 30(b)(6) Dep. (Garcia) 33:10-16, July 2, 2020; ECF 817-14 at 3-4, Garcia Dep. 98:20-99:8, March 13, 2019.

### III.    THE EEOC IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM THAT WESTERN ENGAGED IN A PATTERN OR PRACTICE OF DISABILITY DISCRIMINATION.

 For years, Defendant Western maintained two interrelated discriminatory policies: (1) a policy that required employees who are off work for medical reasons to receive a "full duty" medical clearance before returning to work, and (2) an inflexible maximum leave policy that allowed no exception to provide reasonable accommodation for disabilities. Western summarily discharged employees who could not return to full-duty work within twelve weeks without consideration of potential reasonable accommodations. Because undisputed evidence proves beyond genuine dispute the existence of Western's two discriminatory policies, the EEOC seeks summary judgment as to the existence of the two policies and their discriminatory effect.

**A. Legal standards for proving a prima facie case of discriminatory pattern or practice**

Pattern-or-practice claims differ from ordinary, individualized discrimination claims in "the order and allocation of proof, as well as the overall nature of the trial proceedings . . . ." *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001). This Court previously stated the relevant standards in *EEOC v. W. Distrib. Co.*, 322 F. Supp. 3d 1100, 1103 (D. Colo. 2018) (ECF 166 at 3-4). In a pattern-or-practice case, the "initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy" or "standard operating procedure" of the employer. *Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 336, 360 (1977); *Thiessen*, 267 F.3d at 1106; *Apsley v. Boeing Co.*, 691 F.3d 1184, 1194 (10th Cir. 2012). At this initial "liability" stage, the EEOC "is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy" but only "that such a policy existed." *Teamsters,* 431 U.S. at 360; *Coe v. Yellow Freight Sys. Inc.*, 646 F.2d 444, 449 n. 1 (10th Cir. 1981); *W. Distrib. Co.,* 322 F. Supp. 3d at 1103 (the EEOC need only prove the "discriminatory policy existed," ECF 166 at 17, 3-4).

The statutory "pattern-or-practice" language "was not intended as a term of art, and the words reflect only their usual meaning." *Teamsters*, 431 U.S., at 336 n. 16. Proving a pattern or practice does not require the EEOC to show Western never made an exception to its policies, but that the discriminatory policies were "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Id*. at 336. A pattern or practice is "the regular rather than the unusual practice." *Cooper v. Fed. Res. Bank of Richmond*, 467 U.S. 867, 876 (1984).

If the EEOC has proven its prima facie case, the burden reverts to Western to demonstrate that the "Government's proof is either inaccurate or insignificant." *Teamsters*, 431 U.S. at 360; *see also Thiessen*, 267 F.3d at 1106. If Western fails to meet that burden, this Court may award "'prospective equitable relief.'" *Apsley*, 691 F.3d at 1194 (quoting *Teamsters*, 431 U.S. at 361).

In the second phase of trial, if the EEOC has proven its prima facie case, the individual

victims for whom the EEOC seeks relief are entitled to "a presumption that the employer

discriminated against them." *W. Distrib. Co.*, 322 F. Supp. 3d at 1103; *Teamsters*, 431 U.S. at

362 (presumption that "any particular employment decision, during the period in which the

discriminatory policy was in force, was made in pursuit of that policy"). If the EEOC does not

prevail in this initial phase, the EEOC is "nevertheless entitled to proceed on [] individual claims

of discrimination" in Phase II. *Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1128 (10th Cir.

2009) (*citing Thiessen*, 267 F.3d at 1106 n. 8); *W. Distrib. Co.*, 322 F. Supp. 3d at 1103 (Phase II

"will decide all individual claims," ECF 166 at 17, 3-4).

Summary judgment is appropriate for finding the EEOC has proven the existence of the

alleged pattern or practice of disability discrimination. *See United States v. City & Cty. of

Denver*, 943 F. Supp. 1304, 1308-13 (D. Colo. 1996), aff'd sub nom. *Davoll v. Webb*, 194 F.3d

1116 (10th Cir. 1999) (finding prima facie case of pattern-or-practice discrimination under the

ADA on summary judgment); *United States v. S. Dakota Dep't of Soc. Servs.*, 344 F. Supp. 3d

1055, 1060-75 (D.S.D. 2018) (same, in Title VII case). Summary judgment may be rendered on

the EEOC's entire case or on individual elements of the case. Fed. R. Civ. P. 56, Advisory

Comm. Notes (2010) ("summary judgment may be requested not only as to an entire case but

also as to a claim, defense, or part of a claim or defense"); *United States v. Pioneer Nat. Res.

Co.*, 309 F. Supp. 3d 923, 925 n. 1 (D. Colo. 2018).

**B.  Western's full duty policy constituted a standard operating procedure of unlawful
    discrimination against Western employees.**

Western's Employee Policy Manual stated the full-duty policy in black and white, time and

again, in every manual issued since at least 2009. PSF 11-12. The Employee Policy Manual

states that to return after an injury, an employee's "physician report must state that [the

employee] can return to **full duty** or that [the employee is] 'discharged' before [the employee]

can return to work at **full duty**." PSF 12 (emphasis added). The two physicians Western typically

required its employees to see, Dr. Ladwig and Dr. Brignoni, explained under oath that "full duty"

means "no restrictions" or "returning without restrictions." PSF 8-9, 14.

    The testimony of Western's managers affirms and clarifies the full-duty policy. Mark

Respass, Safety Director from 2010 to 2014, testified that to return to work after an injury, an

employee needed to provide a doctor's note saying the employee could work "full duty to drive a

commercial vehicle with no restrictions." PSF 21-23. Respass's successor, Michael Padilla,

testified that the doctor's note must say the employee was "released of all restrictions from their

injuries, [so that] they're back to full duty." PSF 25. Western's longtime Safety Supervisor,

Wayne Long, testified adamantly that to work at Western, applicants must provide a medical

release showing that the employee "has no restrictions, and can operate a commercial vehicle."

PSF 27. Lakesha McLemore, Western's benefits coordinator and then HR Manager from 1999 to

2008, confirmed under oath that to return to work, employees must submit a medical note stating

"that the person can return to full duty" or "that they can return without restrictions." PSF 18.

Janice Hunt, benefits coordinator from 2001 to 2010, testified that employees could not return

until medically released to "full duty," and if they did not meet this standard, they were

discharged. PSF 15. That is how Hunt explained Western's full-duty policy to managers,

employees, and even to Western's workers' compensation carrier, Pinnacol. PSF 10, 42-44. And

HR Director Jennifer Maddox testified that Western stopped offering modified duty work in

2010. PSF 17.

    Western management's emails are more evidence of the policy and its implementation. HR

Director Maddox's successor, Stephanie Dechant, wrote in emails in early 2018 that Western

"doesn't have any modified duty" and that to return to work, an employee must be "full duty, no restrictions." PSF 19. Safety Supervisor Wayne Long wrote in a 2017 email that return-to-work medical releases should state that the employee is "released with no lifting restrictions to operate a Commercial motor [sic] Vehicle." PSF 28. And Safety Director Respass wrote in a 2012 email to multiple Western departments that the return-to-work process is initiated by a "full release . . . to drive a commercial vehicle without restrictions." PSF 24.

The full-duty policy is also evident in the business records and testimony of third parties Pinnacol and Aviation. Aviation's documents include a 2017 memo regarding Western driver John Cooper stating "there is no point in us seeing him until he is FULL DUTY no restrictions from his surgeon. Western will not accommodate an OTR driver on restriction." PSF 7, 34. Aviation was well aware of Western's regular practice, as was Pinnacol. From at least 2005 and through at least 2018, the notes of Pinnacol's claim managers are replete with references to Western not providing accommodation or light duty work. PSF 10, 29-33. The notes not only confirm Western's full-duty policy, they also often memorialize instructions from Western. PSF 31. Examples include "the employer cannot accommodate restriction of any kind per Jennifer [Maddox]," "the employer has no light duty and will not have any in the future," "[t]hey need him to be at full duty and able to drive per DOT standards before he can return to work," and "the [injured worker] must be at full duty before he can return to work." *Id*. Pinnacol understood that "full duty" in the notes meant "without restrictions." PSF 32. And Pinnacol confirmed that the notes were based on conversations with Western's HR staff, Hunt, and Maddox. PSF 33.

Western's Employee Policy Manual, its managers' testimony and records, and third-party evidence from Pinnacol and Aviation establish the existence of Western's full-duty policy beyond genuine dispute. Thus, the EEOC's prima facie case is proven if the policy constitutes

unlawful discrimination. *Teamsters*, 431 U.S. at 336, 360; *Thiessen*, 267 F.3d at 1106; *Apsley*, 691 F.3d at 1194. Courts regularly find that full-duty policies violate the ADA. 1 Barbara Lindemann, Paul Grossman, & Geoff Weirich, *Employment Discrimination Law,* § 13.VI.B (6th ed. 2020) ("'100% healed' or 'fully healed' policies, which prohibit injured employees from returning to work unless they can do so without restrictions, violate the ADA."). In the landmark case *McGregor v. Nat'l R.R. Passenger. Corp.*, the Ninth Circuit held that a full-duty policy like Western's:

> discriminates against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified individual is "100% healed" from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation.

187 F.3d 1113, 1116 (9th Cir. 1999) (collecting cases). As a result, the court found that full-duty policies are "a *per se* violation of the ADA." *Id.*

"Courts have 'consistently found' that such '100% healed' or 'fully healed' policies violate the ADA." *Warmsley v. New York City Transit Auth.*, 308 F. Supp. 2d 114, 122 (E.D.N.Y. 2004) (quoting *EEOC v. Yellow Freight Systems, Inc.*, No. 98 CIV. 2270, 2002 WL 31011859, at *20 (S.D.N.Y. Sept. 9, 2002)). The Tenth Circuit stated:

> [S]uch policies are considered discriminatory because they "permit[ ] employers to substitute a determination of whether a qualified individual is 100% healed from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation."

*Gardenhire v. Manville*, 722 F. App'x. 835, 839–40 (10th Cir. 2018) (quoting *McGregor*, 187 F.3d at 1116).[4] In *Hutchinson v. United Parcel Serv., Inc.*, the court held that an employer with a full-duty policy:

> does not make an individual assessment of an individual's ability to perform the essential functions of the person's job with or without accommodation following injury and resulting permanent disability, but substitutes for this inquiry simply a determination of whether the person is "100% healed."

883 F. Supp. 379, 397 (N.D. Iowa 1995); *see also Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 699 (7th Cir. 1998); *Heise v. Genuine Parts Co.*, 900 F. Supp. 1137, 1152 & n. 10 (D. Minn. 1995); *Barton v. Checkers Drive-In Restaurants, Inc.*, 2011 WL 1193061, at *3 n. 19 (E.D. La. 2011); *EEOC v. Yellow Freight System, Inc.*, 2002 WL 31011859, at *20.

Like the policies in the cases cited above, Western's full-duty policy replaces the individualized reasonable accommodation process with a categorial "100% healed" or "no restrictions" standard. Consequently, the policy is per se discriminatory, and the EEOC has established its prima facie case for liability as to this regular practice by Western.

## C. Western's inflexible maximum leave policy constituted a standard operating procedure of unlawful discrimination.

Like the full-duty policy, Western repeatedly stated the inflexible maximum leave policy in in its Employee Policy Manual from 2007 to the present. PSF 11, 35. The Employee Policy Manual—which is the policy manual that Western provides to its employees—states: "If you are not able to return at the end of the twelve-week period, you will be replaced in your position and your employment with the company will be terminated." PSF 13, 35. The language has not changed since at least 2007, and until 2015, Western's Employee Policy Manual never included

---

[4] *Gardenhire* held the evidence before the court inadequate to create a triable issue of fact as to the existence of a 100% healed policy, in an individual case that did not involve the pattern-or-practice framework or the government's right to seek redress for a prima facie case of liability.

any language suggesting that exceptions would be made to reasonably accommodate disabilities. PSF 11, 35-36.

Western has repeatedly confirmed the existence of the policy in its responses to the EEOC and in its managers' testimony. In responses to three separate charges of discrimination, Western's counsel thrice admitted that Western's "policy and practice is to automatically discharge employees who are not able to return to work after the 12 weeks of FMLA" and that Western makes "no exceptions" or "does not grant exceptions" to the policy. PSF 37-38. In sworn testimony given in April 2012, HR Director Maddox testified: "If the leave or the illness is going to extend past the twelve weeks, again we terminate the employment at the twelve-week marks" [*sic*]. PSF 39, 41. Maddox also explained in her April 2012 sworn testimony that she did not consider a request to extend leave to be a reasonable accommodation. PSF 40. Western's former benefits coordinator, Hunt, affirmed not only that employees are discharged after twelve weeks if they are not yet "full duty," but that she informed Western's employees, managers, and Western's workers' compensation insurer of the policy. PSF 42-44. She also informed third parties that the policy applied regardless of the employee's reason for leave, "whether it be FMLA, workers' compensation, or long-term disability." PSF 43. Safety Director Respass testified that employees were terminated "once the 12 weeks expired." PSF 45.

As with the full-duty policy, Pinnacol's notes evidence the inflexible maximum leave policy and its regular usage by Western dating to at least 2005. PSF 32, 43, 64-65. Pinnacol's notes from the files of Anthony Padilla ("laid off because > 12 weeks FMLA"), Linda White ("since she has used up all her family leave she does not have a job to go back to"), Julianne Lafuria ("she will be laid off after 12 weeks"), and Curtis Lien ("does not know if he will be ready by 4/18 which is the 12 week time frame for employer to hold his job"), among others, include

41

unmistakable references to the inflexible leave policy. PSF 64-65. The notes for Daniel Dennison show an employee and insurer attempting to speed up medical treatment to beat the FMLA leave deadline, saying Dennison "was going to see if he could be released on Monday of this week . . . so he could return to work at the 90 days prior to policy taking effect, which is termination after being off work for 90 days without return." PSF 65. The notes continue: "Now [Dennison] has missed 90 days, per protocols and policy of trucking company Western, he is under termination if not RTW full duty." *Id.* Western had actually discharged Dennison a week prior, writing on his separation notice "FMLA Expired on 5/3/10." PSF 66. Western used the same "FMLA expired" designation, or variants of it, as the justification for discharging at least 45 other employees dating back to at least 2006. PSF 67.

Western's Employee Policy Manual, company statements, manager testimony, and third-party evidence establish beyond genuine dispute the existence of Western's inflexible, no-exceptions maximum leave policy, and so the EEOC's prima facie case is proven if the policy constitutes unlawful discrimination. *Teamsters*, 431 U.S. at 336, 360; *Thiessen*, 267 F.3d at 1106; *Apsley*, 691 F.3d at 1194. Because the inflexible maximum leave policy does not allow for exceptions to accommodate employees with disabilities, and because the policy results in the discharge of employees who might have been accommodated and continued to be employed if Western had engaged in the requisite interactive process, this standard is met.

The same principles that compel a finding that the full-duty policy is inherently discriminatory also compel a finding that Western's inflexible maximum leave policy is inherently discriminatory. Full-duty policies are inherently discriminatory because they permit an employer to substitute a blind, automatic rule for the "individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or

without accommodation" required by the ADA. *McGregor*, 187 F.3d at 1116; *Gardenhire*, 722 F. App'x at 839-40; *Hutchinson*, 883 F. Supp. at 397. Whether the blind, automatic rule is excluding all employees with medical restrictions or excluding all employees who need an exception to Western's cap at twelve weeks of medical leave, the effect is the same: the employer is not considering reasonable accommodations for the individual or conducting the individualized assessment required under the ADA. The employer should be equally liable for the resultant harm caused by its blind policies, whether the policy is a full-duty rule or an inflexible maximum-leave rule. Accordingly, the EEOC asks this Court to find that Western's implementation of its inflexible, no-exceptions maximum leave policy is inherently discriminatory and that the EEOC has proven its prima facie case.

1.  <u>**Western violated the ADA by not considering accommodations for employees with disabilities, rather than automatically discharging employees unable to return to "full duty" after twelve weeks.**</u>

A finding of discrimination is also compelled by established law and the facts here. Western violated the ADA by automatically discharging employees after twelve weeks of medical leave, without an individualized assessment of what reasonable accommodations could be provided to employees with disabilities. A number of accommodations should have been considered, including additional leave as an exception to Western's usual leave policy, use of assistive devices or workplace modifications, and reassignment if the employee was no longer able to perform their existing job. Western should be found liable for its policy that prevented these accommodations from being considered and provided to qualified employees with disabilities.

The ADA mandates that employers provide reasonable accommodations to employees with disabilities via an individualized, interactive process. The ADA defines discrimination to include both denying reasonable accommodations to qualified individuals with disabilities and denying employment opportunities based on the need to provide accommodations for disabilities. 42

U.S.C. § 12112(b)(5)(A)-(B). A "fact-specific, individualized inquiry" is required to determine the reasonableness of an accommodation, "including whether it imposes an undue hardship on the employer." *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999). The mandatory individualized inquiry requires the employer and employee to meet "in good faith in an interactive process to identify [the employee's] precise limitations and to explore whether there was any accommodation that could enable [the employee] to return to work and perform the essential functions of her job." *Aubrey v. Koppes*, 975 F.3d 995, 1009 (10th Cir. 2020) (plaintiff survived summary judgment based, in part, on evidence that the employer failed to engage in the interactive process). An employer must do its own research on potential accommodations, including consulting experts. *Woodman v. Runyon*, 132 F.3d 1330, 1345 (10th Cir. 1997). As the Tenth Circuit has put it: "There may not always be a workable accommodation, but the ADA ***mandates*** that the employer work with the employee to try to find one." *Aubrey*, 975 F.3d at 1009 (emphasis added).

Once an employer is notified of the individual's medical condition or need for accommodation, the employer is ***required*** to engage in the interactive process. *Valdez v. McGill*, 462 Fed. App'x. 814, 819 (10th Cir. 2012) (citing 29 C.F.R. § 1630.2(o)(3)). The interactive process usually requires meeting with the employee, requesting information about the employee's condition and limitations, indicating to the employee that the employer is considering the request, and offering and discussing reasonable alternatives, all of which show the employer's good-faith effort to consider accommodations. *Williams v. Prison Health Servs., Inc.*, 159 F. Supp. 2d 1301, 1310 (D. Kan. 2001), *aff'd,* 35 Fed. App'x. 774 (10th Cir. 2002). "An employer who fails to engage in a sufficient interactive process risks not discovering a means by which an employee's disability could have been accommodated and thereby increases

the chance that it will be found to have violated the ADA." *Purewal v. T-Mobile USA, Inc.*, 17-CV-2595-JTM, 2019 WL 4805994, at *9 (D. Kan. Oct. 1, 2019) (internal quotes omitted).

Reasonable accommodations include, among other things, acquisition, or modification of equipment or devices, granting an employee a leave of absence, extending that leave of absence, making exceptions to existing policies, and reassigning employees to vacant positions. *See* 42 U.S.C. § 12111(9)(B). First, purchasing equipment as an assistive device can be a reasonable accommodation, as can modifying existing equipment. *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 915 (10th Cir. 2004) (employer could have reasonably accommodated employee by allowing him to use a cart and reducing the length of his workday); *Best v. Shell Oil Co.*, 107 F.3d 544, 545-49 (7th Cir. 1997) (modifying truck cab to provide sufficient leg room to avoid the need to flex the knee beyond the 90–degree position was reasonable accommodation).

It is settled law that a leave of absence may be a reasonable accommodation. *See Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128, 1135-36 (9th Cir. 2001) ("A leave of absence for medical treatment may be a reasonable accommodation under the ADA," citing 29 C.F.R. 1630.2(o)); *Nunes*, 164 F.3d at 1247 ("Unpaid medical leave may be a reasonable accommodation under the ADA. *See* 29 C.F.R. Part 1630, Appendix (discussing § 1630.2(o))"); *Aubrey*, 975 F.3d at 1010-1011. "[T]he ADA does not require an employee to show that a leave of absence is certain or even likely to be successful to prove that it is a reasonable accommodation." *Humphrey*, 239 F.3d, at 1136 (citing *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 878-79 (9th Cir. 1989)).

Extending leave is also a potentially reasonable accommodation. *Rascon v. US W. Commc'ns, Inc.*, 143 F.3d 1324, 1328-29, 1335 (10th Cir. 1998) (rejecting defendant's undue hardship defense over a 30-day extension of a 4-month leave); *Nunes*, 164 F.3d at 1247 ("Even an extended medical leave, or an extension of an existing leave period, may be a reasonable

accommodation if it does not pose an undue hardship on the employer"). Additionally, making exceptions to existing policies is another accommodation expressly provided for in the ADA. 42 U.S.C. 12111(9)(B) (specifying "appropriate adjustment or modifications of . . . policies"); *see also*, *EEOC v. Dolgencorp, LLC*, 196 F. Supp. 3d 783, 805-06 (E.D. Tenn. 2016) (granting diabetic employee an exception to policy against food while working could be reasonable accommodation). Thus, if an extension of leave is reasonable, an employer can be required to grant the extension even if doing so would provide more leave than allowed under the employer's policy. *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 646 (1st Cir. 2000) ("The company's apparent position that the ADA can never impose an obligation on a company to grant an accommodation beyond the leave allowed under the company's own leave policy is flatly wrong under our precedent.") (citing *Ralph v. Lucent Technologies, Inc.*, 135 F.3d 166, 171-72 (1st Cir.1998)).

Reassignment to a vacant position is another accommodation expressly provided in the ADA. 42 U.S.C.A. § 12111(9)(B); *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1164 (10th Cir. 1999). Reassignment "must be considered and, if appropriate, offered if the employee is unable to perform his or her existing job." *Midland Brake*, 180 F.3d at 1167. The reassignment obligation requires "something more than merely allowing a disabled person to compete equally with the rest of the world for a vacant position." *Davoll*, 194 F.3d at 1131 (quoting *Midland Brake*, 180 F.3d at 1165)); *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204-06 (10th Cir. 2018) (reassignment may be required even where the reassigned employee is not the most qualified person for the job). The employee must make the employer aware of his interest in reassignment, but it is sufficient for the employee to make clear his desire for continued employment. *Midland Brake*, 180 F.3d at 1172 (citing *Hendricks-Robinson*, 154 F.3d at 694 ("A

request as straightforward as asking for continued employment is a sufficient request for accommodation.")); *see also Boudreau v. Bethesda Found. of Nebraska*, 114-CV-03451-CMA-CBS, 2016 WL 322706, at *4 (D. Colo. Jan. 27, 2016); *Gallegos v. Swift & Co.*, 237 F.R.D. 633, 657 (D. Colo. 2006).

Critically, the interactive process does not end with the initial accommodation. "The employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed." *Humphrey*, 239 F.3d at 1138; *Dillard v. City of Austin, Texas*, 837 F.3d 557, 562–63 (5th Cir. 2016) (same); *Ralph*, 135 F.3d at 172 ("The duty to provide reasonable accommodation is a continuing one, however, and not exhausted by one effort"); *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir.1996) (same). For example, in *Campbell v. Wal-Mart Stores, Inc.*, 272 F. Supp. 2d 1276, 1283-84 (N.D. Okla. 2003), a deaf and legally blind employee had worked satisfactorily for several years with a co-worker helping to translate. But after the co-worker resigned and the store layout was changed, Wal-Mart needed to engage in the interactive process and give new consideration to what accommodations were needed. *Id.* at 1284, 1292.

In this case, Western's inflexible maximum leave policy led to employees with disabilities being automatically discharged without consideration of possible accommodations and with no interactive process.[5] The evidence shows the lack of an interactive process at Western. Although Western now claims (in this litigation) that before each discharge it did a case-by-case analysis

---

[5] This is not to say Western ultimately enforced its inflexible leave policy against everyone, but only that the policy was "the regular rather than the unusual practice," *Cooper*, 467 U.S. at 876, and its operation automatically discharged several employees without consideration of possible accommodations or interactive process.

and determined no accommodation was possible, Western has not produced even one document evidencing that alleged individualized analysis. Western has not produced the notes, memos, calendar entries, emails, or checklists that would exist and show the meetings or discussions if Western had engaged in a good-faith interactive process with the 57 aggrieved individuals. Instead, many aggrieved individuals first learned they were being discharged by mail. PSF 85-86. And Western's management was not even aware of what the interactive process was, asking the EEOC for clarification about the meaning of the term during the investigation that preceded this litigation. PSF 78. This tracks the testimony of multiple members of Western management who testified that they did not know the meaning of the phrase. PSF 79-84. Moreover, although the notes of Western's third-party agents, Pinnacol and Aviation, are full of references to the full-duty policy and 12-week leave policy, *see* PSF 30-34, 43, 64-65, the notes contain no reference to any interactive process, individualized assessment, or reasonable accommodation as to any of the 57 aggrieved individuals. To the contrary, the notes say "Employer will not accommodate." PSF 31.

Western had sufficient notice to trigger the interactive process. Western was on notice of the employee's medical condition from the employee's initial request for medical leave or from workers' compensation records, among other sources. PSF 87-88. Notice of the medical condition triggered the obligation to engage in the interactive process. *Aubrey*, 975 F.3d at 1009; *Valdez*, 462 Fed. App'x. at 819. Granting medical leave was an initial accommodation, *Aubrey*, 2020 WL 5583649, *10, but was not the end of the required interactive process. *Humphrey*, 239 F.3d at 1138. When an employee could not return to work after twelve weeks of leave, Western was on notice that the initial accommodation had not been fully successful, and that additional accommodation may be needed. *Id.* As in *Campbell*, the changed circumstances required

Western to engage with the employee in the interactive process to ascertain, based on the employee's individual abilities and limitations at the time, whether some accommodation would enable the employee to perform the essential job functions. *Campbell*, 272 F. Supp. 2d at 1292. Alternatively, if the employee was no longer able to do their own job, their request for leave was sufficient notice of their desire to remain employed that Western was required to consider reassignment to a vacant position as a possible accommodation. *Midland Brake*, 180 F.3d at 1167, 1172. But Western did not consider reassignment and instead required employees to be "full duty" to return to their CDL driving jobs, PSF 11-12, 15, 18-34, and discharged those unable to return to "full duty" within twelve weeks. PSF 15, 35, 37-39, 41-45.

Western's automatic approach to discharging employees because of its inflexible maximum-leave policy included no interactive process to consider other potential accommodations. As in *Aubrey*, Western (1) did not ask employees about their limitations resulting from their disability; (2) did not discover—from the employees, or their medical providers, or other experts—whether reasonable accommodations would have enabled employees to return to work; and (3) did not give employees appropriate notice of prerequisites to return to work or any additional time to obtain the information Western required. PSF 85; *Aubrey*, 975 F.3d at 1008-09. If Western had engaged in the interactive process, it would have gained an understanding of the employees' medical conditions and prognoses for improvement. *Williams*, 159 F. Supp. 2d at 1310; *see Aubrey,* 975 F.3d at 1009. For example, if an employee's medical provider indicated the employee was fit to drive a truck but could not do any lifting over fifteen pounds, Western should have considered whether the employee's job actually required lifting over fifteen pounds, and if so, whether some lifting device or other accommodation could be provided to the driver to enable the driver to do the necessary lifting. But Western instead automatically discharged

49

employees after 12 weeks of leave, with no interactive process and did not conduct the individualized assessment required by the ADA.

Western's lack of interactive process before discharge was particularly harmful because Western did not give its employees reason to know they might be entitled to reasonable accommodation or that an exception might be made to the policies as necessary to accommodate a disability. Western expressly stated its full-duty and inflexible 12-week leave policies in its manuals provided to employees, but Western did not include a Reasonable Accommodation policy until 2015. PSF 12, 35-36. Similarly, Western failed to conduct the required individualized assessment—or even obtain the information necessary to conduct the assessment—and instead mailed discharge letters automatically. PSF 37, 85. Thus, employees knew they would be discharged after 12 weeks if they could not by then return to "full duty" without medical restrictions, but they did not know they could request accommodation or engage in the interactive process. Western's policies effectively shut the door on the interactive process.

While the merits of individual employees' cases will be proven in later proceedings and are not relevant to this summary judgment motion, examples of the impact of Western's inflexible, no-exception maximum leave policy show the policy's discriminatory effect. Particularly illustrative are the experiences of Clinton Kallenbach and Steve Bahmer. Western discharged Kallenbach on the day his 12-week leave expired, even knowing that Kallenbach's own doctor had released him to work without restrictions, and the only thing preventing Kallenbach from working was Western's requirement that he see Dr. Ladwig for a DOT medical certification, which appointment was scheduled for 9 days after Kallenbach's 12-week leave had expired. PSF 52-57. Rather than extend Kallenbach's leave for 9 days, Western discharged him, asserting to the EEOC that discharge was necessary because no exceptions were made to the inflexible leave

policy. PSF 57. Similarly, Steve Bahmer injured his spine in December 2013, and by February 2014 his doctor estimated he would be recovered on approximately April 11, 2014. PSF 58, 60. And the doctor's estimate proved to be accurate—Bahmer was released for work on April 14, 2014. PSF 63. But again, rather than extend Bahmer's leave by a few weeks, Western discharged him on March 3, 2014, the date his 12-week leave expired. PSF 61. These and other aggrieved individuals could have met Western's illegal full-duty requirement and returned to work, were it not for Western's "no exceptions" inflexible maximum leave policy.

By refusing to make any exceptions to extend leave as a reasonable accommodation for disability, Western violated the ADA with regard to every qualified individual with a disability who needed a reasonable extension of leave as an accommodation. No reasonable jury could conclude, on a preponderance of the evidence standard, that Western's application of its inflexible maximum leave policy did not regularly deny reasonable accommodation to employees with disabilities. Accordingly, the EEOC has proven Western's inflexible 12-week policy existed and operated to deny employment opportunities to employees with disabilities who were discharged under the policy, and as a result, summary judgment is appropriate as to Western's liability on this claim.

## IV.  WESTERN USED DISCRIMINATORY QUALIFICATION STANDARDS PROHIBITED UNDER SECTIONS 102(B)(3) AND 102(B)(6) OF THE ADA.

Through several baseless discriminatory standards and a battery of tests, Western screened out individuals with disabilities. Collectively these tests, policies, and standard procedures formed Western's effort to reduce workers' compensation costs by screening out people with pre-existing conditions or prior on-the-job injuries, many of whom are people with disabilities. When Western's CEO was warned by the general manager and Vice-President that the standards do not reflect the job's tasks, the CEO insisted that the standards were working because workers'

compensation claims were decreasing. PSF 126-127. These standards holistically and independently violated Sections 102(b)(3)  and (b)(6)  of the ADA. The EEOC seeks summary judgment as to its disparate impact claims under Sections 102(b)(3) and/or (b)(6) of the ADA.

### A.  Legal standards

Two provisions of the ADA prohibit employers from using standards and criteria that deny employment opportunities based on disabilities. Section 102(b)(3)  "prohibits employers from 'utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability.'" 42 U.S.C. § 12112 (b)(3)(A); *see also* 29 C.F.R. § 1630.7 (a). Section 102(b)(6) prohibits use of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities . . ." 42 U.S.C. § 12112(b)(6); *see also* 29 C.F.R. § 1630.10(a) and 1630.15(b), (c).

ADA regulations and guidance define qualification standards and selection criteria. "[Q]ualification standards" are defined as "the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q). Qualification standards must "fairly and accurately measure the individual's actual ability to perform the essential functions of the job." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007). ADA interpretive guidance defines "selection criteria" to include safety requirements, lifting requirements, and employment tests. *See* 29 C.F.R. Pt. 1630, App. § 1630.10(a).

### 1.  Disparate impact prima facie case

To establish a disparate impact prima facie case under both sections 102(b)(3)  and (b)(6) , a plaintiff must "1) identify the challenged employment practice or policy and pinpoint the

Defendant's use of it; 2) demonstrate an adverse impact on a group that falls within the protective class; and 3) demonstrate a causal relationship between the identified practice and the adverse impact." *EEOC v. CTI, Inc.*, CV-13-1279-TUC-DCB, 2015 WL 11120707, at *10 (D. Ariz. May 8, 2015) (citing *Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 834, 839 n. 26 (5th Cir. 1999)). Disparate impact claims do not require a showing of discriminatory motive or intent. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993). In claims under Sections 102(b)(3)  and (b)(6) , a private plaintiff may satisfy the second element by establishing an adverse impact on a single individual rather than a group of individuals. *Gonzales*, 176 F.3d at 839 n. 26 (citing*,* 1 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 333–34 (3d ed. 1996)); *see also* 42 U.S.C. § 12112(b)(6) (prohibiting the use of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out ***an individual with a disability*** or a class of individuals with disabilities . . .") (emphasis added). Statistical evidence is not required. *Id.*

### 2.   Disability status under the ADAAA

The 2008 amendments to the ADA made it easier to establish disability status, which may be shown in three ways based on the statutory definition. "Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities . . .; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 USC 12102(1). *See Williams v. AT&T Mobility Serv., LLC*, 186 F. Supp. 3d 816, 825-826 (W.D. Tenn. 2016). When amending the ADA in 2008, Congress declared, "the question of whether an individual's impairment is a disability under the ADA *should not demand extensive analysis.*" Pub. L. No. 110–325, § 2(b)(5), 122 Stat. 3553, at 3554 (emphasis added); *see also Adair v. City of Muskogee*, 823 F.3d 1297, 1304-05 (10th Cir. 2016). For example, conditions such as diabetes, cancer, epilepsy, and PTSD will "virtually always" be a disability under the ADA. 29 C.F.R. §

1630.2(j)(3) ("predictable assessments"). The "record of" disability prong under the ADA is satisfied with evidence, such as medical records, showing the individual had a history of an impairment that substantially limits a major life activity. *EEOC v. Midwest Reg'l Med. Ctr., LLC*, No. CIV-13-789-M, 2014 WL 3881418, at *4 (W.D. Okla. Aug. 7, 2014) (finding record-of disability based on medical records showing the individual was previously treated for cancer.).

Lifting, pulling, and pushing restrictions may substantially limit major life activities. In assessing whether an impairment "substantially limits" a major life activity, the 10th Circuit, and ADA regulations and guidance recognize that certain physical restrictions substantially limit major life activities. *See Lusk v. Ryder*, 238 F.3d 1237, 1240 (10th Cir. 2001) (affirming that a 15-lb. lifting restriction is "substantially limiting on its face and in such cases, additional evidence is not required); 29 C.F.R. §1630.2(j)(3) (identifying conditions that "virtually always" qualify as disabilities); *see also*, 29 C.F.R. Pt. 1630, App. at §1630.2(j)(1)(ix) ("[I]f an individual has a back impairment that results in a 20 lb. lifting restriction that lasts for several months, he is substantially limited in the major life activity of lifting . . ."). Courts have also recognized pushing and pulling as major life activities. *Maxwell v. Cty. of Cook*, 10 CV 00320, 2014 WL 3859981, at *3 (N.D. Ill. Aug. 4, 2014); *White v. Telcom Credit Union*, 874 F. Supp. 2d 690, 694 (E.D. Mich. 2012); *see also Smith v. C.K.L.C., LLC*, No. CIV-15-1305-L, 2016 WL 11594236, *1 (W.D. Okla. May 25, 2016) (major life activity of performing manual tasks often require lifting, pushing, and pulling). Under the same logic as *Lusk* and the ADA guidance, an impairment that results in a similarly low-weight pulling or pushing restriction is substantially limiting on its face, without additional evidence.

### 3. <u>Sections 102(b)(3) and (b)(6) do not require a showing of qualifications</u>

Under Sections 102(b)(3) and (b)(6), the EEOC need not show an individual was a *qualified* individual with a disability. Unlike other provisions of the ADA, these sections do not include

the word "qualified", or the phrase "qualified individual with a disability." *Compare* 42 U.S.C.

§§ 12112(b)(2), (b)(4), (b)(5)(A), and (b)(5)(B), which include the word "qualified," *with* 42

U.S.C. §§ 12112(b)(3) and (b)(6),  which do not. It is a well settled rule of statutory construction

that "where Congress includes particular language in one section of a statute but omits it in

another section of the same Act, it is generally presumed that Congress acts intentionally and

purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23

(1983). Here, Congress used "qualified" or the phrase "qualified individual with a disability"

when intending to require proof of qualifications. The Court should not read into Sections

102(b)(3)  and (b)(6) a qualifications requirement that Congress omitted from those provisions. It

makes sense that proof of an individual's qualifications is not required to challenge a company's

discriminatory qualification standard because the legitimacy of the standard turns on whether it

accurately measures ability to perform essential job functions, and the ADA defines a "qualified

individual" in terms of performing essential job functions, with or without reasonable

accommodations. 42 U.S.C. § 12111(8). Thus, if the qualification standard is unlawfully

discriminatory, it cannot be a bases to determine an employee unqualified. And requiring an

employee challenging a standard to first prove he is qualified, puts the cart before the horse when

he is treated as unqualified based on the unlawful standard. Accordingly, the EEOC is not

required to prove each individual's qualifications.

Nevertheless, should the Court require a showing of qualifications, this requirement is met

by evidence the person previously held a similar position or the employer extended the person a

conditional offer. *Hatter v. WMATA*, 244 F. Supp. 3d 132, 136 (D.D.C. 2017) (Applicant

qualified for bus driver position based on previous experience driving a commercial passenger

bus, and defendant employer extending a conditional job offer.). Similarly, a person who

currently holds and has satisfactorily performed the position for some time, has proved their ability to perform the essential job functions, with or without accommodation. *See, e.g.*, *Villalobos v. TWC Admin. LLC*, 720 Fed. App'x. 839, 842 (9th Cir. 2017) (considering evidence of prior satisfactory performance to show the plaintiff could perform job duties with accommodation of extended leave; proper question is whether extended leave was reasonable and did not impose undue hardship on employer).

### 4. <u>Western's burden to show its discriminatory standards are job related and consistent with business necessity</u>

Once the plaintiff establishes its prima facie case the employer bears the burden to prove the standard, tests, or selection criteria are job related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation. 42 U.S.C. § 12113(a); *cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78 (2002) (explaining that Sections 102(b)(6) and 103(a) create an affirmative defense for standards shown to be job-related for the position in question and consistent with business necessity); *see also* 29 C.F.R. § 1630.7 (applying the job-related/business-necessity defense to claims under Section 102(b)(3) ). In general, "discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." *Albemarle Paper Co. v. Moody*, 422 US 405, 431 (1975).

Under this defense, Western "must prove by a preponderance of the evidence that its qualification standards are: (1) uniformly applied; (2) job-related for the position in question; (3) consistent with business necessity; and (4) cannot be met by a person with [the employee's] disability even with a reasonable accommodation." *Atkins v. Salazar*, 677 F.3d 667, 681–82 (5th Cir. 2011). "An employer urging a business necessity defense must validate the test or exam in

question for job-relatedness to the specific skills and physical requirements of the sought-after position." *Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir. 1999). Indeed, to show a qualification standard is "'job-related," "the employer must demonstrate that the qualification standard is necessary and related to 'the specific skills and physical requirements of the sought-after position.'" *Atkins*, 677 F.3d at 682, citing *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001) (quoting *Belk*, 194 F.3d at 951).

A business necessity defense also fails when a test lacks content validation.[6] *Harris v. Union Pacific Railroad Co.*, 953 F.3d 1030, 1035 (8th Cir. 2020) (citation omitted); *See* 29 C.F.R. § 1607.3 (selection standards with an adverse impact on a protected class are discriminatory "unless the procedure has been validated."); *see also Ernst v. City of Chicago*, 837 F.3d 788, 800 (7th Cir. 2016) (general physical fitness tests and exams measuring "generalized strength" are not permitted); 29 C.F.R. § 1607.14(C) (the standard should be a "representative sample of the content of the job").

If Western meets its burden then the EEOC may rebut the business necessity defense by showing there are less discriminatory practices that achieve the same business necessity. *Albemarle*, 422 U.S. at 425. If Western cannot meet its burden, then the EEOC's prima facie case of disparate impact is "conclusive on the issue of discrimination." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1152 (10th Cir. 2008) ("Once established, however, a prima facie case of disparate impact shifts the burden of proof and is conclusive on the issue of discrimination unless defendant proves business necessity for the challenged practice to rebut the prima facie case.") (internal citation omitted). Thus, if Western cannot prove its business

---

[6] For further discussion on the distinction between content and construct validation, *see, Gulino v. New York State Educ. Dept.*, 460 F.3d 361, 383–84 (2d Cir. 2006)

necessity defense, the EEOC need not show less discriminatory practices.

**B.  Western used five qualification standards that deny employment opportunities because of disability, in violation of the ADA.**

The full-duty and "no exceptions" maximum-leave policies discussed above are a discriminatory qualification standard under Sections 102(b)(3)  and (b)(6) . The EEOC challenges four physical tests Western used and administered to further its full-duty policy, including two lifting requirements, and two pushing or push/pull requirements. As to each, the undisputed evidence establishes a prima facie case of disparate impact, and Western cannot establish two of the four required elements of the defense – that the requirement is job related and cannot be met with a reasonable accommodation.

**1.  Western's full-duty and inflexible maximum leave policies are unlawful discriminatory standards.**

The first challenged employment practices are Western's "full-duty" and inflexible maximum-leave policies. The challenged practice here is Western's use of both policies as a discriminatory standard that discharged and failed to accommodate individuals with disabilities who could not return to full duty within 12 weeks of FMLA or medical leave. These policies, as administered, necessarily had the effect of discriminating against individuals with disabilities. As discussed above, Western's standing operating procedure was to discharge employees who were unable to return to "full duty" after 12 weeks of leave, and allowed no exceptions as a reasonable accommodation for disability. *See* Sec. II(C). The second and third disparate impact elements are met because this policy adversely impacted individuals with disabilities, such as Kallenbach, Schmotzer, Bahmer, and Valdez whom Western discharged under its full-duty and inflexible leave policies. PSF 46, 56, 62, 67, 68, 73.

Western cannot meet the burden of proving the affirmative defense for either policy. In particular, to establish the defense Western must prove the policies relate to specific job skills or

physical requirements and that the job function at issue cannot be met with reasonable accommodation. *Atkins*, 677 F.3d at 681-82. But Western cannot show the required specificity because the policies are not specific to any essential function or even any particular job. *Id.*; *see also*, *Belk*, 194 F.3d at 951; *Cripe*, 261 F.3d at 890. And because the policies are not tied to any specific job duties, Western cannot show that the duty at issue could not be performed even with accommodations.

Because the EEOC has established a prima facie case of disparate impact discrimination and Western cannot establish the job-related/business-necessity defense, the EEOC is entitled to summary judgment on its claim that Western's full-duty and maximum leave policies are discriminatory standards under Sections 102(b)(3)  and 102(b)(6) .

### 2.   <u>Western's lifting requirements for its drivers are unlawful discriminatory standards.</u>

The EEOC has established a case of disparate impact discrimination for each of two different lifting tests used by Western: 1) a 50 lb. lift-and-carry test for four categories of drivers – OTR, USAC, Local, and Yard Hostler; 2) and a 132-lb. lifting test for all drivers in the Towing department, irrespective of position.

<u>First Element:</u> Western used both lift tests as a screening device to deny employment to drivers with existing medical conditions that limited their ability to lift heavy weights. PSF 125. Since ErgoMed began testing drivers for Western in January 2008, the test battery for OTR, USAC, Local Drivers, and Yard Hostler has included a-50 lb. lift-and-carry test. *Id*. Likewise, since ErgoMed began testing tow drivers for Western the test battery for all tow drivers has included a 132 lb. lift test. PSF 112-114. This 132-lb. lift test was required for all tow drivers even though the test was designed for the most onerous towing job, the Heavy Wrecker position. PSF 112-113.

<u>Second Element:</u> The evidence shows these lifting standards adversely impacted several individuals with disabilities. For instance, Jeffrey Jarvis and David Vasquez had lifting restrictions at 15 lbs. and under for several months, PSF 192, 206, 215, establishing a lifting disability under both *Lusk* and the ADA guidance. 29 C.F.R. Pt. 1630, App. at Section 1630.2(j)(1)(ix); *see also Lusk*, 238 F.3d at 1240. Other individuals such as Korey Preston and Gary Nehrig had a disability under the record-of prong of the definition because their medical records provided to Western and/or ErgoMed showed lifting restrictions imposed due to pre-existing back conditions (back surgery, and degenerative disc disease, respectively). PSF 186, 197. Similarly, Charles Morgan had a record-of his chest injury and lifting restrictions in the records provided to Western. PSF 207. All of these are individuals with disabilities who were denied employment opportunities because they could not meet the lifting standards. PSF 187-188, 194-195, 201-202, 209-212, and 219-223.

Moreover, although the EEOC need not show qualifications, all five were, in fact, qualified for their respective positions. Jarvis, Morgan, and Preston were qualified by virtue of having previously worked for Western as drivers. *Hatter*, 244 F. Supp. 3d at 136; PSF 196, 203, 213. Vasquez and Nehrig were qualified by virtue of Western extending conditional job offers and sending them to ErgoMed for pre-employment testing, which is only done once Western determines the individual met the minimum qualifications. *Hatter*, 244 F. Supp. 3d at 136; PSF 180, 190.

<u>Third Element:</u> The causal relationship between the lifting standard and the impact on individuals with disabilities is straightforward. Western denies employment to individuals with lifting disabilities because they cannot pass the required lift or lift-and-carry tests. PSF 102-105. Western's records show that it deemed Nehrig and Vasquez "not qualified" because they "failed

ErgoMed." PSF 188, 194-195. Similarly, Jarvis was discharged because of his 10 lb. lifting restriction which prevented him from meeting the non-job-related 50 lb. standard. PSF 220, 223. These records, combined with Western's testimony that it does not hire applicants and discharges employees who fail the ErgoMed tests, PSF 105-107, show the requisite causal relationship.

Job Related/Business Necessity Defense: Western cannot show its lifting tests are job related to establish its defense. First, Western maintains the 50 lb. lifting requirement is based on the weight of tire chains, PSF 130, but the uncontroverted evidence contradicts Western's assertion that drivers actually have to ever lift tire chains. *See, e.g.*, PSF 231. First, drivers can use AutoSocks, which weigh less than 7 pounds for a pair. PSF 233.231 And if drivers are not using AutoSocks, a single chain weighs only 25 lbs. and the driver only needs to lift one chain at a time. PSF 131, 132. Lifting tire chains thus does not justify a standard requiring the ability to lift 50 lbs.

Second, because Western failed to follow industry standards in creating its PDEs and related physical demands tests and validated none of the tests, it imposed tests that are not job related and required more onerous lifting, pushing, and pulling than necessary to do the job. The process used to create the PDEs did not follow industry standards for a job analysis because no information was obtained from employees actually doing the job. PSF 149-153. And despite ErgoMed's repeated urging that the tests be validated, Western refused to authorize any validation effort until 2015, when it authorized validation of only one of the three tests being used, and provided only one employee for the validation effort while industry standards require sample testing with a group of 5 to 7 employees who have held the position for more than a year. PSF 108, 157, 163-166. The lack of any validation before 2015, and the substandard effort in 2015 to validate only the OTR test, are fatal to Western's job-relatedness defense which depends

on tests being properly validated. *Belk*, 194 F.3d at 951 (validation tests must occur to ensure the test in question is related to the specific skills and physical requirements of that position); *Albemarle*, 422 US at 431.

Western also cannot establish that installing tire chains requires the driver to lift and carry two chains, each weighing 25 lbs, for 75 feet, as required by the test. A driver has discretion to handle tire chains one at a time, or as a pair, and does not have to carry chains at all; they can be pushed off the truck and drug to where they need to be. PSF 132.

Third, Western also cannot show that no accommodation could be provided to enable drivers with lifting restrictions to safely prepare their vehicles for driving on snow and ice without having to lift or carry a 50 lb. pair of tire chains. Quite the contrary, there are several available accommodations. In particular, Western already provides Autosocks to drivers who ask to use them instead of chains, and a pair of Autosocks weighs less than 7 lbs. PSF 233, 237. Western could easily have provided Autosocks as an accommodation for drivers unable to lift 50 lbs. Other accommodations include allowing the driver to pull off the highway and wait out the storm, rerouting to locations without a mountain pass, or paying a service to install and remove chains. PSF 231. And USAC drivers could be accommodated by allowing the team member to assist with or handle the heavier lifting. PSF 110. Thus, Western cannot show the 50 lb. lift requirement could not be met with accommodation.

Similarly, Western cannot show that its 132 lb. lift test relates to the essential functions of the towing positions. Western explains that it tests all tow drivers under the rigorous standards demanded of a Heavy Wrecker driver because all tow drivers may need to assist on the scene of a recovery site. PSF 113. But Western's own witnesses testified that on rare occasions when Western calls on a tow driver to assist, a number of other employees are on site to lift or assist

with lifting the necessary item(s). PSF 118, 120.

Western's own job descriptions and witnesses also contradict its position that the 132 lb. lift test relates to being able to alone lift a commercial truck tire. PSF 119. The towing job descriptions do not reflect this supposed job function. PSF 117. And Western's own witnesses who demonstrated the towing jobs, testified they do not lift 132 lb. tires, PSF 120, and instead use the winch to lift the tire, PSF 122, an accommodation available to all tow drivers.

Also, various lifting accommodations could be provided to enable a tow driver to do any necessary lifting required for the job, such as using the winch to stand up and lift a 132 lb. tire. PSF 122. Numerous lifting devices are also available to assist individuals with lifting restrictions. *See, e.g.*, https://askjan.org/search.cfm (Lifting). Accordingly, Western cannot show the lifting requirements for tow drivers cannot be met with reasonable accommodations.

Last, rather than spend money having ErgoMed evaluate all the driving positions, Western directed ErgoMed to use the same OTR test for three other positions (Yard Hostler, USAC, and Local Driver).  Similarly, Western directed ErgoMed to use the Heavy Wrecker test for all towing jobs, even though Western had different job descriptions for all of these various positions, PSF 117, and the Heavy Wrecker position is the most physically demanding. PSF 112. As further evidence of Western's lack of regard for ensuring the standards relate to specific positions, it instructed ErgoMed to use the OTR test for the Yard Hostler position without conducting *any* evaluation that it typically performs. PSF 123-124. Western took the same approach for the USAC driver position, even though the OTR and USAC positions are "completely" different, according to Western. PSF 110. Moreover, in 2015 when Western revamped the OTR PDE to reduce the lifting and pull requirements, and eliminating the push requirement, PSF 125, 128-129, 138, it did not modify the USAC PDE thereby leaving the exaggerated 2008 OTR lifting,

push, and pull requirements in place for the USAC drivers through at least 2018 and possibly even now. PSF 110, 128. Western cannot show that these duties are related to each specific job with its hodgepodge and scattershot approach to setting company standards.

As to the two lifting tests, the Court should grant summary judgment on the EEOC's Sections 102(b)(3) and (b)(6) claims of disparate impact, or alternatively, summary judgment as to any of the three elements. In addition, Western is unable to create a triable issue of fact that its lifting requirements were job related and consistent with business necessity so the Court should grant summary judgment as to Western's defense. Because the EEOC has established a prima facie case and Western cannot establish the defense for each position, the EEOC is entitled to summary judgment on its claim that Western's 50 lb. lift-and-carry test and 132 lb. lift test, are discriminatory standards under Sections 102(b)(3) and 102(b)(6).

3.  **Western's requirement that OTR Drivers statically push and pull 130 lbs. and tow drivers push 76 lbs. 100 ft. are unlawful discriminatory standards.**

There are also no material facts in dispute as to the EEOC's claim that the 130 lb. static push/pull tests for OTR, USAC, Local Drivers, and Yard Hostlers, and the 76 lb. push requirement for tow drivers, are unlawful qualification standards.

First Element: Western used these standards as another screening device to deny employment to drivers with existing medical conditions that limit their ability to pull or push heavy weights. There is no dispute that Western denied employment opportunities to drivers who could not meet the requisite push/pull or push test, as acknowledged by both Western and ErgoMed. PSF 102-105. Routine documentation of the test and the no-job-match recommendations ErgoMed issued to Western also corroborate the standard's existence. PSF 114, 115, 125, 133, 137, 174– 176.

Second Element: The 130 lb. push/pull requirement excluded at least Ron Perkins because

of his disability. *Gonzales*, 176 F.3d at 839 n. 26. Perkins's throat cancer is a disability under the ADA because it is a physical impairment that substantially limits the major life activity of cell growth. *See* 29 CFR 1630.2(j)(3)(iii) ("at a minimum . . . cancer substantially limits normal cell growth . . ."). After recovering from treatment for throat cancer, Perkins was denied rehire because he could not pass the 130 lb. push/pull tests. PSF 173-176.

Additionally, both the 130 lb. push/pull requirement and the 76 lb. push requirement also tended to screen out other individuals like Perkins, who could not push or pull the requisite weight without accommodation because of a disability. Pushing and pulling are major life activities, *Maxwell*, 2014 WL 3859981, at *3, *White*, 874 F. Supp. 2d at 694, and are also manual tasks included in the non-exhaustive list of major life activities in the ADA. 42 U.S.C. § 12102(2)(A); *Smith*, 2016 WL 11594236, *1.

A person with low-weight push or pull medical restrictions would have a disability on the same basis that a low-weight lifting restriction constitutes a disability. *Lusk*, 238 F.3d at 1240 and 29 C.F.R. Pt. 1630, App. at Section 1630.2(j)(1)(ix). Such restrictions imposed by a medical provider are due to some impairment. And although not every illness or injury is a disability under the ADA, anyone in this group of people with push/pull disabilities was denied employment, without regard for whether their medical condition was a disability under the ADA, or whether the person was able to actually perform the job duties, with or without reasonable accommodation. Additionally, individuals with shoulder or back disabilities, such as a torn rotator cuff or a herniated disk, may be unable to push or pull the requisite weight because of such disabilities and will be denied employment at Western as a result of these push/pull standards. Therefore, Western's push and pull requirements adversely impact individuals with disabilities.

Third Element: The causal relationship between the push/pull standards and the impact on individuals with disabilities is straightforward. If an individual could not push or pull the requisite weight, no matter how close they got, Western did not hire them or allow them to return to work. PSF 105, 173-176. Having recovered from throat cancer and chemotherapy, Perkins was able to push 114 lbs. and pull 98 lbs., but his effort only resulted in a "no-job-match recommendation" because he failed the 130 lb. static push/pull tests. PSF 173-176. Perkins passed all the other physical tests. PSF 175. Western thus refused to hire Perkins precisely because he could not pass the 130 lb. static push/pull test without accommodation.

Job Related/Business Necessity Defense: Western cannot show the push/pull requirements are job related or that they cannot be met with a reasonable accommodation.

The only explanation Western has given for the 130 lb. static push/pull tests is that it replicates the physical requirements needed to apply ratchet straps. PSF 133. Western's admission that it did not require OTR drivers to even use ratchet straps, PSF 134, dooms its defense. Western's job descriptions lack any mention of a 130 lb. push/pull requirement or the use of ratchet straps, further defeating Western's defense. *Id*. Since Western only justifies the push/pull standard based on the use of ratchet straps and the jobs do not use ratchet straps, Western cannot meet the "high standard" of job-relatedness for OTR drivers. *See Cripe*, 261 F.3d at 890.

Western is also unable to show that ratcheting is a function that cannot be met with reasonable accommodation. Because ratcheting was never an essential function of the OTR job, on the rare occasion before 2010 when Western might have wanted to temporarily assign an OTR driver to a flatbed truck, if the driver was physically unable to manage the ratcheting tasks, the appropriate accommodation was to remove the non-essential function or assign a different OTR

driver to the flatbed. Moreover, no evidence exists that Western even considered any possible accommodation for an OTR driver unable to manage ratchet straps.

Likewise, Western cannot show the 76 lb. push test is job related and cannot be met with a reasonable accommodation. ErgoMed acknowledged the 76 lb. push test still being used in 2019 was a "mistake" because the test was unrelated to any essential function of the towing jobs. PSF 115. Yet Western has not removed this standard or revised its PDE even knowing there is no basis for it. PSF 116. Accordingly, Western has no job-related defense for the 76 lb. push test for towing jobs.

In addition, as discussed above, Western tested different positions with different physical demands all under the OTR or Heavy Wrecker requirements, without regard for the unique and varying responsibilities of each position. As a result, Western cannot show that each facet of its OTR and Heavy Wrecker push/pull requirements related to each position.

The Court should grant summary judgment on the EEOC's Sections 102(b)(3) and (b)(6) claims as to the 130 lb. static push/pull and 76 lb. push requirements, or alternatively, grant summary judgment as to any of the three elements. In addition, Western is unable to create a triable issue of fact that its push and pull requirements were job related and consistent with business necessity so the Court should grant summary judgment as to Western's defense. Because the EEOC has established a prima facie case and Western cannot establish the defense for each position, the EEOC is entitled to summary judgment on its claims that Western's 130 lb. static push/pull and 76 lb. push requirements are discriminatory standards under Sections 102(b)(3) and 102(b)(6) .

## V.    WESTERN CANNOT ESTABLISH THAT THE ACCOMMODATIONS OF AUTOSOCKS, AUTOMATIC DECOUPLERS, AUTOMATIC HOOD OPENERS, AND ADDITIONAL LEAVE WOULD CAUSE IT UNDUE HARDSHIP.

The ADA requires an employer to make a reasonable accommodation for otherwise

qualified employees with disabilities, "unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(5)(A). Undue hardship is an affirmative defense on which the employer bears the burden of proof. *Midland Brake*, 180 F.3d at 1179. "'Undue hardship' means an action requiring significant difficulty or expense when considered in light of . . . the nature and cost of the accommodation; the number of persons employed by the company; the financial resources of the company; and the impact of the accommodation upon the operation of the company." *Id.* at 1178 (quoting *Rascon*, 143 F.3d at 1334); *see also* 29 C.F.R. § 1630.2(p)(2).

The holding in *City of Denver*, is instructive. 943 F. Supp. at 1304. In *City of Denver,* as here, the government moved for summary judgment on an undue hardship defense in an ADA pattern-or-practice case. *Id.* at 1313. The district court granted the motion and its decision was expressly affirmed on appeal. *Id.* at 1313; *Davoll*, 194 F.3d at 1148. The district court observed that "to withstand judicial scrutiny, the employer's undue hardship defense will have to have a strong factual basis and *be free of speculation or generalization about the nature of the individual's disability or the demands of a particular job*." *City of Denver*, 943 F. Supp. at 1312 (emphasis added). Because the defendant offered "no evidence that it has conducted an analysis to determine whether the proposed accommodation is reasonable and whether it actually presents an undue hardship" the court concluded "the City has failed to produce evidence from which a reasonable trier of fact could find that accommodating such individuals would cause it an undue hardship." *Id.* The Tenth Circuit agreed. *Davoll*, 194 F.3d at 1148. That same analysis applies here for several important accommodations.

**A.  Western cannot establish that providing AutoSocks would cause an undue hardship.**

AutoSocks are a lightweight alternative to tire chains, that can be used to accommodate drivers with lifting restrictions. Because AutoSocks are lightweight – under 7 lbs. for a pair –

compared to tire chains – 50 pounds for a pair – AutoSocks can be an effective accommodation for truck drivers with lifting restrictions by enabling them to prepare their vehicles for driving on snow and ice without the need for lifting metal tire chains. PSF 130, 231-233.

Western argues that providing AutoSocks is an undue hardship, but Western cannot establish that affirmative defense. Western argues that AutoSocks are too costly, violate state chain laws, and are a safety risk. PSF 235. None of these assertions withstand scrutiny.

As an initial matter, like the defendant in *City of Denver,* Western has provided no evidence that it has conducted ***any*** analysis whatsoever to determine whether AutoSocks are a reasonable accommodation and whether providing AutoSocks actually presents an undue hardship. 943 F. Supp. at 1312. Accordingly, as in *City of Denver,* the Court may grant summary judgment to the EEOC on that basis alone.

Moreover, AutoSocks are not too costly. At most, AutoSocks cost between $179.00 and $269.00 for a pair. PSF 234. Western has presented no evidence that providing AutoSocks as an accommodation for drivers with disabilities is a significant difficulty or expense for the company. Indeed, any such argument is defeated by Western's own admission that it already provides AutoSocks to any drivers who request them. PSF 161. Western is a multimillion-dollar company with many employees and significant cash assets, and routinely upgrades its tractors with unnecessary amenities such as chrome parts. PSF 2, 225-227. Western provides no explanation for why it can afford to provide AutoSocks upon request, except when the request is for AutoSocks as an accommodation for a driver with a disability. Nor has Western provided any evidence of significant impact on its business operation by allowing drivers to use AutoSocks instead of metal tire chains.

Ultimately, Western's cost argument lacks "a strong factual basis . . . free of speculation or

generalization." *City of Denver*, 943 F. Supp. at 1312. Western tacitly acknowledges this shortcoming by couching its interrogatory response in conditional language: "[the cost] *could be* unduly burdensome *if* a driver is frequently destroying his or her socks." PSF 241 (emphasis added). Notably, Western has not offered any evidence of how often AutoSocks would *actually* need to be replaced or why that real number of replacements would be so costly as to be an undue hardship. Western's Safety Manager's testimony about third-hand opinions that AutoSocks shred quickly on dry pavement is inadmissible hearsay. PSF 243. But even if admitted on some basis, the witness equivocated on how long AutoSocks last saying it "could depend" and that they "hold up well, depending on conditions." PSF 244. And Western has not disputed testimony of the AutoSocks representative, explaining that to be approved as an alternative traction device in Colorado, AutoSocks had to be still functional after driving 100 miles on dry pavement at 20 miles per hour. PSF 245.

Western also cannot show that AutoSocks are an undue hardship due to state chain laws. For its undue hardship defense, Western asserts that its "*understanding* of the chain laws of *various states*" is that "regular chains must be carried" by commercial vehicles. PSF 239 (emphasis added). But what matters here is not Western's understanding, but the actual state laws. And in over four years of litigation Western has never cited a specific state law that actually supports its affirmative defense. *See, e.g.*, PSF 239. Indeed, Western's current Safety Manager knew of no states where drivers could ***not*** use AutoSocks instead of chains, and Western's own expert opined they were permitted in the 48 contiguous states. PSF 236, 240. And even assuming *arguendo* that some unspecified state law requires metal tire chains to be in the truck as a backup device, Western has not established, as part of its affirmative defense, either that the backup chains ever have to be used or that the driver is the one who has to lift the backup chains and put them on the

tires.

The undisputed facts also establish that using AutoSocks is not a safety risk, as Western claims. PSF 235. Western allows drivers to use AutoSocks, purchases them for drivers who make a request, and has never denied such a request. PSF 237. Western's Vice President even suggested providing Autosocks to a driver with a lifting restriction who wanted to return from medical leave. PSF 238. Indeed, Western's claim that Autosocks are unsafe is belied by the facts that Colorado expressly allows AutoSocks as alternatives to chains for commercial vehicles, PSF 230-229, and Western's own expert opined AutoSocks were permitted in the 48 contiguous states. PSF 236.

Thus, based on the undisputed evidence, the court should grant summary judgment on Western's undue hardship defense as to AutoSocks.

### B. Western cannot establish that providing automatic decouplers would cause an undue hardship.

Automatic decouplers allow truck drivers to disconnect a trailer without having to physically pull to unlock the "fifth wheel" that holds the tractor and trailer together. PSF 248. Because automatic decouplers use an air-powered release instead of a manual release, they can be an accommodation for drivers with pulling restrictions by enabling them to disconnect trailers without the need for pulling. Western has automatic decouplers installed on several of its tractors and allows the use of these devices to move trailers being stored at its yard. PSF 252. Yet, Western managers never looked into the feasibility or cost of automatic decouplers as an accommodation for OTR drivers. PSF 253.

Western cannot show that automatic decouplers would be an undue hardship. Here again, because Western has provided no evidence that it has conducted any analysis to determine whether providing automatic decouplers actually presents an undue hardship, no reasonable jury

71

can find that providing this accommodation would cause an undue hardship. *City of Denver*, 943 F. Supp. at 1312. And as with AutoSocks, Western cannot establish undue hardship using the *Midland Brake* factors. The automatic decoupler sold by Jost since 2006, has cost between $750 to $1,200, plus approximately $50.00 to $100.00 to install. PSF 260. Western is a multimillion-dollar company with many employees and significant cash assets. PSF 2. Western regularly upgrades tractors to add amenities such as TVs and refrigerators. PSF 227. Western has provided no evidence that providing automatic decouplers for purposes of reasonable accommodation is a significant difficulty or expense to the company. Indeed, the fact that Western has already installed automatic decouplers on some tractors indicates the company can afford this expense. *See* PSF 252. Nor has Western provided any evidence of significant impact on its business operation by providing automatic decouplers.

Safety arguments from Western's managers are also unavailing. Western raises only speculative safety concerns based on its managers' unsubstantiated testimony. Three Western managers opined that automatic decouplers are dangerous because of the possibility that a trailer could be unintentionally disengaged while driving down the highway. PSF 254. But all three conceded they lacked knowledge of the device and/or its safety features. PSF 255-256.

Contrary to the managers' speculation, Jost explained that the air-powered release on an automatic decoupler does not alter the safety and reliability of the mechanism that locks the tractor and trailer together. PSF 249-250. Jost also testified about the various safety features on the automatic decoupler that prevent the trailer from being released while the vehicle is moving. PSF 251. Further, Jost is notified of any incidents involving its products and has not been notified of any incident like Western speculates about here. PSF 257-259. Western's speculative concerns are insufficient to establish undue hardship based on safety concerns.

Thus, based on the undisputed evidence, the court should grant summary judgment on Western's undue hardship defense as to automatic decouplers.

### C. Western cannot establish that providing automatic hood openers would cause an undue hardship.

Automatic hood openers, such as HoodXpress, allows truck drivers to open and close the hood of their truck without having to physically pull or push the hood. PSF 261-262. Using HoodXpress can accommodate truck drivers with pushing or pulling restrictions by enabling them to open and close the hood of their truck by pressing a button. PSF 261-262. Western managers uniformly testified that they never looked into or considered automatic hood openers as an accommodation. PSF 264.

Here again, because Western has provided no evidence that it has conducted any analysis to determine whether providing automatic hood openers actually presents an undue hardship, no reasonable jury can find that providing this accommodation would cause an undue hardship. *City of Denver*, 943 F. Supp. at 1312. And as with AutoSocks and automatic decouplers, Western cannot establish undue hardship using the *Midland Brake* factors. From 2006 to 2010, the price range for one automatic hood opener, HoodXpress, was $899.00 to $929.00. PSF 263. Western has provided no evidence that it cannot afford this expense, particularly when it is upgrading its tractors to have TVs and additional chrome parts. PSF 227. Nor has Western provided any evidence of significant impact on business operations by providing automatic hood openers as an accommodation under the ADA.

Thus, based on the undisputed evidence, the court should grant summary judgment on Western's undue hardship defense as to automatic hood openers.

### D. Western cannot establish that making an exception to its maximum-leave policy to allow extended medical leave for drivers would cause an undue hardship.

As to making an exception to Western's maximum leave policy to allow some additional or

extended medical leave as an accommodation for drivers, Western's undue hardship defense is based on its asserted "no slip-seating" policy of holding the driver's assigned tractor out of service during any period of medical leave. PSF 265-267. Western argues the lost revenues incurred as a result of holding the tractor out of service for longer than twelve weeks makes the accommodation of extended leave an undue hardship. PSF 267. Significantly, Western's managers testified that the alleged losses from an idle tractor are the ***only*** cost of a driver being out on extended leave. PSF 268. But Western's own practices belie this asserted cost.

First, Western's "no slip-seating" policy is its own choice, and nothing prevents Western from modifying its policy to avoid the cost of allowing a driver extended medical leave. Western could simply modify the policy to make a driver's tractor available to other drivers during extended leave, which Western has done in the past as evidenced by its corporate testimony and policy manual. PSF 273. And because Western always has unused tractors, PSF 270-271, a driver returning from extended medical leave could be assigned to drive any tractor available at the time, which Western has also done in the past. PSF 272. Indeed, the irony is that Western has a "no slip seating" policy to help it recruit and retain drivers, but now uses the policy to justify discharging the very drivers the policy was designed to attract and retain. *See* PSF 274. Drivers who need an extension of medical leave would undoubtedly rather return to a different truck than be denied the extension and fired. The irony is particularly stark due to a shortage of drivers such that Western is always hiring drivers. *See, e.g.*, PSF 275-276.

Second, the alleged lost revenues from holding a tractor out of service is not an undue hardship because Western admits it has always had unused tractors in its yard. PSF 270. In recent years, the number of unused tractors at Western ranged as high as 17 or 18. PSF 271. In essence, Western is claiming an undue hardship based on a cost it has always incurred, sometimes at 17 or

18 times the rate needed to provide the accommodation at issue.

Finally, Western cannot establish undue hardship using the *Midland Brake* factors. *See Midland Brake, Inc.*, 180 F.3d at 1178. As discussed above, Western need not incur any lost revenues at all. But even assuming the alleged costs Western claims, Western has failed to establish that the estimated $8,141.69 per month cost of not adjusting its own "no slip-seating policy" is a significant difficulty or expense for the company. PSF 269. Western is a multimillion-dollar company with many employees and significant cash assets, and routinely upgrades its tractors with unnecessary amenities such as chrome parts. PSF 2, 225-227. Nor has Western provided any evidence of significant impact on its business operation by providing extended leave as accommodation for drivers – the company always has unused tractors and is always hiring drivers.

Accordingly, the Court should grant summary judgment to the EEOC because no reasonable jury can find that providing this accommodation would cause an undue hardship.

## VI.   CONCLUSION

The existence of Western's full-duty and inflexible maximum leave policy is beyond dispute, based on an enormous quantity of evidence from Western's own records and witnesses, and evidence from its workers' compensation doctors and insurance carrier. The EEOC has thus established the existence of the policies as the standard operating procedure. The EEOC is entitled to summary judgment on its allegations that Western engaged in a pattern or practice of discriminating on the basis of disability, in violation of Sections 102(a), 102(b)(5)(A), and 102(b)(5)(B) of the ADA. Alternatively, the Court may grant summary judgment as to individual elements of these claims.

The EEOC is also entitled to summary judgment on its disparate impact claims alleging discriminatory qualification standards in violation of Sections 102(b)(3)  and 102(b)(6) .

Alternatively, the Court may grant summary judgment as to individual elements of each claim.

The EEOC is entitled to summary judgment on Western's undue hardship defense as to the accommodations of AutoSocks, automatic decouplers, automatic hood openers, and an exception to the leave policy to allow extended medical leave.

Dated:  October 26, 2021

Respectfully submitted,

*s/ Karl Tetzlaff*

Karl Tetzlaff
Trial Attorney
Telephone: 720.779.3619
E-Mail: karl.tetzlaff@eeoc.gov

Lauren Duke
Trial Attorney
Telephone: 720.779.3621
E-Mail: lauren.duke@eeoc.gov

Michael LaGarde
Trial Attorney
Telephone: 720.779.3631
E-Mail: michael.lagarde@eeoc.gov

Rita Byrnes Kittle
Supervisory Trial Attorney
Telephone: 720.779.3639
E-Mail: rita.kittle@eeoc.gov

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
DENVER FIELD OFFICE
950 17th Street, Suite 300
Denver, Colorado 80202

Benjamin Price
Trial Attorney
Telephone: 602.661.0005
E-Mail: benjamin.price@eeoc.gov

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PHOENIX DISTRICT OFFICE
3300 N. Central Ave., Suite 690
Phoenix, AZ 85012

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of filing to all attorneys of record and other persons who have appeared or otherwise requested such electronic service in this action.

s/ *Karl Tetzlaff*
Karl R. Tetzlaff