**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-01727-WJM-STV

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

v.

WESTERN DISTRIBUTING COMPANY, d/b/a Western Distributing Transportation Co., a Colorado corporation,

Defendant.

---

**EEOC's RESPONSE TO AMENDED MOTION FOR SUMMARY JUDGMENT**

---

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Denver Field Office
950 17th Street, Suite #300
Denver, Colorado 80202

Rita Byrnes Kittle, Supervisory Trial Attorney
Karl Tetzlaff, Trial Attorney
Benjamin Price, Trial Attorney
Michael LaGarde, Trial Attorney
Lauren Duke, Trial Attorney
Jeff Lee, Trial Attorney

# Table of Contents

I.      **INTRODUCTION** .................................................................................................... 1

II.     **EEOC'S STATEMENT OF ADDITIONAL DISPUTED FACTS ("ADF")** ................. 2

   A.  Western's Full-Duty Policy. ....................................................................................... 2

   B.  Western's Inflexible Leave Policy. ............................................................................. 3

   C.  Western's Lack of Interactive Process. ...................................................................... 6

   D.  ErgoMed and Western's Use of Physical Tests to Screen Drivers. .......................... 6

   E.  Aggrieved Individuals' Interactions with Western ................................................. 13

   F.  Western refused Kallenbach a Yard Hostler position and refused to rehire him ............... 15

   G.  Defendant's Interested Witnesses. ........................................................................... 16

III.    **RESPONSE TO WESTERN'S ALLEGED MATERIAL FACTS ("RMF")** ............. 16

   A.  Overarching concerns regarding Western's Statement of Material Facts ("SMF"). ......... 16

   B.  EEOC's Responses to Western's alleged and enumerated Material Facts ("RMF") ........ 17

IV.    **LEGAL ARGUMENT** ......................................................................................... 41

   A.  The existence and discriminatory nature of Western's full-duty and inflexible leave policies are either undisputed in EEOC's favor or are in genuine dispute. ...................... 41

      1.  There is at least a genuine dispute as to Western's full-duty policy. ............................. 42

      2.  There is at least a genuine dispute as to Western's inflexible 12-week leave policy. ................................................................................................... 43

   B.  Genuine issues of material fact as to whether Western engaged in the interactive process preclude summary judgment for Western. ............................................... 47

      1.  Western had an obligation to engage in the interactive process. ................................... 48

      2.  Western failed to participate in good faith in the interactive process. .......................... 49

   C.  Western discouraged employee requests for accommodation and rendered them futile... 51

   D.  Western's arguments for its two policies do not foreclose a jury finding that Western engaged in a pattern or practice of disability discrimination. ........................................... 53

      1.  In Phase I, the EEOC does not have to prove causation for "a group of aggrieved individuals" or other individual-specific issues. ............................................. 53

      2.  Western's other practices do not disprove Western's discriminatory policies. ................................................................................................... 56

      3.  DOT and FMCSA requirements do not authorize the full-duty policy. ........................ 58

      4.  10th Circuit law does not support Western's position that a pattern-or-practice claim cannot be based on an inflexible leave policy .......................................... 60

i

E.  Western failed to establish there are no disputed material facts regarding the challenged qualification standards. .................................................................... 61

1.  The EEOC is not limited to seeking relief for the identified aggrieved individuals on its qualification standard claim. ............................................. 61

2.  Sections 102(b)(3) and (b)(6) permit the EEOC to proceed on either a disparate impact or treatment theory on behalf of one or more individuals. ................. 62

3.  The EEOC has established a prima facie case of disparate impact discrimination under Sections 102(b)(3) and (b)(6) of the ADA. .................................. 63

4.  Because Western cannot prove its Job Related/Business Judgment affirmative defense, the EEOC prevails based on the prima facie case of disparate impact. ............................................................................................. 67

5.  There is sufficient evidence for a jury to find intentional disparate treatment disability discrimination under Sections 102(b)(3) and (b)(6). ....................................... 69

6.  Western's remaining arguments to defeat the EEOC's third claim miss the mark. ................................................................................................................. 71

F.  Western's other arguments are not grounds to grant summary judgment. ........................ 74

1.  Western makes unsubstantiated and legally incorrect arguments about accommodation requests and the interactive process. ....................................... 74

2.  EEOC's claims need not rely solely on accommodations requested prior to litigation. ................................................................................................................. 76

3.  Western cannot show as a matter of law or through undisputed facts that the proposed accommodations are unreasonable, ineffective, or unsafe. ............................ 77

4.  The allegations Western complains about are examples of the denial of accommodation and disparate treatment alleged in the EEOC's complaint. ................. 79

G.  The Court should deny Western's motion as to compensatory and punitive damages. .... 79

V.  CONCLUSION ...................................................................................................... 80

## TABLE OF AUTHORITIES

**Cases**

*Adamson v. Multi Cmty. Diversified Servs., Inc.*,
    514 F.3d 1136 (10th Cir. 2008) .....................................................................67

*Albemarle Paper Co. v. Moody*,
    422 US 405 (1975).........................................................................................67

*Aston v. Tapco Int'l Corp.*,
    No. 12-14467, 2014 WL 3385073 (E.D. Mich. July 10, 2014), *aff'd*, 631 F.
    App'x 292 (6th Cir. 2015) ..............................................................................77

*Aubrey v. Koppes*,
    975 F.3d 995 (10th Cir. 2020) ............................................................. *passim*

*Barela v. United Nuclear Corp.*,
    462 F.2d 149 (10th Cir. 1972) .......................................................................62

*Barnett v. U.S. Airways, Inc.*,
    157 F.3d 744 (9th Cir. 1998) ..................................................................76, 77

*Bazemore v. Friday*,
    478 U.S. 385 (1986)................................................................................41, 42

*Beck v. U. of Wisconsin Bd. of Regents*,
    75 F.3d 1130 (7th Cir. 1996) ..................................................................49, 50

*Beveridge v. Nw. Airlines, Inc.*,
    259 F. Supp. 2d 838 (D. Minn. 2003)............................................................43

*Billups v. Emerald Coast Utilities Auth.*,
    714 F. App'x 929 (11th Cir. 2017) ................................................................60

*Board of Trustees of Univ. of Ala. v. Garrett*,
    531 U.S. 356 (2001)......................................................................................63

*Bower v. Fed. Express Corp.*,
    156 F. Supp. 2d 678 (W.D. Tenn. 2001)........................................................58

*Brady v. Wal-Mart Stores, Inc.*,
    531 F.3d 127 (2d Cir. 2008)..........................................................................75

*Buckingham v. United States*,
    998 F.2d 735 (9th Cir.1993) ..........................................................................76

*Campbell v. Wal-Mart Stores, Inc.,*
    272 F. Supp. 2d 1276 (N.D. Okla. 2003) ................................................46

*Capps v. Mondelez Glob., LLC,*
    847 F.3d 144 (3d Cir. 2017) ................................................................74

*Chevron U.S.A. Inc. v. Echazabal,*
    536 U.S. 73 (2002) ............................................................................67

*Coe v. Yellow Freight Sys., Inc.,*
    646 F.2d 444 (10th Cir. 1981) ............................................................54

*Contreras v. City of Los Angeles,*
    656 F.2d 1267 (9th Cir. 1981) ............................................................67

*Cooper v. Fed. Res. Bank of Richmond,*
    467 U.S. 867 (1984) ..........................................................................57

*Cripe v. City of San Jose,*
    261 F.3d 877 (9th Cir. 2001) ..............................................................67

*Davoll v. Webb,*
    194 F.3d 1116 (10th Cir. 1999) ..............................................51, 52, 54

*EEOC v. CTI, Inc.,*
    CV-13-1279-TUC-DCB, 2015 WL 11120707 (D. Ariz. May 8, 2015) .................63

*EEOC v. Dolgencorp, LLC,*
    899 F.3d 428 (6th Cir. 2018) ..............................................................46

*EEOC v. Harris Chernin, Inc.,*
    10 F.3d 1286 (7th Cir. 1993) ..............................................................61

*EEOC v. Joe's Stone Crab, Inc.*
    220 F.3d 1263, 1287 (11th Cir. 2000) ...........................................54, 55

*EEOC v. Mach Mining,*
    575 U.S. 480,494-95 (2015) ..........................................................40, 73

*EEOC v. Manufacturers & Traders Tr. Co.,*
    429 F. Supp. 3d 89 (D. Md. 2019) .......................................................61

*EEOC v. Prestige Care, Inc.,*
    1:17-CV-1299, 2018 WL 3473964 (E.D. Cal. July 17, 2018) .......................54

*EEOC v. Schneider Nat., Inc.,*
    481 F.3d 507 (7th Cir. 2007) ..............................................................59

iv

*EEOC v. Waffle House, Inc.*,
    534 U.S. 279 (2002) .............................................................................62

*EEOC v. Wal-Mart Stores, Inc.*,
    187 F.3d 1241 (10th Cir. 1999) ............................................................80

*EEOC v. Yellow Freight Sys., Inc.*,
    No. 98 CIV. 2270, 2002 WL 31011859 (S.D.N.Y. Sept. 9, 2002).........43

*Exby-Stolley v. Bd. of County Commissioners*,
    979 F.3d 784 (10th Cir. 2020) ..............................................................63

*Feldman v. Olin Corp.*,
    692 F.3d 748 (7th Cir. 2012) ................................................................54

*Foreman v. Norfolk S. Corp.*,
    No. 5:15-CV-140 (CAR), 2017 WL 1217174 (M.D. Ga. Mar. 31, 2017)............59

*Garcia v. Spun Steaks*,
    998 F.2d 1480 (9th Cir. 1993) ..............................................................64

*Gardenhire v. Johns Manville*,
    722 F. App'x 835 (10th Cir. 2018) ........................................................54

*General Telephone Co. of the Northwest, Inc. v. EEOC*,
    446 U.S. 318 (1980)...............................................................56, 61, 62

*Golden v. Indianapolis Hous. Agency*,
    698 F. App'x 835 (7th Cir. 2017) (Rovner, J., concurring)....................61

*Gonzales v. City of New Braunfels*,
    176 F.3d 834 (5th Cir. 1999) ......................................................63, 64, 74

*Hall v. U.S. Dept. of Labor, Admin. Review Bd.*,
    476 F.3d 847 (10th Cir. 2007) ..............................................................55

*Hatter v. WMATA*,
    244 F. Supp. 3d 132 (D.D.C. 2017) ......................................................71

*Hazen Paper Co. v. Biggins*,
    507 U.S. 604 (1993)...............................................................................63

*Henderson v. Ardco, Inc.*,
    247 F.3d 645 (6th Cir. 2001) ................................................................54

*Hendricks-Robinson v. Excel Corp.*,
    154 F.3d 685 (7th Cir. 1998) ......................................................43, 47, 48

*Hennagir v. Utah Dep't of Corrections*,
   587 F.3d 1255 (10th Cir. 2009) ....................................................71

*Hohider v. United Parcel Service, Inc.*,
   574 F.3d 169 (3d Cir. 2009)......................................................54

*Howell v. Michelin Tire Corp.*,
   860 F. Supp. 1488 (M.D. Ala. 1994) .............................................48, 51

*Humphrey v. Mem'l Hosp. Ass'n*,
   239 F.3d 1128 .......................................................... *passim*

*Hwang v. Kansas State Univ.*,
   753 F.3d 1159 (10th Cir. 2014) ................................................60, 61

*Int'l Bhd. of Teamsters v. U.S.*,
   431 U.S. 324 (1977)................................................... *passim*

*Jacobsen v. Dillon Cos., Inc.*,
   No. 10–cv–01944, 2012 WL 638122 (D. Colo. Feb. 28, 2012) ...........................45

*Jakubowski v. Christ Hosp., Inc.*,
   627 F.3d 195 (6th Cir. 2010) ....................................................77, 78

*James River Ins. Co. v. Rapid Funding, LLC*,
   658 F.3d 1207 (10th Cir. 2011) ................................................29, 31

*Kilgore v. Tulare Cnty.*,
   CV F 10-0031 LJOBAM, 2012 WL 483085 (E.D. Cal. Feb. 14, 2012)................76

*Kolstad v. Am. Dental Ass'n*,
   527 U.S. 526 (1999)...........................................................80

*Lenker v. Methodist Hospital*,
   210 F.3d 792 (7th Cir. 2000) ...................................................43

*Lievre v. JRM Constr. Mgmt., LLC*
   2019 WL 4572777 (S.D.N.Y. Sept. 20, 2019).......................................75

*Lincoln v. BNSF Railway Co.*,
   900 F.3d 1166 (10th Cir. 2018) ................................................63

*Lowe v. Angelo's Italian Foods, Inc.*,
   87 F.3d 1170 (10th Cir.1996) ...................................................65

*Lusk v. Ryder*,
   238 F.3d 1237 (10th Cir. 2001) ................................................45, 65

*Maxwell v. Cnty. of Cook,*
  No. 10 CV 00320, 2014 WL 3859981 (N.D. Ill. Aug. 4, 2014) ............................................65

*Mbawe v. Ferris State Univ.,*
  366 F. Supp. 3d 942 (W.D. Mich. 2018) ...............................................................................77

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1972) ..................................................................................................................69

*McGregor v. Nat'l R.R. Passenger. Corp.,*
  187 F.3d 1113 (9th Cir. 1999) ............................................................................................43, 44

*McKennon v. Nashville Banner Pub. Co.,*
  513 U.S. 352 (1995) ..................................................................................................................34

*McMackins v. Elk Grove Unified Sch. Dist.,*
  21 F. Supp. 2d 1201 (E.D. Cal. 1998) ....................................................................................76

*Mozee v. American Commercial Marine Service Co.,*
  940 F.2d 1036 (7th Cir.1991) ..................................................................................................54

*Noll v. Int'l Bus. Machines Corp.*
  787 F.3d 89 (2d Cir. 2015) .......................................................................................................76

*Nowlin v. Kmart Corp.,*
  No. 99-3186, 2000 WL 1588116 (10th Cir. Oct. 25, 2000) ..................................................65

*Nunes v. Wal-Mart Stores, Inc.,*
  164 F.3d 1243 (9th Cir. 1999) ............................................................................................46, 80

*Ortega v. Safeway Stores, Inc.,*
  943 F.2d 1230 (10th Cir. 1991) ...............................................................................................64

*Paraham v. Atriums Mgt. Co., Inc.,*
  16-2539, 2019 WL 1434965 (D. Kan. Mar. 29, 2019) ..........................................................65

*Parker v. Columbia Pictures Indus.,*
  204 F.3d 326 (2d Cir. 2000) .....................................................................................................46

*Peyton v. Fred's Stores of Arkansas, Inc.,*
  561 F.3d 900 (8th Cir. 2009) ....................................................................................................60

*Pitre v. W. Elec. Co.,*
  843 F.2d 1262 (10th Cir. 1988) ...............................................................................................55

*Preddie v. Bartholomew Consol. Sch. Corp.*
  799 F.3d 806 (7th Cir. 2015) ....................................................................................................75

*Punt v. Kelly Servs.*,
862 F.3d 1040 (10th Cir. 2017) ...................................................................37, 60

*Purewal v. T-Mobile USA, Inc.*,
17-CV-2595-JTM, 2019 WL 4805994 (D.Kan. Oct. 1, 2019) ..........................45, 46

*Ragsdale v. Wolverine World Wide, Inc.*,
535 U.S. 81 (2002)............................................................................................22, 77

*Ramsey v. City & County of Denver*,
907 F.2d 1004 (10th Cir. 1990) ........................................................................69, 70

*Rascon v. US W. Commc'ns, Inc.*,
143 F.3d 1324 (10th Cir. 1998) .............................................................45, 46, 60, 61

*Raytheon Co. v. Hernandez*,
540 U.S. 44 (2003) .....................................................................................................62

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000).....................................................................................................16

*Robert v. Bd. of Cnty. Comm'rs.*,
691 F.3d 1211 (10th Cir. 2012) .................................................................................60

*Robinson v. Metro N. Commuter R.R. Co.*,
267 F.3d 147 (2d Cir. 2001).....................................................................................55

*Semsroth v. City of Wichita*,
304 F. App'x 707 (10th Cir. 2008) ...........................................................................60

*Severson v. Heartland Woodcraft, Inc.*,
872 F.3d 476 (7th Cir. 2017) ....................................................................................61

*Sheet Metal Workers Local 28 v. EEOC*,
478 U.S. 421 (1986).....................................................................................................62

*Smith v. Midland Brake, Inc.*,
180 F.3d 1154 (10th Cir. 1999) .............................................................................47, 51

*Spaulding v. University of Washington*,
740 F.2d 686 (9th Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d
401 (1984).....................................................................................................................64

*Steinle v. Boeing Co.*,
785 F. Supp. 1434 (D. Kan. 1992), aff'd, 24 F.3d 1250 (10th Cir. 1994)...............64

*Tate v. Farmland Indus., Inc.*
268 F.3d 989 (10th Cir. 2001) .................................................................................59

*Tesone v. Empire Mktg. Strategies*,
    942 F.3d 979 (10th Cir. 2019) ......................................................................64, 65

*Texas Dept. of Community Affairs v. Burdine*,
    450 U.S. 248 (1981)..........................................................................................69

*Thiessen v. Gen. Elec. Capital Corp.*,
    267 F.3d 1095 (10th Cir. 2001) .................................................................53, 54

*Thomas v. Washington Cty. Sch. Bd.*,
    915 F.2d 922 (4th Cir. 1990) ...........................................................................62

*U.S. v. City & County of Denver*,
    49 F. Supp. 2d 1233 (D. Colo. 1999)........................................................51, 53

*U.S. v. City of Denver*,
    943 F. Supp. 1304 (D. Colo. 1996)..................................................................53

*US Airways, Inc. v. Barnett*
    535 U.S. 391 (2002)..........................................................................................76

*Valdez v. McGill*,
    462 F. App'x 814 (10th Cir. 2012) ...................................................................60

*Villalobos v. TWC Admin. LLC*,
    720 Fed. App'x. 839 (9th Cir. 2017) ................................................................71

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989)..........................................................................................64

*Warmsley v. New York City Trans. Auth.*,
    308 F. Supp. 2d 114 (E.D.N.Y. 2004) ..............................................................43

*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988)..........................................................................................54

*Waugh v. Dow*,
    617 Fed. Appx. 867 (10th Cir. 2015).................................................................16

*Weigel v. Target Stores*,
    122 F.3d 461 (7th Cir. 1997) ...........................................................................63

*Wheeler v. C.I.R.*,
    521 F.3d 1289 (10th Cir. 2008) ........................................................................62

*Wilkerson v. Shinseki*,
    606 F.3d 1256 (10th Cir. 2010) ........................................................................59

*Wood v. Green*,
    323 F.3d 1309 (11th Cir. 2003) ...................................................................60

*Woodman v. Runyon*,
    132 F.3d 1330 (10th Cir. 1997) ..............................................47, 49, 76, 77

**Statutes**

C.R.S. § 42-4-106 .......................................................................................31

42 U.S.C.A. § 12102(4) ..............................................................................70

42 U.S.C. § 1981a(a)(3) ..............................................................................48

42 U.S.C. § 2000e-2(k) ...............................................................................64

42 U.S.C. § 2000e-5(g) ...............................................................................62

42 U.S.C. § 12101 .......................................................................................45

42 U.S.C. § 12102 ...............................................................35, 36, 62, 63, 64

42 U.S.C. § 12102(4)(D) .............................................................................34

42 U.S.C. §§ 12112(b)(2), (b)(4), (b)(5)(A), and (b)(5)(B) ........................71

42 U.S.C. § 12112(b)(3) ............................................................63, 64, 71, 73

42 U.S.C. § 12112(b)(6) ........................................................59, 63, 71, 73, 74

42 U.S.C. § 12113(a) ..................................................................................67

42 U.S.C. § 12117 .......................................................................................62

42 U.S.C. § 12204(a) ..................................................................................34

**Other Authorities**

29 C.F.R. Pt. 1630, App. at § 1630.2(j)(1)(ix)...........................................65

29 C.F.R. Part 1630, App. § 1630.9............................................................47

29 C.F.R. § 1630.2(j) .............................................................................35, 65

29 C.F.R. § 1630.2(j)(3)......................................................................11, 45, 65

29 CFR § 1630.2(i)(1)(ii)..............................................................................35

29 CFR § 1630.2(q) .....................................................................................73

29 C.F.R. 1630.2(o) ...........................................................................................................46, 47

49 C.F.R. § 382.301 ...................................................................................................................24

49 C.F.R. § 391.46 .....................................................................................................................24

49 C.F.R. § 396.13 .....................................................................................................................25

Fed. R. Evid. 602 ...........................................................................................................29, 31, 33

Fed. R. Evid. 701 ................................................................................................................29, 31

Fed. R. Evid. 702 .......................................................................................................................29

Fed. R. Evid. 802 ................................................................................................................29, 31

## I. INTRODUCTION

Western strains to put the focus anywhere other than the central Phase I issues identified in the Court's bifurcation order: the existence of Western's inter-related full-duty and inflexible leave policies and their discriminatory nature. ECF 166. Yet again, Western runs afoul of the Court's prior order and focuses its brief in Phase II matters. *See* ECF 613. Western offers red herrings, arguing that a host of individual issues reserved for Phase II should instead be used to preclude Phase I liability. The Court should reject Western's invitation into a morass of Phase II issues and focus on issues properly part of Phase I. Western also makes an emotion-based argument that adhering to the ADA would be unsafe. But the ADA only requires, and the EEOC only asks, that Western give up the policies and practices that deny employment opportunities to individuals with disabilities. The public's safety is not endangered and the DOT regulations are not violated by this Court requiring Western to comply with its obligation to provide reasonable accommodation. Western did violate, however, the rights of its employees with disabilities when it failed to engage in a good-faith interactive process and instituted exaggerated physical demands' standards for its financial benefit.

There are at least undisputed facts in the EEOC's favor or genuine issues of material fact on the EEOC's pattern-or-practice claims as to the subject of Phase I: the existence of a pattern or practice of discrimination in Western's inter-related full-duty and inflexible leave policies. And, as to the EEOC's qualification standards claim, the EEOC can establish a prima facie case of both disparate impact and disparate treatment, and Western cannot establish that any of the challenged standards are job-related, consistent with business necessity, and cannot be met by reasonable accommodation.

Based on these material fact questions for the jury to decide, Western's motion must be denied.

1

## II.  EEOC'S STATEMENT OF ADDITIONAL DISPUTED FACTS ("ADF")

### A.  Western's Full-Duty Policy.

**1.** Since at least 2009 and to the present, Western's Employee Policy Manual (EPM) has stated that to return after an injury, an employee's "physician report must state that you can return to full duty or that you are 'discharged' before you can return to work at full duty." ECF 840-1 at 24; ECF 840-2 at 30; ECF 840-3 at 26; ECF 840-4 at 26; ECF 840-5 at 28; ECF 840-6 at 7-8.

**2.** Five managers stated "full duty" under Western's policy meant no medical restrictions. ECF 838-61 at 2-3, 6, McLemore Dep. 25:24-26:25, 202:3-8 (HR Dir.); ECF 837-1 (HR Dir.); ECF 838-73 at 10, Respass Dep. 100:17-23 (Safety Dir.); ECF 838-69 at 15-16, M. Padilla Dep. 226:25-227:4 (Safety Dir.); ECF 838-52 at 3, 15-16, Long Dep. 12:13-20, 93:20-94:14 (Safety Supervisor).

**3.** Janice Hunt, Benefits Coordinator from 2001 to 2010, testified that employees could not return until medically released to full duty and employees who did not meet this standard in 12 weeks were discharged. ECF 838-40 at 3, 4, 5-6, Hunt Dep. 6:8-19; 26:5-11; 29:20-30:15.

**4.** According to Western's own workers compensation doctors, "full duty" means returning to work without medical restrictions. ECF 838-48 at 3, 4-5, 6, Dr. Ladwig Dep. 20:6-9, 35:20-36:1, 68:16-20; ECF 838-15 at 3-4, 5-6, Dr. Brignoni Dep. 11:15-12:14, 69:24-70:4.

**5.** Between 2005 and 2018, notes from Western's workers compensation carrier (Pinnacol) refer to Western not providing accommodation, confirm the full-duty policy, and memorialize instructions to wait until the employee is full duty before trying to return the employee to work. ECF 837-2. Examples include: "the employer cannot accommodate restriction of any kind per Jennifer [Maddox]," "the employer has no light duty and will not have any in the future," and "the injured worker must be at full duty before he can come back to work." *Id.* at 2, 9, 10.

**6.** In Pinnacol's notes, "full duty" means "without restrictions," ECF 838-4 at 5-6, Pinnacol 30b6 Dep. 208:25-209:20, based on conversations with Western's HR. *Id.* at 3, 4, 164:2-13, 195:14-18.

2

**7.** This policy impacted drivers like Jeffrey Davis, a tow driver abruptly discharged once his 30-lb. lifting restriction reached MMI. ECF 838-20 at 4, 5, Jeffrey Davis Dep. 12:17-23, 81:5-12.

**8.** Rodolfo Morin worked as a tow driver with restrictions by agreement with his supervisor until HR learned of his restrictions, sent him home immediately, and then discharged him once his 12 weeks expired. ECF 838-63 at 4-5, 10, Morin Dep. 182:17-183:8; 203:6-22.

**9.** And Kassandra Wones, who could not breathe at a freezer dock, was discharged because of her COPD limitation. ECF 838-93 at 3, 4-6, 7-8, Wones Dep. 25:15-24; 72:24-74:2; 82:12-83:3.

**10.** The only modified-duty work Western offered was in its beverage division, which Western sold in 2010. ECF 838-53 at 7, 8, Maddox Interview 21:9-15, 22:1-5.

**11.** Western's HR Director wrote in 2018 "Western doesn't have any modified duty." Ex 837-19.

**B. Western's Inflexible Leave Policy.**

**12.** All of Western's EPMs include these provisions: (1) "If you are not able to return at the end of the twelve-week period, you will be replaced in your position and your employment with the company will be terminated," and (2) "The **_total_** amount of FMLA leave an eligible employee is entitled to take for any of the purposes set forth in this Policy, or for any combination of purposes, is 12 weeks during any rolling 12-month period, measured backward from the date the employee uses FMLA leave." ECF 840-1 at 24, 37; ECF 840-2 at 30, 36; ECF 840-3 at 19, 26; ECF 840-4 at 19, 26; ECF 840-5 at 22, 28; ECF 840-6 at 6-8; _see also_ ECF 840-11 at 1; ECF 840-12 at 1; ECF ECF 840-13 at 1. (Emphasis in original).

**13.** Western's EPMs failed to include, however, any mention of an ADA accommodation policy until 2015. _See_ ECF 815-87 (Western's compilation of EEO policies from 2007-2015).

**14.** In 2011, when the EEOC asked if there were exceptions to Western's "policy and practice to automatically discharge employees who are not able to return to work after the 12 weeks of FMLA expire," Western responded: "Yes. There are no exceptions to this policy." ECF 840-15 at 4.

3

**15.** In Western's 2011, 2012, and 2013 position statements regarding three different charges of discrimination, Western told the EEOC: "Western Transportation does not grant extensions of the 12-week policy; to do so could give rise to a probable claim of discriminatory, preferential practices." ECF 840-15 at 7; ECF 840-16 at 5; ECF 840-17 at 4.

**16.** In a pre-litigation sworn interview, HR Director Maddox testified Western makes no exceptions to discharging employees after 12 weeks of leave. ECF 838-53 at 4-6, Maddox Interview 17:3-19:4.

**17.** Maddox testified "If the leave or the illness is going to extend past the 12 weeks, again we terminate the employment …;" asked if she considered a request for time off beyond 12 weeks to be a reasonable accommodation, she testified: "I would say no" and  *Id.* at 3, 10, 14:18-20, 47:20-23.

**18.** Benefits Coordinator Hunt discussed with Pinnacol "that [drivers] are only given the 12 weeks to return to work full duty." ECF 838-40 at 12, Hunt Dep. 118:16-20.

**19.** Hunt's testimony is corroborated by Pinnacol records which include the following note dated Jan. 6, 2009: "Ms. Hunt explained the company policy regarding termination following 12 weeks away from work, whether it be FMLA, workers' compensation, or long-term disability. According to company policy, the employee must be terminated at 12 weeks off-duty . . . ." ECF 837-20 at 4.

**20.** Hunt told employees that after 12 weeks of leave without being full duty "they would be let go, yes. That's in the manual." ECF 838-40 at 13-14, Hunt Dep. 122:8-123:23. Hunt also informed Western's managers of the policy. *Id.* at 5-6, 29:20-30:15.

**21.** Per Safety Director Respass, "once the 12 weeks expired, if they were not in a position to return to work, that they would be terminated." ECF 838-73 at 11, Respass Dep. 103:12-22.

**22.** Respass required a doctor's note saying the driver "could return to full duty to drive a commercial vehicle with no restrictions" before he would send a driver for DOT certification or ErgoMed testing. ECF 838-73 at 10, 18-19, Respass Dep. 100:17-23, 248:25-249:6.

**23.** Undisputed examples of Western's full duty and 12-week policies include Western's treatment

of four employees who were discharged after 12 weeks of FMLA leave despite having return-to-work dates that required minimal extensions of leave. ECF 837-12 at 4, 5 and ECF 840-40 (Schmotzer–6 days); ECF 837-21 and ECF 840-42 (Kallenbach–9 days); ECF 837-14 at 5 and ECF 840-44 (Valdez–5 weeks, 4 days); ECF 840-20 and ECF 837-3 (Bahmer–5 weeks, 5 days).

**24.** Clinton Kallenbach is an aggrieved individual ("AI") whom Western approved for 12 weeks of FMLA leave for a coronary artery bypass graft in 2009. ECF 837-13 at 4-5.

**25.** Kallenbach's procedure was necessary because of his severe triple vessel coronary disease, ECF 838-39 at 3, Henson Dep. 28:12-21, which substantially limited his circulatory system.

**26.** By May 26, 2009, Western knew Kallenbach could return to work on or around June 26, 2009 from orders of Dr. Ladwig at Aviation, whom Western sent Kallenbach to. ECF 840-66 at 1; ECF 837-54 at 2; ECF 837- 21; ECF 838-53 at 9, Maddox Interview 32:1-7.

**27.** Nevertheless, per Western, "On 6/17/2009 Mr. Kallenbach reached his 12 weeks of allowed FMLA leave and his position was terminated" because his FMLA expired. ECF 840-66; ECF 840-42.

**28.** Rather than extend Kallenbach's leave for nine days, Western discharged him, asserting to the EEOC that no exceptions are made to the 12-week policy. ECF 840-62 at 4; ECF 840-66 at 2.

**29.** AI Steve Bahmer injured his spine in December 2013, resulting in a condition that made it difficult for him to walk and sit. ECF 838-11 at 4, Bahmer Dep. 103:9-19.

**30.** By February 2014, Bahmer's doctor estimated Bahmer would be recovered on approximately April 11, 2014. ECF 838-47 at 3-4, 4-5, Dr. Krafft Dep. 46:22-47:7, 47:22-48:8, ECF 837-22.

**31.** Nevertheless, Western discharged Bahmer on March 3, 2014, after 12 weeks. ECF 840-20.

**32.** Bahmer was released to work less than six weeks later, on April 14, 2014. ECF 837-3.

**33.** Pinnacol notes repeatedly reference the inflexible leave policy dating back to 2005. ECF 837-5. For example, notes state AI Padilla was "laid off because > 12 weeks FMLA;" and "since [AI White] has used up all her family leave she does not have a job to go back to." *Id.* at 3-4.

**34.** The Pinnacol notes for Daniel Dennison say Dennison "was going to see if he could be released on Monday of this week . . . so he could return to work at the 90 days prior to policy taking effect, which is termination after being off work for 90 days without return." ECF 837-23 at 2.

**35.** Western wrote "FMLA expired" (or similar language) as the reason for discharge for at least 46 individuals, including Dennison, from 2006 to 2016. ECF 840-69 at 1-46; ECF 840-56.

### C.   Western's Lack of Interactive Process.

**36.** When the EEOC asked Western to describe its "interactive process in effect during the relevant time period," ECF 840-15 at 9, Western's counsel responded: "Neither Ms. Prochaska nor I is clear in what is meant by 'interactive process' in this Information Request." ECF 840-24.

**37.** Multiple other Western managers did not know the meaning of "interactive process." ECF 837-79 at 8, Garcia Dep. 36:17-19 (USAC General Mgr); ECF 838-52 at 5, Long Dep. 63:15-22 (Safety Supervisor); ECF 838-61 at 4, McLemore Dep. 50:4-12 (HR Director).

**38.** Multiple Western managers were never trained on the ADA. ECF 838-69 at 16, M. Padilla Dep. 185:1-24; ECF 838-73 at 23, Respass Dep. 134:2-5; ECF 837-79 at 16, Garcia Dep. 28:21-25; ECF 838-40 at 15, Hunt Dep. 35:9-14; ECF 838-50 at 5, Larsen Dep. 98:7-12.

**39.** During more than a hundred orientations over nine years, Benefits Coordinator Hunt did not cover the ADA, or reasonable accommodations, or what employees should do if they needed a medical accommodation. ECF 838-40 at 3, 7-8, 9, Hunt Dep. 6:8-19, 43:22-44:25, 45:2-18.

**40.** Western HR knew it was unlawful to deny employment to people based on their disabilities. ECF 838-55 at 11-12, Maddox Dep. Vol. II 384:14-385:17.

### D.  ErgoMed and Western's Use of Physical Tests to Screen Drivers.

**41.** In 2007, Western engaged ErgoMed to conduct pre-employment and fitness-for-duty physical tests for various Western driving positions. ECF 837-24; ECF 837-25.

**42.** Western engaged ErgoMed at the suggestions of its insurance agent, Don Carver, "to reduce

Western's workers' compensation costs" for truck drivers. ECF 837-26.

**43.** ErgoMed's November 9, 2007 proposal explained one goal was to "decrease[] workers' compensation exposure" by *inter alia* "screening new hires" and "limit[ing] the organization's exposure to pre-existing conditions." ECF 837-24 at 2-3.

**44.** Safety Director Respass confirmed Western used ErgoMed to learn about pre-existing medical conditions and make hiring and return-to-work decisions. ECF 838-73 at 8, Respass Dep. 93:7-25.

**45.** In 2017, Carver confirmed to Western CEO Vieri Gaines that engaging ErgoMed to conduct physical testing of drivers had "significantly" improved Western's loss experience. ECF 837-26.

**46.** ErgoMed tests are not a DOT requirement. ECF 838-73 at 20-22, Respass Dep. 262:20-264:7.

**47.** Western required employees returning from medical leave to pass the ErgoMed test. ECF 838-56 at 5, 6, Maddox Dep. Vol. III 660:12-15, 661:13-16; *see* ECF 840-25.

**48.** If a driver could not successfully complete the entire battery of tests, ErgoMed issued a "no job match recommendation" to Western. ECF 838-2 at 4, ErgoMed 30(b)(6) Dep. (Haynes) 59:9-22.

**49.** Upon receipt of a "no job match recommendation" Western would retract its offer to a new hire or discharge an existing employee. ECF 838-5 at 3, 4, 5, 6, Western 30(b)(6) Dep. (Garcia) 52:1-24, 56:10-16, 60:10-15, 64:16-23; ECF 838-52 at 6, Long Dep. 91:4-13.

**50.** USAC drivers must work in two-person teams, and some Reefer drivers work in teams. ECF 838-6 at 30, Western 30b6 Dep. (Rau) 170:2-7; ECF 838-72 at 8, Rau Dep. 57:13-21.

**51.** Both drivers are not required to perform all physical tasks, ECF 838-2 at 5, ErgoMed 30b6 Dep. (Haynes) 118:5-23, such as performing truck inspections, ECF 838-25 at 4-5, D. Dryden Dep. 101:25-102:15, opening and closing the truck hood, ECF 838-69 at 5, M. Padilla Dep. 84:17-25, disconnecting the trailer and tractor by pulling the fifth wheel pin, ECF 838-13 at 5-6, R. Brethour Dep. 19:4-20:7, chaining tires, ECF 838-2 at 5, ErgoMed 30b6 Dep. (Haynes) 118:16-23, and **moving cargo. ECF 838-6 at 31, Western 30b6 Dep. (Rau) 179:12-20.**

**52. [There is no Fact 52.]**

**53.** An expert found ErgoMed testing lacked validation and is not an "accurate representation of the essential and marginal physical demands" of the OTR and USAC positions. ECF 840-26 at 8-9.

**54.** Starting in 2008, ErgoMed tested OTR, USAC, Local, and Yard drivers to lift 50 pounds to shoulder height, based on the weight of two tire chains. ECF 840-28 at 1-2; ECF 840-29 at 1-2; **ECF 838-6 at 3, 24-25, Western 30b6 Dep. (Rau) 33:20-22, 119:18-120:9.**

**55. [There is no Fact 55.]**

**56.** OTR, USAC, Local, and Yard drivers do not have to lift a pair of tire chains to any height, let alone shoulder height. Drivers can drag rather than carry chains, ECF 838-6 at 12-13, Western 30b6 Dep. (Rau) 64:17-65:17, handle them one at a time, ECF 837-6 at 5, use an alternative traction device like AutoSocks, ECF 841-103 at 2, McGee Decl. ¶¶ 7, 13, hire a chaining service to assist, ECF 838-42 at 5, Jarvis Dep. 127:1-19, have a team driver assist, ECF 838-25 at 6, D. Dryden Dep. 104:6-12, or park until inclement conditions pass, ECF 838-51 at 8-9, Lien Dep. 159:21-160:20.

**57.** A pair of AutoSocks weighs up to 6.6 pounds. ECF 841-103 at 3, McGee Decl. ¶ 19.

**58.** ErgoMed tested OTR, Local, USAC, and Yard drivers' ability to static push/pull 130 lbs. at 58 inches above ground based on using ratchet straps, ECF 840-28 at 4; ECF 840-29 at 1-2, even when these jobs do not use ratchet straps, ECF 838-6 at 19, Western 30b6 Dep. (Rau) 91:3-11, 19-24.

**59.** Since 2009, Western required all tow drivers to lift 60 pounds 45 inches off the ground, lift 132 pounds 40 inches off the ground for 30 feet, and push 76 pounds for 100 feet. ECF 840-74 at 1.

**60.** The 60-lb. requirement was based on the weight of a pair of tow chains. ECF 838-75 at 4, Rodriguez Dep. 29:7-14; ECF 838-8 at 13, Allison Dep. 89:19-25.

**61.** ErgoMed acknowledged in 2019 that it was a "mistake" to test drivers on their ability to push 76 pounds for 100 feet because the test was unrelated to any aspect of the job. ECF 838-1 at 9-10, ErgoMed 30b6 Dep. (DuShane) 92:21-93:4; ECF 841-107 at 4, Grinolds Decl. ¶ 21.

**62.** Western asserts the 132-lb. lift test is to replicate the strength necessary to lift a tire of a commercial truck into the back of a tow truck. ECF 840-74 at 3, 4.

**63.** Jorge Rodriguez, the driver Western selected to demonstrate towing jobs, has never had to lift a truck tire in his eight years at Western. ECF 838-75 at 3, 5, Rodriguez Dep. 7:4-6, 44:12-14.

**64.** Rodriguez noted that the need for more than one vehicle is also rare, occurring only ten to fifteen times over 8 years, but dispatch never turned down his request for more help. ECF 838-63 at 9-10, Morin Dep. 75:18-76:5; ECF 841-107 at 5, Grinolds Decl. ¶ 29.

**65.** Keithline, another entry-on-land demonstrator, testified he could use a truck's winch to stand a tire up; he then typically rolls the tire. ECF 838-46 at 4-6, Keithline Dep. 61:22-62:5, 62:21-63:16.

**66.** The 130-lb. push/pull OTR standard and the 132-lb. lift and 76-lb. push standards for tow drivers do not appear in any job descriptions. ECF 840-75; ECF 840-76.

**67.** From January 14, 2008 to November 10, 2015, ErgoMed tested Hostler, Local, USAC, and OTR drivers for a) static push and pull of 130 lbs. of force, b) lift 50 lbs. and carry it 20 feet, and c) lift 50 lbs. ground-to-shoulder. ECF 840-77 at 1; ECF 840-78 at 1; ECF 840-79 at 1.

**68.** In November 2015, Western revised the OTR PDE and test battery, but did not change the PDE or test battery for USAC drivers and continued to test USAC drivers using the old OTR/USAC test. ECF 840-80; ECF 838-6 at 32-33, Western 30b6 Dep. (Rau) 203:16-204:3 (Dep. Ex. 831 at 43-47).

**69.** With the revised 2015 OTR PDE, Western required lifting 50 pounds from 15 inches off the ground to waist, instead of to shoulder level as required in the prior PDE. ECF 840-80 at 1.

**70.** In 2015, Western's Vice President alerted another manager and Maddox about problems in the ErgoMed test, noting it was "very old" by some 10 years, and multiple parts of the test were either obsolete or too high based on new lighter equipment. ECF 840-31.

**71.** In December 2014, Western "medically disqualified" an applicant who was nine pounds below the 130-lb. pull requirement, to which the Vice President remarked "Dunno if I could pull 130 lbs." and the President and CEO remarked "Never heard of that one. . . ." ECF 840-32; see also ECF 837-7 and ECF 837-8 at 1 (similar disqualifications in May and November 2015).

9

**72.** After an applicant was unable to complete the ErgoMed push test, Maddox denied another **manager's request for a re-test, writing "Why would we retest him?" ECF 840-25.**

**73. [There is no Fact 73.]**

**74.** In October 2015 VP Guadagni told other managers that ErgoMed "is getting a little out of hand . . . the weight test is a little overboard . . . get them to tone it down a bit." ECF 837-28 at 1.

**75.** Western's HR Director responded that on multiple occasions she discussed with the Vice President and General Manager changing the standards, but cautioned that the test was "effective [at] reduc[ing] our work comp claims year after year since we implemented ErgoMed." Id.

**76.** Dr. Allison explained the industry standards for creating physical demands tests includes both job analysis and content validation. ECF 840-82 at 5.

**77.** According to industry standards, job analysis entails four steps: 1) interviewing incumbent workers, supervisors, and others with knowledge of the position to assess the physical demands; 2) observe and document an incumbent worker performing the job duties, including necessary measurements; 3) circulate a draft job analysis and obtain feedback from incumbent workers, supervisors and others with knowledge of the job; 4) design a physical demands test based on information gleaned through the prior steps. ECF 838-8 at 4-6, Allison Dep. 30:4-32:22.

**78.** To validate the test based on industry standards entails three steps: 1) run a sample of the designed test using five to seven incumbent workers who have held the position for at least a year and two supervisors; 2) survey the sample incumbents to see of the test accurately replicated their job duties; 3) modify and retest until 70% of the sample incumbents agree that each component of the test accurately matches the skill required. *Id.*

**79.** There is no evidence that incumbent workers had any role in the 2008 and 2009 PDEs (2008 OTR PDE, 2009 USAC PDE, 2009 Heavy Wrecker PDE). Only one manager was interviewed and managers performed the demonstrations. ECF 840-28; ECF 840-29; ECF 840-74.

**80.** None of the three PDEs developed in 2008 and 2009 were validated despite ErgoMed's repeated

suggestions that Western validate the tests. ECF 837-29 at 1-3, 5-6; ECF 840-77 at 2; ECF 840-78 at 2; ECF 840-74 at 2; ECF 838-37 at 3, Haynes Dep. 76:10-17.

**81.** Perkins was diagnosed with cancer, a disability. 29 CFR 1630.2(j)(3)(iii); ECF 837-32 at 1.

**82.** Western discharged Perkins for "FMLA expired, medical." ECF 837-43.

**83.** In December 2014 Perkins reapplied for the OTR Driver position, received a conditional offer of employment, and went to ErgoMed for pre-employment testing. ECF 837-41; ECF 837-42.

**84.** When Perkins took the pre-employment test at ErgoMed, he successfully pushed 114 lbs. and pulled 98 lbs. but could not pass the 130-lb. push/pull tests. ECF 837-33.

**85.** Western rescinded its offer to Perkins and refused to hire him. ECF 837-34.

**86.** Western made a conditional offer of employment to Gary Nehrig and sent him to ErgoMed to be tested on January 6, 2014 for an OTR Driver position. ECF 837-35 at 20.

**87.** ErgoMed obtained a medical record indicating Nehrig suffered from a lumbar strain and degenerative disc disease, with a restriction of no lifting over 30 - 35 lbs. Id. at 15-16.

**88.** ErgoMed sent Western a no-job-match recommendation for Nehrig. Id. at 18.

**89.** Western deemed Nehrig "not qualified" because he "failed ErgoMed." ECF 837-36.

**90.** On August 18, 2014, David Vasquez took the OTR driver ErgoMed test, after receiving a conditional offer. Vasquez told ErgoMed he had a 15-lb. "weight restriction" on his left arm and a fractured elbow from 2011. ECF 837-37 at 2-9, 14, 17, 19.

**91.** ErgoMed obtained a physician's note dated September 5, 2013, clearing Vasquez to return to full-time truck driving but restricting him to "Light-Medium lifting" defined as 35 pounds occasional lift, 15 pounds frequent lift, and 7 pounds continuous lift. Id. at 21.

**92.** The ErgoMed screener noted Vasquez's 35-lb. lifting restriction and tested him but stopped the test when Vasquez reported pain in his elbow when lifting 30 pounds. Id. at 7.

**93.** ErgoMed's no-job-match recommendation noted "required to lift 50 lbs." Id. at 22.

**94.** HR Manager Maddox then deemed Vasquez unqualified for hire. ECF 840-92.

**95.** On August 18, 2009, K. Preston reapplied for an OTR position at Western. ECF 840-92.

**96.** On August 31, 2009, Western sent Preston for testing at ErgoMed and received a no-job-match recommendation based on his 30-lb. lifting restriction. ECF 837-43 at 3

**97.** On September 16, 2009, Western determined Preston was "not qualified" for the OTR position and rescinded the conditional offer it had extended to him. ECF 840-92.

**98.** On September 15, 2007, Charles Morgan injured his chest at Western. ECF 837-44.

**99.** On December 18, 2007, Morgan's doctor reported to Western that he had reached "Maximum Medical Improvement" (MMI) and imposed the following permanent restrictions: "25-lb. max lift, bending and twisting to [sic] an occasional basis." ECF 837-45 at 2.

**100.** Dr. Ladwig restricted Morgan from driving in the mountains. Id. at 6.

**101.** On January 14, 2008, Western sent Morgan for fitness-for-duty testing at ErgoMed, which issued a no-job-match recommendation because of his 25-lb. lifting restriction. Id. at 7.

**102.** On January 21, 2008, Western discharged Morgan because he was deemed "unable to perform work due to ErgoMed evaluation." ECF 837-38.

**103.** Morgan reapplied on September 29, 2011, and on October 3, 2011, HR Director Maddox deemed Morgan "not qualified," noting "permanent restrictions." ECF 840-92.

**104.** On December 28, 2007, Jeffrey Jarvis slipped on ice and hurt his hand and wrist, which injury resulted in a 10-lb. lifting restriction. ECF 837-39 at 1.

**105.** On January 6, 2008, Jarvis aggravated a shoulder injury. ECF 837-39 at 2.

**106.** Jarvis went to ErgoMed for testing on January 9, 2008. ECF 837-46; ECF 840-96 at 2.

**107.** ErgoMed would not perform the test because it wanted more medical information from Jarvis's primary care physician. ECF 840-96 at 2, ECF 837-46.

**108.** On January 10, 2008 Jarvis failed ErgoMed's test and ErgoMed issued a no-job-match

12

recommendation, with the following notation: "Able to lift 10 lbs. Has M.D. restriction of 10 lbs.; job requires in excess of 50 lbs." ECF 840-96 at 1.

**109.**   Western fired Jarvis due to his shoulder limitation. ECF 838-42 at 4, Jarvis Dep. 116:10-15.

**E.  Aggrieved Individuals' Interactions with Western**

**110.**   Western was aware of most AIs' disability and need for accommodation through their FMLA paperwork, ECF 837-10 (at least 14 AIs), or workers compensation First Reports of Injury on medical conditions, ECF 837-11 (at least 25 AIs), submitted to Western HR.

**111.**   Western discharged multiple employees after 12 weeks of medical leave despite Western knowing the employees had return-to-work dates that required minimal extensions of leave. ECF 837-12 at 4, 5 and ECF 840-40 (Schmotzer–6 days); ECF 837-13 at 5 and ECF 840-42 (Kallenbach–9 days); ECF 837-14 at 4, 5 and ECF 840-44 (Valdez–5 weeks + 4 days); ECF 840-20 and ECF 837-3 (Bahmer–5 weeks + 5 days).

**112.**   Many AIs first learned Western discharged them through a letter. ECF 838-49 at 2-3, 4, 8, LaFuria Dep. 71:15-72:3, 75:1-21, 108:17-20; ECF 838-80 at 3, Simms Dep. 61:10-16; ECF 838-94 at 5, 6, Wyman Dep. 55:4-12, 57:9-24; ECF 838-81 at 7, Smallridge Dep. 244:18-23; ECF 838-77 at 3-4, 5, Schmotzer Dep. 13:25-14:20, 45:12-23; ECF 838-51 at 4-5, 10-11, Lien Dep. 72:15-73:9, 165:21-166:16; ECF 838-62 at 3, Mendoza Dep. 43:16-23 (letter came "out of nowhere").

**113.**   After Lien received his discharge letter, he called Western multiple times and filled out a job application, but he never received a call back. ECF 838-51 at 6-7, Lien Dep. 75:25-76:13.

**114.**   When Curtis Lien was on medical leave, Western did not contact him to discuss his medical condition, the restrictions he was placed on, whether he could do his job, or whether he could do a different job at Western. ECF 838-51 at 12, Lien Dep. 167:2-23.

**115.**   While on medical leave, James Smith often called Western's dispatch and HR to ask when he

could return. ECF 838-83 at 6-8, June Smith Dep. 63:14-65:4[1]. With no prior notice, Western

discharged Smith noting "Requested FMLA for medical reasons" on his paperwork. ECF 840-45.

116.  Catherine Valdez worked at Western for almost 14 years before being discharged because her

"FMLA ended." ECF 840-44. In phone calls, HR Director Maddox said she would no longer have a

job "[b]ecause you can't go past 12 weeks. It's in the policy…" and "there is no extensions." ECF

838-90 at 6-7, 8-9, Valdez Dep. 148:6-149:17; 150:17-151:3.

117.  Valdez could drive with accommodations, but Maddox did not discuss them; Valdez knew of

Western's "zero-restriction policy." ECF 838-90 at 5, 10, Valdez Dep. 147:8-22, 156:16-24.

118.  While on medical leave, Mitch Smith submitted medical documents to HR regarding his back

injury stating he could work modified duty. ECF 838-84 at 4, M. Smith Dep. 78:8-15. Before

Smith's discharge, Western never contacted him to say his leave was expiring, to ask about his

medical condition, or to discuss how they could help him return to work. *Id.* at 6-9, 130:18-133:14.

119.  Jesse Otsea told Maddox he was "willing to do anything in the office or anything they could

find," but she never offered any options. ECF 838-66 at 3, 4, Otsea Dep. 63:1-17, 64:15-22.

120.  Jacob Oney requested non-mountain routes due to his hypertension and anxiety, a request

which Western denied. ECF 838-65 at 3-5, Oney Dep. 112:23-114:3; ECF 837-77.

121.  Edwin Wyman, on FMLA leave for cancer treatment, told Maddox he wanted to continue

working for Western, ECF 838-94 at 10, Wyman Dep. 98:16-24, but Maddox said no because his

12 weeks were up. *Id*. at 7-11, 72:11-14, 73:18-74:6, 98:1-12, 99:5-16.

122.  Rodolfo Morin, who was released to work with restrictions, asked HR for a reassignment but

was told he could not work with restrictions.  ECF 838-63 at 12, Morin Dep. 231:12-25.

123.  Walter Edwards took medical leave for necrotizing fasciitis. ECF 837-15.

124.  Edwards asked Maddox if there were other jobs at Western and reminded her of his

---

[1] June Smith was deposed for the deceased James Smith.

14

accounting degree and computer and sales experience, as well as his interest in light duty or dispatch. ECF 838-27 at 8-11, Edwards Dep. 120:3-123:9.

**125.**  After 12 weeks of leave, Maddox discharged Edwards by mail. *Id.* at 7, 77:8-11; ECF 840-51.

**126.**  William Arseneau was discharged by mail. ECF 838-9 at 4-5, Arseneau Dep. 81:25-82:21. Before his discharge, Western never contacted Arseneau to discuss his condition, his return to work, whether he needed accommodations, or whether could do a different job at Western. *Id.*

**127.**  Before Western discharged Tony Grossman, Western did not contact him to tell him his medical leave was expiring or to discuss his 5-lb. lifting restriction, whether he could do his job with accommodations, could do a different job at Western, or should have his leave extended. ECF 838-33 at 6-7, Grossman Dep. 137:20-138:16; ECF 837-16.

**128.**  Western fired him by letter after 12 weeks. ECF 838-33 at 4-5, Grossman Dep. 103:13-104:8.

**129.**  Jeffrey Jarvis asked Western managers for help to chain tires, to be rerouted where he would not need to chain up, for light duty, and for reassignment, but all his requests were rejected. ECF 838-42 at 6-8, Jarvis Dep. 146:24-148:22. He was told there was no light duty. *Id.* at 8, 148:7-16.

**130.**  Anthony Padilla kept Western informed by providing medical reports about his shoulder injury, ECF 838-68 at 5, 6, 11-13, A. Padilla Dep. 72:8-17, 81:4-11, 92:22-94:18, yet while on leave, Maddox refused to answer his questions, *id.* at 7-8, 8-9, 88:16-89:4, 89:12-90:13, so he asked his dispatcher about reassignment. *Id.* at 14-15, 100:20-101:25.

**F. Western refused Kallenbach a Yard Hostler position and refused to rehire him.**

**131.**  Western did not consider reassignment to a Yard Hostler position as light or modified duty because it generally required physical activity. ECF 838-73 at 14-15, Respass Dep. 142:21-143:4.

**132.**  A Yard Hostler position was open from April 3, 2009, to June 15, 2009. ECF 840-60 at 7.

**133.**  In May 2009, Kallenbach requested a Hostler position because of his disability, ECF 837-18.

**134.**  In response to Kallenbach's charge of discrimination, Western said he was not placed in the

Yard Hostler position because "there were no openings for these positions." ECF 840-62 at 4.

**G. Defendant's Interested Witnesses.**

**135.** Western relies on testimony of interested witnesses: Vieri Gaines, current CEO since 1990s, ECF 838-31 at 3-5, Gaines Dep. 21:17-23:25; Sterling Guadagni, Gaines' son and current Operations Managers since 2011, ECF 838-35 at 3-4, S. Guadagni Dep. 8:5-9:3; Marty Rau, current Reefer Division General Manager since 2017, ECF 838-72 at 3, 4, Rau Dep. 11:1-3, 14:16-24; Jennifer Maddox, 2008 to 2017 HR Dir., ECF 838-54 at 3, Maddox Dep. Vol. I 31:13-20; Michael Padilla, current Safety Dir. since 2015, ECF 838-69 at 3-4, M. Padilla Dep. 14:12-15:2; Martin Garcia, current Vice President since 2018, ECF 837-79 at 3, 4, Garcia Dep. 14:7-24, 20:2-12; Bill Thompson, current Towing General Manager since 2011, ECF 838-89 at 4-6, Thompson Dep. 38:20-40:13; Wayne Long, Safety Supervisor since 2010, ECF 838-52 at 3, Long Dep. 12:13-20.

**III. RESPONSE TO WESTERN'S ALLEGED MATERIAL FACTS ("RMF")**

**A.     Overarching concerns regarding Western's Statement of Material Facts ("SMF").**

Reliance on Testimony from Movant's Interested Witnesses: The Court should not consider evidence supporting Western's argument unless "that evidence comes from disinterested witnesses" and is "uncontradicted and unimpeached." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000); *Waugh v. Dow*, 617 Fed. Appx. 867, 874 n.6 (10th Cir. 2015). Where a fact cites **only** interested witnesses, the EEOC notes this as "Interested Witnesses." *See* ADF 135; SMFs 1-2, 5, 8, 17-18, 23, 27, 31, 34-35, 37-38, 44-45, 47-50, 52-56, 59, 64-66, 69, 74, 75-76, 81-83, 111.

Improper Injection of Phase II Issues: Pursuant to *Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 360 (1977), the Court bifurcated trial in this matter, ECF 166, and later ordered dispositive motions be "limited solely to Phase I issues." ECF 613. In Phase I, the EEOC must "demonstrate that Defendant has a pattern or practice of unlawful discrimination" and need only prove "the discriminatory policy existed." ECF 166 at 17, 3. Phase II "will decide all individual claims . . ." *Id.*

16

at 17. The EEOC notes Western's improper raising of Phase II issues as "Phase II."

**B.     EEOC's Responses to Western's alleged and enumerated Material Facts ("RMF")**

The following facts are **undisputed**: 3-5, 8, 12-13, 25-26, 67-68, 80, 86, 108, 110.

**1. Disputed.** Western Distributing is a closely-held, multi-corporation conglomerate consisting of over 15 companies, one of which is Western Distributing Transportation Corp. ("WDTC"). ECF 841-1. More than two-thirds of WDTC routes are to states other than AZ, CA, NV, WA, OR, and UT. ECF 841-2; ECF 841-3. [Interested witnesses].

**2. Disputed.** Western must comply with DOT regulations, but they include exceptions and waivers and do not preempt the ADA's requirement to provide accommodations. *See* § IVD.3, *infra*. DOT "guidelines" are suggestions. ECF 841-4, ECF 838-36 at 3-4, Dr. Hartenbaum Dep. 154:12-155:16; ECF 838-86 at 3-4, Dr. Swotinsky Dep. Vol. I 124:22-125:15. [Interested witnesses].

**6. Disputed** that Local drivers in the Reefer division "pickup" or physically load or unload deliveries; they do not. ECF 838-6 at 23, Western 30b6 Dep. (Rau) 115:4-13. Reefer Local Drivers are a separate and distinct position from Beverage Delivery Drivers who deliver kegs. ECF 838-72 at 7, Western 30b6 Dep. (Rau) 54:5-18. Half of local drivers' routes are not to the mountains. ECF 838-50 at 4, Larsen Dep. 65:3-6.

**7. Disputed**. USAC drivers work in two-person teams; both drivers are not required to load and unload cargo. *See* ADFs 50-51. Further, team drivers can assist one another with lifting tasks and Western trained drivers to use a two person lift for items over 50 lbs. ECF 838-73 at 3-4, Respass Dep. 52:20-53:19. *See also* ECF 837-86 at 2-5, Edwards Decl. ¶¶ 7-34. [Interested witnesses].

**9. Disputed** that dispatching requires "complex logistical planning." According to long-time dispatcher and manager Sheila Scoyne, re-routing a driver is "basic scheduling" and "dispatch is not a complicated process." ECF 841-104 at 1, 3, Scoyne Decl. ¶¶ 2, 19. Western typically has contracts that last from six months to two years, which allows dispatchers to plan driver routes weeks in

advance. ECF 838-72 at 5, Rau Dep. 40:24-41:17. And dispatch work is simplified by software that automatically tracks dispatch records, route and truck assignments, driver locations, and driver service hours. ECF 841-51 at 2-6.

**10. Disputed** that Western's activities are always time sensitive. Cited testimony states that only 40 percent of Western's freight is perishable produce, ECF 838-31 at 14, Gaines Dep. 291:6-10, and Western can re-route drivers around highways that are likely to be closed for multiple days during winter months. ECF 838-50 at 3, Larsen Dep. 55:3-8. **Disputed** that USAC drivers could not wait out a snowstorm because they would "risk death" due to potential robbers, a hyperbolic allegation unsupported by any actual evidence. *See also* ECF 837-86 at 3, 4, Edwards Decl. ¶¶ 21, 30-31.

**11. Disputed.** Western utilizes "floaters", part-time, and relief drivers as necessary to cover for drivers on vacation or medical leave. ECF 837-79 at 9-11, Garcia Dep. 96:12-98:19; ECF 838-73 at 17, Respass Dep. 181:8-11. Western is "always hiring for drivers, period." ECF 837-79 at 10, Garcia Dep. 97:3-4. Western's no "slip-seating" policy is not required by any DOT regulation.

**14. Disputed** as to Western's actual policies and practices. *See* ADFs 1-39; ECF 841-7 at 6-12.

**15. Disputed.** Western did not have a Reasonable Accommodation Policy before 2015 (*see* ECF 815-87; ADF 13) and did not effectively distribute it when added in 2015. Western's cited Keithline testimony undermines its assertions, when he was unsure he received the policy or discussed it with anyone. ECF 838-46 at 3, 10, Keithline Dep. 6:14-23, 126:1-20. The GM and VP of WDTC also did not recall receiving it or being trained on it. ECF 838-72 at 10, 11, Rau Dep. 135:5-20, 136:10-22; ECF 838-34 at 3-5, 7-8, D. Guadagni Dep. 15:1-17:10, 150:24-151:19. Longtime Western drivers did not recognize the policy and did not recall any training on it. ECF 838-58 at 3, 6, 7, Mays Dep. 7:9-21, 163:2-5, 174:17-25; ECF 838-25 at 10-11, D. Dryden Dep. 122:13-123:7.

**16. Disputed.** The cited testimony of Western's interested witnesses contradicts Western's other assertions. In SMF 18, Western asserts it provided three accommodations: CPAP machines,

modified work schedules, and headsets. Maddox was not involved in CPAP machines. ECF 838-55 at 6-7, Maddox Dep. Vol. II 437:20-438:19. There is no evidence the other argued accommodations were provided as accommodations *for disabilities*. *See id.* at 4-5, 8, 434:17-435:22, 439:3-9 (Maddox did not know if the employees she claimed to have accommodated had a disability). Additionally, Western's managers did not sufficiently understand the concepts of disabilities or reasonable accommodations to implement Western's purported policy. ECF 837-79 at 7-8, Garcia Dep. 35:20-36:5; ECF 838-34 at 6, D. Guadagni Dep. 100:9-18; ECF 838-52 at 4-5, Long Dep. 62:20-63:25; ECF 838-50 at 5, 6-7, Larsen Dep. 98:7-12, 99:9-100:1; ECF 838-69 at 12-13, M. Padilla Dep. 195:5-196:1; ECF 838-72 at 10, Rau Dep. 135:5-20. Western deems itself unqualified to determine whether an employee is disabled, ECF 841-8 at 2-3, meaning Western does not make the decision prerequisite to providing a reasonable accommodation.

**17. Disputed** as to Maddox's responsibilities. Maddox did not participate in providing the accommodations Western claims it made. RMF 16. The EEOC disputes that Maddox handled Western's interactive process because Maddox did not know what the interactive process was, ECF 840-24, and Western rarely engaged in any interactive process with employees on medical leave. *See* ADFs 110-130, ECF 841-7 at 12-13, (Maddox's lack of qualifications). [Interested witnesses].

**18. Disputed** that Western provided headsets or modified schedules as reasonable accommodations, as Western did not provide them as accommodations for disability. RMF 16. [Interested witnesses].

**19. – 20. Undisputed** that the 2015 EPM says what is asserted in SMF 19. **Disputed** as to Western's actual policies and practices. *See* RMF 15; ADFs 1-39, 110-130.

**21. Disputed.** *See* RMF 15 regarding Western's 2015 Reasonable Accommodation Policy. Janice Hunt handled employee leave for on-the-job injuries and did not handle reassignment as described by Maddox or the 2015 Policy. ECF 838-40 at 3, 10-11, Hunt Dep. 6:8-19, 86:2-87:4. Hunt only discussed reassignment with an employee if their supervisor was interested, and Hunt did not invite

workers injured on the job to apply for other positions. *Id.* And several employees who not only expressed interest in, but actually requested reassignment were not treated as Maddox describes. *See, e.g.*, ECF 838-93 at 9-14, Wones Dep. 92:4-97:5; ECF 838-29 at 3-4, Floyd Dep. 17:18-18:1; ECF 838-49 at 5-6, LaFuria Dep. 80:15-81:8; ECF 838-63 at 12, Morin Dep. 231:12-25.

**22. Disputed** as to Western's actual policies and practices. *See* ADFs 1-39, 110-130; RMFs 18-21.

**23. Disputed** where evidence indicates that Western's "Return to Work" policy—found in the safety section, not the EEO section of the EPM—was not implemented and was written to satisfy Western's workers compensation insurers. ECF 840-1 at 32; ECF 838-18 at 3-4, 5-7, Carver Dep. 35:16-36:13, 46:23-48:1 (policy was required for insurer's cost containment program); ECF 838-17 at 4-5, Burns Dep. 50:19-51:16 (Western's expert did not see or hear about the modified duty lists the policy requires). **Disputed** that Western is a small company. *See* RMF 0. **Undisputed** that Western has had light-duty positions available in, at a minimum, its offices, yard, and its beverage division. *See also* ECF 837-86 at 2-3, Edwards Decl. ¶¶ 11-15, 19-20. [Interested witnesses].

**24. Disputed** that reassignment and light duty occurred frequently. During the EEOC's investigation, Western provided a spreadsheet indicating it did not accommodate any employees from 2008 through 2010. ECF 841-9 at 10, 12. Maddox offered little or no light-duty work after 2010. ECF 838-53 at 7, 8, Maddox Interview 21:9-15, 22:1-5; ECF 838-56 at 3-4, Maddox Dep. Vol. III 642:23-643:12. *See* RMF 105.

**27. Disputed** as unproven that employees were told to "communicate to HR any changes to their anticipated return-to-work date," an assertion not reflected in the cited testimony. Cited testimony says nothing about return-to-work dates. [Interested witnesses].

**28. Disputed.** The evidence does not support this assertion, and Western has neither produced nor cited the type of documentary evidence that would exist if Western had the process it claims. The cited Gaines, McLemore, and Respass testimony only addresses the inflexibility of the 12-week

policy, while the Maddox testimony directly contradicts her prior sworn testimony and signed position statements from the EEOC investigation. ADFs 15-17.

29. **Undisputed** that the EPM's Return to Work Policy says what Western asserts in SMF 29. **Disputed** as to Western's actual policies and practices. *See* ADFs 1-39, 110-130; RMFs 18-21.

30. **Disputed** that Maddox's practice was to communicate with employees on medical leave. Numerous AIs on medical leave heard nothing from Western until receiving a discharge letter. *See* ADFs 112, 114, 115, 118, 126, 127, 130. And multiple AIs testified that Western did not return their calls. *See* ADFs 113, 130. [Phase II].

31. **Disputed as unproven** that rehire was provided to employees discharged "because [they are] unable to return or be accommodated at that time," an assertion not reflected in the cited testimony. **Dispute** the implication that firing employees is not an adverse action if the employer allows the employee to reapply within 30 days. [Interested witnesses; Phase II].

32. **Disputed.** The EEOC does not allege Western has a policy of prohibiting rehire. Denying rehire is only one way Western denies employment opportunities based on disabilities. Nevertheless, evidence of such a policy exists in two emails showing Western's intention to avoid rehire of individuals who posed a risk of reinjury. ECF 837-47; ECF 837-48 at 1-3. Additionally, Western managers told at least two AIs they would not be rehired because of a medical condition. ECF 838-49 at 9-10, LaFuria Dep. 118:4-119:19; ECF 838-82 at 6-8, Julie Smith Dep. 120:25-122:21.

33. **Disputed** as to Fries, Kallenbach, and Otsea, none of whom were rehired by Western. **Disputed** as to Ingland and Jimenez, whom Western discharged for reasons other than their medical conditions. *See* ECF 837-55; ECF 841-102 at 2-3. **Disputed** as to Dennison, Marshall, McCallan, Morin, O'Dwyer, A. Padilla, Julie Smith, and White because they did not leave or quit Western; Western discharged them. ECF 837-56 (Dennison); ECF 841- 56 (Marshall); ECF 841-57 (Fernandez); ECF 841-58 (Lafuria); ECF 838-60 at 4, 5-6, McCallan Dep.15:3-13, 136:22-137:8;

ECF 841-59 (Morin); ECF-840-53 (O'Dwyer); ECF 841-60 (A. Padilla); ECF 838-82 at 4, Julie

Smith Dep. 111:12-21; ECF 840-69 at 1 and ECF 838-16 at 3, Bryan Dep. 28:1-10[2] (White).

**34. Disputed** that FMLA leave is "limited to 12 weeks of leave as required by law." "The Act

encourages businesses to adopt more generous policies, and many employers have done so."

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 84 (2002). [Interested witnesses].

**35. Disputed.** During the interview, Maddox repeatedly stated that Western discharged employees

after 12 weeks and made no exceptions. ECF 838-53 at 3, 4-6, Maddox Interview 14:18-20; 17:3-

19:4. Maddox freely explained Western's rationale for not allowing any exceptions. *Id.* at 5-6,

18:22-19:4. *See also* ADFs 14, 16 (Western repeatedly said no exceptions). [Interested witnesses].

**36. Undisputed** that from 2009 to present, Western's EPM included the following statement

reflecting Western's inflexible twelve-week leave policy: "If you are not able to return at the end of

the twelve-week period, you will be replaced in your position and your employment with the

company will be terminated." ECF 840-1 at 24; ECF 840-2 at 30; ECF 840-3 at 19; ECF 840-4 at

19; ECF 840-5 at 22. Further, Western's EPM included the following statement of the "full-duty"

policy: "The physician report must state that you can return to full duty or that you are 'discharged'

before you can return to work at full duty." ECF 840-1 at 24; ECF 840-2 at 30; ECF 840-3 at 19;

ECF 840-4 at 19; ECF 840-5 at 22. *See also* ECF 840-1 at 37; ECF 840-2 at 36; ECF 840-3 at 26;

ECF 840-4 at 26; ECF 840-5 at 28.

**37. Disputed** that Western had an ADA or reasonable accommodation policy prior to 2015 when it

was added to the EPM. *See* ECF 841-66 at 30-33. [Interested witnesses].

**38. Disputed**. Substantial evidence shows Western's policy of not allowing employees to return to

work with restrictions. Western managers testified or sent emails stating "full duty" under

Western's policy meant no medical restrictions. ADFs 2-3. According to Western's own medical

---

[2] David Bryan testified as Personal Representative for Linda White (deceased.)

providers, "full duty" means returning to work without medical restrictions. ADF 4. Pinnacol testimony and records say the same. *See* ADFs 5-6. [Interested witnesses].

**39. Disputed**. Western managers contradict one another and themselves. Western managers testified or sent emails stating "full duty" under Western's policy meant no medical restrictions. ADFs 2-3. And Pinnacol notes indicate Maddox said Western could not make any accommodations: "the employer cannot accommodate restriction of any kind per Jennifer [Maddox]." ADF 5. Respass testimony cited by Western came at direction of Western's counsel at lunch, and Respass admitted that during his time as Safety Director at Western, he never allowed anyone to return to work with a medical restriction. ECF 838-73 at 12-13, Respass Dep. 124:25-125:14. Similarly, after McLemore testified that employees had to be without restriction to return to work, ECF 838-61 at 5-6, McLemore Dep. 201:1-6; 202:3-8, Western's counsel asked leading questions to elicit the testimony cited it Western's motion. Sterling Guadagni, Dutton, and Long all provided testimony contrary to the testimony Western cites. ECF 838-35 at 5-7, S. Guadagni Dep. 33:20-35:15 (didn't know the procedure for returning employees to work, and relied on Maddox to clear the employee); ECF 838-26 at 3, Dutton Dep. 55:20-24 (only a DOT certification was needed to return to work); ECF 838-52 at 9-11, Long Dep. 185:19-187:24 (a driver had to have a no-restrictions release from his own physician before Western would send him for DOT certification or ErgoMed testing).

**40. Disputed**. Western's managers testified otherwise, explaining that Western's "full duty" policy required that returning employees have no medical restrictions. ADFs 2-3. And Western's workers compensation doctors and insurance carrier say the same. ADFs 5-6.

**41. Disputed**. The cited evidence states that Western's policy is to be DOT compliant and Western's Corporate Manual merely states drivers need to "abide" by two specific DOT regulations; neither the testimony nor the exhibit discuss essential job functions as asserted.

**42. Disputed** that drivers "must" complete a drug screen and an ErgoMed test. These are Western's

internal standards, not DOT requirements, as Western's SMF 42 implies. ECF 838-17 at 3, Burns Dep. Vol. I 39:10-25 (re: ErgoMed screen); ECF 838-73 at 18-19, Respass Dep. 248:25-249:6 (only required DOT certificate); 49 C.F.R. § 382.301. **Disputed** that the ErgoMed test "ensure[s] [drivers] can perform the physical demands of the specific driving position for which they will perform." The ErgoMed test includes components that are not related to any essential job function. ADFs 53-70.

**Disputed** that upon return from medical leave drivers "must" complete a DOT physical. Western's own expert stated that the employer determines whether a driver returning to work after an injury or illness should have a new DOT physical. ECF 838-36 at 7-8, Dr. Hartenbaum Dep. 215:9-216:4.

**43. Disputed.** ErgoMed "gathered information" by only measuring two OTR trucks. ECF 838-69 at 6-7, M. Padilla Dep. 119:4-120:7. The test ErgoMed developed for the OTR position was used to test other positions (USAC, Local Driver, and Yard Hostler), without regard for the differing job functions of these positions. ECF 837-4 at 2; *compare* ECF 838-1 at 3-8, ErgoMed 30b6 Dep. (DuShane) 77:6-82:4, *with* ECF 838-6 at 5-6, Western 30b6 Dep. (Rau) 52:22-25, 53:6-11. The test ErgoMed developed for the Heavy Wrecker Towing position was used to test other towing positions without regard for the differing job functions. ECF 838-6 at 26-27, 29, Western 30b6 Dep. (Rau) 162:10-163:3, 166:17-22 (Dep. Ex. 821 at 37-42). ErgoMed did not accurately measure the physical demands of the positions. ECF 838-76 at 3-4, Schelly Dep. Vol. I 293:25-294:10; ECF 837-6 at 5.

**44. Disputed** that ErgoMed tests whether drivers can perform functions "required by DOT." ErgoMed tests functions that are not required by DOT regulations or guidelines. DOT regulations are silent as to any specific lifting, pushing, or pulling requirements. [Interested witnesses].

**45. Disputed.** Western does not follow all DOT guidelines. DOT regulations allow drivers with diabetes controlled by insulin to get approval to drive with a waiver. 49 C.F.R. § 391.46. Western does not follow the waiver guideline and instead prohibits drivers with diabetes controlled by insulin from driving. ECF 838-6 at 4, Western 30b6 Dep. (Rau) 39:1-19 (Dep. Ex. 799 at 36).

24

Western's own DOT certification doctor does not issue DOT waivers for diabetes. ECF 838-48 at 9-10, Dr. Ladwig Dep. 208:2-209:8. [Interested witnesses].

46. **Disputed** that the cited page of the Medical Examiner Handbook defines, identifies, or explains what driving and non-driving responsibilities are. **Undisputed** that the cited page states, "When you determine that a driver is medically fit to drive and also able to perform non-driving responsibilities, you will certify the driver and issue a Medical Examiner's Certificate."

47. **Disputed.** Western cites interested witnesses instead of the regulation, which states:

Before driving a motor vehicle, the driver shall:

(a) Be satisfied that the motor vehicle is in safe operating condition;

(b) Review the last driver vehicle inspection report if required by § 396.11(a)(2)(i); and

(c) Sign the report to acknowledge that the driver has reviewed it and that there is a certification that the required repairs have been performed. The signature requirement does not apply to listed defects on a towed unit which is no longer part of the vehicle combination.

49 C.F.R. § 396.13. The regulation requires no post-trip inspection and says nothing about DOT guidelines. **Disputed** as to team drivers. *See* ADFs 50-51. [Interested witnesses].

48. **Disputed** as to "requirements" imposed by Western and not in DOT regulations or guidelines. DOT regulations are silent on the need to "stoop" or inspect underneath a vehicle. *See* 49 C.F.R. § 396.13. A long-handled mirror can be used instead. ECF 837-52 at 1-2. [Interested witnesses].

49. **Disputed** as to "requirements" imposed by Western and not in DOT regulations or guidelines. DOT regulations are silent on the need to open and close the hood of the truck as part of any inspection. *See* 49 C.F.R. § 396.13. Further, with HoodXpress, drivers do not need to physically open or close the hood of the truck. ECF 838-71 at 4-6, Pullins Dep. 16:22-18:6. **Disputed** as to team drivers. *See* ADFs 50-51. [Interested witnesses].

50. **Disputed.** The cited testimony does not support that new hydraulic technology became a "standard feature" on Western trucks in 2014. When deposed Western only knew approximate years

when it purchased the technology and updated its trucks on a rolling basis. ECF 838-6 at 8-9, Western 30b6 Dep. (Rau) 57:20-58:5. Cited testimony does not support that ErgoMed conducted an evaluation to assess a new force requirement. [Interested witnesses].

**51. Disputed**. Dr. Allison noted that measurements of a single truck (selected by Western for purposes of the Entry on Land) were adversely impacted by a too-small sample size (one truck) and resulted in unreliable force measurements. ECF 840-26 at 8.

**52. Disputed** as to overhead reaching, which is not an essential job function for OTR and USAC drivers. ECF 841-27; ECF 841-28; *see also* ECF 841-29 at 2 (Vice President highlighting and removing "overhead reaching" from ErgoMed OTR Testing). **Disputed** as to Western "requirements" which are not in DOT regulations or guidelines. Drivers can use retractable steps to get in and out of a truck. ECF 837-86 at 5, Edwards Decl. ¶ 38. [Interested witnesses].

**53. Disputed as unproven.** The cited testimony does not support that opening and closing trailer doors "can require a lot of force," as Western asserts. **Disputed** as to team drivers. *See* ADFs 50-51. **Disputed** as Western has "no touch" loads where drivers cannot open the trailer, and do not enter a trailer or secure a load. ECF 838-6 at 17-18, 30(b)(6) Dep. of Western (Rau) 82:8-14, 83:4-8; ECF 837-79 at 14-15, Garcia Dep. 158:11-159:23. [Interested witnesses].

**54. Disputed.** Cited testimony does not support that drivers must use both legs to "pull in the clutch and pedals." *See also* ECF 837-86 at 5, Edwards Decl. ¶ 37. [Interested witnesses].

**55. Disputed.** Drivers can use a hook as an assistive device to pull the pin without needing to bend or squat. ECF 838-6 at 14-15, Western 30b6 Dep. (Rau) 68:5-69:5; Auto-decoupler devices can disconnect the trailer automatically. ECF 838-3 at 4, Jost 30b6 Dep. 10:5-15. Only one of the team members is needed to disconnect the trailer. *See* ADF 51. [Interested witnesses].

**56. Disputed as unproven.** The cited testimony does not support that the task can be more difficult depending on weather conditions. *See* RMF 57 (assistive devices for fifth wheel pin and

26

decoupling); ECF 837-86 at 5, Edwards Decl. ¶¶ 35-36. [Interested witnesses].

**57. Disputed.** *See* RMF 53 regarding force measurements. Western and Jost agree manually pulling a fifth wheel pin to decouple a trailer takes around 60 lbs of force. ECF 838-6 at 16, Western 30b6 Dep. (Rau) 70:1-5; ECF 838-3 at 6-7, Jost 30b6 Dep. 34:25-35:7. Auto-decouplers let drivers pull the fifth wheel pin without any physical force. ECF 838-3 at 4, Jost 30b6 Dep. 10:5-15.

**58. Undisputed,** based on the assumption that "to safely navigate hazardous driving conditions" means understanding when it is safe to drive and when it is not. **Disputed** that driving in hazardous conditions is an essential job function for "any DOT-driving position."

**59. Disputed as unproven** that Western "primarily hauls time-sensitive refrigerated goods between Denver and the West Coast," an assertion not reflected in the cited testimony. Western hauls goods throughout 48 states. ECF 841-30; ECF 841-3. Disputed that driving through the mountains in inclement weather is an essential function of Western's driver jobs; drivers may pull over and wait until inclement weather passes or go on routes that are not over the mountains. ECF 838-51 at 2-3, Lien Dep. 55:20-56:2; ECF 838-74 at 7, Rockhill Dep. 206:3-10. [Interested witnesses].

**60. Disputed.** Drivers do not have to use chains, drivers have discretion to push and drag them, rather than lift and carry them, and discretion to handle them one at a time. *See* ADF 56.

**61. Disputed.** Western cites no FMCSA guideline or regulation which requires a 50 lbs. lifting requirement for drivers or that classifies commercial motor vehicle operation as "medium work". Rather, the FMCSA Medical Examiner Handbook specifically states, "Federal Motor Carrier Safety Administration (FMCSA) guidelines do not specify the number of pounds a driver must be able to lift." ECF 841-67; ECF 838-87 at 4, Dr. Swotinsky Dep. Vol. II 348:1-24.

**62. Disputed.** Cited testimony does not support that a lifting restriction affects a driver's ability to get into a truck, couple the trailer, and open the hood. Rather, Western's own expert notes that whether an employer would send a driver with a lifting restriction to a DOT physical exam would

depend upon the lifting restriction, noting that "if it was minimal lifting restriction then [the employer] probably would not send them". ECF 838-36 at 5-6, Dr. Hartenbaum Dep. 178:15-179:5. **Disputed** that a driver must be able to lift his or her own body weight in order to enter a truck, a lifting requirement not contemplated by FMSCA guidelines or standards or by Western's own ErgoMed testing standards for all driving positions. Drivers can use retractable steps to get in and out of a truck. *See* RMF 52.

**63. Disputed as unproven** that USAC, Auto Transport, Heavy Wrecker, and Rollback Driver positions are more physically demanding than Reefer Driver jobs, an assertion not reflected in the cited testimony. Garcia discusses only USAC without comparing it to other positions and Respass indicates only that "[b]ecause of the nature of the work . . . towing probably had higher [workers compensation] claims than the other three divisions." ECF 838-73 at 7, Respass Dep. 80:8-17. Western used the same ErgoMed test for OTR and USAC, indicating Western and ErgoMed considered the physical demands were the same. *Compare* ECF 841-31 at 1 *with* ECF 841-32 at 1. Because USAC uses teams, both drivers are not required to perform all physical tasks. *See* ADFs 50-51. Western admits tow drivers can assist one another in the physical labor of the job. *See* SMF 69.

**64. Disputed.** USAC uses team drivers. *See* ADF 50. Only one driver is necessary to bring cargo to the end of the trailer, and that person manually handles no more than 50 pounds while using equipment like a forklift or a power pallet jack for heavier items. ECF 837-79 at 16-17, Garcia Dep. 161:1-162:13; ECF 838-25 at 7-9, D. Dryden Dep. 109:8-111:8; ECF 838-81 at 3-4, Smallridge Dep. 86:22-87:1; *See also* ECF 837-86 at 2, Edwards Decl. ¶ 8; ADF 51. [Interested witnesses].

**65. Disputed**. For USAC team drivers, only one needs to be able to move cargo. ECF 838-6 at 31, Western 30b6 Dep. (Rau) 179:17-20. ErgoMed stated, both drivers not required to perform all tasks. ECF 838-2 at 5, ErgoMed 30b6 Dep. (Haynes) 118:5-23. *See also* ECF 837-86 at 1, 2-5, Edwards Decl. ¶¶ 3, 7-34. **Rule 56(c)(2) Obj:** Claiming one driver to handle the unloading would increase

the risk of injury and increase the time to complete the tasks is inadmissible opinion by an

unqualified, non-expert witness without personal knowledge. Fed. R. Evid. 701, 702. *James River*

*Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1213-16 (10th Cir. 2011). [Interested witnesses].

**66. Disputed.** An autotransport driver with 18 years experience testified that the gate was the only

lifting he did, and that three of four Western auto transport trucks had hydraulic gates that required

no lifting. ECF 838-29 at 5-7, Floyd Dep. 23:23-24:3, 24:15-18, 25:1-25. [Interested witnesses].

**69. Disputed as unproven** that all tow drivers assist in the physical labor of recovery, an assertion

not reflected in the testimony. **Disputed.** Tow drivers can call for assistance or use the courtesy

patrol for help. ECF 838-46 at 8-9, Keithline Dep. 100:8-101:12. **Rule 56(c)(2) Obj:** The testimony

that "95% of towing jobs" are done by one driver and "all tow drivers assist in the physical labor of

recovery" cannot be presented in admissible form because it is inadmissible hearsay and speculation

by a witness without personal knowledge. Fed. R. Evid. 802, 602. [Interested witnesses].

**70. Disputed as unproven** that all tow drivers perform extremely physical work, an assertion not in

the cited testimony. **Disputed** that all tow drivers must be able to perform "extremely physical"

work as the work may not be extremely physical and they can call for assistance. ECF 838-38 at 3-

6, Heisa Dep. 65:16-66:11, 72:12-73:17; ECF 838-46 at 7-8, Keithline Dep. 99:10-100:15.

**71. Undisputed.** *But see* Sec. IV(B)(2), *infra*, (Western failed to engage in the interactive process);

Sec. IV(C), *infra*, (Western rendered accommodation requests futile); Sec. IV(F)(1), *infra*

(Western's arguments about accommodation requests and the interactive process are wrong); Sec.

IV(F)(2), *infra*, (Western is wrong that only accommodations requested prior to litigation matter).

**72. Disputed as unproven** as to whether automatic hood openers were "readily available or easily

accessible . . . during the relevant period of this case," and that Western "never received a request to

install" one and "was not aware of [its] existence," assertions not in the cited testimony. **Disputed**

as to availability and accessibility during the relevant time. At least from 2006 to 2010, HoodXpress

was available online. ECF 838-71 at 10, Pullins Dep. 54:5-21. Western's expert testified the device "is available" just not "regular" or "over-the-counter." ECF 838-79 at 3, Sill Dep. 57:8-10.

**73. Disputed as unproven** that HoodXpress was only available from 2006 to 2010, an assertion not reflected in the testimony. The witness did not testify it was unavailable after 2010 – he did not know its availability because the rights and inventory were sold in 2010. ECF 838-71 at 7-9, 13-14, Pullins Dep. 51:15-53:5, 87:24-88:9. **Disputed** that no Kenworth or Peterbilt units were sold after 2008 – at least 18 such application kits were sold after 2008. *Id.* at 11-12, 75:25-76:2; ECF 841-33.

**74. Disputed.** Western's driver selected to demonstrate the Heavy Wrecker job uses a winch to lift anything too heavy for him. ECF 838-75 at 6-8, Rodriguez Dep. 48:24-50:7. [Interested witnesses].

**75. Disputed.** Lumpers are available when Reefer cargo needs to be lifted or moved. ECF 838-6 at 18, 17, Western 30b6 Dep. (Rau) 82:8-14, 83:4-8. Western's policy was that drivers were not allowed to touch loads, even those that "shifted". *Id.*; ECF 838-21 at 3, Jesse Davis Dep. 81:18-24; ECF 837-79 at 14-15, Garcia Dep. 158:23-159:10, 159:16-23. [Interested witnesses].

**76. Disputed** that Western has at least two trucks with automatic couplers. ECF 838-31 at 8, Gaines Dep. 245:15-20; ECF 838-69 at 14-15, M. Padilla Dep. 287:24-288:3. [Interested witnesses].

**77. Disputed** that automatic couplers pose a "major safety risk." The device has safety features to prevent accidentally disconnecting a trailer. ECF 838-3 at 8-9, Jost 30(b)(6) Dep. 55:21-56:17. The safety of the locking mechanism is the same for automatic and standard couplers. *Id.* at 5, 23:7-16. Jost is notified of any incidents involving its product, and is unaware of any accidents where the device malfunctioned or a trailer was unintentionally released on a highway. *Id.* at 9-10, 56:22-57:18. National trucking companies like FedEx, UPS, and Walmart "use it nearly all of the time[]." *Id.* at 11-12, 92:13-93:17; *see also* ECF 838-73 at 16, Respass Dep. 179:5-10 (noting UPS uses it).

**78. Disputed.** The fact the Western provides AutoSocks for drivers to use, belies its assertion that it believed they were unsafe. SMF 79, 80. Western's own expert noted that AutoSocks are allowable

as an alternate traction device in the 48 contiguous states. ECF 841-36 at 5. Autosocks are an approved ATD in Colorado, which requires AutoSocks to show "traction comparable to that of metal chains or tire cables under similar conditions," C.R.S. § 42-4-106, and travel 100 miles on dry pavement at 20 miles per hour and still function. ECF 841-103 at 2-4, McGee Decl. ¶¶ 12, 30. **Rule 56(c)(2) Obj:** Western cannot present evidence of the safety and efficiency of AutoSocks in an admissible from because it is inadmissible hearsay and speculation. Fed. R. Evid. 802, 602.

**79. Disputed** that carrying or using tire chains is an essential function of driver positions. *See* ADF 56; *see also* RMF 78 (AutoSocks). Drivers can carry spare AutoSocks to replace damaged ones.

**81. Disputed.** *See* RMF 78. **Rule 56(c)(2) Obj:** The cited testimony is opinion testimony by unqualified, non-expert witnesses, inadmissible under Fed. R. Evid. 701 or 702. *James River,* 658 F.3d at 1213-16. The alleged "conversations with safety representatives of other trucking companies, and . . . a representative from AutoSocks" are inadmissible hearsay under Fed. R. Evid. 802. Additionally, the only specific "experience" is a one-time use of AutoSocks in Western's yard. ECF 837-79 at 12, 13, Garcia Dep. 155:5-16, 156:21-23.  [Interested witnesses].

**82. Disputed.** If automatic snow chains break or become usable, the driver has a variety of options, including AutoSocks. *See* ADF 56. [Interested witnesses].

**83. Disputed as unproven** that automatic chains have been unreliable for the relevant time period, an assertion not reflected in the cited testimony. Western's CEO testified based on his use "some years ago," admitting "perhaps they have improved over the years. We have not been able to prove or disprove that yet." ECF 838-31 at 9-11, Gaines Dep. 247:22-24, 248:25-249:2. This does not support that the device is unreliable now or has been since 2008. Disputed as to the implication that providing automatic chains as accommodation for a disability is undue burden for Western. Western concedes it has installed automatic chains on multiple trucks. *See* SMF 82. [Interested witnesses]

**84. Disputed as unproven** that Western knowingly reassigned Kallenbach "to accommodate his

31

health issues." No evidence exists that Kallenbach gave a reason for his transfer request and his transfer form does not list any reason either. *See* ECF 838-45 at 4, Kallenbach Dep. 84:7-23; ECF 837-76 (Western learned of the medical basis for his transfer request mid-deposition).

**85. Disputed** that Kallenbach informed Western. Kallenbach informed the DOT certifying doctor, who noted it in the medical exam report provided to Western. ECF 837-57.

**87. Disputed as unproven.** Citations do not support the fact. The referenced "regulation" is actually DOT guidance which is not a mandate. ECF 838-86 at 4-5, Dr. Swotinsky Dep. Vol. I 124:22-125:15. **Objection:** The cited testimony to the effect that "DOT regulations mandated that he not work in a DOT position for three months" cannot be presented in a form that would be admissible in evidence because Kallenbach lacks the foundation to testify regarding DOT guidance.

**88. Disputed.** Kallenbach requested "yard work and dispatch." ECF 837-18. **Disputed** that "driving outside the yard" was an essential function of the yard hostler position at this time. ECF 838-6 at 20, Western 30(b)(6) Dep. 100:3-10 (Rau). **Disputed** that there were no vacant positions when Kallenbach requested reassignment. Between May 14, 2009 (when Kallenbach was released to work) and his discharge on June 17, 2009, two vacant positions were available: Yard Hostler and Auto/Tow Night Dispatcher. ECF 837-54 at 2; ECF 840-60 at 1, 7; *See* ADF 132.

**89. Disputed** that there were no vacant positions. *See* RMF 88; ADF 132.

**90. Disputed as unproven**. No evidence exists supporting the assertion that Western made an offer or that it came "immediately" after firing Kallenbach. Western required Kallenbach to reapply and notified him July 6th of his ErgoMed examination set for the next day, July 7th. ECF 841-39 at 5.

**91. Disputed** that Kallenbach was denied rehire because he missed the [ErgoMed] pre-hire screening appointment. Western refused to reschedule Kallenbach's ErgoMed test despite it being Western's common practice to reschedule. ECF 838-2 at 3, ErgoMed 30b6 Dep. (Haynes) 42:2-8.

**Rule 56(c)(2) Obj:** Kallenbach's testimony about Western's discharge reasons and hypothetically

what Western would have done under different facts cannot be presented in a form that would be admissible in evidence because Kallenbach has no personal knowledge. Fed. R. Evid. 602.

**92. Disputed.** The EEOC has submitted some statistical evidence to support its claims. *See, e.g.*, ECF 823 at 10, ¶ 67 (Western wrote "FMLA Expired" (or similar language) as reason for discharge of at least 46 individuals from 2006 to 2016).

**93. Disputed.** Western's citations do not support its assertions as to Backstrom, Manley, McDonald, Mendoza, Simms, Julie Smith, Tacker, White, and Wyman. Dr. Ladwig testified that his return-to-work assessments were specific to the job. ECF 838-48 at 7-8, Dr. Ladwig Dep. 91:8-92:4. Another 14 AIs were on modified duty restrictions at the time of discharge. ECF 837-58 (Bahmer); ECF 837-59 (Dean); ECF 838-22 at 4-7, Dean Dep. 177:6-180:14; ECF 837-60 (Dennison); ECF 837-81 (Gildner); ECF 837-82 (Grossman); ECF 837-61 (Ingland); ECF837-62 (McCafferty); ECF 837-63 (Morin); ECF 837-64 and ECF 837-65 (O'Dwyer, whose termination date is disputed); ECF 837-66 (Padilla); ECF 838-70 at 3-5, Perkins Dep. 151:15-152:2, 157:12-21; ECF 837-67 at 2 (Schmotzer); ECF 837-68 (M. Smith); ECF 838-84 at 7-8, M. Smith Dep. 131:19-132:14; ECF 838-90 at 3, 5, Valdez Dep. 96:3-20; 147:8-19. Western disputes its own assertion as to Floyd. *Compare* SMF 93 *with* SMF 97. [Phase II].

**94. Disputed.** It is unclear how Western reached its total of 41 AIs who "were unable to drive commercially at the time of separation." Western identifies 9 AIs in SMF 94 and cites to SMF 103, which identifies 35 AIs who Western claims "did not request a definite amount of additional leave," but that only adds up to 37 AIs because 7 of the AIs overlap. The EEOC also disputes that the cited testimony supports Western's assertion about Newport and disputes Western's assertions about Russell Brethour (*see* ECF 838-13 at 7-8, R. Brethour Dep. 24:2-25:22; ECF 841-80) and Jarvis (*see* ECF 838-42 at 9-10, Jarvis Dep. 153:22-154:9; ECF 837-69 at 7). Western disputes its own assertion as to Brethour. *Compare* SMF 94 *with* SMF 97. [Phase II.]

**95. Disputed.** Western fails to state a timeframe. Western's citations do not support its assertions as to Davis, Dixon, Grossman, Hines, Manley, McCafferty, O'Dwyer, Otten, Valdez, and Wyman, and contradict Western's assertion as to Smallridge. Mendoza did not admit he could not perform duties other than driving. **Rule 56(c)(2):** The testimony cited by Western frequently assumes facts not in evidence, uses improper hypotheticals, and is insufficiently specific as to time. [Phase II.]

**96. Disputed.** Western is not specific about whom it claims the AI did not disclose to; "potentially DOT-disqualifying conditions" is vague and often disputed; and any failure to disclose would only be relevant to damages. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360-63 (1995). The cited Newport testimony states that Western was aware of his medical condition because it was disclosed on his DOT paperwork. Aldridge testified that he did not disclose his medical conditions because he had not experienced them recently. ECF 838-7 at 3-6, Aldridge Dep. 40:2-43:4. The cited testimony for Otsea addresses the period *after* his Western employment. The cited testimony for Wones addresses a time before her medical condition was diagnosed. The EEOC disputes that the cited medical conditions of Aldridge, Lisk, and Newport and the back disorder of Wade were DOT-disqualifying. ECF 837-70 at 3 (Swotinsky Report re Lisk); ECF 837-71 at 1-2 (Swotinsky Report re Newport). [Phase II.]

**97. Disputed.** The EEOC does not argue that all AIs were restricted or impaired when discharged, which is not an element of the EEOC's claims. An AI who is not "restricted or impaired" may still be a person with a "disability" as defined in the ADA. For example, a medical condition in remission is a disability if it would limit a major life activity when active. 42 U.S.C. § 12102(4)(D). Also, for some AIs, the EEOC only asserts retaliation, which does not require a covered disability. 42 U.S.C. § 12204(a). Western's record cites do not support its assertions as to Floyd, McCallan, Otten, Scott, and Wade. Western disputes its own assertion as to Brethour, Floyd, and Wade. *Compare* SMF 97 *with* SMFs 93 (Floyd), 94 (Brethour), and 96 (Wade). Western's assertion about

34

Julie Smith likely depends on her discharge date, which is disputed. *See* RMF 104. **Disputed** as to all other cited AIs, all of whom had restrictions or impairments when discharged. ECF 838-13 at 12-13, R. Brethour Dep. 38:24-39:6 (ongoing shoulder condition); ECF 838-28 at 4-6, Fernandez Dep. 60:15-62:10 (cancer); ECF 838-29 at 10-12, Floyd Dep. 72:22-73:24; 87:16-22 (ongoing recovery from hernia); ECF 837-78 at 3, Hines Dep. 9:14-21 (gran mal seizures and high blood pressure); ECF 838-44 at 3-5, Johnson Dep. 101:24-103:19 (lifting and back issues); ECF 837-83 at 1 (McCallan, diabetes); ECF 838-67 at 3-5, 11, Otten Dep. 66:17-68:24, 100:5-10 (knee condition); ECF 838-74 at 3-6, Rockhill Dep. 150:4-153:3; ECF 837-83 (Scott, ongoing neck and back strains); ECF 838-85 at 3-7, Sombelon Dep. 208:20-210:22; 218:14-219:3 (hernia-related impairments); ECF 838-92 at 3, 4-5, 6, 7-8, Wade Dep 36:9-15; 58:8-59:1; 67:18-25, 106:9-107:10 (lower back condition); ECF 838-94 at 3, 4, Wyman Dep. 28:10-15, 35:15-19 (cancer). [Phase II].

**98. Disputed.** This assertion is vague but it is also is immaterial because under the 2008 ADA Amendments Act (ADAAA), whether a condition is "transitory and minor" applies only to claims under the "regarded as" prong of the definition of disability.[3] 42 U.S.C. § 12102(1)(C), (3)(B); 29 C.F.R. § 1630.2(j)(1)(ii), (ix). Similarly, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* at § 1630.2(j)(1)(iii). Western's citations do not support its assertions as to Rockhill and Sombelon. Cross had a long-term, 10-lb. lifting restriction. ECF 838-19 at 4, Cross Dep. 108:2-25. Vancil had chronic diarrhea. ECF 838-91 at 3, Vancil Dep. 54:5-9; ECF 837-85 at 2-3, Gallo Decl. ¶ 9, 11-13, 15-17; 29 CFR § 1630.2(i)(1)(ii). Kallenbach had a heart attack. ECF 838-45 at 3, Kallenbach Dep. 50:9-13. The broken bones of Gildner and Marshall were complicated. ECF 838-32 at 3-5, Gildner Dep. 63:16-65:8 and ECF 837-72 (referred to hand surgeon for spiral fracture); ECF 838-57 at 4, Marshall Dep. 118:4-18. [Phase II].

---

[3] A disability is (A) a physical or mental impairment that substantially limits one or more major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102.

**99. Disputed.** Western's citations do not support its assertions as to Johnson, Oney, and Otten. Western had notice of each cited employee's need for accommodation. ECF 838-13 at 3-4, 8-11, R. Brethour Dep. 17:8-22, 18:13-19, 25:14-26:14, 27:8-28:13; ECF 838-19 at 4, Cross Dep. 108:2-25; ECF 841-96 at 1 (Cross DOT certification); ECF 837-78 at 4-5, Hines Dep. 16:17-17:6 (told dispatcher about blood pressure and need for medication); ECF 838-65 at 2, 8-10, 11, Oney Dep. 107:1-16; 118:22-120:13, 143:11-15; ECF 838-67 at 6-9, Otten Dep. 71:15-72:15, 85:23-86:4; ECF 841-97 (Otten disability notice); ECF 841-98 (Wade disability notice). [Phase II].

**100. Disputed.** For Brethour, *see, e.g.,* ECF 837-80. For Oney, *see, e.g.,* ECF 837-77. For Otten, *see, e.g.,* ECF 837-75, at 1, 3, 10. Documentation is not essential for recovery, 42 U.S.C. § 12102(1), and not all claims require a covered disability, *see* RMF 97. [Phase II].

**101. Disputed.** Western's arguments that constructive discharges were voluntary resignations and that AIs who Western discriminatorily discharged were separated for pretextual performance or conduct issues are disputed. The Separation Notices' reasons, commonly written without the AI's presence, are also disputed. Western's citations do not support its assertions as to Cross. The cited Fries Separation Notice and Gildner testimony contradict Western's assertions. The cited Scott and Sombelon testimony show the AIs dispute the reasons Western assert. Similarly, see ECF 838-19 at 3, Cross Dep. 21:1-24; ECF 838-64 at 4-5, Newport Dep. 152:19-153:20; ECF 838-67 at 8-9, Otten Dep. 86:20-87:8; ECF 838-92 at 3, Wade Dep. 36:9-15 (all disputing Western's asserted reasons for their discharges); ECF 838-28 at 7, Fernandez Dep. 69:4-19; ECF 838-43 at 2-3, Jimenez Dep. 31:19-32:7 (terminated within three weeks of filing workers' compensation); ECF 838-57 at 7-8, Marshall Dep. 137:24-138:7; ECF 838-65 at 3-5, 6-7, Oney Dep. 112:23-114:3, 116:18-117:3 (testifying to actual reasons for their discharges). And even if an AI quit or there is a legitimate non-discriminatory reason, Western may still be liable for a prior discriminatory act or failure to accommodate, if unlawful discrimination was also a reason for the discharge. [Phase II].

36

102. **Disputed** as to AIs who did require accommodation at separation, though not all claims asserted by the EEOC require that the AI need an accommodation when discharged. Western's cites for R. Brethour, Jarvis, Manley, Oney, Otten, and Wones to show that the AIs did need accommodation at separation. Western's citations do not support its assertions as to Johnson and Cross. And the testimony immediately following Western's cited testimony for Gildner and Wade states that they needed accommodation. ECF 838-32 at 6, Gildner Dep. 81:10-12; ECF 838-92 at 9, Wade Dep. 132:3-15. **Disputed** that leave is not an accommodation. *See* § IV(A)(2), *infra*. **Undisputed** that Western routinely granted requests for up to 12 weeks of medical leave. [Phase II].

103. **Disputed.** What constitutes a definite or indefinite amount of leave is a fact- and AI-specific legal question best suited for Phase II. *Punt v. Kelly Servs.,* 862 F.3d 1040, 1050 (10th Cir. 2017). Western's citations do not support its assertions as to Arseneau, Bohannon, Dean, Fernandez, Floyd, Lafuria, McCafferty, Otsea, Perkins, Rockhill, and Valdez. Some of the cited AIs did not have the opportunity to request leave because Western did not engage in the interactive process. *See* ECF 838-10 at 3, Backstrom Dep. 36:6-21 (understood that if he took leave he would be fired); ECF 838-29 at 8-9, Floyd Dep. 59:23-60:6 (understood policy of terminating employees with restrictions at end of 12 weeks); ECF 838-41 at 2-3, Ingland Dep. 19:3-20:21 (only informed at firing that there was a 90-day timetable to return);  ECF 838-57 at 5-8, Marshall Dep. 125:21-126:2, 137:24-138:7 (discharged when Western learned of medical condition); ECF 838-63 at 6-8, Morin Dep. 199:6-201:1 (Western denied request of an additional day of leave to have restrictions lifted); ECF 838-64 at 3, Newport Dep. 149:12-22 and ECF 841-85 (discharged same day Western learned of medical condition); ECF 838-68 at 11-13, A. Padilla Dep. 92:22-94:18 (Maddox cut off interactive process by hanging up on him and not returning calls); ECF 838-77 at 6-9, Schmotzer Dep. 76:19-77:7, 105:1-5, 110:18-25 (discharged before initial FMLA leave period ended); ECF 838-84 at 5, M. Smith Dep. 89:4-21 (M. Smith unable to request additional leave because discharged); ADF 115

(Western informed J. Smith that he could not take additional leave); ECF 838-88 at 3-4, 5, Tacker

Dep. 52:18-53:1, 58:3-5 (terminated same day admitted into hospital). *See* futile gesture doctrine at

§ IV(C) *infra*. Western had definite notice of the amount of leave for most of the other AIs. *See*

ECF 841-99 at 4, 5 (Backstrom FMLA form); ECF 837-73 at 6 (Mendoza FMLA forms); ECF 837-

22 (Bahmer work-hardening form); ECF 838-14 at 3-4, T. Brethour Dep. 145:25-146:16 (doctor

said recovery "usually takes approximately three months"); ECF 837-23 at 2-3 (Dennison and

workers compensation provider were seeking to return him to work before Western's 12-week

deadline; ECF 838-24 at 4-5, Dixon Dep. 72:24-73:18 (asked Western for an additional month of

leave); ECF 837-74 at 4 (Edwards's doctor specifies recovery in "possibly 6-8 weeks"); ECF 838-

49 at 7, Lafuria Dep. 85:3-7 (told Western she needed a couple more months); ECF 838-59 at 4-7,

McCafferty Dep. 99:11-102:16 (anticipated recovery time 6 months but hoping to recover in 3

months); ECF 838-55 at 9-10, Maddox Dep. Vol. II 526:14-527:1 (knew Otsea needed 1 year); ECF

838-82 at 5-6, Julie Smith Dep. 119:21-120:1 (needed "a week or two" over 12 weeks). [Phase II].

**104.  Disputed.** For several AIs, the discharge date is in dispute because Western provided varying

dates. *Compare* ECF 841-100 *with* ECF 841-101. When a discrepancy exists, Western chooses the

date most advantageous to its position. **Disputed** for six AIs,[4] who were allowed 12 weeks of leave

or less using the earliest of the discharge dates Western has provided. ECF 841-13 (Arseneau); ECF

841-14 (Bahmer); ECF 841-15 (Floyd[5]); ECF 841-16 (Manley); ECF 837-50 and ECF 837-51 at 2

(Dennison[6]); ECF 841-17 (Backstrom). Another AI (Fries) was a seasonal worker who was off

during the winter and not on medical leave. ECF 838-30 at 3-6, Fries Dep. 17:2-20:10.

**105.  Disputed.** As a preliminary matter, the EEOC does not claim that Western has a policy

---

[4] The EEOC does not dispute that AI Julie Smith was allowed 13 weeks of leave and AI Valdez was allowed 12 weeks and two days of leave as part of the original time allowed.
[5] Injured on a Saturday, Floyd's leave started Monday, March 23, 2009, exactly 12 weeks before Western discharged him on July 8, 2009. ECF 837-49.
[6] Western fails to count Dennison's return to work for 7 days, Feb. 3-9, 2010, putting his total leave at exactly 12 weeks. ECF 837-50; ECF 837-51 at 2.

prohibiting reassignment. At least four of the purported reassignments Western claims were not provided as accommodations. *See* ECF 838-45 at 4, Kallenbach Dep. 84:7-23; ECF 837-76 (Western learned of the medical basis for his transfer request mid-deposition); ECF 838-81 at 5-6, Smallridge Dep. 184:17-185:12 (offer made after workers compensation case); ECF 838-58 at 4-5, Mays Dep. 142:20-143:21 (Western did not allow return to full duty despite doctor's clearance); ECF 838-66 at 2, Otsea Dep. 42:1-6 (transferred to try a new opportunity). Western's citations unsupported as to Mays and Otsea. Most of the people cited by Western (Western cited non-AIs for SMF 105) were not reassigned, they were provided temporary or light-duty work. *See* the testimony Western cites for Backstrom, Davis, Hale, Heisa, Jimenez, Manley, Morin, and from Hunt. Western refused Morin's request for reassignment. ECF 838-63 at 11, 12, Morin Dep. 230:2-20, 231:12-25. Edwards and Scott were not reassigned, but simply allowed to perform driving jobs despite their restrictions, ECF 838-27 at 3-5; Edwards Dep. 54:15-56:9; ECF 838-78 at 3-5, Scott Dep. 154:5-156:9, which is evidence that accommodations were possible or that tasks were not essential functions. Western's allowance of light- or modified-duty work was the exception, not the rule, and usually provided because of workers' compensation circumstances. *See* RMFs 23-24.

106. **Disputed.** Western does not submit evidence of how many AIs lived outside Denver at the relevant time. Many of the AIs Western cited testified they were willing to relocate to Denver to work. *See* ECF 838-011 at 5-8, Bahmer Dep. 107:8-110:3 (requested light-duty work and temporary local housing but was rejected); ECF 838-23 at 3-5, Dennison Dep. 199:19-200:13, 208:5-10 (would have relocated temporarily for light-duty work); ECF 838-59 at 8-11, McCafferty Dep. 113:8-115:8, 129:1-5 (would have accepted temporary, light duty work and would have moved for a full-time office job); ECF 838-62 at 2, Mendoza Dep. 36:5-14 (would have relocated); ECF 838-81 at 5-6, Smallridge Dep. 184:17-185:12 ("could come temporarily"); ECF 838-85 at 8-9, Sombelon Dep. 259:23-260:4 (tried to move to Denver when Western did not allow him the home time

originally promised). Western's citations do not support its assertions as to Arseneau, Bahmer, Dennison, Fernandez, Johnson, Lisk, McCafferty, McDonald, Mendoza, Sombelon, or Valdez. **Rule 56(c)(2), FRE 602 Obj:** The asserted fact cannot be presented in a form that would be admissible in evidence as to AIs who prior to being discharged were not asked whether they would relocate to Denver because the testimony is speculation based on an improper hypothetical. [Phase II].

**107.  Disputed** that there is "no evidence" Western denied reassignment as an accommodation. *See* RMFs 22, 112; ADFs 119, 122, 124, 126, 129, 130. Western would not reassign individuals if they had restrictions. ECF 838-40 at 10-11, Hunt Dep. 86:13-87:4; ECF 838-63 at 12, Morin Dep. 231:12-25. Had Western met its obligation to engage with employees in the interactive process to determine possible accommodations, the interactive process would have fleshed out what accommodations were appropriate, including potential reassignment to a vacant position.

**109.  Disputed** that the position required a CDL. ECF 838-6 at 20, Western 30(b)(6) Dep. (Rau) 100:3-10. **Disputed** that Western had a Yard/Local Driver position between 2009 and 2011. A posting with a similar title and description, "Yard Hostler/Local," was first advertised in May 2012 and Western provides no job description for the Yard Hostler position. ECF 841-87.

**111.  Disputed** that a dispatcher who typically earns $9-$11 per hour is a promotion for drivers who earn $14-$18.90 per hour. ECF 840-60 at 1, 5-6. **Disputed as unproven** as to what Western considers a promotion. The cited testimony is not from a Rule 30(b)(6) designee and does not support any understanding beyond the witness, who is an interested witness. [Interested witnesses].

**112.  Disputed.** The Edwards charge of discrimination indicates that employees are not allowed to return to work unless they can return without the need for an accommodation and until all restrictions are lifted. This requirement necessarily impacts those seeking rehire. ECF 815-109 at 3.

**113.  Disputed.** The Amended Letters of Determination are sufficient under *EEOC v. Mach Mining*, 575 U.S. 480,494-95 (2015) to provide Defendant with notice of the violations found. The

Determinations indicate that Western violated the ADA by its inflexible twelve-week leave policy, allowing no exceptions to accommodate individuals with disabilities, ECF 815-110 at 5-6, 15, and discriminating against individuals who reapplied or attempted to return to work after taking leave for injuries or disabilities. ECF 815-110 at 2. The challenged qualification standards are the policies requiring discharge of employees unable to return to full-duty after 12 weeks of medical leave, with no exceptions to reasonably accommodate people with disabilities, and eleven physical tests that define and enforce the full duty policy. Specifically, employees are not allowed to work if they are subject to any medical restriction that prevents them from taking the lift, carry, push, and pull tests, and are able to, without accommodation, lift, carry, push, and pull the required weights.

**114. Disputed.** The Amended Determinations find that Western violated the ADA by refusing to rehire individuals with disabilities. ECF 815-110 at 1-2, 5-6, 8-9, 11-12 and 14-15.

**115. Disputed.** Discriminatory standards of excessive lifting, carrying, pushing, or pulling as administered in the physical tests are encompassed in discovery responses. *See* ECF 815-111 at 4, ¶ 4 (Western's "physical fitness test"); *id.* at 4, ¶ 5 (requiring "a higher degree of physical requirements than necessary to perform the essential functions of the position."); *Id*. at 4, ¶ 6 (requiring discriminatory standards greater than DOT requirements).

## IV. LEGAL ARGUMENT

### A. The existence and discriminatory nature of Western's full-duty and inflexible leave policies are either undisputed in EEOC's favor or are in genuine dispute.

In a pattern-or-practice case, the EEOC's "initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy" or "standard operating procedure" of the employer, by a preponderance of the evidence. *Teamsters*, 431 U.S. at 336, 360; *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). Accordingly, this Court ordered that the EEOC's Phase I burden is "to demonstrate that Defendant has a pattern or practice of unlawful discrimination" and only

prove "the discriminatory policy existed." ECF 166 at 17, 3-4. The Phase I dispositive motions are thus "limited solely to Phase I issues." ECF 613. Phase II "will decide all individual claims." *Id.*

Western initially admitted the existence of the policies during the EEOC's pre-litigation investigation. ADFs 14-17, 36. During the litigation, however, Western has tried to rescind its admissions and focus discovery on Phase II issues to argue each AI should be denied relief for various AI-specific reasons rather than contest the existence of its discriminatory policies. With its Amended Motion for Summary Judgment, Western attempts to jump directly to Phase II, arguing the existence of a discriminatory policy cannot be found until the EEOC proves that a statistically significant number of AIs were subjected to unlawful discrimination. Western's approach is inconsistent with the *Teamsters* framework and the Court's bifurcation order.

In this Section, the EEOC explains the fact issues as to the existence of the two challenged policies. The EEOC responds to Western's counterarguments in Section D below.

**1.   *There is at least a genuine dispute as to Western's full-duty policy.***

Western repeatedly affirmed its "full-duty" (or "no restrictions," though "full duty" is the phrase Western uses in its EPMs) policy in its EPMs, manager testimony, and business records. ADFs 1-3. Every EPM since at least 2009 states Western's full-duty policy. ADF 1. Two Safety Directors, a Safety Supervisor, and three HR employees testified or wrote in company emails that Western required a medical note confirming "full duty" or "no restrictions" to return to work. ADFs 2-3. Western advised its employees and affiliates of the policy, and they understood the "full-duty" policy to mean "no restrictions." ADFs 2-6, 18-20, 22, 117, 122. Not until 2015, when this litigation was imminent, did Western add reasonable accommodation to its EPM, a revision that was poorly announced and implemented. ADF 13, RMFs 15, 19, 37. Simply put, there is plentiful evidence from which a jury could reasonably find that Western maintained a full-duty, no-restrictions policy.

The discriminatory nature of the policy is firmly established. Courts have "'consistently found'

that such '100% healed' or 'fully healed' policies violate the ADA." *Warmsley v. New York City Trans. Auth.*, 308 F. Supp. 2d 114, 122 (E.D.N.Y. 2004) (quoting *EEOC v. Yellow Freight Sys., Inc.*, No. 98 CIV. 2270, 2002 WL 31011859, at *20 (S.D.N.Y. Sept. 9, 2002)). This is because full-duty policies "permit[] employers to substitute a determination of whether a qualified individual is '100% healed' from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation." *McGregor v. Nat'l R.R. Passenger. Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999) (collecting cases and finding full-duty policy "a per se violation of the ADA"); *see also Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 699 (7th Cir. 1998). Three AIs harmed by the policy are described at ADFs 7-9.

Western argues that its "full duty" policy is not a "100% healed" policy, but the evidence undermines Western's argument. Western repeatedly stated employees must have "no restrictions," and only in rare instances were employees allowed to work with any form of lifting restriction. ADFs 2-7, 87-89, 92-94, 101-102, 108-109, 127; RMFs 38-40, 62, 103. Western's policy and practice is unlike the policy in *Beveridge v. Nw. Airlines, Inc.*, 259 F. Supp. 2d 838, 848-51 (D. Minn. 2003), cited in Western's motion. Western's full-duty policy was not person- and job-specific or applied through a Reasonable Accommodations Guide as in *Beveridge.* ADFs 1-6, 13, 19. And unlike *Lenker v. Methodist Hospital*, 210 F.3d 792, 798 (7th Cir. 2000), also cited in Western's motion, lifting was not an essential job function for Western's "no touch" drivers. RMF 75.

## 2. *There is at least a genuine dispute as to Western's inflexible 12-week leave policy.*

Western's own evidence is also sufficient to establish at least a genuine dispute as to Western's maintenance of a discriminatory inflexible leave policy. Western stated its policy in two places in each EPM from 2007 to the present. ADF 12. In response to three charges of discrimination, Western thrice confirmed its "policy and practice is to automatically discharge employees who are

43

not able to return to work after the 12 weeks of FMLA" and Western "does not grant exceptions" to the policy. ADFs 14-15. Western wrote "FMLA expired" (or similar language) as the justification for discharging at least 45 employees dating back to at least 2006. RMF 35. Western's HR Director, Benefits Coordinator, and Safety Director all testified to the existence of the policy. ADFs 16-22. And importantly, Western's Benefits Coordinator informed employees of the inflexible leave policy, ADF 20, and made it known that the policy applies regardless of the reason for leave, "whether it be FMLA, workers' compensation, or long-term disability." ADF 19.

The merits of individual employees' cases will be proven in Phase II, but the experiences of Clinton Kallenbach and Steve Bahmer demonstrate the nature of the policy. Kallenbach needed just nine additional days to obtain DOT certification from Western's doctor. ADFs 26-28. Nevertheless, Western discharged Kallenbach the same day his leave expired and later explained to the EEOC that it discharged Kallenbach because it does not make exceptions to its 12-week leave policy. *Id.*[7] Similarly, Steve Bahmer's doctor estimated in February 2014 that he would be able to return to work on approximately April 11, 2014, but Western automatically discharged him when his FMLA leave expired on March 3, 2014. ADFs 29-31.

Western's inflexible leave policy is discriminatory for the same reasons courts have held that full-duty policies are discriminatory: the arbitrary determination of whether the employee has been off work for 12 weeks replaces the required individualized assessment of whether the employee is able to perform the essential functions of their job or another job, either with or without accommodation. *See McGregor*, 187 F.3d at 1116. There is evidence that at least 45 people were

---

[7] Western's other arguments regarding Kallenbach are inaccurate and disputed. Western argues Kallenbach had already been accommodated by his reassignment to a local driver position (which the EEOC disputes – see RMF 105), but the duty to accommodate is ongoing. *Humphrey*, 239 F.3d at 1138; *Campbell*, 272 F. Supp. 2d at 1283-84. Western's attempt to place all the responsibility for identifying a reasonable accommodation on Kallenbach, without the benefit of a good-faith interactive process, contravenes Western's duties under the law. *Aubrey*, 975 F.3d at 1006. Western's arguments that Kallenbach is at fault for Western's failure to allow him to return to work are, of course, hotly disputed and matters of speculation. *See* ADFs 24-28; RMFs 85-91.

discharged under the policy because of a physical or mental impairment that had kept them off work for at least 12 weeks, conditions likely to be disabilities under the ADA. RMF 35. The impairments of AIs discharged under the 12-week policy include cancer, heart disease, necrotizing fasciitis, and conditions that substantially limit major life activities such as walking and lifting – all conditions that are "disabilities" as defined in the ADA. 42 U.S.C. § 12101, 29 C.F.R. § 1630.2(j)(3) (identifying conditions that "virtually always" qualify as disabilities); *Lusk v. Ryder*, 238 F.3d 1237, 1240 (10th Cir. 2001) (15-lb. lifting restriction is "substantially limiting on its face"); *see* ADFs 24-25, 29, 123, 127. Thus, the policy resulted in workers with disabilities, as defined in the ADA, being discharged because of their disabilities.

Also, as discussed in Section B below, there is substantial evidence that, before discharging employees under the inflexible 12-week policy, Western failed to engage with employees in the required interactive process and failed to make the requisite, highly-individualized determinations about reasonable accommodations. ADFs 36-39, 110-130; RMFs 16-17, 28. Without an interactive process, and absent a reasonable accommodation policy until 2015, Western failed to identify potential accommodations such as definite periods of additional leave, assistive devices, alternate routes, or potential reassignments.[8] *See* ADFs 24-32, 111, 120, 122, 129; RMFs 15-17, 103. Western risks liability for its failures to provide reasonable accommodations that could have been identified in the interactive process. *Purewal v. T-Mobile USA, Inc.,* 17-CV-2595-JTM, 2019 WL 4805994, at *9 (D.Kan. Oct. 1, 2019).

Courts have repeatedly found leave to be a reasonable accommodation, even if lengthy. *See Aubrey v. Koppes*, 975 F.3d 995, 1001-02 (10th Cir. 2020) (~ 6 months of leave); *Rascon v. US W. Commc'ns, Inc.*, 143 F.3d 1324, 1328-9 (10th Cir. 1998) (~ 5 months of leave); *Jacobsen v. Dillon*

---

[8] Western's lack of interactive process also resulted in the company failing to accurately assess which of its employees have medical conditions covered by the ADA. *See* RMFs 104-105.

*Cos., Inc.*, No. 10–cv–01944, 2012 WL 638122 at *8 (D. Colo. Feb. 28, 2012) (unpaid leave of four to six months was facially reasonable); *Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128, 1135-36 (9th Cir. 2001) (citing 29 C.F.R. 1630.2(o); "the ADA does not require an employee to show that a leave of absence is certain or even likely to be successful"). "Even an extended medical leave, or an extension of an existing leave period, may be a reasonable accommodation." *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999); *Rascon*, 143 F.3d at 1328-29, 1335 (30-day extension of multiple-month leave).

"The employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed." *Humphrey*, 239 F.3d at 1138; *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332, 338 (2d Cir. 2000) (employer who failed to consider additional leave as a reasonable accommodation and instead terminated the employee discriminated against the employee because of his disability). For example, in *Campbell v. Wal-Mart Stores, Inc.*, a deaf and legally blind employee had worked satisfactorily for several years with a co-worker helping to translate. 272 F. Supp. 2d 1276, 1283-84 (N.D. Okla. 2003). But after the co-worker resigned and the store layout was changed, Wal-Mart was obligated to give new consideration to what accommodations were needed. *Id.* at 1284, 1292.

In this case, Western failed to engage in the interactive process and thus risks liability for the reasonable accommodations it failed to provide as a result. *Purewal,* 2019 WL 4805994, at *9; *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435-36 (6th Cir. 2018) (failure to consider reasonable accommodation for known disabilities which leads to discharge constitutes a discharge "because" of the disabilities). From having previously granted the accommodation of medical leave, Western was aware of the employees' medical conditions and the need for accommodation. ADF 110; RMFs 96, 99. And as in *Campbell,* when the initial accommodation (12 weeks of medical leave) was not fully

46

successful, Western was obligated to engage in the interactive process to consider what additional or different accommodations might be needed. *Campbell*, 272 F. Supp. 2d at 1284, 1292.

But before discharging employees after 12 weeks of leave, Western did not talk with them about possible accommodations. ADFs 112-114, 118-119, 123; RMFs 16-17. Western just mailed the discharge letter, usually without any conversation. ADFs 111, 117, 126-128, 130. Because Western imposed the 12-week policy "without exceptions" and did not conduct the individualized analysis necessary to determine accommodations, the policy as administered is discriminatory for its failure to provide reasonable accommodations required under Section 102(b)(5)(A) of the ADA.

## B.     Genuine issues of material fact as to whether Western engaged in the interactive process preclude summary judgment for Western.

Employers are mandated to participate with employees in an interactive process to make decisions about accommodations for disabilities. *Aubrey*, 975 F.3d at 1006 ("the ADA mandates that the employer work with the employee to try to find [a workable accommodation]."); *see also*, 29 C.F.R. § 1630.2(o)(3). The process requires a highly-specific individualized assessment of both the employee's limitations and the job's requirements. 29 C.F.R. Part 1630, App. § 1630.9. During the interactive process, an employer must engage with the employee and may not merely speculate that accommodations are not feasible. *Woodman v. Runyon*, 132 F.3d 1330, 1345 (10th Cir. 1997).

The employer's duty to engage in the interactive process arises when an employee requests an accommodation, or the employer is otherwise aware of the impairment. *Id.* (employer need only know the impairment exists, not whether it is a disability.) "A request as straightforward as asking for continued employment is a sufficient request for accommodation." *Hendricks–Robinson*, 154 F.3d at 694. And as discussed above, the obligation is ongoing. *Humphrey*, 239 F.3d at 1138; *Campbell*, 272 F. Supp. 2d at 1283-84.

Fact issues as to the employer's good faith participation in the interactive process will generally

47

preclude summary judgment for the employer. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1174 (10th Cir. 1999); *Aubrey*, 975 F.3d at 1009 (reversed summary judgment based, in part, on the employer failing to engage in the interactive process). And because good faith participation in the interactive process is an affirmative defense to punitive damages for denial of accommodation, 42 U.S.C. § 1981a(a)(3), fact issues as to the employer's participation also preclude summary judgment as to damages. *Howell v. Michelin Tire Corp.*, 860 F. Supp. 1488, 1494 (M.D. Ala. 1994).

The *Aubrey* decision is instructive here. In *Aubrey* the court held that "a jury could find that County officials made no effort to discover exactly what Aubrey's limitations were at that time, nor in exploring with Aubrey whether there were any accommodations that would have enable [sic] her to return to work at that time, or in the near future, even with her limitations." 975 F.3d at 1008. And although Aubrey knew she needed a doctor to certify she was fit for duty, the employer did not tell her a due date for the certification and denied the additional time she requested to obtain it. *Id.* at 1001, 1008. The Tenth Circuit held that a reasonable jury could find the employer not only failed to engage in the interactive process but had "affirmatively acted to avoid having to consider possible accommodations" by disallowing the requested extension and "essentially ignoring any possible accommodation Aubrey suggested." *Id.* at 1009. The employer's lack of engagement in the interactive process was central to the decision reversing summary judgment. *Id.* Here, there is evidence that Western was obligated to engage in the interactive process and failed to do so.

## 1.     *Western had an obligation to engage in the interactive process.*

Many AIs triggered Western's obligation by directly communicating with Western that they had an injury or illness or needed time off for medical reasons. For the AIs who requested medical leave, the request is a "straightforward [request] for continued employment" and thus a request for accommodation. *Hendricks*, 154 F.3d at 694; *see* ADFs 110, 121. Some of the AIs requested other accommodations such as an alternate route, lifting assistance, or another position. ADFs 119-120,

124, 129. Each of these requests for accommodation, including an initial request for medical leave, triggered Western's obligation to participate in the interactive process. *Aubrey*, 975 F.3d at 1009.

For many AIs, Western's obligation to engage in the interactive process was triggered by Western's own required paperwork. Often, Western was aware of the employee's impairment from the company's FMLA paperwork requesting medical leave for a medical condition specifically identified by the employee's medical provider. ADF 110. Many other AIs had on-the-job injuries that required incident reports sent to Western HR by their managers or dispatchers. *Id.* For any employee seeking workers compensation benefits, there are also Pinnacol notes sent to Western's HR updating Western on the employee's claim and medical status. *See* ADFs 33-34, 110. These records put Western on notice of the AIs' impairments and triggered the obligation to engage in the interactive process. *Woodman*, 132 F.3d at 1345; *Aubrey*, 975 F.3d at 1009.

Whether initiated by the AI's request or Western's knowledge of the impairment from its own paperwork requirements, Western was obligated to engage in the interactive process to determine reasonable accommodations. *Woodman*, 132 F.3d at 1345; *Aubrey*, 975 F.3d at 1009.

### 2.     *Western failed to participate in good faith in the interactive process.*

By failing to adequately communicate with employees on medical leave, Western failed to participate in the required interactive process. *Beck v. U. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996); *Aubrey,* 975 F.3d at 1009. Western did not initiate communications with employees on medical leave to discuss reasonable accommodations or returning to work. ADFs 114, 117-118, 126-127. Although Western claims its usual practice is to communicate with employees who are off work on medical leave (SMF 28), many AIs heard nothing from Western until receiving a discharge letter in the mail. ADFs 112, 125-126, 128. Whether it was treatment for cancer, an injured shoulder, or a strained back, Western did not gather information from the employees to see what accommodations might enable them to return to work. ADFs 118, 121, 126-

49

127, 130. Western also complains that some AIs had no definite return-to-work date, ECF 821 at 41-42, but as in *Aubrey,* Western did nothing at the time to either ask the employees or their medical providers for more definite information, or even inform employees that they were expected to provide a definite return-to-work date. ADFs 111-121, 126-127, 130. Western's lack of communication evidences its lack of good faith effort to initiate or participate in the interactive process. *Beck*, 75 F.3d at 1135. And even more indicative of Western's failure to engage in the interactive process is the evidence that Western failed to respond to employees who affirmatively contacted Western. ADFs 113, 115-116, 119, 130.

Also, Western has not cited any documentary evidence showing its alleged efforts to communicate with employees about reasonable accommodation. Specifically, Western cites no emails or communications with the AIs that show Western scheduled a meeting or invited an AI to discuss their limitations or potential accommodations that might enable the employee to return to work. Western has produced no notes from any such alleged discussion, or anything reflecting the analysis of limitations and job duties that is part of the required individualized assessment. Nor are there records from Pinnacol that reflect the kinds of communications Western alleges; the Pinnacol records only affirm Western's policy to provide no accommodations. ADFs 5-6, 18-19, 33-34. There are no records of any interactive process because there was none. Indeed, neither Western nor its managers were even aware of what the interactive process was, asking the EEOC for clarification about the meaning of the term during the EEOC's investigation. ADFs 36-37.

Here, as in *Aubrey,* Western's conduct defeats its own motion. As in *Aubrey,* Western (1) did not ask employees about their limitations resulting from their disability; (2) did not discover – from the employees, or their medical providers, or other experts – whether reasonable accommodations would have enabled employees to return to work; and (3) did not give employees appropriate notice of prerequisites to return to work, or any additional time to obtain the information Western required.

50

*Aubrey*, 975 F.3d at 1008-09. Thus, a jury could reasonably conclude that Western failed to engage in the interactive process. Additionally, however, as in *Aubrey,* a jury could also reasonably find that Western affirmatively acted to avoid having to consider possible accommodations by 1) expressly stating its full-duty and inflexible 12-week leave policies in the EPMs, but not including any Reasonable Accommodation policy until 2015, ADFs 1, 12-13; 2) failing to conduct the required individualized assessment, or even obtain the information necessary for the assessment, and instead issuing automatic discharge letters, usually without any prior notice or discussion with the employee about what information they needed to provide and when, in order to keep their jobs, ADFs 112118-118, 126-127; and 3) denied requested extensions. ADFs 111, 116, 121.

Accordingly, summary judgment as to liability or punitive damages is not appropriate because a jury may reasonably find that Western failed to engage in the interactive process and acted affirmatively to avoid having to consider possible accommodations. *Midland Brake*, 180 F.3d at 1174; *Aubrey*, 975 F.3d at 1009; *Howell*, 860 F. Supp. at 1494.

## C.     Western discouraged employee requests for accommodation and rendered them futile.

An employer who actively discourages an employee from requesting accommodation cannot rely on a lack of request to defend a failure-to-accommodate claim. *U.S. v. City & County of Denver*, 49 F. Supp. 2d 1233, 1241 (D. Colo. 1999). And under the futile-gesture doctrine, an employee is not required to make a futile request. *Id.* As the Supreme Court recognized in *Teamsters,* "[a] consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection." 431 U.S. at 365. And the Tenth Circuit held:

> The logic of *Teamsters* similarly applies to ADA cases in which an employer has a set policy against a particular type of reasonable accommodation, or against such accommodation generally. If an employee actually knows of an employer's discriminatory policy against reasonable accommodation, he need not ignore the policy and subject himself 'to personal rebuffs' by making a request that will be denied.

*Davoll*, 194 F.3d at 1132-33.

The futile gesture doctrine applies "where an employer has essentially foreclosed the interactive process through its policies or explicit actions." *Id.* at 1133. In *Davoll,* the employer had an established policy against reassigning employees, even as an accommodation for an employee's disability. *Id.* at 1125. The employee was aware of the policy and was told by her supervisor that the employer would not help her find another position. *Id.* at 1133. The Tenth Circuit found that the known policy and the supervisor's comment "effectively indicated that the [employer] had no intention of engaging in the interactive process in good faith with [the employee]" and that not inquiring about reassignment was "a logical result of the [employer's] position." *Id.* Because the policy preempted the interactive process, the employer could not escape liability by claiming the employee did not properly initiate the process. *Id.*

Here, Western created an environment that discouraged employees from seeking accommodations and essentially foreclosed the interactive process. As in *Davoll,* the "logical result" of Western policies was that employees did not ask for accommodation because Western's EPM included explanation of the "full-duty" and 12-week leave policies, but until 2015, the EPM did not have a reasonable accommodation policy or anything to inform employees of their right to seek accommodation for disability. ADFs 1, 12-13. The policy descriptions gave no indication that exceptions might be made, and in fact, the practice was "no exceptions." ADFs 14, 16. As a result, employees were informed about the policies that foreclosed possible accommodations but had no reason to know about the law requiring accommodations.

Further, several AIs knew from management statements it was futile to ask for exceptions. Western managers told employees there was no avoiding the policy. ADFs 116, 121, 129. Thus, as in *Davoll,* Western's well-known policies are sufficient to deny summary judgment grounded on the alleged lack of employee requests for accommodation. *See Davoll*, 194 F.3d at 1133.

Western also used the ErgoMed tests to discourage employee requests for accommodation. Employees returning from medical leave were often sent to ErgoMed for physical testing, and not allowed to return to work unless they could pass this battery of tests with components that were not required for the job (e.g. a 50-lb. lift-and-carry test). ADFs 54-56, 69-71. Employees who failed any component of the ErgoMed test knew they would not be allowed to work, but they had no reason to know they could or should ask for some disability-related accommodation. ADFs 49, 71-72.

In this environment, employees aware of the policies or the ErgoMed testing process had good reason to believe there was no point in asking for what the policies expressly disallowed – to work within set medical restrictions or medical leave for more than the 12 weeks allowed. For employees told they had to pass the ErgoMed test to return to work, it was reasonable to think it would be futile to ask to work after failing the test. And the actual futility of such requests is further demonstrated by individuals who did request accommodations and were denied. ADFs 119-122, 124, 129-130.

Accordingly, Western cannot prevail on summary judgment based on alleged lack of employee requests for accommodation because through its policies and actions, Western discouraged employees from seeking accommodation and thwarted the interactive process.

**D.      Western's arguments for its two policies do not foreclose a jury finding that Western engaged in a pattern or practice of disability discrimination.**

   **1.   *In Phase I, the EEOC does not have to prove causation for "a group of aggrieved individuals" or other individual-specific issues.***

Western's argument about proof of causation and the necessity of statistics runs afoul of the Court's bifurcation order, which excluded individualized causation from the EEOC's Phase I burden: "During Phase I, the [EEOC] is not required to produce evidence proving that each AI was indeed a victim of the employer's policy." ECF 166 at 3 (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001)). Western fails to address either the bifurcation order or *Thiessen.* Indeed, the only pattern-or-practice case Western cites for its argument is *City of*

53

*Denver*, where the court found the *Teamsters* standard applies and did not require proof of causation for class members. *U.S. v. City of Denver*, 943 F. Supp. 1304, 1309 (D. Colo. 1996) (aff'd sub nom. *Davoll v. Webb*, 194 F.3d 1116 (10th Cir. 1999).

Requiring in Phase I that the EEOC prove the alleged policies actually caused discrimination against "a group of disabled individuals" would improperly and impractically inject a multitude of individual-specific Phase II issues into the Phase I proceedings. Western's suggested approach would require the parties to brief and argue matters as to an individual's disability status,[9] their qualifications to perform specific jobs, the requirements of their job and potential reassignment jobs, and a wide variety of job- or AI-specific potential accommodations. These issues are reserved for Phase II; proof of them cannot be a basis for summary judgment in Phase I. ECF 166; ECF 613.

Western cites a number of cases that are not pattern-or-practice opinions, and as a result, do not mean the EEOC must prove the cases of a group of AIs in order to establish a pattern or practice of discrimination.[10] The cases cited by Western in support of its statistical evidence argument are similarly unpersuasive because they use permissive, not mandatory, language regarding use of statistics as proof and are generally inapplicable or non-controlling. For instance, *EEOC v. Joe's Stone Crab, Inc.* was remanded to the trial court with instructions including:

> A plaintiff **may** establish a pattern or practice claim "through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally." *Mozee v. American Commercial Marine Service Co.,* 940 F.2d 1036, 1051 (7th Cir.1991) We also point out that **"direct evidence of an intent to discriminate" may be used to establish a pattern or practice claim.** *Lujan [v. Franklin Cty Bd. Of Educ.],* 766 F.2d [917] at 929 n. 15 [(6th Cir. 1985)]. Finally, we observe that in determining pattern or practice liability, **the government is not required to prove that any particular employee**

---

[9] Discovery remains partly open on this topic, as medical professionals for some AIs remain to be deposed.

[10] *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988); *Gardenhire v. Johns Manville*, 722 F. App'x 835 (10th Cir. 2018); *Feldman v. Olin Corp.*, 692 F.3d 748 (7th Cir. 2012); *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009); *Henderson v. Ardco, Inc.,* 247 F.3d 645 (6th Cir. 2001); *Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444 (10th Cir. 1981); *Thiessen*, 996 F. Supp. 1071 (district court opinion rejecting opt-in class members); *EEOC v. Prestige Care, Inc.*, 1:17-CV-1299, 2018 WL 3473964, *2-3 (E.D. Cal. July 17, 2018) (addressing only whether the pleading standards were met for individuals whose facts the EEOC pled in the complaint).

**was a victim** of the pattern or practice; **it need only establish a prima facie case that such a policy existed**.

220 F.3d 1263, 1287 (11th Cir. 2000) (emphases added); *see also Robinson v. Metro N. Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001) (statistical and anecdotal evidence are circumstantial evidence that plaintiffs have "typically" relied on). Western cites no case holding that a pattern-or-practice case cannot be proved without statistical evidence. Instead, the law is well-settled that statistical evidence is "clearly not required" to prove a pattern or practice of discrimination, "especially when the sample size is too small to produce meaningful results." *Pitre v. W. Elec. Co.*, 843 F.2d 1262, 1267 (10th Cir. 1988) (collecting cases). Moreover, Western ignores the fact that discrimination may be proved by direct evidence, which includes proof of an unlawful policy or statements on the part of a defendant showing discriminatory motivation. *Hall v. U.S. Dept. of Labor, Admin. Review Bd.*, 476 F.3d 847, 854 (10th Cir. 2007).

Here, as recognized in *Pitre*, statistical evidence is not necessary or particularly informative because each employee's ADA facts are highly person-specific, and because the sample size is not large. This is not a case in which a pattern will be best proven by finding a trend in data.

The most relevant evidence in this case is the substantial direct evidence of Western's policies and the policies' effect of denying employment to individuals with disabilities. This includes evidence found in Western's own records, testimony of its own managers about how the policies were implemented, and records from third parties Aviation and Pinnocol. ADFs 1-6, 10-22, 33-39. Employee testimony about the challenged practices is also relevant, even from employees not seeking relief. *Pitre*, 843 F.2d at 1270, 1277 (in pattern-or-practice case, employees testified about challenged practices, including employees who refused to participate because they feared retaliation). For example, in response to Western's assertion that it routinely contacts employees who are on medical leave to discuss how they might return to work, *see* SMF 28, 30, testimony

55

from employees who say they never heard from Western while on medical leave is relevant to establish what Western's practices actually were. Indeed, the merits of the individual-specific claims are deferred to Phase II precisely because the existence of the challenged policies does not depend on whether any particular AI was a victim of the discriminatory policy. ECF 613 at 3.

Western's motion goes on to argue many individual-specific issues that the Court's bifurcation order reserves for Phase II, incorrectly portraying the EEOC's pattern-or-practice claims as a conglomeration of 57 individual claims and arguing the EEOC can only rely on individuals with proven ADA claims. *See* ECF 821 at 32-34, 40-42, 48-58. The Court should reject Western's arguments that depend on Phase II questions determining the merits of individual-specific claims. Nevertheless, out of an abundance of caution to prevent Western's accusations from going unanswered, the EEOC responds briefly to Western's various arguments as follows:

- Western's argument that some AIs did not have covered disabilities when employed at Western, ECF 821 at 48-50, is unsupported and inaccurate. *See* ADFs 24-25, 29, 123, 127; RMFs 93-94, 97-98.

- Western's argument that some AIs were unqualified to perform their jobs, ECF 821 at 50-51, 54-55, is based on SMFs 93-96, refuted at RMFs 93-96. Qualification is a particularly person-specific issue, one on which considerable expert opinion has been collected. *See* RMFs 93-96.

- Western's argument that some AIs did not sufficiently provide notice or request accommodation, ECF 821 at 56-58, is based on SMFs 71-72, 74-75, 79-80, 99, 103, 107 and refuted at the corresponding RMFs. *See also* § IV(B), *supra*.

- Western's argument that it could not provide some accommodations to AIs, ECF 821 at 55-56, 58-63, is based on SMFs 47-57, 59, 62, 64-65, 71-73, 75-77, 78-83 and refuted at the corresponding RMFs. *See also* §§ IV(D)(2), IV(D)(3), IV(E)(4).

- Western's argument that the AIs' facts must be similar in order to prove the existence of a pattern or practice is mistaken. Rule 23 does not apply to EEOC class enforcement cases. *General Telephone Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 321 (1980). The focus is Western's policies and practices, not the characteristics of the AIs harmed as a result of the policies.

### 2. *Western's other practices do not disprove Western's discriminatory policies.*

Western argues it is entitled to summary judgment based on three other practices, relating to (a)

temporary light duty assignments, (b) bridging seniority for employees rehired within 30 days of discharge, and (c) providing 12 weeks of medical leave for employees not eligible for FMLA leave. ECF 821 at 36, 42, 44-45. None of these practices disprove the discriminatory policies.

**Light duty:** Although Western's EPM includes a disputed policy of trying to find temporary light duty work for employees recovering from illness or injury, it is undisputed that Western provides very few such assignments.[11] ECF 821 at 44-45; *see* ADFs 5, 10-11, 118, 124, 125, 129; RMFs 23-24, 105. Western's rare or unusual provision of light-duty assignments does not disprove its regular application of the full-duty policy. *See Teamsters,* 431 U.S. at 360 (pattern or practice is "regular procedure or policy"); *Cooper v. Fed. Res. Bank of Richmond*, 467 U.S. 867, 876 (1984) ("the regular rather than the unusual practice"). Moreover, testimony of Western's own HR Manager indicates there has been no light-duty work since 2010, when Western sold its beverage division. RMF 24. In any event, for employees able to work with medical restrictions, Western was required to consider what accommodations could be made, rather than apply its full-duty policy of not allowing employees to return until they had no medical restrictions. *See* §§ IV(A)-(C), *supra*. Some AIs could have returned to work before they were "full duty" if Western had provided job modifications. *See* ADFs 117-119, 124, 129; RMFs 93, 100. Others could have returned with assistive devices. *See* ADFs 56; RMFs 48-49, 55-57. Others could have returned if they had been allowed reassignment. ADFs 119, 121-122, 124, 129; *see* RMFs 21, 105. The rare or non-existent light duty assignment does not disprove Western's regular and discriminatory full-duty policy.

**Bridging seniority:** Nor does Western's "policy of reinstating employees to full seniority if they return within 30 days of termination" (ECF 821 at 36) disprove Western's regular and discriminatory policies. Subsequent rehiring with bridged seniority does not undo the

---

[11] Light-duty assignments, which are temporary and usually provided for employees with workers' compensation injuries, should be distinguished from reassignments, which are long-term and more likely to be provided as reasonable accommodation. The disputed policy is in the EPM's safety section and not part of Western's EEO policy. RMF 13.

discriminatory discharge. And Western cites no authority for its novel theory that discharge is not

an adverse action if the employee is rehired. Subjecting employees to discharge and the rehiring

process imposes extra work, uncertainty, a potentially delayed return-to-work date, potential lost

benefits, and unnecessary stress on the employee. At most, the policy operates to mitigate the

employee's economic damages, a matter reserved for Phase II of this litigation. ECF 613 at 18.

**Non-FMLA medical leave:** Western's discretionary, alleged practice of providing 12 weeks of

medical leave to employees ineligible for FMLA (ECF 821 at 36) does not disprove the challenged

discriminatory policies. An employee granted non-FMLA medical leave is still subject to the full-

duty policy and not allowed to return to work with medical restrictions, and will still be discharged

after 12 weeks rather than being provided accommodations. ADF 19.

### 3.  *DOT and FMCSA requirements do not authorize the full-duty policy.*

Western makes a number of summary, unsuccessful arguments that Department of

Transportation (DOT) and Federal Motor Carrier Safety Administration (FMCSA) guidelines and

regulations justify its full-duty policy. Each argument fails or, at a minimum, is in genuine dispute.

Western argues that compliance with federal regulations is a "complete defense" to the ADA

based on *Bower v. Fed. Express Corp.*, 156 F. Supp. 2d 678, 686 (W.D. Tenn. 2001). ECF 821 at

46. In *Bower*, the court found that an employer was not required to allow a disabled employee to sit

in exit rows of an airplane—but held the employer was still required to consider other reasonable

accommodations for the employee, such as rearranging the seats in the airplane. *Id.* at 687-88. So

according to Western's own authorities, Western is required to consider accommodations even

when DOT or FMCSA regulations actually limit Western's options. Western has not produced any

of the documentary evidence that could be expected to exist if Western actually considered potential

reasonable accommodations in a good-faith interactive process. RMF 16.

Western also argues that DOT and FMCSA regulations and guidelines require or authorize its

full-duty policy, but Western interpreted the regulations and guidelines too narrowly and insisted on

excessively-stringent job requirements. Western's requirements exceeded what DOT and FMCSA

regulations and guidelines require, inaccurately asserting that certain disabilities were not

permissible, *see* RMF 45 (diabetes, hypertension) and that certain rules were DOT-required, *see*

ADFs 46, 53; RMFs 42, 96 (fitness-for-duty testing, drug testing to return from leave, incomplete

medical disclosure). Similarly, Western imposed excessively-stringent job requirements and then

embedded them in the testing that Western claimed was DOT-required. *See* ADFs 41-80; RMFs 42-

44, 52, 57, 61-63 (50-lb. lifting, 130-lb. push/pull requirements). The regulations do not require all

drivers to be full-duty, no restrictions; this was Western's own requirement. RMF 2.

If a safety standard is more restrictive than regulations require and operates to screen out a

person with a disability or a class of people with disabilities, it is a qualification standard that must

be both job-related and consistent with business necessity. 42 U.S.C. § 12112(b)(6). *Tate v.

Farmland Indus., Inc.*, cited by Western, does not give an employer carte blanche. *Tate* states that

an employer "has the right to establish what a job is and what is required to perform it," but this is

subject to the proviso "that any necessary job specification is job-related, uniformly-enforced, and

consistent with business necessity." 268 F.3d 989, 993 (10th Cir. 2001); *see also Wilkerson v.

Shinseki*, 606 F.3d 1256, 1263-1265 (10th Cir. 2010) (stating the same standard and that 1) physical

qualifications must be "reasonable" and 2) if safety standards are based on tasks that only occur in

emergencies, the emergency must be a "realistic component of the job"); *Foreman v. Norfolk S.

Corp.*, No. 5:15-CV-140 (CAR), 2017 WL 1217174, at *8 (M.D. Ga. Mar. 31, 2017).[12] The facts at

ADFs 41-80 and RMFs 2, 5-11, 41-75, 87, 105 raise, at a minimum, genuine disputes about the job-

---

[12] Western also cites the inapposite case of *EEOC v. Schneider Nat., Inc.*, 481 F.3d 507 (7th Cir. 2007). In *Schneider,*
the EEOC brought a regarded-as-disabled claim, arguing the employer mistakenly perceived the employee's medical
condition as a disability. *Id.* at 509-11. The court found the employer was not mistaken, foreclosing the ADA claim. *Id.*
Because there was no ADA claim, the employer's right to choose its own safety standards was unimpeded. *Id.* at 512.

relatedness and business necessity of Western's full-duty requirements, and Western does not make any specific arguments to the contrary. *See* ECF 821 at 45-48; *infra* § IV(E)(4)(b). Accordingly, Western's argument fails.

### 4. *10th Circuit law does not support Western's position that a pattern-or-practice claim cannot be based on an inflexible leave policy.*

Based solely on *Hwang v. Kansas State Univ.*, 753 F.3d 1159, 1161 (10th Cir. 2014), Western argues the Tenth Circuit has "flatly reject[ed] . . . that the ADA requires employers to provide additional leave (beyond that required by the FMLA) as a reasonable accommodation." ECF 821 at 37.[13] The *Hwang* court did not reject—"flatly" or otherwise—requiring leave beyond what the FMLA requires. The dicta from *Hwang* addressed a six-month, paid leave policy and referred to it as "long." 753 F.3d at 1162. The Court contrasted the "long" six-month paid leave against "[p]olicies providing unreasonably short sick leave periods," which "may not provide accommodation enough for employees who are capable of performing their jobs' essential functions with just a little more forgiven absence." *Id.* at 1164. Western's inflexible leave policy, allowing 12 weeks of unpaid leave, is much shorter and less accommodating than the six-month paid leave at issue in *Hwang*. In any event, in *Rascon* and *Aubrey* the Tenth Circuit endorsed requiring leave beyond what the FMLA requires. *Rascon*, 143 F.3d at 1334-35; *Aubrey*, 975 F.3d at 1001.

*Hwang* is also inapplicable because the language Western relies on was dicta in an individual discrimination case, not a pattern-or-practice case. *See* 753 F.3d at 1161. In an individual case, the plaintiff must "first demonstrat[e] all aspects of a prima facie case" of discrimination. *Semsroth v. City of Wichita*, 304 F. App'x 707, 716 (10th Cir. 2008). In *Hwang,* the court first found the plaintiff's request for additional paid leave unreasonable – resolving the issue before the court –

---

[13] The other cases Western cites are indefinite leave, not duration-of-leave, cases. *Valdez v. McGill*, 462 F. App'x 814, 818 (10th Cir. 2012) ("it was uncertain he would be able to return to work on March 1, 2007"); *Robert v. Bd. of Cnty. Comm'rs.*, 691 F.3d 1211, 1218 (10th Cir. 2012) ("we do not address the potential that the accommodation exceeded reasonable durational bounds"); *Punt*, 862 F.3d at 1051 (plaintiff "was very vague about how much time she ... was going to miss'"); *Billups v. Emerald Coast Utilities Auth.*, 714 F. App'x 929, 936 (11th Cir. 2017); *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003); *Peyton v. Fred's Stores of Arkansas, Inc.*, 561 F.3d 900, 903 (8th Cir. 2009).

then addressed Hwang's argument about "all 'inflexible' sick leave policies." 53 F.3d at 1163. The

Court's assertion that inflexible leave policies may benefit employees is not binding on this or any

other court. The EEOC's pattern-or-practice case against Western requires examination of the

legality of the policy first, then examination of its impact on specific individuals. *Teamsters*, 431

U.S. at 360. As a result, the *Hwang* opinion is not controlling here.

Western also relies heavily on the Seventh Circuit's aberrational decision in *Severson v.*

*Heartland Woodcraft, Inc.*, 872 F.3d 476 (7th Cir. 2017), holding that "multimonth" leave is not

required by the ADA. But the *Severson* rule has not been adopted in the Tenth Circuit and

contradicts Tenth Circuit case law. *See Rascon*, 143 F.3d at 1334-35; *Aubrey*, 975 F.3d at 1001.

*Severson* has also been roundly criticized. *See, e.g.*, *EEOC v. Manufacturers & Traders Tr. Co.*, 429

F. Supp. 3d 89, 108-09 (D. Md. 2019) ("there is good reason to doubt the soundness of *Severson*'s

logic"); *Golden v. Indianapolis Hous. Agency*, 698 F. App'x 835, 837 (7th Cir. 2017) (Rovner, J.,

concurring) (describing *Severson*'s per se rule as "nonsensical").[14]

## E.      Western failed to establish there are no disputed material facts regarding the challenged qualification standards.

### 1.     The EEOC is not limited to seeking relief for the identified aggrieved individuals on its qualification standard claim.

Besides individual-specific relief, the EEOC has authority to seek declaratory and injunctive

relief to prevent Western from continuing to use discriminatory qualification standards. As the

federal agency charged with enforcing the Americans with Disabilities Act, the EEOC has a right to

sue independent of the rights of any private individual. *General Telephone Co.*, 446 U.S. at 326. "In

this respect, EEOC acts 'to vindicate the public interest in preventing employment discrimination,'

---

[14] The EEOC objects to Western's characterization of the agency's position in *Severson*. ECF 821 at 39-40. In *Severson*, the EEOC argued that the charging party's request for leave was reasonable because it was "of definite, time-limited duration, requested in advance, and likely to enable the employee to perform the essential job functions when he or she returns." Case No. 15-3754, Dkt. 14, filed 3/15/2016. The EEOC did not argue that each of these must always be proven for an accommodation to be reasonable, and the EEOC did not argue that the employee must do so unilaterally. The EEOC argued that the plaintiff's request was sufficiently definite even though the charging party did not know whether he would need two months of leave or three. *Id.*

and its interests are broader than those of the individuals injured by discrimination." *EEOC v. Harris Chernin, Inc.*, 10 F.3d 1286, 1291 (7th Cir. 1993), *quoting Gen. Telephone,* 446 U.S. at 326. Thus, the Supreme Court has recognized the EEOC's ability to seek declaratory and injunctive relief even where no relief is available for any individual. *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 305 (2002) (Thomas, J., dissenting) ("I do not question the EEOC's ability to seek declaratory and broad-based injunctive relief in a case where a particular employee, such as Baker, would not be able to pursue such relief in court."). Because no argument is made as to declaratory and injunctive relief, those arguments are waived. *Wheeler v. C.I.R.*, 521 F.3d 1289, 1291 (10th Cir. 2008) (Courts need not consider arguments first raised in a reply.).

Nor is there any dispute that the Court has authority to grant such relief. 42 U.S.C. § 12117, incorporating 42 U.S.C. § 2000e-5(g); *Barela v. United Nuclear Corp.*, 462 F.2d 149, 154 (10th Cir. 1972) ("vast number" of cases recognize the court's authority to "fashion an injunctive remedy designed to uproot the policy or practice for the protection of the other employees"); *see also, Thomas v. Washington Cty. Sch. Bd.*, 915 F.2d 922, 924-26, (4th Cir. 1990) (entitled to injunction without prevailing on her claim). And courts "may, in appropriate circumstances, order preferential relief benefiting individuals who are not the actual victims of discrimination as a remedy for violations of Title VII." *Sheet Metal Workers Local 28 v. EEOC,* 478 U.S. 421, 444-47 (1986). The EEOC's case is not limited to individual-specific relief for aggrieved individuals.

### 2. *Sections 102(b)(3) and (b)(6) permit the EEOC to proceed on either a disparate impact or treatment theory on behalf of one or more individuals.*

Contrary to what Western asserts, the EEOC's third claim for relief was initially pled in the complaint to include disparate treatment. **First,** the disparate treatment theory is evident from the EEOC's allegation of intentional discrimination. *See* ECF 1 at 17, ¶ 100. Disparate treatment requires proof of intentional discrimination; disparate impact does not. *Raytheon Co. v.*

62

*Hernandez*, 540 U.S. 44, 52-53 (2003). **Second**, the EEOC repeatedly cites to Section 102(a) in the third claim. *See* ECF 1 at 16 (subheading), ¶¶ 96-99. Section 102(a) is recognized as a discriminatory treatment provision. *Lincoln v. BNSF Railway Co*., 900 F.3d 1166, 1191-92 (10th Cir. 2018). **Third,** Sections 102(b)(3) and (b)(6) can be proven under disparate treatment and impact theories. *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 372 (2001) (disparate impact under Section 102(b)(3)); *Weigel v. Target Stores*, 122 F.3d 461, 464 (7th Cir. 1997) (disparate treatment under Section 102(b)(3)); *Exby-Stolley v. Bd. of County Commissioners*, 979 F.3d 784, 796, 841-42 (10th Cir. 2020) (disparate treatment and impact under Section 102(b)(6)). Thus, Western had notice from onset of the case that EEOC was alleging both disparate impact and treatment theories for the third claim.

   3.   ***The EEOC has established a prima facie case of disparate impact discrimination under Sections 102(b)(3) and (b)(6) of the ADA.***

   a.   The prima facie elements can be proven with a single individual.

To establish a disparate impact prima facie case under both sections 102(b)(3) and (b)(6), a plaintiff must "1) identify the challenged employment practice or policy and pinpoint the Defendant's use of it; 2) demonstrate an adverse impact on a group that falls within the protective class; and 3) demonstrate a causal relationship between the identified practice and the adverse impact." *EEOC v. CTI, Inc.*, CV-13-1279-TUC-DCB, 2015 WL 11120707, at *10 (D. Ariz. May 8, 2015) (citation omitted). Disparate impact claims do not require a showing of discriminatory motive or intent. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993). In ADA claims under Sections 102(b)(3) and (b)(6), a plaintiff may satisfy the second element by establishing an adverse impact on a single individual rather than a group of individuals. *Gonzales v. City of New Braunfels*, 176 F.3d 834, 839 n. 26 (5th Cir. 1999) (citing 1 Lindemann & Grossman, *Employment Discrimination Law* 333–34 (3d ed. 1996)); *see also* 42 U.S.C. § 12112(b)(6) (prohibiting the use of "qualification

standards, employment tests or other selection criteria that screen out or tend to screen out **_an individual with a disability_** or a class of individuals with disabilities . . .") (emphasis added). Statistical evidence is not required. *Gonzales*, 176 F.3d at 839. The cases Western cites are inapposite because they do not analyze sections 102(b)(3) or (b)(6) of the ADA.[15]

Western relies on outdated authority to argue the EEOC must show a "significant disparate impact." ECF 821 at 70, 74-75. Western fails to account for the 1991 Civil Rights Act which codified the disparate impact standard.[16] *See Steinle v. Boeing Co.*, 785 F. Supp. 1434, 1436 n. 3 (D. Kan. 1992), aff'd, 24 F.3d 1250 (10th Cir. 1994). The regulations, which state the legal standard for disparate impact cases, do not require a "significant" disparate impact. *See* 42 U.S.C. §2000e-2(k).[17]

   b.   Disability status under the ADAAA

The 2008 ADA amendments made it "easier" to establish a disability. *Tesone v. Empire Mktg. Strategies,* 942 F.3d 979, 994 (10th Cir. 2019). Although the definition of "disability" did not change, Congress added an entire section of rules for construing the definition, beginning with the mandate that the definition "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). Congress also added a non-exhaustive list of major life activities and a section making bodily functions a major life activity. 42 U.S.C. § 12102(2)(A) and (B).

Lifting, pulling, and pushing restrictions may substantially limit major life activities. In assessing whether an impairment "substantially limits" a major life activity, the Tenth Circuit as

---

[15] Western cites to four Title VII and one Fair Housing case to argue statistical evidence is required. ECF 821 at 76.

[16] Although Western cites cases decided after the implementation of the 1991 Civil Rights Act, references in those cases to a requirement of "significance" cite authorities from prior to the 1991 amendments. *See* ECF 821 at 70 (citing *Carpenter*, 456 F.3d at 1193 which quotes *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1242 (10th Cir. 1991) which cites *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659 (1989)).

[17] Western's quote from *Garcia v. Spun Steaks*, 998 F.2d 1480, 1486 (9th Cir. 1993), is incomplete in a way that is misleading about the EEOC's burden. ECF 821 at 70. The full quote states, "[T]he requirements of a prima facie disparate impact case . . . are **_in some respects_** more exacting than those of a disparate treatment case." *Id.* (emphasis added to language deleted by Western), *quoting Spaulding v. University of Washington*, 740 F.2d 686, 705 (9th Cir.) (citation omitted), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984).

well as ADA regulations and guidance recognize that certain physical restrictions substantially limit major life activities. *See Lusk*, 238 F.3d at 1240 (affirming that a 15-lb. lifting restriction is "substantially limiting on its face" and in such cases, additional evidence is not required); 29 C.F.R. §1630.2(j)(3) (identifying conditions that "virtually always" qualify as disabilities); *see also* 29 C.F.R. Pt. 1630, App. at § 1630.2(j)(1)(ix) (A 20-lb. lifting restriction that lasts months because of a back impairment substantially limits the major life activity of lifting.).

Western misinterprets *Lusk* to argue that a "lifting limitation, without more, is insufficient to establish a substantial limitation." ECF 821 at 68. In fact, *Lusk* stands for the opposite, pointing to Tenth Circuit precedent that a 15-lb. "lifting impairment appeared substantially limited on its face, and thus plaintiff created a genuine issue of material fact with respect to whether her impairment substantially limited the major life activity of lifting." 238 F.3d at 1240 (citing *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170 (10th Cir.1996)). [18] Pushing and pulling are also recognized as major life activities. *Maxwell v. Cnty. of Cook*, No. 10 CV 00320, 2014 WL 3859981, at *3 (N.D. Ill. Aug. 4, 2014). Under the same logic as *Lusk*, an impairment causing a similarly low-weight pulling or pushing restriction is substantially limiting on its face, without additional evidence.

Moreover, contrary to what Western argues, "it is settled in [the Tenth] Circuit that plaintiffs need not present comparative evidence regarding the population as a whole in order to prove they are disabled." *Nowlin v. Kmart Corp.*, No. 99-3186, 2000 WL 1588116, at *2 (10th Cir. Oct. 25, 2000)). The comparison usually "will not require such scientific, medical, or statistical analysis." *Tesone*, 942 F.3d at 996 (*quoting* 29 C.F.R. § 1630.2(j)(1)(v)). For summary judgment purposes, the EEOC need only present sufficient evidence that would allow a jury to infer that lifting or other tasks caused pain or a limitation that most people would not experience. *Paraham v. Atriums Mgt.*

---

[18] *Lusk* and *Lowe* were both decided prior to the ADA amendments which made it much easier for a plaintiff to establish an impairment substantially limits a major life activity. *Tesone,* 942 F.3d at 994.

*Co., Inc.*, 16-2539, 2019 WL 1434965, at *4 (D. Kan. Mar. 29, 2019).

        c.   <u>There is sufficient evidence for a jury to find disparate impact as to each of the challenged standards.</u>

The EEOC has identified thirteen employment practices – the inter-related full-duty and inflexible leave policies, and eleven physical tests. ECF 808 at 5. There is ample evidence to establish the three elements of disparate impact as to both the policies and the tests.

Substantial evidence demonstrates, and thus "pinpoints" Western's use of the two policies. ADFs 1-21; *see also* ECF 823 at 3-10. As to the two policies, the second and third elements are established with the five individuals with disabilities denied employment because they were unable to return to "full duty" within 12 weeks, ADFs 8, 23 (Bahmer, Morin, Kallenbach, Schmotzer, Valdez), and three individuals discharged because of permanent restrictions. ADFs 7-9. Western's discharge of individuals with disabilities pursuant to these policies establishes the final elements.

The EEOC has pinpointed Western's use of the eleven physical standards with evidence from ErgoMed's PDEs and physical tests it administers for Western. ADFs 54, 58-59. On their face, the challenged standards operate to identify anyone unable to lift, carry, push, and pull the required weights. And because Western uses the ErgoMed tests as a proxy for qualifications, it denies employment to individuals unable to pass the tests. ADFs 49, 85, 89, 94, 97, 102, 103, 109. As used by Western, therefore, the eleven challenged tests exclude at least the class of individuals with disabilities due to low-weight restrictions that interfere with the major life activities of lifting, pushing, or pulling. ADFs 85, 88, 93, 96, 101, 108. This evidence establishes the second and third elements of disparate impact discrimination.

Thus, as to each of the thirteen challenged standards, the EEOC has presented sufficient evidence to establish a prima facie case of disparate impact under Sections 102(b)(3) and (b)(6).

**4.   *Because Western cannot prove its Job Related/Business Judgment affirmative defense, the EEOC prevails based on the prima facie case of disparate impact.***

     a.   <u>Western must prove both job relatedness and a business necessity.</u>

Once the plaintiff establishes a prima facie case the employer must prove the challenged standards are job related, consistent with business necessity, and that the business necessity cannot be met by reasonable accommodation. 42 U.S.C. § 12113(a); *cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78 (2002). "The 'business necessity' standard is quite high, and is not [to be] confused with mere expediency." *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001) (internal citation omitted). In general, "discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." *Albemarle Paper Co. v. Moody*, 422 US 405, 431 (1975). The "professionally acceptable methods" referenced in *Albemarle* refer to validation of the standards. *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1280 (9th Cir. 1981) *citing Albemarle,* 422 U.S. at 431. Such validation requires a showing "the qualification standard is necessary and related to 'the specific skills and physical requirements of the sought-after position.'" *Cripe,* 261 F.3d at 890.

If Western meets its "quite high" burden the EEOC may rebut by showing there are less discriminatory practices that achieve the same business necessity. *Albemarle*, 422 U.S. at 425. But if Western cannot meet its burden, the EEOC's prima facie case of disparate impact is "conclusive on the issue of discrimination." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1152 (10th Cir. 2008).

     b.   <u>Western's full duty and inflexible leave policies and its exaggerated physical standards are not job related or consistent with business necessity.</u>

Western failed to directly defend its qualification standards. To start, neither of Western's policies, nor any of the eleven challenged ErgoMed tests, are DOT requirements. RMFs 42, 61. As

previously discussed, Western's inter-related full duty and inflexible leave policies are neither job related nor consistent with business necessity. *See* Sec. IV(D)(3), *supra*. Western also fails to provide specificity as to any of the standards, and instead generally concludes they are all job related and consistent with business necessity because ErgoMed said so. ECF 821 at 80. This lack of specificity dooms Western's motion on this defense because it fails to show how each standard is justifiably related to a specific task. Case in point, the only semblance of a justification for the 50-lb. lifting requirement is that tire chains weighing 25 pounds apiece, come packaged "in a bag" containing two chains, ECF 821 at 14 ¶60, apparently on the incredible notion that drivers will lift the 50-lb bag and carry it around the truck for 75 feet, rather than taking the chains out and handling them one at a time. Western fails to directly defend these standards.

Moreover, Western cannot establish the physical tests are job related because ErgoMed failed to follow industry standards in creating its PDEs and related physical demands tests. ADFs 76-80. This failure resulted in imposing standards and tests requiring more onerous lifting, carrying, pushing, and pulling than necessary to do the job. ADFs 58, 60, 61, 63, 71-74. For example, Western requires OTR drivers to be able to lift 50 pounds based on the task of installing tire chains. ADFs 54, 56. But drivers have a number of alternatives to installing tire chains, including AutoSocks, weighing less than 7 pounds for a pair. ADF 57. And even drivers who opt to use metal tire chains can push, pull, and drag them one at a time. ADF 56. Thus, a jury cannot reasonably conclude, as Western asserts, that the 50-lb lift-and-carry test is job related when a driver never has to lift 50 pounds of tire chains, let alone carry them 75 feet. Similarly, Western requires all tow drivers to be able to lift 60 pounds based on lbs. a set of tow chains when one chain could be lifted at half the weight.[19] ADF 59.

---

[19] Western's Wrecker PDE lists this 60-lb. lift as a lift for "tire chains." But Western's tow driver and its Rule 30(b)(6) designee both confirmed that the referenced chains are used to tow vehicles. ADF 60. Regardless of the purpose, the 60 pound weight requirement is based on a *pair* of chains. ADF 60.

There is ample evidence that all the other ErgoMed tests the EEOC challenges are similarly unjustified. The 130-lb. static push/pull test for OTR is based on using ratchet straps, which Western admits is not a function of the job. ADF 58. The 132-lb. lift test for tow drivers is based on lifting a truck tire, a task that Western's own driver demonstrating the job has never done. ADFs 62-63. Likewise, the 76-lb. push test for tow drivers is not job-related as admitted by ErgoMed. ADF 61. These tasks and weight requirements are also not reflected in Western's job descriptions for these positions. ADF 66. These are not essential functions.

Western also cannot establish there was no possible accommodation. AutoSocks are one obvious accommodation to lifting restrictions because Western already provides Autosocks to drivers who ask to use them instead of chains, and a pair of Autosocks weighs less than 7 pounds. ADF 57, RMF 78. Other accommodations include allowing the driver to pull off the highway and wait out the storm, rerouting to locations without a mountain pass, or paying a service to install and remove chains. ADF 56. USAC drivers could be accommodated with assistive lifting devices or allowing the team member to assist with or handle the heavier lifting. ADF 56. Tow drivers can be accommodated by using the winch on all tow trucks, other assistive devices, or bringing other employees to the site to assist. ADFs 64, 65, RMF 74. Similarly, the 132-lb. tire lift can be accommodated with a two-person lift or by using a winch. ADFs 65. The Court should find that Western failed to support its defense.

### 5. *There is sufficient evidence for a jury to find intentional disparate treatment disability discrimination under Sections 102(b)(3) and (b)(6).*

As in any discrimination case, the plaintiff can meet its burden with either direct or circumstantial evidence.[20] *Ramsey v. City & County of Denver*, 907 F.2d 1004, 1007-08 (10th Cir.

---

[20] Proof by circumstantial evidence follows the well-known burden-shifting analysis articulated in *McDonnell Douglas*, and its progeny. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

1990). Ample evidence exists to show Western maintained qualification standards that intentionally denied employment opportunities to individuals with disabilities. In particular, Western set out to reduce workers compensation costs by employing ErgoMed to administer tests that screened out and denied jobs to people with "pre-existing" medical conditions. ADFs 43-44. At the outset of its relationship with ErgoMed in 2007, Western targeted individuals with "pre-existing conditions" to lower workers compensation costs. *Id.* Western's Safety Director until 2014 also acknowledged Western's goal of keeping workers compensation costs down by "screening out individuals with pre-existing conditions." *Id*. A decade later in 2017, Western emails show its policies accomplished what was intended in 2007 – lower workers compensation costs. ADF 45. As a result, ErgoMed's "program" resulted in the exaggerated lifting, carrying, pushing, and pulling standards Western uses to screen out individuals with disabilities. ADFs 56, 60-61, 63.

Although some pre-existing conditions may not amount to a disability under the ADA, many do, particularly under the statute's rules of construction requiring the definition of disability "be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C.A. § 12102(4). Further, Western HR knew it was unlawful to deny employment to people based on their disabilities, ADF 40, and knew or should have known that the "pre-existing conditions" it was using to deny employment, were likely to also be disabilities under the ADA. Indeed, Western's own managers expressed concern that the ErgoMed tests were unduly burdensome. ADF 74. ErgoMed also repeatedly invited Western to update its standards. ADF 80. But Western's CEO ignored such concerns in favor of saving money on worker's compensation costs. *Id*. This evidence demonstrates the intentional discrimination necessary for a disparate treatment claim – Western intentionally created a policy that screened out individuals with disabilities.

**6.  *Western's remaining arguments to defeat the EEOC's third claim miss the mark.***

    a.  <u>Sections 102(b)(3) and (b)(6) do not require a showing of qualifications</u>

Under Sections 102(b)(3) and (b)(6), the EEOC need not show an individual was a *qualified* individual with a disability. Unlike other provisions of the ADA, these sections do not include the word "qualified", or the phrase "qualified individual with a disability." *Compare* 42 U.S.C. §§ 12112(b)(2), (b)(4), (b)(5)(A), and (b)(5)(B), which include the word "qualified," *with* 42 U.S.C. §§ 12112(b)(3) and (b)(6), which do not. Moreover, Western's reliance on *Hennagir v. Utah Dep't of Corrections*, 587 F.3d 1255, 1262 (10th Cir. 2009), is misplaced, where that case does not analyze claims under Sections 102(b)(3) and (b)(6). ECF 821 at 68.

Nevertheless, should the Court require a showing of qualifications, this requirement is met by evidence the person previously held a similar position or the employer extended the person a conditional offer. *Hatter v. WMATA*, 244 F. Supp. 3d 132, 136 (D.D.C. 2017). Similarly, a person who currently holds and has satisfactorily performed the position for some time, has proved their ability to perform the essential job functions, with or without accommodation. *See, e.g.*, *Villalobos v. TWC Admin. LLC*, 720 Fed. App'x. 839, 842 (9th Cir. 2017). In this case, the EEOC has shown six individuals qualified by virtue of having previously worked for Western as drivers (Jarvis, Morgan, Morin, Davis, Perkins, Wones), ADFs 7-9, 82, 98, 109, and two individuals who were qualified by virtue of Western extending conditional job offers. (Nehrig, Vasquez) ADFs 86, 90.

    b.  <u>The exaggerated physical standards are encompassed by the inter-related full duty and inflexible leave policies.</u>

The lifting, carrying, pushing, and pulling standards created with ErgoMed were critical in executing Western's inter-related full duty and inflexible leave policies. In order for someone to drive for  Western, they were required to meet four standards: 1) a DOT medical certification, which has no lifting, pulling, or pushing requirements; 2) an ErgoMed screen, which includes

71

review of medical records for pre-existing conditions and a battery of physical tests; 3) have no medical restrictions; and 4) return from any medical leave within 12 weeks. These requirements were interrelated and not mutually exclusive. For example, drivers seeking to return from medical leave could not even get scheduled for DOT medical certification without approval of Safety Manager Respass, who refused to make the referral if the employee had medical restrictions. ADF 21. If Respass allowed the driver to be seen by Aviation for DOT certification, Aviation then conducted its exam knowing of Western's full duty policy. ADF 4. If a driver made it past Respass and Aviation, the driver next had to satisfy ErgoMed's exaggerated lifting, carrying, pushing, and pulling test. ADF 47. If the driver failed any of the physical tests, ErgoMed would issue a no-job-match recommendation. ADF 48. Upon such recommendation, Western would not allow the driver to return to work, or would rescind the conditional job offer of an applicant, without discussion regarding potential accommodations. ADF 49. Thus, Western executed its inter-related full duty and inflexible leave policies to exclude drivers who could not meet its exaggerated physical standards.

      c.   <u>Western's qualification standards are not supported by DOT regulations.</u>

Western obfuscates the qualification standards' issue by pointing to DOT regulations. Western generally asserts that Western only tests DOT-required functions, but cites no DOT regulation or other authority, and instead relies entirely on testimony of its CEO. ECF 821 at 80 (citing SMF 44). Notably, although Western retained a DOT expert who wrote 59 reports, and Western deposed the EEOC's DOT expert for 14 hours, Western cites neither expert, nor any other authority to support its assertion that the lift/carry/push/pull standards challenged by the EEOC are required by DOT regulations, or necessary for "DOT compliance." RMF 61. Western's position is not credible.

      d.   <u>Inflexible leave policies can be a discriminatory qualification standard.</u>

Western's argument that its inflexible leave policy cannot be a discriminatory qualification standard cites no authority and ignores the statute and regulations. ECF 821 at 73-74. A

qualification standard is defined to include "physical, medical . . . and other requirements . . . which an individual must meet in order to be eligible for the position held or desired." 29 CFR § 1630.2(q). Under Western's policy, an employee unable to return to full duty after 12 weeks of medical leave is discharged. The policy is plainly a physical and medical requirement that an employee must meet to be eligible to continue holding their position. Moreover, Western ignores that Section 102(b)(3) prohibits "methods of administration" that have the effect of discrimination based on disability.[21] 42 U.S.C. § 12112(b)(3). Western's method of administering its no-exceptions leave policy was to automatically discharge employees unable to return to full duty after 12 weeks of medical leave, allowing for no exceptions to accommodate employees who are unable to return because of a disability as defined by the ADA. ADFs 12, 14-17. This method of administration has the effect of disability discrimination by denying reasonable accommodations, as prohibited by Section 102(b)(5)(A). And Western also ignores that its no-exceptions leave policy operated to screen out employees with disabilities, ADF 28 (e.g. AI Kallenbach discharged rather than granting 9 additional days of medical leave), as prohibited by Section 102(b)(6). Western's argument is contrary to law.

>   e.   The EEOC satisfied the prerequisites to filing suit.

The Court should follow the previous ruling that the EEOC met its pre-suit requirements. ECF 58 at 9-15. The prior order expressly noted "that the outcome would be the same" under the Rule 56 summary judgment standard. *Id.* at 9. Judicial review of the pre-suit conciliation requirement is "relatively barebones." *Mach Mining*, 575 U.S. at 494. As relevant, the statute requires the EEOC to "tell the employer about the claim—essentially, what practice has harmed which person or class." *Id.* at 488. The EEOC is given wide discretion and need not "lay out the 'factual and legal basis' for all its positions." *Id.* at 491-92. Under this narrow review, Western's arguments fail. *See* Sec.

---

[21] Western only cites to the types of policies "frequently" involved in qualification standard cases. ECF 821 at 73-74.

IV(E)(6)(b); *see also* RMF 113.

      f.   <u>The Court should reject Western's final argument that lacks any legal authority.</u>

Western's final argument regarding the EEOC's third claim, ECF 821 at 67, should be summarily rejected for lack of any cited authority. Western cites no authority for the notion that reference in the EEOC's third claim to a "group of aggrieved individuals" affected by the challenged standards, ECF 821 at 67 (citing ECF 1 at 17, ¶ 102), operates to change the law and statutory language allowing a plaintiff to prove disparate impact under the ADA by showing even one person with a disability denied employment opportunities. *See Gonzales*, 176 F.3d at 839 n. 26; 42 U.S.C. § 12112(b)(6) (referring to "an individual with a disability or a class of individuals with disabilities . . ."). The Court should reject Western's unsupported argument.

## F.    Western's other arguments are not grounds to grant summary judgment.

### 1.  *Western makes unsubstantiated and legally incorrect arguments about accommodation requests and the interactive process.*

Western is not entitled to summary judgment based on its faulty arguments that the AIs did not request accommodation or failed to participate in the interactive process.

First, Western's argument that a request for FMLA leave cannot be an ADA request for accommodation is based on cases from other jurisdictions, and ignores the Tenth Circuit decision in *Aubrey,* holding the employer was obligated to engage in the interactive process regarding an accommodation to further extend the employee's FMLA leave. *Aubrey,* 975 F.3d at 1001, 1008; *see also Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 156-57 (3d Cir. 2017) (FMLA leave can be an ADA request for accommodation, district court erred holding otherwise). Second, the EEOC has addressed Western's incorrect legal and factual arguments regarding statistical and anecdotal evidence. Secs. IV(D)(1), IV(E)(3)(a), IV(E)(5), *supra*; RMFs 71-72, 74-75, 79, 99, 103, 107.

Third, Western misstates the facts and misapplies the law concerning the interactive process. Western obfuscates the actions it took by arguing it "granted the AIs the precise accommodation

they requested" when it "granted the requested medical leave of 'many of the AIs.'" *See* ECF 821 at 57. Western granted some AIs 12 weeks of leave following its regular FMLA policy – there was no AI whose "precise request" was for exactly 12 weeks of leave.  In any event, an employer is required to continue engaging in the interactive process when it is aware "that the initial accommodation is failing and further accommodation is needed." *Humphrey*, 239 F.3d at 1138; *Campbell*, 272 F. Supp. 2d at 1292. Here, when the initial leave failed to return the AIs to work, Western was obligated to engage in the interactive process to consider what additional or different accommodations might be needed. *See Campbell*, 272 F. Supp. 2d at 1284, 1292. But Western did not talk with AIs about possible accommodations before automatically discharging them after 12 weeks of medical leave. ADFs 110-118, 121-130;  RMFs 15-16, 23-24, 30.

Last, Western's argument that it had no obligation to continue engaging in the interactive process after granting medical leave, relies on inapposite cases. In *Lievre v. JRM Constr. Mgmt., LLC*, the plaintiff lost his failure to accommodate claim because he did not show there was an accommodation that would have allowed him to do his job, not because the employer had no obligation continue engaging in the interactive process. 17-CV-4439 (BCM), 2019 WL 4572777, at *21 (S.D.N.Y. Sept. 20, 2019). Indeed, the *Lievre* opinion reiterates that "'if the employer knew or reasonably should have known that the employee was disabled,' that employer may have a 'duty reasonably to accommodate' the disability **even if no specific request is made**." *Id.* (emphasis added) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008)). *Preddie v. Bartholomew Consol. Sch. Corp.* is inapposite because unlike the plaintiff there, who only intermittently asked for days off and did not request an accommodation for his condition, here Western employees requested an accommodation when they sought and were granted extended medical leave. 799 F.3d 806, 813 (7th Cir. 2015). And unlike in *Preddie,* Western was aware of both the employees' impairments and the need for further accommodation because it had already

75

granted the accommodation of medical leave. *See Humphrey*, 239 F.3d at 1138; *Campbell* 272 F. Supp. 2d at 1292. Finally, *Noll v. Int'l Bus. Machines Corp.*, is inapposite because there, unlike here, the employer's provided accommodation was not failing. 787 F.3d 89 (2d Cir. 2015).

## 2. *EEOC's claims need not rely solely on accommodations requested prior to litigation.*[22]

Western's argument about "hypothetical" accommodations raised in litigation, ECF 821 at 56-58, runs contrary to the Supreme Court decision in *US Airways, Inc. v. Barnett*, which held that to show reasonable accommodation, "a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." 535 U.S. 391, 401-02 (2002) (citing cases). The Supreme Court said nothing to suggest the plaintiff must show an accommodation was requested prior to the litigation, as Western argues. Contrary to what Western argues, a so-called "hypothetical" accommodation raised in litigation is sufficient if it "seems reasonable on its face, *i.e.* ordinarily or in the run of cases," or "at least on the face of things will be feasible for the employer." *Id.* at 401-02. Moreover, "the employer has a duty to 'gather sufficient information from the applicant and qualified experts as needed to determine what accommodations are *necessary* to enable the applicant to perform the job. . . .'" *Woodman*, 132 F.3d at 1345, *quoting Buckingham v. United States,* 998 F.2d 735, 740 (9th Cir.1993) (emphasis in original).

Western misconstrues out-of-circuit cases. *See* ECF 821 at 58-59. For example, Western cites the Ninth Circuit's *Barnett v. U.S. Airways, Inc.* decision as supporting its position.[23] However, the Ninth Circuit cautioned it was "not suggesting that, in order for an accommodation to be reasonable, the employee must have suggested it to the employer." *Barnett v. U.S. Airways, Inc.*, 157 F.3d 744,

---

[22] The **only** proposed accommodation Western directly challenges as "hypothetical" is the automatic hood opener. ECF 821 at 57-58. The underlying facts are disputed. *See* RMFs 72-73. And these facts still do not establish that the device is merely a "hypothetical" accommodation – Western does not question its existence or functionality. *See id.*

[23] Western also cites *Kilgore v. Tulare Cnty.*, CV F 10-0031 LJOBAM, 2012 WL 483085 (E.D. Cal. Feb. 14, 2012) and *McMackins v. Elk Grove Unified Sch. Dist.*, 21 F. Supp. 2d 1201 (E.D. Cal. 1998), which both quote *Barnett* (9th Cir).

749 (9th Cir. 1998) (allowing identification of a reasonable accommodation "following discovery").

Contrary to Western's implication, the other cases it cites do not rely on the fact that the accommodations were raised for the first time in litigation. In *Aston*, the court held that summary judgment was appropriate "because Plaintiff cannot establish that he is a qualified individual with a disability." *Aston v. Tapco Int'l Corp.*, No. 12-14467, 2014 WL 3385073, at *20, *23 (E.D. Mich. July 10, 2014), *aff'd*, 631 F. App'x 292 (6th Cir. 2015). In *Mbawe*, which is not an employment case, the court rejected a failure-to-accommodate claim because the plaintiff never requested any accommodation and because he refused an offered reasonable accommodation – neither of which is the case here. *Mbawe v. Ferris State Univ.*, 366 F. Supp. 3d 942, 958-59 (W.D. Mich. 2018).

Western also points to the Sixth Circuit's decision in *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010). ECF 821 at 54, 57. There, the employer met with the employee, discussed the employee's proposed accommodations, and offered the employee a reasonable accommodation. *Id.* Western took none of those actions in this case. *See e.g.*, ADFs 36-39, 110-130; Sec. IV(B.2), *supra*. However, to the extent *Jakubowski* stands for the notion that a failure-to-accommodate claim must be based on accommodations requested prior to discharge, the case was wrongly decided and is contrary to binding precedent. *See Barnett*, 535 U.S. at 401-02; *Woodman*, 132 F.3d at 1345. As the concurring opinion notes, "shackl[ing] a plaintiff to his initial, pre-termination proposed accommodation" runs "counter to the ADA." *Jakubowski,* 627 F.3d at 204-05 (Cole, J. concurring).

**3.** ***Western cannot show as a matter of law or through undisputed facts that the proposed accommodations are unreasonable, ineffective, or unsafe.***

Western attempts to frame a number of potential accommodations as unreasonable as a matter of law, on the premise that the accommodations would relieve an employee of an essential job function. Western glosses over and ignores that, at a minimum, it is disputed which functions of the various driving positions are essential. *See* ECF 821 at 58-59; RMFs 59, 64-65, 75.

As to providing non-mountainous routes, the EEOC disputes Western's assertions that "most of Western's routes go west from Denver" and that "drivers are almost always going to encounter a mountain pass." *See*, *e.g.*, RMFs 6, 10, 59. As to paying third-party workers to lift or move cargo, lumpers are available in the situations where cargo must be moved. RMF 75. Indeed, Western's policy was that drivers were not allowed to touch loads. *Id.* Western's cites do not address paying third-parties to chain tires, but the evidence supports that these services exist and that Western has paid for them. *See* ADF 56. As to USAC team drivers, the EEOC disputes that both drivers are required to move cargo. *See* RMFs 64-65. And Western's evidentiary support for its position comes solely through a single interested witness: current Vice President Martin Garcia. ADF 132.

Western also argues that certain proposed accommodations like automatic decouplers and AutoSocks create safety risks. However, Western relies heavily on its own interested management witnesses to support these arguments. *See* ADF 135; SMF 77 (M. Padilla, Gaines); SMF 78 (Western corporate designee, M. Padilla, Gaines); SMF 81 (M. Padilla, Garcia).[24] Moreover, much of this testimony is inadmissible lay opinion testimony or hearsay. *See* RMFs 78, 81. At a minimum, the safety of these devices is factually disputed, based in part on the testimony from distributors and manufacturers of these devices." RMFs 77-78, 81. Western's argument that automatic snow chains do not eliminate the need to use manually installed metal chains is faulty, because even if the device is inadequate in a particular circumstance (which is disputed, *see* RMF 83), a driver has a variety of alternatives to manually installing metal chains. RMF 82.

AutoSocks and automatic chains are possible accommodations that would allow driving in winter conditions without lifting metal chains. *See, e.g.*, ADF 56. Western argues these accommodations would not enable drivers with lifting restrictions to perform other job functions.

---

[24] Western frames facts based on its **beliefs** about safety, but cites these facts to argue whether the devices are **actually** safe. *Compare* SMF 77 ("Western determined"), SMF 78 ("Western does not believe"), and SMF 81 ("Western's opinion") *with* ECF 821 at 61 ("would pose a major safety risk") and *id.* at 62 ("safety issues that may arise").

But the only functions Western expressly argues are opening the hood and pulling the fifth wheel pin. *See* ECF 821 at 59. Western's assertion fails to acknowledge that both activities require pushing or pulling – not lifting. SMFs 51, 57; RMFs 51, 57, 62. At a minimum, the underlying facts regarding these other alleged "essential" functions are disputed. *See* RMFs 47-57, 62.

> ### 4.   *The allegations Western complains about are examples of the denial of accommodation and disparate treatment alleged in the EEOC's complaint.*

As an initial matter, Western's argument about "other alleged policies and practices," ECF 821 at 64-65, should be rejected because it cites no legal authority. If not rejected for lack of authority, the argument should be rejected because although it broadly asserts "other alleged policies and practices," it identifies only two allegations, both of which are plainly encompassed by the EEOC's pattern-or-practice claims alleging denial of accommodation and disparate treatment.

The first two claims in the EEOC's lawsuit allege Western engaged in a pattern or practice of disability discrimination by a) failing to accommodate disabilities (1st Claim); and b) disparate treatment based on disability or the need to provide accommodation (2nd Claim). Evidence that Western itself produced during discovery support the allegations Western points to about denying light duty and denying rehire. ADFs 2, 6, 11, 32, 33; RMFs 24, 104, 105, 112-114. The EEOC has consistently maintained that Western disparately provided light or modified duty to persons with workers' compensation injuries as a means to keep insurance losses down. ADFs 41-48, 75. Light- or modified-duty work was the exception, not the rule; and when provided, it was usually to employees with workers' compensation circumstances, not employees with off-the-job injuries. See RMFs 23, 24, 104, 105. Therefore, Western's complaints of new theories should be denied.

### G.   **The Court should deny Western's motion as to compensatory and punitive damages.**

Western is not entitled to summary judgment on compensatory or punitive damages in this case where a reasonable jury could find that Western did not engage in good faith efforts to

accommodate the AIs. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999) (punitive damages can be imposed without showing egregious or outrageous discrimination). *See* Sec. IV(C), *supra.* Further, the Tenth Circuit has recognized in an ADA case, that punitive damages may be based on evidence the employer failed to adequately train its managers regarding the ADA and the duty to provide reasonable accommodations. *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1249 (10th Cir. 1999) (holding Wal-Mart's anti-discrimination policy insufficient to avoid vicarious punitive liability where the company failed "to educate its employees, especially its supervisors, on the requirements of the ADA, and to prevent discrimination in the workplace."). Here, as in the *Wal-Mart* case, there is significant evidence that Western failed to adequately train its managers and supervisors on their obligations under the ADA. ADFs 2, 20, 37-39; RMFs 16, 32.

Additionally, Western's motion as to compensatory damages is premature because under the bifurcation order, compensatory damages are a Phase II issue. ECF 166 at 18.

## V. CONCLUSION

There are at least genuine issues of material fact precluding summary judgment on the EEOC's pattern or practice claims, including whether the challenged policies existed and are discriminatory, whether Western engaged in in the interactive process in good faith, and whether Western discouraged employees from requesting accommodations or otherwise rendered such requests futile. There are also at least genuine issues of material fact on the EEOC's qualification standards claim, including whether Western implemented the standards to screen out individuals with disabilities, whether any of the challenged standards are job related, consistent with some business necessity and cannot be met by reasonable accommodations. Accordingly, summary judgment is inappropriate and Western's motion must be denied.

Dated: December 3, 2021

Respectfully submitted,

s/ *Karl Tetzlaff*
Karl Tetzlaff
Trial Attorney
Telephone: 720.779.3619
E-Mail: karl.tetzlaff@eeoc.gov

Lauren Duke
Trial Attorney
Telephone: 720.779.3621
E-Mail: lauren.duke@eeoc.gov

Michael LaGarde
Trial Attorney
Telephone: 720.779.3631
E-Mail: michael.lagarde@eeoc.gov

Rita Byrnes Kittle
Supervisory Trial Attorney
Telephone: 720.779.3639
E-Mail: rita.kittle@eeoc.gov

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
DENVER FIELD OFFICE
950 17th Street, Suite 300
Denver, Colorado 80202

Benjamin Price
Trial Attorney
Telephone: 602.661.0005
E-Mail: benjamin.price@eeoc.gov

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
PHOENIX DISTRICT OFFICE
3300 N. Central Ave., Suite 690
Phoenix, AZ 85012

Jeff Lee
Trial Attorney
Telephone: 505.738.6723
E-Mail: jeff.lee@eeoc.gov

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
ALBUQUERQUE FIELD OFFICE
500 Gold Avenue SW, Suite 6401
P.O. Box 128
Albuquerque, NM 87103

### CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of filing to all attorneys of record and other persons who have appeared or otherwise requested such electronic service in this action.

*s/ Karl Tetzlaff*

Attorney for Plaintiff EEOC