**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-1727-WJM-STV

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

     Plaintiff,

v.

WESTERN DISTRIBUTING CO.,

     Defendant.

---

**ORDER DENYING DEFENDANT'S CORRECTED AMENDED
MOTION FOR SUMMARY JUDGMENT**

---

In this case, the Equal Employment Opportunity Commission ("EEOC" or "Plaintiff") sues Western Distributing Company ("Western" or "Defendant") on behalf of 57 aggrieved individuals ("AIs"), alleging a pattern or practice of discrimination against employees with disabilities, in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.*, ("ADA"). As discussed in its December 21, 2022, Order denying Plaintiff's motion for partial summary judgment (ECF No. 1026 at 2–3), trial and discovery in this action have been bifurcated. The Court incorporates by reference the discussion from that Order of the Issues to be decided during Phase I.

Before the Court is Defendant's Corrected Amended Motion for Summary Judgment (ECF No. 821) ("Motion"), in which Defendant seeks summary judgment with respect to all Phase I issues. For the reasons stated below, the Motion is denied.

## I. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. MATERIAL FACTS[1]

Since at least 2007, Defendant's employee manual has contained two policies in the section relating to workers' compensation: (1) that in order to return to work from a non-life-threatening injury, an employee must bring a physician report to their supervisor that "must state that [the employee] can return to full duty or that [the employee is] "discharged" before [the employee] can return to work at full duty; and (2) that if the employee is "not able to return at the end of the twelve-week period, [the employee] will be replace in [their] position and [their] employment with the company will be

---

[1] The following factual summary is based predominantly on the parties' briefs on the Motion for Summary Judgment and documents submitted in support thereof.  Facts disputed by the parties are noted as such.

terminated." (ECF No. ECF 815-87; ECF No. 849-1 at 15.) Plaintiff refers to these policies as the "full-duty" and "maximum-leave" policies, respectively, and the Court adopts this nomenclature. (ECF No. 849-1 at 54–55.) Two additional relevant policies—the return-to-work policy and the reasonable-accommodation policy—were added to the employee manual in 2015. (ECF No. 821 at 6–7; ECF No. 849-1 at 15.)

The parties disagree as to both the existence and nature of the full-duty and maximum-leave policies. Plaintiff asserts these "interrelated" policies were applied by Western beyond the workers' compensation context, are per se discriminatory, and their enforcement constitutes a pattern or practice of discrimination against people with disabilities. (ECF No. 849-1 at 53–59.) Defendant argues Plaintiff seizes upon out-of-context policy language, and the full-duty and maximum-leave policies do not exist. (ECF No. 821 at 35–38, 42–45.) Employees of third-party medical and insurance companies that worked closely with Defendant testified in their depositions that they understood Defendant's employment practices did not accommodate medical restrictions. (ECF No. 849-1 at 67.) Managers at Defendant testified that there were no exceptions to the 12-week hard cap on leave. (*Id.*) And some aggrieved individuals testified that they were aware that the maximum-leave policy was enforced without exception. (ECF No. 849-1 at 25–27.)

The same managers who testified that there were no exceptions to its maximum-leave policy also testified that Defendant had informal practices of providing reasonable accommodations to employees with disabilities during the relevant period. (*See* ECF No. 821 at 8.) According to Defendant, those pre-existing, informal practices were merely memorialized when the written return-to-work and reasonable-accommodation

policies were added to the employee handbook in 2015.  (*See* ECF No. 870 at 11.)

Defendant uses third-party company ErgoMed to assess the physical capacity of prospective drivers before they begin work through eleven physical tests Plaintiff alleges were discriminatory.  (ECF No. 821 at 11, 65–66.)  Both applicants and current employees who have been on leave due to injury must submit to ErgoMed's testing before driving for Defendant.  (ECF No. 821 at 11.)  Plaintiff asserts that Defendant hired ErgoMed to develop these tests so that it could screen drivers with pre-existing conditions, thereby reducing the likelihood that its employees would be hurt on the job and reducing workers compensation costs.  (*See* ECF No. 849–1 at 81–82.)  Plaintiff cites at least eight aggrieved individuals who, in its view, were subjected to negative employment actions because of the ErgoMed tests.  (ECF 849-1 at 78.)  Defendant asserts that the tests accurately assess drivers' ability to perform the very physical work required of commercial motor vehicle operators and protects the community from drivers unable to safely perform their duties.  (*See* ECF 821 at 51–54.)

The parties dispute whether certain employees requested accommodations and, if they did, whether any accommodations other than additional leave were requested. (ECF No. 849-1 at 26; ECF No. 870 at 24.)  While Plaintiff argues that Defendant could have offered certain drivers reasonable accommodations, Defendant asserts the proposed accommodations "would pose a major safety risk" to its drivers and the general public.  (ECF No. 821 at 61.  *Compare id.* at 17, *with* ECF No. 849-1 at 38.)  While Defendant contends that it regularly permitted reassignment as an accommodation for disability, Plaintiff disputes this and argues that Defendant created a culture that discouraged employees from requesting accommodations even when they

needed them.  (ECF No. 821 at 64; ECF No. 849-1 at 63–65.)

## III. ANALYSIS

**A.    Disparate Treatment Claims**

Defendant argues it is entitled to summary judgment on the Disparate Treatment Claims for a litany of reasons.  Western's most fundamental argument is that there are not genuine issues of material fact with respect to the existence of the two alleged policies that form the basis of Plaintiff's Disparate Treatment Claims.  (ECF No. 821 at 35–38, 42–45.)  In Defendant's view, the undisputed facts demonstrate that the policies, as conceived and articulated by Plaintiff, do not exist.  (*Id.*)  Consequently, they cannot be the basis for a pattern or practice of discrimination against people with disabilities. (*Id.*)

The Court has already ruled that there are genuine issues of material fact with respect to the existence, nature, and application of these two alleged policies, and it will not restate its analysis here.  (ECF No. 1026 at 9, 12.)  Instead, the Court addresses the remaining arguments raised by Defendant in its Motion.

1.    <u>Western's Other Arguments with Respect to the Alleged Full-Duty Policy</u>

In Defendant's view, even if the Court determines that it has a full-duty policy, it is nonetheless entitled to summary judgment because it has "non-discriminatory reasons for its policy because it is necessary to comply with [Department of Transportation ("DOT") and Federal Motor Carrier Safety Administration ("FMCSA")] regulations and [to] ensure the safety of Western's workforce and the general public."  (ECF No. 821 at 45–46.)  Western argues that federal regulations require it to ensure that its drivers are physically capable of safely operating a commercial motor vehicle, and that its policies (including the physical tests it requires drivers to perform) are either minimum-

DOT/FMCSA requirements or "more stringent physical requirements" explicitly permitted by law.  (*Id.* at 46.)  Therefore, "[t]o the extent Western has not returned certain drivers to work due to medical reasons, . . . [it is] not an example of a pattern of discrimination" against individuals with disabilities.  (*Id.* at 47.)

Building on this foundation, Defendant argues Plaintiff has not produced evidence of a pattern of discrimination against *qualified* individuals with disabilities.  (*Id.* at 48–63.)  Defendant's numerous theories for why the alleged full-duty policy—even if it did exist—would have no impact on qualified individuals include that: (1) drivers unable to complete the physical tests were unable to perform essential functions of the job and were therefore unqualified (*id.* at 50–55); (2) accommodation was not possible, feasible, or reasonable (*id.* at 55–56); (3) drivers did not request accommodations and/or did not participate in the interactive process (*id.* at 56–58); (4) the accommodations Plaintiff asserts are reasonable were never requested by any drivers (*id.* at 58–60); and (5) certain of Plaintiff's proposed accommodations were unreasonable as a matter of law (*id.* at 60–63).

Plaintiff argues that Defendant attempts to stretch DOT/FMCSA regulations to fit its onerous physical requirements, while glossing over the fact that if "a safety standard is more restrictive than regulations require and operates to screen out a person with a disability or a class of people with disabilities, it is a qualification standard that must be both job-related and consistent with business necessity."  (ECF No. 849-1 at 71.)  As for Defendant's more specific arguments related to individuals' qualifications, Plaintiff argues these "individual-specific issues" are reserved for Phase II by the Bifurcation

Order.[2]  (*Id.* at 68.)  Beyond this, Plaintiff responds summarily to each argument via a single bullet point.  (*Id.*)

The Court agrees with Plaintiff that DOT/FMCSA regulations do not mandate the specific physical requirements Defendant imposes on its drivers.  (*Id.* at 39 (FMCSA "guidelines do not specify the number of pounds a driver must be able to lift."); *see also* ECF No 977 at 10 (noting Defendant's concession that "there is no lifting requirement in the FMCSA regulations").)  An employer may rely on DOT/FMCSA regulations when defining the essential functions of its driver positions*, Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570–572 (1999), and it may even set qualification standards that are more stringent than the minimums required by federal regulations.  *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 995 (10th Cir. 2001).  The court in *Tate*, however, did not give license to trucking companies to ignore the ADA when setting qualification standards.  *Id.* at 993.  It expressly limited businesses' "right to establish what a job is and what is required to perform it" to "necessary job specification[s that are] job-related, uniformly-enforced, and consistent with business necessity."  *Id.*

The Court does not, however, agree with Plaintiff that the "individual-specific issues" Defendant identifies are exclusively Phase II issues.  It would be impossible to determine whether Defendant has engaged in a pattern or practice of discrimination in violation of the ADA without considering whether the individuals affected by this alleged discrimination were in fact protected under the ADA.  (*See* ECF No. 1026 at 3 (adopting Plaintiff's "distillation and description of the Phase I Issues").)  Evaluations and determinations of this type must, in the Court's view, necessarily encompass evidence

_____

[2] The Court's prior Order denying Plaintiff's motion for partial summary judgment (ECF No. 1026 at 2–3) discusses the Bifurcation Order in further detail.

that is appropriately admissible in Phase I of the trial.

Ultimately, however, the Court is unconvinced by Defendant's arguments because it is clear from the record that genuine disputes of material fact exist as to each of the remaining arguments made by Defendant.

**Essential Functions.**  Though Western argues that the physical tests administered by ErgoMed accurately measured drivers' ability to perform the essential functions of their jobs (ECF No.821 at 53), that factual issue is hotly contested.  In fact, it is the subject of competent, "dueling" expert testimony, which is perhaps the quintessential example of a genuine factual dispute.  (*See* ECF No. 977 at 17 (discussing proposed testimony from experts Cathy Schelly, Margot Burns, and Dr. Steve Allison regarding whether ErgoMed's tests correspond with essential functions of Defendant's driver positions).)

**Availability of Reasonable Accommodations.**  In a section of the Motion that is approximately one-half page, Defendant argues accommodation was not possible, feasible or reasonable.  (ECF No. 821 at 55.)  Confoundingly, in this section, Defendant quotes caselaw stating unequivocally that the reasonability of an accommodation is a factual issue.  (*Id.* at 55–56 (citing *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017).)  In the final sentence of this section, Defendant apparently argues by implication that certain accommodations Plaintiff suggests are reasonable would in fact relieve drivers from having to perform essential functions of their jobs.  (*See id.* at 56.)  But which functions are or are not essential to those jobs is also the subject of factual dispute.  (*See* ECF No. 957 at 16–18 (permitting expert testimony that "not all job functions are essential" and on the frequency of certain job functions to permit the jury to evaluate whether particular job functions are in fact essential).)

**Driver Obligations Under the ADA.**  Defendant emphasizes that its obligation to make reasonable accommodations is triggered only when an employee with a disability requests an accommodation.  (ECF No. 821 at 56.)  And it argues that employees who asked for leave but not any of the "hypothetical alternative and additional accommodations" proposed by Plaintiff failed to participate in the interactive process.  (*Id.* at 57.)  As the Court has previously explained, an employer "cannot merely reject its employees' specific requests and avoid liability under the ADA."  (ECF No. 957 at 23.)  An employee need merely "provide[] notice of her disability, any limitations which result therefrom, and the accommodation she wishes to receive" to trigger the employer's obligation to engage in the interactive process.  *Punt*, 862 F.3d at 1048.  There is, for example, a factual dispute as to whether at least two employees made specific requests for accommodations other than additional leave.  (ECF No. 849-1 at 26; ECF No. 870 at 24.)

**"Hypothetical" Accommodations.**  Defendant argues that the accommodations Plaintiff asserts Western should have considered or provided to employees with disabilities are hypothetical because there is no evidence that any employee specifically requested them.  (ECF No. 821 at 59 ("EEOC has failed to produce evidence showing that such accommodations were ever requested as an accommodation for a disability.").)  As just discussed, Defendant misreads *Barnett v. U.S. Air, Inc.*, 157 F.3d 744, 749 (9th Cir. 1998).  An accommodation is not hypothetical because it was not specifically requested by an employee seeking continued employment despite a disability; an accommodation is hypothetical if it does not or did not exist at the relevant time.  *Id.* ("We hold now that this prima facie burden on the plaintiff-employee includes

the burden of showing the existence of a reasonable accommodation. This holding is dictated by the plaintiff's burden to show that an accommodation is reasonable. In order to be reasonable, an accommodation cannot be merely hypothetical.")

**Accommodations Unreasonable as a Matter of Law.**  Defendant argues that certain accommodations proposed by Plaintiff are unreasonable as a matter of law on the basis that they would relieve an employee of an essential job function (ECF No. 821 at 60–61) or would be unreasonably unsafe (*id.* at 61–63).  As discussed above in this section, which functions are or are not essential functions of the Defendant's driving positions is a subject of significant factual dispute.  And whether certain accommodations "would pose a major safety risk" is also subject to factual dispute. (ECF No. 821 at 61.  *Compare id.* at 17, *with* ECF No. 849-1 at 38.)

The Court concludes that there are numerous genuine disputes of material fact that preclude summary judgment on the Disparate Treatment Claims, insofar as they are predicated on the existence and application of a purported full-duty policy.

    2.    <u>Western's Other Arguments with Respect to the Alleged Maximum-Leave Policy</u>

    a.    *ADA Is Not a Leave Statute & Policies are Nondiscriminatory*

In Defendant's view, even if it did have the alleged maximum-leave policy, it would be entitled to summary judgment because "the Tenth Circuit has rejected the notion that such policies are 'inherently discriminatory'" as Plaintiff argues.  (ECF No. 821 at 37.)  According to Defendant, "EEOC's entire case is based on flawed legal analysis that treats the ADA like a leave-entitlement statute rather than an anti-discrimination statute."  (*Id.* (citing *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017).)  Defendant argues that the United States Court of Appeals for the

Tenth Circuit has "flatly reject[ed] EEOC's suggestion that the ADA requires employers to provide additional leave (beyond that required by the FMLA[3]) as a reasonable accommodation." (*Id.* (citing *Hwang v. Kan. State Univ.*, 853 F.3d 1159, 1162 (10th Cir. 2014)).) Defendant argues *Hwang* forecloses Plaintiff's argument because in that case, which concerned the Rehabilitation Act of 1973, the Tenth Circuit "held the 'inflexible' nature of a leave policy is *not* 'inherently discriminatory.'" (*Id.* at 38 (emphasis in original).)

Defendant argues that Plaintiff cannot show that a policy of denying additional leave is a failure to accommodate because leave is only a reasonable accommodation under the ADA if it is: (1) of a definite period; (2) requested in advance; and (3) likely to enable the employee to perform the essential job functions upon return. (*Id.* at 39–40.) According to Defendant, Plaintiff must show that it "utilized a maximum-leave policy to deny requests for additional leave" to individuals with disabilities "who, prior to their termination, requested a definite amount of leave [*sic*] additional leave that would have allowed them to perform the essential functions of their job in the near future." (*Id.*)

Defendant argues that Plaintiff's evidence is insufficient to create a genuine issue of fact as to this issue. (*Id.*) Defendant first turns to Clinton Kallenbach, who it believes Plaintiff will rely upon in proving it discriminated via the alleged maximum-leave policy, arguing that his claim fails because he was previously accommodated by Defendant and his termination was the result of his own actions. (*Id.* at 40–41.) Moreover, Defendant argues, even if Kallenbach's individual claim were valid, Plaintiff cannot prove a pattern or practice claim via a single, isolated act of discrimination. (*Id.* at 41–

---

3 Family and Medical Leave Act of 1993, 28 U.S.C. §§ 2601, *et seq.*

42.)

Plaintiff responds that "[c]ourts have repeatedly found leave to be a reasonable accommodation, even if lengthy." (ECF No. 849-1 at 57–58 (citing cases). Plaintiff also stresses that an employer's obligation to provide reasonable accommodation is ongoing and not extinguished by prior accommodations. (*Id.* at 58.) Plaintiff argues that fact issues regarding how Defendant administered the maximum-leave policy—particularly its alleged practice of terminating employees by mail and without prior discussion or warning after 12 weeks of leave—preclude summary judgment. (*Id.* at 60–63.) It also argues that Defendant discouraged its employees from requesting accommodation, rendering such requests futile and excusing any employees' failures to make such requests. (*Id.* at 63–65.)

As the Court has explained, *see* Section III.A.1, Plaintiff does not need to show that Defendant's employees specifically requested additional leave as an accommodation. It must merely show that individuals covered by the ADA notified Defendant of their disabilities and specifically requested an accommodation. (ECF No. 957 at 23.) Even if requesting leave explicitly or implicitly under the FMLA is not a request for accommodation, Plaintiff cites evidence in the record tending to show that some aggrieved individuals requested accommodations other than leave. (ECF No. 849-1 at 60–61 (citing record evidence of aggrieved individuals requesting reassignment, lifting assistance, or alternative driving routes).)

Defendant cites deposition testimony supporting its contention that its "policy and practice is to conduct a case-by-case assessment of the circumstances regarding the employee's ability to return to work in their original position, a modified or light duty

position, or a reassignment position, or whether a definite amount of reasonable leave extension can be determined and granted as an ADA accommodation." (ECF No. 821 at 8.) On cue, however, Plaintiff cites other deposition testimony tending to show Defendant rigidly applied the maximum-leave policy with a one-size-fits-all approach, terminating employees unable to return to work after 12 weeks of leave by letter without prior communication. (ECF No. 849-1 at 25–27.) Further, Plaintiff cites deposition testimony tending to show that some of Defendant's employees were aware that the maximum-leave policy had "no exceptions," rendering any request for additional leave— definite or not—futile. (*Id.* at 26–27.)

> b.   *Nondiscriminatory Reasons for Leave Policies*

Defendant maintains that, once an employee has exhausted the 12 weeks of leave permitted under its FMLA policy, it has a policy and practice of "conduct[ing] a case-by-case assessment of the individual's ability to return to work—in their original position, in a modified or light duty position, or in a reassignment position if any are available—or whether a reasonable extension of leave can be definitely determined and granted." (ECF No. 821 at 42.) According to Defendant, its leave policies are structured in this way because it needs certainty with respect to when drivers will or will not be available to carry out its logistically complex and time-sensitive business. (*Id.*)

The Court has already determined that there are genuine issues of material fact with respect to whether Defendant in fact engages in a "case-by-case assessment" of its employees' ability to return to work before discharging them. *Supra* Section III.A.2.a. If Defendant does in fact discharge its employees in the way Plaintiff alleges (no exceptions, no notice), then its maximum-leave policy would displace the individualized assessment of whether an employee can perform their job with or without

accommodations mandated by the ADA.  *See McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999).

Therefore, the Court concludes that disputed, material fact issues preclude summary judgment on the Disparate Treatment Claims, insofar as they are predicated on the existence and application of a purported maximum-leave policy.

3.      Failure to Accommodate via Reassignment

Defendant argues that "EEOC fails to establish the essential elements of its reassignment claim."  (ECF No. 821 at 63.)  Though Defendant's organization of the Motion suggests that it considers Plaintiff's arguments regarding reassignments to be a standalone claim, the Court notes that this does not align with the "distillation and description of the Phase I Issues" adopted by the Court in its Order denying Plaintiff's motion for partial summary judgment.  (ECF No. 1026 at 3.)  Under this framework (which will apply at trial), reassignment is only one possible accommodation to be considered by the jury in the context of the EEOC's Disparate Treatment Claims.  (ECF No. 849-1 at 57.)

In any event, Defendant argues it is entitled to summary judgment on the issue of reassignment because there is no evidence that it has a pattern or practice of prohibiting reassignments, its reasonable-accommodation policy explicitly encourages reassignments, and there is no evidence that it denied reassignment to vacant and appropriate position.  (ECF No. 821 at 63–64.)  With respect to aggrieved individual Kallenbach, Defendant argues that "although [he] requested reassignment to a dispatcher position[4] that was not vacant and a yard hostler position which required

---

[4] Defendant argues in a footnote that the "dispatcher position also would have been considered a promotion . . . , and as such Western would have no duty to reassign Kallenbach

DOT-certification that he did not possess." (*Id.* at 64.)

Plaintiff argues that "Western created an environment that discouraged employees from seeking accommodations and essentially foreclosed the interactive process." (ECF No. 849-1 at 64.)  According to Plaintiff, the predictable result of Defendant's full-duty and maximum-leave policies, Defendant's practice of "no exceptions" to those policies, and the lack of any policy in Defendant's policy manual informing employees of their right to seek accommodations, including reassignment, "was that employees [generally] did not ask for accommodation[s]." (ECF No. 849-1 at 64.)

Moreover, Plaintiff cites record evidence disputing Defendant's contention that employees did not request reassignment to vacant positions that they could perform with additional accommodations. (ECF No. 849-1 at 26, 44, 52.)  Plaintiff cites evidence which it claims shows that this is the case because, pursuant to the full-duty policy, Defendant would not permit drivers to work with restrictions. (*Id.*)

For all these reasons, the Court finds that there are numerous genuine issues of material fact precluding summary judgment on the Disparate Treatment Claims, insofar as they are predicated on Defendant's alleged refusal to accommodate employees with disabilities via reassignment.

## B.    Disparate Impact Claims

Defendant argues that it is entitled to summary judgment on the Disparate Impact Claim because Plaintiff cannot meet its burden to show that each qualification standard had a discriminatory impact on aggrieved individuals. (ECF No. 821 at 66.)  It

---

to such a position." (ECF No. 821 at 64 n.10.)

emphasizes that, under the Bifurcation Order, Plaintiff must show every element (including causation) during Phase I to prevail on the Disparate Impact Claim.  (*Id.*) Further, according to Defendant, because Plaintiff pleaded the Disparate Impact Claim as a class claim, Plaintiff must show that the allegedly discriminatory qualification standards screen out or tend to screen out a *group* of individuals protected by the ADA. (*Id.* at 67.)

       1.    <u>Disparate Treatment Theory</u>

The parties dispute whether Plaintiff can make out a claim under Sections 102(b)(3) and (b)(6) of the ADA under a disparate treatment theory.  (ECF No. 821 at 77–78; ECF No. 849-1 at 74–75, 81–82.)  This argument is moot, given that in its Order denying Plaintiff's motion for partial summary judgment, the Court explained that Phase I Issue No. 4 "raises a disparate impact theory of discrimination only."  (ECF No. 1026 at 3 n.4.)

       2.    <u>*Prima Facie* Case Based on Non-Qualified Individuals</u>

Defendant also argues that, to make out its *prima facie* case, Plaintiff must show that the individuals affected by the allegedly discriminatory qualification standards were qualified individuals within the meaning of the ADA.  (*Id.*)  This requires showing both that the individual had a disability at the relevant time and that the individual was qualified for the position sought.  (*Id.* at 68–69.)  Defendant argues that because Plaintiff relies heavily on individuals unable work at all, or unable to obtain DOT certification, in establishing the impact of the allegedly discriminatory qualification standards, it is entitled to summary judgment on the Disparate Impact Claim.  (*Id.* at 69.)

The Court finds that genuine, disputed issues of material facts preclude summary judgment on this issue.  In arguing that Plaintiff cannot rely on aggrieved individuals

who were "not able to perform DOT driving," Defendant argues in relevant part: "41 out of 57 AIs were unable to drive commercially at the time of separation."  (ECF No. 821 at 20, 69.)  Plaintiff disputes this characterization of the factual record on the basis that 35 of the 41 referenced aggrieved individuals were deemed unable to drive commercially because they "did not request a definite amount of additional leave."  (ECF No. 849-1 at 45.)  In the Court's view, Defendant's characterization of this issue improperly conflates an alleged failure to request a specific accommodation with an inability to perform the essential functions of a position with a reasonable accommodation.[5]

### 3.   Elements of Disparate Impact Claim

Defendant argues that Plaintiff has failed to raise genuine issues of material fact as to any of the elements of its Disparate Impact Claim.  (ECF No. 821 at 69–71.)  To establish a disparate impact discrimination claim, Plaintiff must: (1) identify the challenged employment policy or practice and pinpoint Defendant's use of it; (2) demonstrate a disparate impact on a group that falls with the protected class; and (3) demonstrate a causal relationship between the identified practice and the disparate impact.  *Gonzales v. City of New Braunfels*, 176 F.3d 834, 839 n.26 (5th Cir. 1999).

#### (i)   Identify the Policy or Practice and Pinpoint Defendant's Use

Defendant argues that Plaintiff has failed to adequately identify the challenged standards and pinpoint Defendant's use due to deficient pleading.  In Defendant's view, Plaintiff failed to allege any discriminatory standards other than the alleged full-duty and

---

[5] Plaintiff separately responds to Defendant's legal arguments that the Disparate Impact Claim requires a showing of qualifications.  (ECF No. 849-1 at 83.)  Because the Court finds there are genuine disputes of material fact as to the qualifications of AIs affected by Defendant's allegedly discriminatory employment qualification standards, this argument is moot, and the Court does not consider it.

maximum-leave policies in the Complaint.  (ECF No. 821 at 71.)  Though Plaintiff makes reference to eleven other allegedly discriminatory standards (various physical capacity tests) in the Final Pretrial Order, according to Defendant the EEOC is bound by its pleading and should be limited to asserting the Disparate Impact Claim on the basis of the full-duty and maximum-leave policies alone.  (*Id.* at 72–73.)

Plaintiff counters by arguing that the eleven physical tests included as part of the Disparate Impact Claim in the Final Pretrial Order are not "mutually exclusive" of the full-duty and maximum leave policies.  (ECF No. 849-1 at 83–84.)  In fact, according to the EEOC, all thirteen allegedly discriminatory qualification standards operated in concert to create the disparate impact for it now seeks relief.  (*Id.*)  The full-duty policy operated to prevent drivers from working after injuries or while under restrictions for other reasons, and the eleven physical tests enforced the strictures of the full duty policy.  (*Id.*)  The maximum-leave policy, in turn, limited the time an employee had to recover from whatever restrictions the employee might have before being terminated.  (*Id.*)

The Court finds that the eleven physical tests are so closely related to the full-duty and maximum-leave policies that preventing Plaintiff from asserting the Disparate Impact Claim on the basis of the physical tests would be manifestly unjust.  And apart from this, Defendant's contention that Plaintiff is bound by its allegations in its Complaint is simply wrong.  The law is clear in this and other circuits that the claims and defenses in the Final Pretrial Order supersede the parties' earlier pleadings, and for purposes of the trial, it is the contents of the Final Pretrial Order which control.  *E.g.*, *Hullman v. Bd. Trs. Pratt Cmty. Coll*, 950 F.2d 665, 667 (10th Cir. 1991); *Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 830 (8th Cir. 2019); *Rathborne Land Co., LLC v. Ascent*

*Energy, Inc.*, 610 F.3d 249, 261 (5th Cir. 2010); *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950 (9th Cir. 1993).

(ii)     Pinpointing the Use of the Remaining Policies

In addition to identifying the allegedly discriminatory policies or practices, Plaintiff must also "pinpoint" Defendant's use of them to survive summary judgment.  As discussed above, Defendant argues the Court should "find as a matter of law that [the] EEOC cannot proceed on [its Disparate Impact Claim] with the eleven physical test standards."  (ECF No. 821 at 73.)  Apparently for this reason, it only argues Plaintiff failed to pinpoint its use with respect to the full-duty and maximum-leave policies.  (*Id.* at 73–74.)  Because Defendant fails to make any argument regarding whether Plaintiff pinpointed its use of the eleven physical tests, any failure-to-pinpoint arguments with respect to those qualification standards have been waived. *See Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992).

Defendant goes on to reiterate its argument that it does not have a full-duty policy as described by Plaintiff and that Plaintiff "cannot cite a single example of any qualified [aggrieved individual] with a disability who was actually subjected to" such a policy.  (*Id.* at 73.)  The Court has already ruled there are genuine disputes as to material issues of fact with respect to the "existence and nature" of the alleged full-duty policy.  (ECF No. 1026 at 9.)  Therefore, this argument is rejected.

With respect to the maximum-leave policy, Defendant argues that a leave policy is not a qualification standard, test, or selection criteria and therefore cannot be the basis for liability under Sections 102(b)(3) and (b)(6).  (ECF No. 821 at 73–74.)  Defendant argues that the maximum-leave policy, as administered, is a qualification standard that has the effect of discrimination based on disability.  (ECF No. 849-1 at

84–85.)  Plaintiff on the other hand argues that Defendant enforced the maximum-leave policy by terminating employees who exhausted their leave without warning or any case-by-case consideration of the employees' ability to return to work with accommodation.  (*Id.*)

The Court agrees with Plaintiff's reading of the statute and concludes that a leave policy, if administered in the manner Defendant is alleged to have administered the maximum-leave policy, could be a qualification standard under Section 102(b)(3) of the ADA.  Therefore, because the Court has ruled that there are genuine disputes as to material issues of fact with respect to the "existence and nature" of the alleged maximum-leave policy, this argument is also rejected.  (ECF No. 1026 at 12.)

### b.   *Disparate Impact on a Protected Group*

Defendant argues that Plaintiff is unable to establish that any of the qualification standards are discriminatory because the EEOC "has not submitted any statistical evidence" in support of such a claim.  (ECF No. 821 at 74–75.)  According to Defendant, "[s]tatistical evidence is the acceptable and most-common [*sic*] means of proving disparate impact."  (*Id.* at 76 (citing *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1222 (10th Cir. 2013), and *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1196 (10th Cir. 2006), and *Fair Housing Opportunities Nw. Ohio v. Am Family Mut. Ins. Co.*, 684 F. Supp. 2d 964, 969 (N.D. Ohio 2010).)  Defendant further argues that the proffered statistical evidence must concern the proper population, be based on people qualified for the job who were subject to the challenged standard, and show a statistically significant disparity between the compared group.  (*Id.*)  Because Plaintiff has failed to submit any statistical evidence—let alone that which is of the kind and quality courts have found acceptable in proving a disparate impact claim—Defendant argues Plaintiff cannot prove an essential

element of its Disparate Impact Claim.[6]  (*Id.* at 76–77.)

Plaintiff argues there is "ample evidence" to establish the thirteen challenged standards had a disparate impact on people with disabilities.  With respect to the alleged full-duty and maximum-leave policies, Plaintiff points to eight aggrieved individuals who were denied employment or discharged because they could not return to "full duty" after 12 weeks of leave or could never return to full duty because they had permanent restrictions.  (ECF 849-1 at 78.)  Plaintiff argues that "[o]n their face, the challenged [physical] standards operate to identify anyone unable to lift, carry, push, and pull the required weights."  (*Id.*)  And because Defendant denies employment to anyone who cannot meet the physical requirements, the EEOC contends that these standards predictably exclude people "with disabilities due to low-weight restrictions that interfere with the major life activities of lifting, pushing, or pulling."  (*Id.* (citing at least five aggrieved individuals whose weight restrictions impacted the physical tests).)

In its reply, Defendant reasserts that Plaintiff needs statistical evidence to

---

[6] Defendant seems to suggest that Plaintiff might be able in theory to prove its Disparate Impact Claim with anecdotal evidence; however, its argument that there must be evidence comparing the impact of challenged standards on people with disabilities subject to the standard against the entire population of people subject to the standard makes it difficult to imagine how any "anecdotal" evidence could accomplish this task in a meaningful way.  (ECF No. 821 at 74, 77.)

> There is no evidence in the record that compares any two groups of disabled and non-disabled individuals uniformly subjected to a challenged standard in order to demonstrate a significant disparate impact on the protected group. Without evidence demonstrating the content of the group of impacted disabled individuals, the group of non-disabled individuals enjoying an employment benefit, and any comparison of the two groups to show a legally significant disparity between them, it is impossible for EEOC to meet its prima facie case on Claim Three.

(*Id.*)

establish its Disparate Impact Claim.  Quoting *Grider v. City and County of Denver*, 2011 WL721279, at \*4 (D. Colo. Feb. 23, 2011), it argues that even in cases in which statistical evidence may not be necessary, "the plaintiff must nevertheless produce some analytical mechanism to determine disproportionate impact."  (ECF No. 870 at 38) (internal quotation marks omitted).  And while Defendant insists that a "simple anecdotal showing" will not suffice, it gives no indication of what kind of showing (other than statistical evidence) could survive a motion for summary judgment.

After reviewing the applicable caselaw, the Court concludes that statistical evidence is not required in all instances to prove a claim of disparate impact.  While such claims are "generally shown by statistical evidence involving the appropriate comparables necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors," the qualifier "generally" necessarily implies that there will be some cases which will *not* require statistical evidence to prove disparate impact.  *J.V. v. Albuquerque Public Schools*, 813 F.3d 1289, 1299 (10th Cir. 2016) (quoting *Apsley v. Boeing Co.*, 691 F.3d 1184, 1200 (10th Cir. 2012)).

As a preliminary matter, *Grider* is an opinion written by fellow United States District Judge Christine M. Arguello, which, respectfully, is not binding on the Court. 2011 WL721279.  Further, Judge Arguello quoted *Tsombanidis v. West Haven Fire Department*, 352 F.3d 565, 576 (2d Cir. 2003) for the proposition that, in the absence of statistical evidence, a plaintiff must still nonetheless offer "some analytical mechanism to determine disproportionate impact."  *Grider*, 2011 WL721279, at \*4.

The Court is unable to find support for this proposition in a decision (published or

otherwise) of the Tenth Circuit, and Defendant has not provided such a citation.  (*See* ECF No. 870 at 37–40.)  Regardless, in *Tsombanidis*, the court explained that to show disparate impact, a plaintiff must show that the allegedly discriminatory conduct must "actually or predictably" result in the discriminatory impact alleged to be discriminatory. 352 F.3d at 576.

After considering the parties arguments and the evidence, the Court finds that there are genuine disputes of material fact with respect to this element of Plaintiff's *prima facie* case.  As the Court understands it, Plaintiff's theory is that Defendant implemented the subject policies and tests to intentionally exclude persons with medical restrictions, and that these policies and tests in fact had the effect of disproportionately excluding people with disabilities.  It will not require statistical evidence for the jury to conclude that policies that operate to exclude someone with a medical restriction from driving for Defendant may disproportionately affect those who have a disability due to such medical restrictions

The Court has already found that genuine disputes of material fact exist with respect to the existence and nature of the full-duty and maximum-leave policies.  If Plaintiff is able to prove these policies existed, non-statistical evidence of persons actually impacted by Defendant's allegedly discriminatory qualification standards may be sufficient to establish disparate impact.

   c. *Causal Relationship*

Defendant does not clearly define its arguments with respect to the disparate impact and causation elements.  (*See* ECF 821 at 74–77.)  Rather, it treats the elements together, apparently on the theory that because Plaintiff has not presented statistical evidence with respect to the existence of a disparate impact, Plaintiff also

23

cannot show causation.  (*See id* at 76 ("Generally, when a plaintiff does not have the statistical evidence necessary to show causation, a disparate impact claim cannot survive summary judgment.").)

The connection Plaintiff argues exists between physical tests designed to screen out people with physical restrictions on lifting, carrying, pushing, or pulling, and the disproportionate screening out of people with disabilities predicated on substantial limitations to the major life functions of lifting, carrying, pushing, or pulling is relatively straightforward.  (*See* ECF No. 849-1 at 77.)  While comparative evidence—statistical or otherwise—might assist the jury, it may not be necessary.  *See Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1240 (10th Cir. 2001).  With this in mind, and given the Court's ruling that this may be the kind of case where non-statistical evidence is sufficient to show disparate impact, the Court finds that genuine disputes of material fact exist precluding summary judgment on the basis that Plaintiff cannot establish the causation element of its Disparate Impact Claim.

For these reasons, the Court finds that there are genuine issues of material fact precluding summary judgment on the Disparate Impact Claim based on Plaintiff's ability to make out its *prima facie* case.

### 4.   Business Relatedness

Defendant argues that "[e]ven if EEOC could satisfy its prima facie case for [the Disparate Impact Claim], Western can nonetheless prevail by showing that the standards were job-related, consistent with business necessity, and performance cannot be accomplished by reasonable accommodation."  (ECF No. 821 at 78.)  And while this is a correct statement of law, the substance of Defendant's argument in support of its business-relatedness defense is merely a recapitulation and recasting of

numerous assertions and arguments about which the Court has already determined there are genuine disputes of material fact.  (*See id.* at 78–81.)  Accordingly, the Court cannot grant summary judgment with respect to the Disparate Impact Claim on the basis of Defendant's business-relatedness defense.

For these reasons, the Court finds that there are genuine issues of material fact precluding summary judgment on the Disparate Impact Claim based on Defendant's business-relatedness defense.

## C.  Undue Hardship

At the end of the Motion, Defendant argues in summary fashion that: (1) it had "policies prohibiting discrimination on the basis of disability and provided reasonable accommodations, including medical leave, light duty, modified work schedules, CPAP machines, and reassignments to disabled employees, including many of the AIs"; and (2) the EEOC "has failed to establish that Western had a pattern or practice of denying reasonable accommodations to employees who actually requested them."  (ECF No. 821 at 81.)  Therefore, Defendant argues, neither compensatory nor punitive damages can be awarded in this case.  (*Id.*)

After giving this short overview of the law and its argument, Defendant merely references its earlier arguments and description of the record in support of its undue-hardship defense.  (*Id.*)  The Court has already ruled there are genuine disputes of material fact precluding summary judgment on each of Defendant's arguments, and without further argument or reference to relevant facts, the Court cannot grant summary judgment on the basis of Defendant's undue-hardship defense.

Therefore, the Court finds that there are genuine issues of material fact precluding summary judgment on the Disparate Treatment Claim based on Defendant's

undue-hardship defense.

## IV. CONCLUSION

For the foregoing reasons:

1.      Defendant's Corrected Amended Motion for Summary Judgment (ECF No.

821) is DENIED;

2.      Trial in this action remains set for January 9, 2023 at 8:30 a.m.


Dated this 22nd day of December, 2022.

BY THE COURT:

William J. Martinez
United States District Judge